**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| NEW STREAM SECURED CAPITAL, INC., *et al.*,[1] | Case No. 11-10753 (\_\_\_\_\_) (Joint Administration Pending) |
| Debtors. | |

**DECLARATION IN SUPPORT OF DEBTORS'**
**CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

Michael Buenzow, declares the following to be true under penalty of perjury:

1.      I am a Senior Managing Director of FTI Consulting, Inc., a firm that specializes in providing business reorganization, crisis management and interim leadership services.  I have served as Chief Restructuring Officer ("CRO") for the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") since September 2, 2010.  The four Debtors are: (i) New Stream Secured Capital, Inc. ("NSCI"), a Delaware corporation; (ii) New Stream Capital, LLC, a Delaware limited liability company ("NSC"); (iii) New Stream Secured Capital, L.P., a Delaware limited partnership ("NSSC"); and, (iv) New Stream Insurance, LLC, a Delaware limited liability company ("NSI").

**I.      Introduction to these Pre-packaged Chapter 11 Cases**

2.      The Debtors are an inter-related group of companies that collectively comprise an investment fund, headquartered in Ridgefield, Connecticut, that is colloquially referred to as "New Stream."  For the most part, these cases have been filed to resolve claims relating to New Stream's investors, who provided New Stream's capital by making secured loans through three

---

[1]        The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are:  New Stream Secured Capital, Inc. (3903), New Stream Insurance, LLC (6966), New Stream Capital, LLC (0364) and New Stream Secured Capital, L.P. (2948).  The corporate address of the Debtors is 38C Grove Street, Ridgefield, CT 06877.

feeder funds.

3.      Differing perspectives on the allocation of asset value among these investors lie at the heart of these cases.  These differences brought the Debtors' activities to a standstill and surrounded the Debtors with an aura of uncertainty that made it impossible to raise capital and perpetuated an escalating cycle of redemption requests, all of which undermined the Debtors' ability to operate.

4.      During the last several months, the Debtors have successfully negotiated the pre-packaged reorganization that is embodied in the Debtors' Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code, dated January 24, 2011 (the "Plan").  The Debtors have just concluded a solicitation of all of the impaired classes of creditors affected by the Plan and have filed these cases in order to confirm the Plan and implement a reorganization that is the culmination of an effort that dates back more than two years.

5.      As detailed below, the Plan has been accepted by three impaired classes of creditors and is ready to be confirmed.[2]

6.      As the CRO, I am one of the individuals responsible for devising and implementing the Debtors' business plans and strategies and overseeing the Debtors' financial, operational and business restructuring.  I have accumulated knowledge of the business and financial affairs of the Debtors, am fully familiar with the Debtors' restructuring process and have been engaged *inter alia*, in: (a) the development, negotiation and implementation of various alternatives for restructuring, reducing or modifying the Debtors' indebtedness; (b) negotiation

---

[2]      As will be explained below (see, note 21 at p.32), while the Debtors did classify and solicit four impaired classes of creditors, there were no voting creditors in one of those classes, which is comprised of unsecured creditors of NSC.  The Debtors anticipate that there may not be any creditors with allowable claims in this class and therefore, its non-acceptance would not be an impediment to confirmation.

of the Plan and each of the ancillary agreements and arrangements necessary to implement the reorganization; (c) supervision of the preparation of the documents necessary to document these agreements and file these cases; and (d) consultation on a periodic basis, with the Debtors' managers and executives with respect to the foregoing.

7.     In filing these cases, the Debtors have two overarching goals.  The first is to preserve the value of their assets and monetize them in a manner that is consistent with each asset's individual character and circumstance.  The second is to provide for a fair allocation of the asset value among the various creditor constituencies and avoid protracted inter-creditor litigation.  Confirmation and implementation of the Plan would accomplish these goals.  Moreover, the Plan effectuates the resolution of issues among the various creditor constituencies that have required the Debtors to liquidate a major portion of their investments.

8.     The Plan is the product of many months of negotiations with several creditor constituencies, including representatives of all classes of secured creditors.  The understandings reached during these negotiations have been incorporated into the Plan and the relevant constituencies have agreed to support the Plan in accordance with the terms set forth in two separate plan support agreements.  Commencing on January 24, 2011, the Debtors solicited all of the impaired classes of creditors, who have voted to accept the Plan.

9.     The Plan, which is summarized in greater detail below, is predicated on a rapidly executed sale of NSI's portfolio of life settlement contracts[3] on the terms set forth in the asset

---

[3]     The term "life settlement" refers to a transaction in which a life insurance policy is purchased from its owner.  The purchaser makes a lump sum cash payment to the policy's owner and becomes the owner, assuming responsibility for all subsequent premium payments, and is entitled to the benefit payable upon the death of the insured.  The value of a life settlement at any point in time is a function of a variety of factors, including the amount of the death benefit, the age of the insured and the premiums that are necessary to maintain the policy in force until the benefit is payable.

purchase agreement. The Plan provides for both the implementation of this asset sale and the allocation of the net proceeds among the Debtors' secured creditors.

10.     Although many of the Debtors' investors, primarily hedge funds and other sophisticated investors, will recover only a portion of their investment, the vast majority have agreed to accept the Plan since the alternatives to confirmation are far less attractive. The following background discussion provides a brief summary of the more detailed information that was provided to creditors during the solicitation process. This summary is intended to assist the Court in consideration of the motions that are identified below.

## II.     The Petitions and First Day Motions

11.     On March 14, 2011 (the "Petition Date"), each of the Debtors filed a voluntary petition (collectively, the "Petitions") for relief under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code") in an effort to seek confirmation of the Plan. The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

12.     Contemporaneously with the filing of the Petitions, the Debtors are filing the following motions and applications (collectively, the "First Day Motions"):

(1)     Motion for an Order Pursuant to Bankruptcy Rule 1015 and Local Rule 1015-1 Authorizing Joint Administration

(2)     Motion for an Order Authorizing Debtors to File Consolidated List of Creditors

(3)     Motion for an Interim and Final Order Pursuant to 11 U.S.C. §§ 105(a) and 345(b), and Fed. R. Bankr. P. 2015 (I) Authorizing and Approving, Pending the Hearing to be Scheduled to Consider Confirmation of the Debtors' Prep-Packaged Plan of Reorganization, (a) the Debtors' Continued Use of Their Existing Cash Management System, (b) the Debtors' Use of Pre-Petition Bank Accounts and Business Forms, (c) the Continuation of Ordinary Course Intercompany Transactions, and (ii) Waiving The Requirements of Section 345(b) With Respect to the Debtors' Cash Deposits Pending

the Debtors' Opening of Debtor-in-Possession Accounts

(4)     Application for Entry of Order Authorizing Debtors to Employ and Retain Kurtzman Carson Consultants LLC as Notice, Claims and Solicitation Agent *Nunc Pro Tunc* to the Petition Date

(5)     Motion for an Order (I) Scheduling Combined Hearing on Adequacy of Disclosure Statement and Prepetition Solicitation Procedures and Confirmation of Plan, (II) Establishing Procedures for Objecting to Disclosure Statement, Solicitation Procedures, and Plan, (III) Approving Form, Manner, and Sufficiency of Notice of Combined Hearing, (IV) Establishing Bar Dates for the Filing of Proofs of Claim or Interests, and (V) Granting Related Relief

(6)     Motion for an Order (I) Approving Debtor-in-Possession Financing Pursuant to 11 U.S.C. §§ 105(A), 362, and 364 and Fed. Bankr. P. 2002, 4001 and 9014 and Local Bankruptcy Rule 4001-2; (II) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. Sections 105, 361, 362 and 363 of the Bankruptcy Code; (III) Granting Adequate Protection and Superpriority Administrative Claims; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief

13.     I submit this declaration in support of the Debtors' Petitions and the above-referenced First Day Motions. I have reviewed each of the Petitions and the First Day Motions and participated in the preparation thereof. I believe, to the best of my knowledge and with reliance on information provided by other persons affiliated with the respective Debtors, that the facts set forth in the Petitions and the First Day Motions are true and correct. This representation is based upon information and belief and through my general review of various materials and information, as well as conversations with persons who are associated with the Debtors, various creditors and their representatives, as well as my experience and knowledge of the Debtors' operations and financial condition. Based upon the foregoing, if called to testify, I could and would testify to the key facts set forth in each of the First Day Motions.

## III.   Background of the Debtors

### A.  The Debtors

14.     The Debtors and their respective organization and operations are summarized in

this section of my declaration.

### 1.    Overview of the Master Fund and Three Feeder Funds

15.    The Debtors' businesses utilize an organizational structure based on the "master-feeder fund" structure commonly used by investment managers.  The master-feeder fund structure is commonly utilized by investment managers to accumulate funds raised from both U.S. and foreign investors and pool them into a single master fund.  In this way, the investment manager can achieve a critical mass of investments, realize economies of scale, enhance operating efficiencies and thereby reduce costs.

16.    In this parlance, NSSC is the "master fund" and the primary operating entity of New Stream.  All of the working capital for the investments made by NSSC was provided by investors that invested through one of three "feeder funds," which are described below.  Two of the feeder funds, one in Bermuda and the other in the Cayman Islands, were vehicles for investments made by nonresident aliens and foreign entities.  The third feeder fund is the vehicle through which U.S. residents made investments.  Neither NSSC nor any of the three (3) feeder funds is registered, or is required to be registered, with the U.S. Securities and Exchange Commission or otherwise.

17.    New Stream Secured Capital (U.S.), LLC (the "US Fund"), a Delaware limited liability company, is the entity through which U.S. residents have invested in New Stream.  Each domestic investor owns a membership interest in the US Fund, which is a secured creditor of NSSC.  The US Fund is not one of the Debtors in these cases; however, on March 8, 2011, an involuntary Chapter 11 petition was filed against the US Fund.[4]  As far as I am aware, no order

_____

[4]    The involuntary case is pending before this Court.  *See*, *In re New Stream Secured Capital (U.S.), LLC*, putative debtor.  Case No. 11-B-10690 (MFW)

for relief has been entered in that case.

18.     The two foreign feeders were organized primarily for non-U.S. investors, and were, therefore, structured to allow nonresident aliens and foreign entities to invest without subjecting their investments to U.S. taxation by taking advantage of the "portfolio interest exemption" under the Internal Revenue Code.[5]  To qualify for the portfolio interest exemption, these foreign entities make investments in the nature of secured loans and not equity.

19.     The first foreign feeder, New Stream Capital Fund Limited (the "Bermuda Fund"), is a segregated accounts company[6] formed in Bermuda.  Foreign investors purchase and hold shares in one or more segregated accounts maintained by the Bermuda Fund (collectively, the "Segregated Account Classes").  In turn, each of these Segregated Account Classes made a secured loan to either NSSC or NSI.  The Bermuda Fund is not a debtor in these cases. However, it is in a judicial liquidation proceeding in Bermuda (see, ¶ 52, infra).

20.     The second foreign feeder is a group of corporations organized under the laws of the Cayman Islands (collectively, the "Cayman Funds" and, together with the US Fund the "US/Cayman Funds").  Each of the Cayman Funds has a single shareholder, although they have a common investment manager.  Each of the Cayman Funds holds two assets (i) a note issued by NSSC that is secured by an interest in its investment portfolio and (ii) some of the common

---

[5]     I understand that the portfolio interest exemption was enacted to give U.S. borrowers access to foreign capital markets and to allow a larger pool of funds to be available for financings.  It exempts portfolio interest earned by a foreign investor from the flat 30 percent tax imposed on U.S.-source "fixed or determinable, annual or periodical income" earned by a nonresident alien or foreign corporation.

[6]     In a segregated account company, sometimes referred to as a "cell" company, the assets and liabilities of each of the accounts established by the company are completely walled off from the company's other assets and liabilities.

stock of NSCI.  None of the Cayman Funds is a debtor in these cases; however, on March 8,

2011, an involuntary Chapter 11 petition was filed against two of the Cayman Funds.[7]  As far as

I am aware, no order for relief has been entered in those cases.

### 2.    NSSC -  the Master Fund

21.    NSSC, the master fund, is a Delaware limited partnership.  It was formed in

October, 2002 (originally under the name Porter Secured Capital Partners, L.P.).  As an

unregistered investment vehicle, investment in New Stream is available only to "accredited

investors" under the Securities Act of 1933 and "qualified purchasers" under Section 2(a)(51)(A)

of the Investment Company Act of 1940.

22.    NSSC does not have any employees.  All management, investment and

administrative functions are provided by its general partner, NSC, either directly or through

NSC's wholly-owned subsidiary, New Stream Capital Services LLC (which is not a debtor in

these cases).

23.    Over the last eight years, NSSC has invested primarily by making loans and

equity investments.  Virtually all of these investments have been made by or through various

direct and indirect subsidiaries.  The portfolio of investments has generally included life

insurance policies, accounts receivable, inventory, real property and oil and gas producing

properties.

24.    The primary debt obligations of NSSC are:

     (a)    the Second Amended and Restated Notes, made by NSSC to
           each of Segregated Account Classes B, E, H, K, L, N and O of
           the Bermuda Fund (the "NSSC Bermuda Lenders"), as lenders,

---

[7]    Both of the involuntary cases are pending before this Court.  *See*, *In re New Stream Secured Capital Fund P1 (Cayman), Ltd.*, putative debtor.  Case No. 11-B-10694 (MFW), and *In re New Stream Secured Capital Fund K1 (Cayman), Ltd.*, putative debtor.  Case No. 11-B-10696 (MFW).

as each may have been amended, restated, amended and restated, supplemented or otherwise modified from time to time;

     (b)     the Second Amended and Restated Notes, made by NSSC to each of the Cayman Funds, as lenders, as each may have been amended, restated, amended and restated, supplemented or otherwise modified from time to time; and

     (c)     the Second Amended and Restated Notes, made by NSSC to the US Fund, as lenders, as each may have been amended, restated, amended and restated, supplemented or otherwise modified from time to time.

25.     Pursuant to a Collateral Agency Agreement, dated as of October 5, 2006 (as amended, restated or otherwise modified from time to time) by and among NSSC, the lenders identified above in paragraph 24 and Wilmington Trust Company, as collateral agent, each of these lenders holds a security interest in NSSC's investment portfolio. The aggregate indebtedness secured by the investment portfolio of NSSC is approximately $688,412,974.[8]

### 3.     *NSCI – the Limited Partner of NSSC*

26.     Debtor NSCI is a holding company through which the US/Cayman Funds hold the limited partnership interests in NSSC. NSCI is a Delaware corporation and the sole limited partner of NSSC.

27.     Generally speaking, aside from its limited partnership interest in NSSC, NSCI has no other assets and no employees.

### 4.     *NSC – the General Partner of NSSC*

28.     NSC, a Delaware limited liability company, is an unregistered investment adviser and asset management company that serves, among other roles, as the general partner and investment manager for NSSC. It is also the sole member of New Stream Capital Services LLC

---

[8]     As is explained below, this debt is divided into two tranches. The secured claims of the NSSC Bermuda Lenders, in the approximate amount of $369,066,322, have first priority over the secured claims of the Cayman Fund and US Fund, which are *parri passu*; the claims of the Cayman Fund and US Fund aggregate $319,346,652.

("NSC Services"), a Delaware limited liability company whose employees have provide

administrative and operational support and management services to the Debtors.

### 5. *NSI*

29.     NSI, a Delaware limited liability company, is one of eight first-tier subsidiaries of

NSSC.  Generally speaking, each of these subsidiaries owns a portfolio of particular

investments.  In the case of NSI, the portfolio consists of insurance-related investments,

primarily interests in companies and partnerships that invest in life settlements, provide premium

financing or invest in other insurance-related businesses.

30.     In addition to the senior secured debt obligations owed to the Note Lenders as

described in Section IV.F (infra at pp. 25-26), NSI is indebted to certain Segregated Account

Classes of the Bermuda Fund.  These primary debt obligations of NSI are:

>       (a)     Amended and Restated Loan and Security Agreement, dated as of August
>       1, 2008, between NSI and Segregated Account Class C;
>
>       (b)     Second Amended and Restated Loan and Security Agreement, dated as of
>       May 1, 2009, between NSI and Segregated Account Class F; and
>
>       (c)     Amended and Restated Loan and Security Agreement, dated as of August
>       1, 2008, between NSI and Segregated Account Class I,

as each may have been amended, restated, amended and restated, supplemented or otherwise

modified from time to time.

31.     NSI's aggregate indebtedness to these three Segregated Account Classes of the

Bermuda Fund (collectively referred to as the "NSI Bermuda Lenders") is in the approximate

amount of US $81,573,375.88.

32.     Pursuant to the Second Amended and Restated Loan and Security Agreement, and

a Collateral Agency Agreement, dated as of October 5, 2006 by and among the NSI Bermuda

Lenders, NSI and Wilmington Trust Company, as collateral agent, as amended, restated,

amended and restated, supplemented or otherwise modified from time to time, NSI granted the NSI Bermuda Lenders a security interest in its investment portfolio. This security interest was perfected by the filing of a UCC financing statement by Wilmington Trust Company, as collateral agent, on August 10, 2006.

### A.  Management of the Debtors

33.     As discussed above, NSC is the general partner of, and acts as the investment manager of, NSSC. The employees of NSC's affiliated entity, NSC Services, have provided the Debtors with investment management services and administrative and operational support.

34.     NSC is indirectly owned and managed by three individuals, David Bryson, Bart Gutekunst and Donald Porter, who had jointly constituted the Debtors' senior management team. It is common – indeed, it is expected – that the principals of an investment manager participate along with their investors. Accordingly, these principals of New Stream are investors in the US Fund. Each of the three principals was fully invested at the time of the 2009 Restructuring (as defined in paragraph 47, infra) and, therefore, they each await payment along with all of the other US Fund investors.

### IV.    Events Precipitating these Chapter 11 Cases

### A.    Changes in Financial Markets Prompt Flood of Redemptions

35.     The vast majority of New Stream's investors are "Fund of Funds". This means that the investors themselves are pooled investment vehicles with investors of their own. Typically, an investment with the Debtors is among several investments that these Fund of Funds investors have made. The balance of the Debtor's investors consists largely of pension funds, private bank/trust accounts and investment/wealth advisors.

36.     Since 2005, NSSC and its subsidiaries (including both debtor and non-debtor entities) have invested in a specialized portfolio that yielded positive returns for investors.

These investments included commercial loans, real estate holdings and oil and gas related investments. However, the largest and most valuable of these investments is the portfolio of life insurance settlement contracts held by NSI.

37.     In late September 2008, a series of fund failures (most notably, the allegedly fraudulent "*Ponzi* Scheme" funds run by Thomas Petters and by Bernard Madoff) had an adverse effect on many of the Debtors' investors even though there was no connection to New Stream. Other events during September 2008, including the collapse of Lehman Brothers and the near failure of several other financial institutions, compounded this negative effect, resulting in a substantial number of redemption requests by the Debtors' investors, comprising approximately 60% of the value of the Debtors' feeder funds (40% during just the month of September, 2008).

38.     As a result of these redemptions, the Debtors made a decision in October 2008 to take the actions necessary to put all investors who had not yet requested redemption, or whose redemptions had not yet become effective, on an equal footing with investors submitting the most recent redemption requests with respect to any cash to be distributed by the feeder funds. These actions were intended to avoid a situation in which investors in the feeder funds who had not sought to redeem, primarily because they had no impairment issues themselves and were satisfied with the Debtors' performance, would find themselves with concentration or other adverse selection issues in a fund that would be shrinking by 60%.

39.     In the US Fund and the Cayman Funds, actions were taken to reject all the redemption requests which had not become effective on or before October 1, 2008, in order to keep such requesting investors in the US Fund and the Cayman Funds with the intent to pay them (and investors who had not requested redemption) on a *pro rata* basis from the net proceeds generated from the liquidation of NSSC's assets in the ordinary course.

40.     In contrast, the Bermuda Fund took no action to prevent ordinary course redemption requests because there were hardly any investors who had not requested redemption. However, as set forth in the Disclosure Statement, there were verbal discussions between New Stream representatives and the Bermuda Fund investors during which New Stream representatives explained that the Debtors intended to pay out redemptions in the Bermuda Fund which had not become effective on or before September 30, 2008 in the same manner as was adopted for the US Fund and the Cayman Funds.

**B.      Changes in the Life Settlement Market**

41.     On November 28, 2008, a second catastrophic event occurred.  AVS Underwriting LLC ("AVS"), the largest rating agency for life settlements, announced that it was revising its methodology for determining life expectancy.  In simple terms, AVS extended its views on mortality and life expectancies, which reduced the implicit value of the life settlements held by NSI.

42.     Over the following three months, secondary sales of life settlements progressively dried up.  Buyers and sellers were unable to translate the changes in mortalities and life expectancies into current policy values because so few sales were being transacted.  Policies that had clear value, using any reasonable estimate of life expectancy, would frequently receive no bids when brought to market.

43.     By late February 2009, the combination of the uncertainty around policy values and the general market illiquidity effectively shut down the life settlement market.

44.     These events negatively impacted the Debtors in two ways.  First, as of November 30, 2008, approximately 42% of New Stream's assets were in life settlements or life settlement related investments (such as premium finance loans).  These assets needed to be marked to reflect the rating agencies' changing views on mortality.  The Debtors engaged a respected,

independent actuarial firm, Milliman Inc., to revalue the life assets. This complex and time-consuming analysis was completed in late February 2009. As a result, of Milliman's actuarial analysis, the Debtors took a markdown against the NSI insurance portfolio (the "<u>NSI Insurance Portfolio</u>") (valued at $194 million in November 2008), resulting in $71 million of unrealized losses for NSSC at December 31, 2008.

45.     Second, the Debtors' ability to monetize assets in the NSI Insurance Portfolio at reasonable value in the short term was impaired. Sales could only be achieved at distressed, not fair, value. The Debtors needed time for the market to normalize and reasonable trading to resume. Indications from leading participants were that the market would re-emerge over time. The Debtors expected this re-emergence to take between 12 to 24 months. This estimate proved to be accurate, as limited liquidity began to return to the market late in 2010. But, it continues to be a very limited market, with only a few buyers seeking to purchase distressed portfolios

46.     While caught between redemption demands from investors and the illiquidity of the life settlement portfolio, New Stream was still required to pay the premiums on the individual policies in the life settlement portfolio to preserve their value. These premium payments required ongoing expenditures approximating $5 million per month. An inability, or the failure, to make the necessary monthly premium payments in a timely manner would result in the termination of the policy and a 100% loss on the value of the policies.

### C.     Development of the 2009 Restructuring Plan

47.     Faced with the incompatible demands of investor redemptions, the illiquidity of the Debtors' investments, and the cash needed to pay premiums on the policies in the life settlement portfolio, the Debtors were compelled to take action. During April and May of 2009, the Debtors attempted to negotiate a restructuring of their relationships with investors (hereinafter the "<u>2009 Restructuring</u>").

48.     The purpose of the 2009 Restructuring was to enable the Debtors to liquidate investments over a period of time that would maximize their value.  The Debtors solicited the consent of the investors in each of the feeder funds to this restructuring and by May 7, 2009, the Debtors believed that they had obtained the investors' consent.

49.     However, shortly after the 2009 Restructuring was implemented, two Bermuda Fund investors who had not consented to the 2009 Restructuring commenced litigation in the Supreme Court of Bermuda (the "Bermuda Court").  (*See*, Disclosure Statement, Article B.B.2, for a discussion of the Bermuda Litigation).  On June 8, 2010, one of those Bermuda Fund investors obtained a judgment declaring that the terms of the 2009 Restructuring did not apply to Segregated Account Class C or Segregated Account Class I (the "Bermuda Judgment").[9]  As a result of this ruling, the Debtors were unable to liquidate assets and distribute available funds in the manner anticipated by the 2009 Restructuring.  Shortly after the Bermuda Court made its ruling, it appointed a receiver, John McKenna ("McKenna"), to act on behalf of Segregated Account Class C and Segregated Account Class I.

50.     The appointment of McKenna created a potential conflict between the interests of the prevailing Bermuda Fund investors who owned Segregated Account Classes C and I (who were a portion of the NSI Bermuda Lenders) and the investors in all of the other Bermuda Fund Segregated Account Classes.

51.     Accordingly, NSC, in its capacity as the investment manager for the Bermuda Fund, caused the Bermuda Fund to petition the Bermuda Court for the appointment of a receiver to act on behalf of the other Bermuda Segregated Account Classes.  In response to that request,

---

[9]     I understand that the Bermuda Court's ruling dealt with issues of first impression under Bermuda's Segregated Accounts Company Act, a relatively new statute.

on June 18, 2010, the Bermuda Court appointed Michael Morrison and Charles Thresh of KPMG Advisory Limited, as interim joint receivers for Segregated Account Classes B, E, H, K, L, N and O of the Bermuda Fund (the "<u>Bermuda Joint Receivers</u>" and, together with McKenna, the "<u>Bermuda Fund Receivers</u>") pursuant to section 19(1) of the Bermuda Segregated Accounts Companies Act of 2000 and appointed McKenna as the receiver over Segregated Account Class F.  Their respective appointments were made final on July 16, 2010.[10]

52.     On September 13, 2010, acting by *ex parte* summons, the Bermuda Fund Receivers asked the Bermuda Court to order the winding-up of the Bermuda Fund under the provisions of the Bermuda Companies Act.  That same day, the Bermuda Court appointed Messrs. Morrison, Thresh and McKenna as the Joint Provisional Liquidators of the Bermuda Fund.  On October 7, 2010, the Bermuda Court ordered that the Bermuda Fund be wound up under the provisions of Bermuda Companies Act and confirmed the appointment of the Joint Provisional Liquidators.

53.     On November 26, 2010, the Bermuda Court declared that the 2009 Restructuring was void under Bermuda law and therefore had no effect on any of the Segregated Account Classes of the Bermuda Fund.

**D.      The NSI Insurance Portfolio Sale**

54.     On May 3, 2010, NSI engaged Guggenheim Securities, L.L.C. ("<u>Guggenheim</u>"), an independent investment bank with extensive experience in the life settlement market, to help the Debtors explore financing opportunities for the NSI Insurance Portfolio.

---

[10]     As a consequence of these appointments, McKenna is the legal representative of the NSI Bermuda Lenders and the Bermuda Joint Receivers are the legal representatives of the NSSC Bermuda Lenders.

55.     By late May, 2010, Guggenheim was prepared to go to the market to obtain a five year $200 million credit facility designed to maintain the NSI Insurance Portfolio.  However, when the Bermuda Judgment was issued on June 8, 2010, Guggenheim advised NSSC that it was necessary to suspend solicitation for the financing until such time as it became clear that any prospective lender would be able to obtain a first priority security interest in the NSI Insurance Portfolio.

56.     Following the Bermuda Judgment and the appointment of the Bermuda Fund Receivers, the Debtors entered into negotiations with the Bermuda Fund Receivers.  While these discussions were ongoing, there was disagreement concerning the use of the cash proceeds generated by NSSC's other investment portfolios to pay the premiums needed to preserve the NSI Insurance Portfolio.  Specifically, the Bermuda Joint Receivers on behalf of the NSSC Bermuda Lenders objected to any use of NSSC's cash to pay insurance premiums for the NSI Insurance Portfolio since the NSI Bermuda Lenders had a structurally superior position.  Meanwhile, the Bermuda Judgment made it impossible for the Debtors to obtain financing for the insurance premiums from a third-party lender on commercially reasonable terms.

57.     Without financing from either NSSC or a third-party, NSI was unable to pay current premiums in full and as a result it made only *de minimis* payments on premiums coming due, causing the policies in the NSI Insurance Portfolio to fall into "grace periods" during which arrearages could be brought current.  If premiums were not paid during the grace period, the policies would be terminated by the insurer, and the policies would have little or no remaining value.

58.     During this time the Debtors were also engaged in discussions with the Bermuda Fund Receivers about the possibility of providing financing for the payment of premiums for the

NSI Insurance Portfolio.  Over the course of the month of June and into July, numerous attempts were made at obtaining approval from the NSI Bermuda Lenders to permit Guggenheim to proceed with the offering, but no agreement could be reached.  On July 20, 2010, a meeting was held among the Debtors, the Bermuda Fund Receivers and representatives of Bermuda Fund investors, at which a decision was reached to cease efforts to obtaining financing and instead to explore an outright sale of NSI's life settlements.

59.     Thereafter, the Debtors, with the encouragement and consent of the Bermuda Fund Receivers, instructed Guggenheim to solicit offers for the purchase of the NSI Insurance Portfolio in order to prevent the termination of the life insurance policies.

60.     While Guggenheim was exploring the market, the Debtors, with Guggenheim's assistance, also began discussions with some investors in the US Fund and Cayman Funds to explore their interest in making an offer to purchase the NSI Insurance Portfolio (toward the goal of preserving its future value for investors who were structurally subordinate to the NSI Bermuda Lenders and the NSSC Bermuda Lenders).  Eventually, these discussions coalesced around MIO Partners, Inc., a Delaware corporation ("MIO") an affiliate of several investors in the US Fund and Cayman Funds.[11]

61.     Guggenheim then contacted more than a dozen parties to seek additional bids and it received expressions of interest from five interested parties.  As Guggenheim engaged in discussions with these parties, it became clear that only three of the five had both serious interest and the ability to make binding offers to purchase the NSI Insurance Portfolio.  In fact, the three

---

[11]     I understand that MIO is a manager of several investment and retirement funds that hold investments in either the US Fund or the Cayman Fund.

interested parties began making uncommitted offers and continued to negotiate the purchase price with Guggenheim and the Debtors.

62.     These efforts to sell or finance the portfolio were conducted under the looming specter of the expiring grace periods and the Debtors' illiquidity.  As policies reached the end of their grace periods for non-payment of premiums, they would lapse and critically diminish the sale value of the portfolio.  Given this looming deadline, the refusal of the NSI Bermuda Lenders to subordinate their liens to permit a financing, and the uncertainty created by the Bermuda Judgment, the Debtors and Guggenheim concluded that the only way to recover value to the Debtors' creditors and investors would be to expedite the sale and require that all interested parties submit their final and best offers.

63.     Between July 23, 2010 and July 28, 2010, Guggenheim worked with each of the parties who had expressed interest in, or made offers for, the NSI Insurance Portfolio, including MIO.  Because there were substantial differences among the various bids, Guggenheim and the Debtors developed a standard set of terms, which Guggenheim presented to each of the interested parties on July 27, 2010, together with a notice of a bid deadline of 3:00 p.m. EST on July 28, 2010, for bidders to introduce, refine or improve their offers.  The notice made clear that the Debtors would welcome offers on any terms, but that they would ideally like to see certain features in any offer, including bridge financing with a commitment to close by July 30, 2010.

64.     Three parties delivered bids to Guggenheim prior to the deadline.  Guggenheim and Debtors' special counsel, O'Melveny & Myers LLP, reviewed each bid and provided the Debtor with an evaluation based on (a) an assessment of the assurance of closing the transaction, (b) total economics including the size of the cash component of any offer and (c) any other features proposed.

65. On July 29, 2010, the evaluation process concluded with Guggenheim recommending the acceptance of the offer made by MIO, on behalf of an entity to be formed (the "Purchaser")[12], to purchase the entire portfolio for a cash payment of $127.5 million.[13] After reviewing the bids and discussing them with Guggenheim and legal counsel, the Debtors concluded that the MIO offer was the highest and best offer. Thereafter, NSI and MIO, on behalf of the Purchaser, entered into a binding term sheet agreement ("MIO Purchaser Term Sheet") on July 29, 2010 setting forth the terms and conditions of the sale, which was then shared with the Bermuda Fund Receivers.

66. As of the date of the MIO Purchaser Term Sheet, the terms of the NSI insurance portfolio sale provided for:

(i)     A purchase price of $127,500,000 payable in cash at closing;

(ii)    No additional due diligence required[14];

(iii)   Bridge financing of up to $25,000,000, the proceeds of which were to be used to pay the premiums of the NSI Insurance Portfolio;

(iv)    The financing would be provided on a "purchase price neutral" basis (*i.e.*, repayment would be forgiven and the amount outstanding added to the purchase price provided that MIO or its nominee was the ultimate purchaser);

(v)     As soon as possible after the execution of the MIO Purchaser Term Sheet,

---

[12]     MIO subsequently formed and assigned its rights under the MIO Purchaser Term Sheet to the entities Limited Life Assets Master Limited and Limited Life Assets Holdings Limited, who now constitute the Purchaser.

[13]     The Purchaser has advised the Debtors that it subsequently entered into an agreement with an unrelated entity that had been an unsuccessful participant in the auction. The Debtors understand that this post-auction arrangement grants the unrelated entity an option, exercisable after the closing of the Insurance Portfolio Sale, to acquire up to 50% of the equity interests of the Purchaser for a *pro rata* share of the acquisition cost (including the Purchase Price, all amounts loaned under the Bridge Note and DIP Facility, and the transaction costs and fees incurred).

[14]     MIO's bid was the only bid that was not subject to additional due diligence.

the parties would enter into definitive documentation with a closing to occur no later than September 30, 2010;

(vi)    The sale was conditioned upon either (i) consent of 100% of the investors or (ii) a bankruptcy court order authorizing a sale free and clear of all claims and interests through a bankruptcy process;

(vii)    If the NSI Insurance Portfolio were sold to an alternative bidder, MIO or its nominee (*i.e.*, the Purchaser) would be entitled to a break-up fee equal to 3% of the base $127.5 million purchase price and expense reimbursement of up to $500,000; and

(viii)    MIO or its nominee (*i.e.*, the Purchaser) would offer additional incentives to the US Fund/Cayman Funds investors in order to induce them to support the sale.

67.    Following the execution of the MIO Purchaser Term Sheet, the parties began negotiating and drafting definitive documentation (the "Purchase Agreement") for the sale of the NSI Insurance Portfolio to the Purchaser (the "Insurance Portfolio Sale").[15]   The provisions of the Purchase Agreement are substantially the same as those set forth in the MIO Purchaser Term Sheet.  There are however, certain modifications that were negotiated during the documentation of the transaction.

68.    The parties had anticipated a closing of the Insurance Portfolio Sale on or prior to September 30, 2010.  However, the parties were unable to satisfy the conditions to closing before such date and so the Purchaser agreed to (i) extend the timeline for closing, (ii) increase the principal amount of the "price neutral" bridge financing from $25 million to $39,480,268.58, which has been used to finance the premiums and maintain the value of the NSI Insurance Portfolio pending the filing of these cases, and (iii) offer $15 million of post-petition financing under a "price neutral" debtor-in-possession credit facility (the "DIP Facility"), provided, however, that all interest, fees and expenses under the DIP Facility would not be "price neutral"

---

[15]    The final, agreed upon terms of the sale to the Purchaser are set forth in the Purchase Agreement, substantially in the form annexed to the Plan.

and would be fully payable in cash upon termination of the DIP Facility.  In return, the Debtors

agreed that any death benefits received by the Debtors on or after October 1, 2010 would be held

in escrow for the benefit of the Purchaser upon the closing of the sale (the "Escrowed Benefits").

69.     For a variety of structural and logistical funding reasons, the entities that provided

the bridge financing are not the same legal entities that will be the acquisition vehicles for the

Insurance Portfolio.  However, all of these entities are controlled or managed by MIO, solely in

its capacity as general partner, adviser, managing member, investment manager or manager.

70.     Pursuant to the terms of the Purchase Agreement and the DIP Credit Agreement

(as defined below), all amounts loaned by the DIP Lenders (as defined below) are "purchase

price neutral" meaning, so long as the Purchaser or its nominee is the ultimate purchaser, an

amount equal to the principal outstanding amounts under the DIP Facility and all outstanding

amounts under the Bridge Loan will be added by the Purchaser to the purchase price set forth in

the Purchase Agreement for the NSI Insurance Portfolio and paid in cash by the Purchaser on the

effective date of the Plan, with NSI immediately using such purchase price proceeds received

from the Purchaser to repay the DIP Facility and Bridge Loan (except for interest, fees and

expenses relating to the DIP Facility which will be paid from other funds by NSI).

71.     It is important to highlight the critical value of the financing being provided by

the Purchaser in connection with the Insurance Portfolio Sale.  The Debtors have already

received the benefit of approximately $41,850,000 of pre-petition financing.  In addition, the

Purchaser has committed to fund up to an additional $15,000,000 during the pendency of these

Chapter 11 Cases.  So long as the NSI Insurance Portfolio is sold to the Purchaser, the

approximately $56,825,000 of financing will effectively not need to be repaid by NSI (except for

interest, fees and expenses relating to the DIP Facility, which will need to be repaid in cash).

72.     On the other hand, a sale to any party other than the Purchaser will require the

Debtors to repay the $56,825,000 from its own funds.  Hence, in order for a sale to any party

other than the Purchaser to be of greater value to the Debtors' estates, it would require a

purchase price of up to $184,350,000, the effective purchase price to be paid by the Purchaser.[16]

### E.     The Plan Support Agreements

73.     The Debtors anticipated that consummation of the Insurance Portfolio Sale would

serve as the foundation for a comprehensive reorganization that they were attempting to

negotiate with the Bermuda Fund Receivers.  On November 9, 2010, the Debtors entered into an

Initial Plan Support Agreement with, *inter alia*, the Bermuda Fund Receivers and a

representative of the Purchaser of the NSI Insurance Portfolio '("Initial Plan Support

Agreement"), which outlined the terms of a restructuring that was to be more fully negotiated.  A

copy of the Initial Plan Support Agreement is attached as Exhibit 2 to the Disclosure Statement.

74.     Over the next several months, the Debtors negotiated the details of the

reorganization with the Bermuda Fund Receivers and the Purchaser.  These negotiations

centered on a closing of the Insurance Portfolio Sale and an allocation of the net proceeds among

the Debtors' creditors.  In the latter part of January 2011, the parties reached a final agreement

on the details of a global settlement, which are embodied in the Plan and described in detail in

the Disclosure Statement.

75.     The Plan, if confirmed, would settle and resolve issues related to the rights of

creditors, including the relative priorities and potential claims and causes of action that each of

them may have against the other.  The Plan is intended to achieve a global resolution of all such

---

[16]     The Purchaser's break-up fee is calculated only on the base purchase price of
$127,500,000, not the effective actual purchase price of up to $184,350,000 that includes the
bridge and DIP Facility financing amounts.

issues and for that reason the Plan contains broad provisions relating to the distribution of assets, the method of liquidation, the release of claims and the compromise of rights and claims that the Debtors' creditors may have.

76.     The Initial Plan Support Agreement had contemplated that a second, more comprehensive, agreement would be entered into when the parties had agreed on all the terms of a reorganization plan and to which they would annex copies of an agreed pre-packaged reorganization plan and disclosure statement.  Consequently, on January 21, 2011, the Debtors entered into the Plan Support Agreement with, *inter alia*, the Bermuda Fund Receivers and the Purchaser, which annexed copies of the Plan and Disclosure Statement (the "Plan Support Agreement" and together with the Initial Plan Support Agreement, the "Plan Support Agreements").  A copy of the Plan Support Agreement is attached as Exhibit 3 to the Disclosure Statement.

77.     By the Plan Support Agreements, the signatories thereto have agreed to support confirmation of the Plan subject to certain terms and conditions.  The Debtors have filed their respective Chapter 11 cases in order to confirm the Plan and implement that agreement with the Bermuda Fund Receivers.

**F.     The Bridge Loan**

78.     As described above, in order to maintain the value of the NSI Insurance Portfolio, which is in excess of the amounts owed to the NSI Bermuda Lenders, NSI needed to obtain financing.

79.     With the consent of NSI's other lenders, NSI and certain designated affiliates of the Purchaser (hereinafter, the "Note Lenders") entered into a bridge note (the "Bridge Note") and related secured loan documents (collectively, the "Bridge Loan Documents"), pursuant to which the Note Lenders initially advanced the sum of $25 million to fund on-going premium

payments until a sale of the NSI Insurance Portfolio could be closed (hereinafter, the "Bridge Loan").

80.     On November 8, 2010, the Bridge Loan was amended to increase the principal amount loaned to $39,480,268.58.  The proceeds of the additional amounts borrowed under the Bridge Loan, as amended on November 8, 2010, were also used to pay additional premiums required to preserve the insurance contracts contained in the NSI Insurance Portfolio.

81.     Pursuant to the Bridge Loan Documents, as amended, the Bridge Loan is secured by a first priority perfected lien on a portion of the NSI Insurance Portfolio, senior to the liens and security interests of any other party or creditor.[17]

82.     Pursuant to the Initial Plan Support Agreement, the Debtors, the Receivers and the Purchaser had agreed to negotiate the terms of a plan of reorganization that provided, *inter alia*, for the consummation of the Insurance Portfolio Sale and required the commencement of these Chapter 11 cases on or before December 20, 2010.  Consequently, the Bridge Note specified that the failure to commence the Chapter 11 Cases on that date was an event of default under the Bridge Loan.

83.     The negotiations among the Debtors and the other parties to the Initial Plan Support Agreement did not produce an agreement on the details of the contemplated reorganization by December 20, 2010.

84.     On December 21, 2010, the Note Lenders sent NSI a Notice of Event of Default and Reservation of Rights Letter (the "Default Letter") (i) indicating that an "Event of Default"

---

[17]     The NSI Bermuda Lenders consented to the subordination of their security interests to enable NSI to grant such a first lien to the Note Lenders.  That security interest was perfected by placing the life settlement contracts which comprise the collateral in a securities control account over which the Bank of Utah acts as trustee.

(as defined in the Bridge Note) had occurred as of December 20, 2010, (ii) stating that all "Obligations" (as defined in the Bridge Note) had become due and payable as of such date and (iii) reserving all rights, powers, privileges and remedies accruing to the Note Lenders under the Bridge Note and related Bridge Loan Documents.

85.     The default under the Bridge Loan continues unremedied as of the date hereof, although the Note Lenders have neither enforced their rights nor taken any further action as a consequence of the default.

86.     The delay in reaching a final agreement and initiating the contemplated Chapter 11 cases made it necessary for NSI to borrow additional amounts to service the premiums and maintain the value of the NSI Insurance Portfolio. A failure to pay premiums could result in the cancellation of policies and a reduction of the purchaser price. As the Bridge Note was in default and the Debtors have agreed to hold the Escrowed Benefits for the Purchaser, the Debtors sought the permission of the Note Lenders to use the Escrowed Benefits to pay the premiums relating to the NSI Insurance Portfolio. Subject to the reservation of rights set forth in the Default Letter and the obligations of NSI under the Bridge Note and related loan and security documents, the Note Lenders have approved the use of up to $1,815,184.30[18] from the Escrowed Benefits solely to pay the premiums relating to the NSI Insurance Portfolio in the amounts and pursuant to a schedule agreed to by the Purchaser and NSI.

87.     As of the Petition Date, NSI was liable to the Note Lenders in the amount of $41,824,935 which includes fees and expenses incurred under and in connection with the Bridge Loan.

---

[18]     This amount may be increased with the written consent of the Note Lenders.

### G. The DIP Facility

88. During the period of time between the Petition Date until a closing of the Insurance Portfolio Sale, the Debtors must continue to pay premiums on the NSI Insurance Portfolio in order to preserve those assets. As noted above, the Purchaser agreed to provide or arrange for price neutral debtor-in-possession financing for the payment of these premiums.

89. For a variety of structural and logistical funding reasons, the entities that provided the bridge financing are not the same legal entities that will be the acquisition vehicles for the Insurance Portfolio. However, all of these entities are controlled or managed by MIO, solely in its capacity as general partner, adviser, managing member, investment manager or manager.

90. Accordingly, the Note Lenders, as their capacity as lenders under the DIP Facility, (the "DIP Lenders") will provide the DIP Facility on the terms and conditions set forth on Exhibit 5 to the Disclosure Statement, which is now reflected in the DIP Credit Agreement (as defined below).

91. The sole purpose of the DIP Facility will be to support and maintain the NSI Insurance Portfolio pending a closing of the Insurance Portfolio Sale to the Purchaser.

92. In the event the Debtors sell the NSI Insurance Portfolio to anyone other than Purchaser, any amounts outstanding under the Bridge Loan and the DIP Facility will be immediately due and owing in full. Hence, a sale to any party other than Purchaser would require a purchase price sufficient to repay all amounts due and owing to the Note Lenders and the DIP Lenders. If the sale to the Purchaser is consummated, an amount equal to s the principal outstanding amounts under the DIP Facility and all outstanding amounts under the Bridge Loan will be added by the Purchaser to the purchase price set forth in the Purchase Agreement for the NSI Insurance Portfolio and paid in cash by the Purchaser on the effective date of the Plan, with NSI immediately using such purchase price proceeds received from the Purchaser to repay the

DIP Facility and Bridge Loan (except for interest, fees and expenses relating to the DIP Facility which will be paid from other funds by NSI).

93.     In light of the substantial advantages provided by this price neutral financing, it is not realistic that any other lender would be willing to provide post-petition financing on terms that are more advantageous than what is contemplated by the DIP Facility.

## V.     Summary of the Plan[19]

94.     If the Plan is confirmed by the Court, on its Effective Date, or as soon as practicable thereafter, the Debtors will close the Insurance Portfolio Sale and utilize the proceeds to make distributions as provided in the Plan.  The classes of claims against, and interests in, the Debtors created under the Plan, the treatment of those classes under the Plan and distributions to be made under the Plan are described below.

95.     The Plan provided for the sale of the NSI Insurance Portfolio either pursuant to a "Consensual Process" or a "Cramdown Process".  In either case, the terms of the Insurance Portfolio Sale would be pursuant to the Purchase Agreement, substantially in the form annexed to the Plan and incorporated therein.  In either process, the proceeds from the Insurance Portfolio Sale are to be contributed to the Bermuda Liquidation Account and distributed pursuant to the terms of the Plan as finally confirmed by the Bankruptcy Court.

96.     However, since Class 3 (which is described more fully in ¶104, infra) has voted to accept the Plan, the sale will take place pursuant to the Consensual Process and the Debtors do not presently intend to seek approval of the Insurance Portfolio Sale pursuant to Section 363 of the Bankruptcy Code prior to seeking confirmation of the Plan.

---

[19]     Capitalized terms that appear in Sections V and VI of this Declaration and which are not defined elsewhere herein shall have the meanings ascribed to them in the Plan.

### A.  Classification and Treatment of Claims and Interests

97.    Claims against and Interests in the Debtors are classified in the Plan as follows:[20]

#### *Class 1: NSI Bermuda Lender Claims*

98.    Class 1 consists of all Claims, liens, rights and interests held by the NSI Bermuda Lenders.  Since the Class 1 Claims are fully secured by the NSI Insurance Portfolio, the Class 1 Claims will be paid from the net proceeds of the Insurance Portfolio Sale in accordance with an allocation to be agreed upon between the Bermuda Fund Receivers and approved by the Bermuda Court.

99.    The aggregate amount of the Class 1 claims is $81,573,375.88.

100.   Class 1 is Impaired since the Claims in this Class will receive less than the full amount owed and the holders of the Class 1 Claims have voted to accept the Plan.

#### *Class 2: NSSC Bermuda Lender Claims*

101.   Class 2 consists of all Claims, liens, rights and interests of held by the NSSC Bermuda Lenders.  The Class 2 Claims hold a first lien on the investment portfolio of NSSC, which includes the residual proceeds from the Insurance Portfolio Sale after payment of the Class 1 Claims.  The Class 2 Claims will receive a distribution from the remaining proceeds of the Insurance Portfolio Sale in accordance with an allocation to be agreed upon between the Bermuda Fund Receivers and approved by the Bermuda Court, in addition they will be allocated substantially all of the remainder of NSSC's assets, except for certain assets that are being released for the benefit of the Class 3 Claims.  On the Plan's Effective Date, the assets allocated to Class 2 (defined in the Plan as the "Bermuda Wind Down Assets") will be transferred to the

---

[20]    The Plan's provisions with respect to the treatment of Claims is more fully described in Section VIII of the Disclosure Statement.

exclusive control and supervision of the Joint Bermuda Receivers, or at their direction, shall be liquidated with the net proceeds of such liquidation to be paid by the Joint Bermuda Receivers to the Class 2 Creditors in such manner as may be directed by the Bermuda Court. In addition to the foregoing treatment, including the release of certain collateral (defined in the Plan as the "USC Wind Down Assets") to permit distributions to be made to subordinate creditors, the Class 2 Creditors have agreed to make cash payments to Class 3 Creditors who vote to accept the Plan and thereby release certain claims that the Class 3 Creditors may have (see discussion of the Global Release, *infra*).

102.    The aggregate amount of the Class 2 claims is $ 369,066,322.05.

103.    Class 2 is Impaired and the holders of the Class 2 Claims have voted to accept the Plan.

### Class 3: US/Cayman Funds Class Claims

104.    Class 3 consists of all US-Cayman Claims to the extent that they are secured claims. The Holders of Claims in Class 3 will each receive a Percentage Share of periodic distributions of the net proceeds from the liquidation of the USC Wind Down Assets, which shall be paid by the post-confirmation Debtors on dates to be determined in the reasonable discretion of the post-confirmation Debtors until all of the USC Wind Down Assets have been liquidated.

105.    In addition to distributions on account of the Class 3 Claim, holders of Class 3 Claims who voted to accept the Plan, and thereby grant the third-party releases provided for in section 12.5 of the Plan, will be entitled to receive a cash payment from the Global Settlement Fund upon the Plan's Effective Date (see discussion of the Global Release, *infra*).

106.    The aggregate amount of the Class 3 Claims is $319,346,652.90.

107.     Class 3 is Impaired and the holders of the Class 3 Claims have voted to accept the

Plan.

### Classes 4 (a) – (d) General Unsecured Claims

108.     General Unsecured Claims against the Debtors are classified as follows:

Class 4(a):  General Unsecured Claims against NSI.

Class 4(b):  General Unsecured Claims against NSSC.

Class 4(c):  General Unsecured Claims against NSC.

Class 4(d):  General Unsecured Claims against NSCI.

109.     Each Allowed General Unsecured Claim in Class 4(a) and Class 4(d) will be paid

in full upon Confirmation.  Classes 4(a) and 4(d) are not Impaired under the Plan and pursuant to

Bankruptcy Code §1126(f) solicitation of these Classes was not required.  Accordingly, these

Classes were not solicited.

110.     Each Allowed General Unsecured Claim in Class 4(c) will share, on a *pro rata*

basis, in a cash distribution of $200,000 (the "Class 4(c) Distribution Amount").[21]  Any Claims

in Class 4(c) would be Impaired and the Debtors solicited the vote from the only know creditor

who is likely to be a Creditors in Class 4(c), however that Creditor did not vote.  Nevertheless,

the Debtors believe that the Plan is still confirmable since that potential creditor is not

anticipated to have an allowable claim in Class 4 (c).[22]

---

[21]     In the event that the Class 4(c) Distribution Amount is in excess of the aggregate amount of the Face Amount of Allowed Class 4(c) Claims and any amount required to be reserved for Class 4(c) Claims that have not been Allowed, such excess shall be deemed to be part of the Bermuda Wind Down Assets.

[22]     SPAR (2004) LLC ("SPAR") commenced an action in the United States District for the Southern District of New on January 4, 2011.  *SPAR (2004) LLC, plaintiff, against, New Stream Insurance, LLC and New Stream Capital, LLC, Defendants*.  Civil Action No. 11 Civ. 20 (JR).
Continued on following page

111. Holders of Class 4(b) Claims will not receive any distribution or retain any property on account of such Claims and pursuant to Bankruptcy Code §1126(g) this Class is deemed not to have accepted the Plan. Accordingly, although Creditors in this Class were served with a copy of the Plan and Disclosure Statement on January 24, 2011, the Debtors did not solicit acceptances or rejections of the Plan from Class 4(b).

### *Classes 5(a)-(d): Interests in the Debtors*

112. Interests in the Debtors are classified as follows:

Class 5(a): Interests in NSI.

Class 5(b): Interests in NSSC.

Class 5(c): Interests in NSC.

Class 5(d): Interests in NSCI.

113. The Class 5(a) Interests in NSI that are currently held by NSSC will continue to be held by NSSC and the Class 5(d) Interests in NSCI that are currently held by the Cayman Funds will continue to be held by the Cayman Funds. Interests in Class 5(a) and 5(d) will not be in any way affected by the Plan.

114. Class 5(b) Interests in NSSC and Class 5(c) Interests in NSC will be extinguished and the Holders of Interests in Class 5(b) and Class 5(a) shall not receive or retain any property on account of such Interests.

---

Continued from previous page

In the complaint, SPAR is claiming certain fees and compensation alleged to be owed by NSI and NSC, jointly and severally. The Debtors intend to schedule SPAR's claim as "disputed." The allowed amount will be treated as an unsecured claim in both Class 4 (a) and (4c). However, since Class 4(a) is unimpaired, SPAR's allowed claim would be satisfied in full by NSI and since the Plan extinguishes intercompany claims there would be no remaining claim to be asserted in Class 4 (c).

### B. Global Settlement

115.    In addition to distributions to which the Holders of Class 3 Claims will be entitled in exchange for their Claims under the Plan, US-Cayman Investors who return a ballot accepting the Plan will be entitled to receive Cash payments that will be funded by the Purchaser and the Creditors in Class 1 and Class 2.  The amount of such contributions is partly subject to certain contingencies but may total as much as $15 million.  These Cash payments are not being offered by the Debtors or paid from their estates.  The details of the Global Settlement Fund are set forth in Section 12.7 of the Plan and described in Article XV.D.6 of the Disclosure Statement, but are briefly summarized here.

116.    Each US-Cayman Investor who either (i) voted to accept the Plan or (ii) executed a ballot that consents to the acceptance of the Plan by the US Fund or any of the Cayman Funds in which such US-Cayman Investor holds an Interest (collectively, "Accepting US-Cayman Investors"), will receive a payment from the Global Settlement Fund that is calculated based on the ratio that each such US-Cayman Investor's Percentage Share (as defined in Plan §1.110) bears to the aggregate of the Percentage Share of all other Accepting US-Cayman Investors.  In consideration of these cash payments, each Accepting US-Cayman Investor will be deemed to have consented to the third-party release provisions in Section 12.5 of the Plan (the "Third-Party Release").[23]

117.    The amount of the payments from the Global Settlement Fund made to each Accepting US-Cayman Investor will be dependent on several factors including: the acceptance of the Plan by Class 3 and, the aggregate amount of the Percentage Share of the Accepting US-

---

[23]    The ballots utilized to solicit the acceptance or rejection from Class 3 contained a provision that specifically acknowledged the accepting parties' understanding of and consent to the Third-Party Release.

Cayman Investors. As is described in the Plan and Disclosure Statement, if Class 3 had not

accepted the Plan the aggregate of Cash contributed to the Global Settlement Fund would not be

not more than $2,500,000. However, since Class 3 has voted to accept the Plan, the aggregate of

Cash contributed to the Global Settlement Fund could be in excess of $10,000,000 and,

ultimately, as much as $15,000,000. Moreover, the calculation of the Global Settlement

Payment to be paid to each Accepting US-Cayman Investor will be a calculated based on the

ratio that each Accepting US-Cayman Investor's Percentage Share bears to the aggregate of the

Percentage Shares of all Accepting US-Cayman Investors.

118.    Holders of Class 3 Claims that did not timely return a ballot accepting the Plan

will not receive a share of the payments to be made from the Global Settlement Fund, although if

the Plan is confirmed they will participate in the periodic distributions that will be made to all

Holders of Class 3 Claims as USC Wind Down Assets are liquidated. Such distributions will be

made to Holders of Class 3 Claims without regard to the manner in which they vote on the Plan.

### C.    Third Party Release

119.    The payments from the Global Settlement Fund have been offered to induce the

Holders of Class 3 Claims to vote in favor of the Plan, support confirmation and agree to the

Third-Party Release that are set out in Section 12.5 of the Plan.[24]

120.    Section 12.5 of the Plan provides that each Creditor or Holder of a Claim that was

entitled to vote on the Plan and did not vote timely to reject the Plan will be deemed to have

---

[24]    For purposes of voting on, and receiving distributions under, the Plan, each US-Cayman
Investor was entitled to cast a ballot in Class 3, whether their Claims are held through the US
Fund or the Cayman Funds. For purposes of voting on the Plan, each US-Cayman Investor was
entitled to execute a Ballot, and as a result, if such Investor accepts the Plan, to receive
distributions from the Global Settlement Fund in exchange for granting the Third Party Release
provided for in the Plan.

unconditionally, irrevocably and forever, released each of the Released Parties (as defined in

§ 1.126 of the Plan) from any claims in any way relating to the Debtors, the Bermuda Fund

Receivers, the Bermuda Liquidators, the Chapter 11 Cases, the Plan, or the Disclosure

Statement, the subject matter of, or the transactions or events giving rise to, any Claim or

Interest that is treated in the Plan, the business or contractual arrangements between any Debtor

and any Creditor, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases,

the negotiations, formulation, or preparation of the Plan, the Disclosure Statement, or any of the

related agreements, instruments, or other documents, or upon any other act or omission,

transaction, agreement, event, or other occurrence taking place before the Effective Date and that

could have been asserted at any time up to immediately prior to the Effective Date.[25]

     121.    The ballots that were utilized to solicit votes from Class 3 explicitly set forth that

an acceptance of the Plan was also a consent to the Third-Party Release. Consequently, the

Third-Party Release is consensual and not binding on any Class 3 creditor who voted to reject

the Plan.

## VI.    Solicitation

### A.  The Commencement of Solicitation

     122.    As noted above, the Debtors began the solicitation on January 24, 2011, when

Kurtzman Carson Consultants LLC ("KCC"), acting as the solicitation agent, sent the Plan,

Disclosure Statement and appropriate forms of ballots to all parties entitled to vote.

     123.    Each holder of a claim in Classes 1, 2, 3 and 4(c) was entitled to vote either to

accept or reject the Plan and was provided with a form of ballot.

---

[25]    Notwithstanding the language of the Third-Party Release, it will not affect (i) any rights or remedies of the Purchaser pursuant to the Asset Purchase Agreement or (ii) any regulatory or governmental claim or action.

124.     Pursuant to Section 1126(f) of the Bankruptcy Code, holders of claims in Classes 4(a) and 4(d) and the holders of interests in Classes 5(a) and 5(d) are conclusively deemed to have accepted the Plan and solicitation of acceptances of the holders of claims or interests in such Classes was not required.  Nevertheless, all known creditors in such classes were provided with a copy of the Plan and Disclosure Statement, together with a notice stating that they were not entitled to vote.

125.     Pursuant to Section 1126(g) of the Bankruptcy Code, holders of claims in Class 4(b) and interests in Classes 5(b) and 5(c) are deemed not to have accepted the Plan and were not solicited.

**B.     Voting by US-Cayman Investors**

126.     For purposes of voting on, and receiving distributions under, the Plan, each US-Cayman Investor was entitled to cast a ballot in Class 3, whether their Claims are held through the US Fund or the Cayman Funds.

127.     Investors in the US Fund were provided with a form of ballot that provided direction to the managing member of the US Fund for the manner in which it should vote the single Claim of the US Fund.  The US Fund has voted its single Claim to accept the Plan, in the manner directed by those Investors who timely returned a US Fund Investor Ballot, holding a majority of the Interests in the US Fund.[26]

128.     The US Fund Investor Ballot also provided the mechanism by which US Investors can participate in the distributions from the Global Settlement Fund.   Each US Investor who

---

[26]     In accordance with the provisions of the Operating Agreement for the US Fund, the US Fund Ballot contained a notice of the managing member's intent to vote the Claim of the US Fund in this manner.  This provided these investors with any opportunity to object in writing within the period provided in the US Fund's Operating Agreement.  No Investor has filed such a written objection and, accordingly, all US Fund Investors are deemed to have consented to the manner in which the US Fund cast its ballot.

votes timely to direct the managing member of the US Fund to accept the Plan will be entitled to receive a payment from the Global Settlement Fund that is calculated based on the ratio that such Investor's Percentage Share bears to the aggregate of the Percentage Shares of all US-Cayman Investors who vote to accept the Plan. This process was described in more detail in the Disclosure Statement at pages 125-26.

129.    Notwithstanding the foregoing, the determination as to whether Class 3 Creditors voted to accept or reject the Plan was made in accordance with Section 1126 of the Bankruptcy Code.

        **C.**      **Extension of the Voting Deadline**

130.    When the Solicitation commenced on January 24, 2011, the Debtors had advised all interested parties that the deadline for returning ballots to accept or reject the Plan was February 22, 2011. However, shortly after the Solicitation had commenced, the Debtors realized that Schedule 1 to the Plan was incomplete.

131.    Because Schedule 1 set forth the Percentage Share for Class 3 Creditors, the Debtor decided to amend the Plan, solely to amend, supersede and replace Schedule 1 in its entirety with an amended Schedule 1. On February 4, 2011, KCC sent the Amendment to all parties who had received the original Solicitation. To afford affected parties an adequate opportunity to consider the Amendment, KCC also notified the recipients that the voting deadline had been extended to March 8, 2011 at 5 p.m. Pacific time.

**VII.**    **The Results of the Voting**

132.    The Solicitation period ended several days ago, and the results have been certified to the Debtors by KCC.

133.    Briefly, the following Classes are the voting Classes, which are the only Classes entitled to vote to accept or reject the Plan:

| Class | Claim | Estimated Amount[27] | Status |
|-------|-------|------------------------|--------|
| 1 | NSI Bermuda Lenders | $ 81,573,375 | Accepted |
| 2 | NSSC Bermuda Lenders | $369,066,322 | Accepted |
| 3 | US/Cayman Fund | $319,346,652 | Accepted |
| 4(c) | General Unsecured Claims against NSC | unknown | No votes |

134.    With the acceptance of the impaired classes of creditors, the Debtors have filed these cases in order to seek confirmation of the Plan.

## VIII.   First Day Motions

135.    I have formed opinions as to (a) the necessity of obtaining the relief requested by the Debtors in their First Day Motions, (b) the need for the Debtors to continue to operate, (c) the deleterious effects and immediate and irreparable harm to which the Debtors would be exposed if the Debtors do not obtain the relief requested in the First Day Motions.  My opinions are based upon my first-hand experience with the Debtors' businesses and operations, through my general review of various materials and information and discussions with other executives of the Debtors.

136.    The relief sought in the First Day Motions will allow the Debtors to proceed quickly and efficiently to seek confirmation of the Plan while minimizing the adverse impact of these cases on the Debtors and maximizing the remaining value for creditors.  I believe that the relief sought in the First Day Motions is necessary to enable the Debtors to achieve their goal of concluding their restructuring and allowing their creditors to receive the benefits of confirmation.

---

[27]    This is the Debtors' estimate of the aggregate of all Claims that it believes, as of December 31, 2010, will be Allowed in each of the identified Voting Classes.  The Debtors intend to Schedule these amounts if they commence Chapter 11 cases.  The Face Amount of Filed Claims may be higher, which could reduce the value of any distributions made to Creditors in the Voting Classes if the Claims were Allowed in such higher amounts.

**A.** **Motion for an Order Pursuant to Bankruptcy Rule 1015 and Local Rule 1015-1 Authorizing Joint Administration**

137.    The Debtors believe that the motions, applications, hearings and orders that will arise in these Chapter 11 cases will jointly affect all of the Debtors.  Due to the integrated nature of the Debtors' operations and their jointly proposed Plan, it would be most efficient to jointly administer these cases for procedural purposes only.  Specifically, the Debtors request that the Court maintain one file and one docket for all of the Chapter 11 cases under the case number assigned to New Stream Secured Capital, Inc. and also request that an entry be made on the docket of each of the Debtors' Chapter 11 cases, other than that of NSCI to reflect the joint administration of these Chapter 11 cases.

138.    The Debtors believe that joint administration will also significantly reduce the volume of documents that otherwise would be filed with the Clerk of this Court, render the completion of various administrative tasks less costly, and minimize the number of unnecessary delays.  Moreover, the Debtors believe that the relief requested by this motion will also simplify supervision of the administrative aspects of these cases by the Office of the United States Trustee.  For these reasons, the Debtors submit that the relief requested in this motion is in the best interests of the Debtors, their estates and their creditors and should therefore be approved.

**B.** **Motion for an Order Authorizing Debtors to File Consolidated List of Creditors**

139.    The Debtors seek an order for the authorization to file a consolidated list of creditors.

140.    The Debtors presently maintain various computerized lists of the names and addresses of their respective creditors that are entitled to receive the Notices and other documents in these Cases.  The Debtors believe that the information, as maintained in computer files (or those of their agents), may be consolidated and utilized efficiently to provide interested

parties with the Notices and other similar documents, as contemplated by Local Rule 1007-2.

Accordingly, by this Motion, the Debtors seek authority to file the lists on a consolidated basis,

identifying their creditors and equity security holders in the format or formats currently

maintained in the ordinary course of the Debtors' business.

141.    The Debtors further submit that a single consolidated list of their combined

unsecured creditors in these cases would be more reflective of the body of unsecured creditors

that have the greatest stake in these cases, as opposed to filing separate lists for each of the

Debtors.  The Debtors are aware that the general practice is to provide a consolidated list of the

twenty largest unsecured creditors to assist the Office of the United States Trustee in the

administration of the estates and to comply with the service requirements of Local Rule 2002-

1(b).  In these cases, however, the Debtors believe that there are few, if any, unsecured creditors.

142.    Therefore, the Debtors respectfully request authorization to file a single

consolidated list of their unsecured creditors in these cases.  For the foregoing reasons, the

Debtors submit that the relief requested in this motion is in the best interests of the Debtors, their

estates and their creditors and should therefore be approved.

**C.     Motion for an Interim and Final Order Pursuant to 11 U.S.C. §§ 105(a) and 345(b), and Fed. R. Bankr. P. 2015 (I) Authorizing and Approving, Pending the Hearing to be Scheduled to Consider Confirmation of the Debtors' Prep-Packaged Plan of Reorganization, (a) the Debtors' Continued Use of Their Existing Cash Management System, (b) the Debtors' Use of Pre-Petition Bank Accounts and Business Forms, (c) the Continuation of Ordinary Course Intercompany Transactions, and (ii) Waiving The Requirements of Section 345(b) With Respect to the Debtors' Cash Deposits Pending the Debtors' Opening of Debtor-in-Possession Accounts**

143.    The Debtors have filed a motion (the "<u>Cash Management Motion</u>") requesting

entry of an order (I) granting the following relief through the date of the Combined Hearing,

authorizing and approving (a) the continued use of their existing Cash Management System (as

hereinafter defined), (b)  the continued use of their existing bank accounts and business forms,

(c) authorizing the continuation of ordinary course intercompany transactions, and (II) authorizing their deposit practices and waiving the requirements of Section 345(b) in connection therewith pending the Debtors' opening of debtor-in-possession accounts at J.P. Morgan Chase Bank, an authorized depositary institution.  In connection with this requested relief, the Debtors also respectfully request the temporary waiver of certain of the operating guidelines established by the Office of the United States Trustee for the District of Delaware that require debtors to close all pre-petition bank accounts, open new accounts designated as debtor-in-possession accounts, and to provide new business forms and stationary.

144.    The Debtors currently maintain a cash management and disbursement system in the ordinary course of their operations (the "Cash Management System"), which is described in detail in a Exhibit A to the Cash Management Motion.  In summary, the Debtors' Cash Management System utilizes the bank accounts (the "Bank Accounts") identified in the Cash Management System, which are currently maintained at two federally-insured banking institutions: Citibank, NA ("Citibank") and Fairfield County Bank (together with Citibank, the "Banks").   The primary Citibank account is a money market savings account, which serves as the cash concentration account for the Debtors and their non-debtor affiliates.  The Fairfiled County Bank account is a checking account maintained by NSSC.  The non-debtor affiliates who participate in the Cash Management System also have their own checking accounts, the balances of which are periodically swept into a Citibank cash concentration account.

145.    Under the Cash Management System, cash collected from the investments of the subsidiaries of NSSC (such as payments from performing loans, proceeds of assets sales or redemptions and interest income on cash deposits) is concentrated in the Bank Accounts; and, disbursements are made from the Bank Accounts in the ordinary course of the Debtors'

operations (for administrative overhead, including rent and salaries) and to maintain and preserve the value of the portfolio of investments.

146.    The Debtors and non-Debtor affiliates maintain relationships with each other that are documented and accounted for in the following manner: (i) when funds are provided to the Master Fund's subsidiaries, it is recorded as an equity investment in a subsidiary, and when funds are paid up to the Master Funds, they are recorded as a return on investment; and (ii) when funds are paid, or obligations are incurred, to affiliates other than the Master Fund's subsidiaries, the transactions are recorded as intercompany receivables and payables in the ordinary course of business, (all as described in the Cash Management Motion).  At any given time there may be post petition intercompany claims owed by one Debtor to another Debtor or between a Debtor and a non-Debtor affiliate.

147.    The Debtors track all fund transfers in their accounting system and can ascertain, trace and account for all intercompany transactions, regardless of the manner in which they are characterized.  The Debtors propose to pay these amounts in the ordinary course of business and consistent with past business practices.

148.    To lessen the disruption caused by the bankruptcy filings while the Debtors seek confirmation of their Plan, and reduce the expenditures of resources associated with the changes required by an immediate transfer of the Debtors' existing banking and cash management systems, it is desirable for the Debtors temporarily to maintain their existing Cash Management System, including their existing Bank Accounts.

149.    The Banks are not parties to a Uniform Depository Agreement with the Office of the United States Trustee.  The Debtors are currently in the process of migrating their accounts to J.P. Morgan Chase Bank, which is a party to a Uniform Depository Agreement with the

Office of the United States Trustee. The Debtors' expect to complete the migration of their

accounts within approximately ten (10) business days after the Petition Date.

150.     The Debtors' Bank Accounts comprise an established element of their Cash

Management System that the Debtors need to maintain to ensure smooth collections and

disbursements in the ordinary course of their businesses. To avoid delays in paying debts

incurred post-petition, and to ensure as smooth a transition to Chapter 11 as possible, the

Debtors should be permitted to continue to maintain the existing bank accounts and, if necessary,

to open new accounts and close existing accounts in the normal course of business operations.

Otherwise, an immediate closure of existing accounts and transferring funds to new bank

accounts will be disruptive, time consuming and expensive.

     **D.**     **Application for Entry of Order Authorizing Debtors to Employ and Retain
Kurtzman Carson Consultants LLC as Notice, Claims and Solicitation Agent
*Nunc Pro Tunc* to the Petition Date**

151.     Although the office of the Clerk of the United States Bankruptcy Court for the

District of Delaware (the "Clerk's Office") ordinarily administers claims filed in Chapter 11

cases and serves notices on the creditors and other parties in interest, the Debtors believe that

KCC is in a position to provide these services more efficiently than the Clerk's Office due to

(i) KCC's pre-petition involvement with the Solicitation of acceptances of the Debtors' Plan,

(ii) KCC's work in assisting the Debtors in preparing their Schedules, (iii) the number of

creditors and parties in interest who are located outside the United States and, therefore, require

individualized notices, and (iii) the tight timelines that are contemplated for a timely hearing to

consider confirmation of the Plan.

152.     The Debtors believe that the most effective and efficient manner of providing

notice to creditors and parties in interest is for the Debtors to engage an independent third party

to act as the Debtors' claims and noticing agent. KCC specializes in noticing, claims processing,

balloting, and other administrative tasks in chapter 11 cases, and is frequently used in Chapter 11

cases.  The Debtors chose KCC based on both its experience and the competitiveness of its fees.

The Debtors believe that KCC is well qualified to serve as Agent in these cases and their

employment will provide the Debtors with efficient management of the claims, noticing and

balloting processes in these cases leaving the Debtors' management and professionals to focus

on the Debtors' reorganization efforts.

> **E.** **Motion for an Order (I) Scheduling Combined Hearing on Adequacy of Disclosure Statement and Prepetition Solicitation Procedures and Confirmation of Plan, (II) Establishing Procedures for Objecting to Disclosure Statement, Solicitation Procedures, and Plan, (III) Approving Form, Manner, and Sufficiency of Notice of Combined Hearing, (IV) Establishing Bar Dates for the Filing of Proofs of Claim or Interests, and (V) Granting Related Relief**

153.   By this Motion, the Debtors request entry of an order (the "Scheduling Order")

(a) scheduling a hearing (the "Combined Hearing") as soon as practicable between the dates of

April 21, 2011 and May 3, 2011 to consider approval of the adequacy of the Disclosure

Statement, confirmation of the Plan, and the adequacy of the solicitation procedures utilized in

connection with the prepetition solicitation of votes to accept or reject the Plan (the "Solicitation

Procedures"), (b) establishing procedures for objecting to the Disclosure Statement, the Plan,

and the Solicitation Procedures, and (c) approving the form, manner, and sufficiency of notice of

the Combined Hearing.

> *(a)* *Deadline and Procedures for Objections to Adequacy of the Disclosure Statement and/or Confirmation*

154.   The Debtors require at least two (2) days following entry of an order approving

this Motion for the service of notice of the Combined Hearing.  As already stated, the Debtors

propose that the Combined Hearing be set as soon as practicable between the dates of April 21,

2011 and May 3, 2011.  In order to meet the timeline in the Plan Support Agreement and the

post-petition financing, the hearing to consider confirmation must take place not later than May

12, 2011.  Accordingly, the Debtors respectfully request that the Court schedule the Combined Hearing for a date convenient to the Court between April 21 and May 3, 2011, while setting the deadline to file objections to the adequacy of the Disclosure Statement, the Solicitation Procedures, or confirmation of the Plan for a date that is seven (7) days prior to the Combined Hearing (the "Objection Deadline").  The exigencies of these chapter 11 cases require the expeditious effectuation of the Plan.  Moreover, the effect of shortening time is minimal, if any, as all creditors entitled to vote have had notice of the Plan and Disclosure Statement since January 24, 2011 and such holders belong to a class of creditors that has already voted to accept the Plan.

155.    The Debtors also request that the Court direct that any objections filed with respect to the Disclosure Statement, the Solicitation Procedures and/or the Plan must (a) be in writing, (b) state the name and address of the objecting party and the nature and amount of the claim against or interest in the Debtors asserted by such party, (c) state with particularity the legal and factual basis for such objection, and (d) be filed with the Bankruptcy Court no later than 4:00 p.m. Prevailing Eastern Time on the Objection Deadline and served so as to be received no later than the Objection Deadline by (i) the Office of the United States Trustee and certain parties, on whom notices are required to be served pursuant to §15.11 of the Plan.

### (b)    *Establishing Bar Dates for the Filing of Claims*

156.    In order for the Debtors to prepare for the hearing to consider confirmation of the Plan, establish appropriate reserves and make distributions under a confirmed Plan, the Debtors must obtain complete and accurate information regarding the nature, validity, and amount of all claims that will be asserted.  Consequently, the Debtors respectfully request that, pursuant to Bankruptcy Rule 3003(c)(3) and Local Rule 2002-1(e), the Court fix a bar date for the filing of

proofs of claim or interests and approve the form and manner of notice thereof.

      **F.**      **Motion for an Interim Order (I) Approving Debtor-in-Possession Financing Pursuant to 11 U.S.C. §§ 105(A), 362, and 364 and Fed. Bankr. P. 2002, 4001 and 9014 and Local Bankruptcy Rule 4001-2; (II) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. Sections 105, 361, 362 and 363 of the Bankruptcy Code; (III) Granting Adequate Protection and Superpriority Administrative Claims; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief**

157.    To provide the liquidity necessary to preserve the value of the Debtors' assets, the Debtors have contemporaneously herewith filed a motion (the "<u>DIP Motion</u>")[28], for entry of a proposed interim order (the "<u>Interim Order</u>") and a final order (the "<u>Final Order</u>") that, if granted, will among other things:  (a) authorize NSI to obtain post-petition interim financing up to the aggregate principal amount of not more than $8,000,000, on the terms and conditions set forth in the Senior Secured, Super-Priority Debtor in Possession Credit Agreement, (the "<u>DIP Credit Agreement</u>") and other related documents (collectively, with the DIP Credit Agreement, the "<u>DIP Documents</u>"); (b) authorize the Debtors to enter into and perform all acts, requirements and obligations set forth in or in connection with the DIP Documents; (c) authorize, pursuant to sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code, the Debtors to grant senior, first-priority, fully-perfected liens to the collateral agent, for the benefit of the DIP lenders, upon certain of the Debtors' assets; (d) authorize, pursuant to section 364(c)(1) of the Bankruptcy Code, the Debtors to grant claims to the collateral agent, for the benefit of the DIP lenders, and to the DIP Lenders, with priority over all administrative expenses, diminution claims and all other claims against the Debtors; (e) grant an interim hearing on the Motion be held before this Court to consider entry of the Interim Order; and (f) schedule a final hearing to consider entry of the Final Order authorizing and approving, on a final basis all of the relief requested in the

---

[28]    Capitalized terms not defined in this subsection of the Buenzow Affidavit shall have the meanings ascribed thereto in the DIP Motion.

Motion and DIP Documents, including authorizing NSI to obtain post-petition financing up to the aggregate principal amount of not more than $56,825,000.

158. Approval of the DIP Motion will provide the Debtors with immediate and ongoing access to borrowing availability, which will be used for the sole purpose of supporting and maintaining the NSI Insurance Portfolio pending a closing of the Insurance Portfolio Sale to the Purchaser. The inability to make such payments upon the NSI Insurance Portfolio would result in immediate and irreparable harm to the Debtors' businesses through the termination of the Insurance Portfolio, resulting in the life insurance policies having little or no remaining value. The DIP financing is necessary to preserve and enhance the value of the Debtors' estates for the benefit of all creditors. Accordingly, the timely approval of the relief requested in the DIP Motion is imperative.

159. Furthermore, the terms of the DIP Facility are very favorable to the Debtors. If the sale to the Purchaser is consummated, an amount equal to s the principal outstanding amounts under the DIP Facility and all outstanding amounts under the Bridge Loan will be added by the Purchaser to the purchase price set forth in the Purchase Agreement for the NSI Insurance Portfolio and paid in cash by the Purchaser on the effective date of the Plan, with NSI immediately using such purchase price proceeds received from the Purchaser to repay the DIP Facility and Bridge Loan (except for interest, fees and expenses relating to the DIP Facility which will be paid from other funds by NSI). This is a critical component to the terms of the DIP Facility.

## IX.    Conclusion

160.    For all of the reasons set forth herein, I respectfully request that the Court grant each of the First Day Motions.

Dated: Wilmington, Delaware
       March 14, 2011

_Michael Buenzow_
Michael Buenzow