# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: <br><br> NEW STREAM SECURED CAPITAL, INC., *et al.*,[1] <br><br> Debtors. | Chapter 11 <br><br> Case No. 11-10753 (MFW) <br> (Jointly Administered) <br><br> Objection Deadline: April 1, 2011 at 4:00 p.m. <br> Hearing Date: April 8, 2011 at 9:30 a.m. |

## DEBTORS' MOTION FOR AN ORDER (I) APPROVING BID INCENTIVES, INCLUDING BREAK-UP FEE, AND (II) GRANTING RELATED RELIEF

New Stream Secured Capital, Inc. ("NSCI"), New Stream Insurance, LLC ("NSI"), New Stream Capital, LLC ("NSC") and New Stream Secured Capital, L.P. ("NSSC" and, together with NSCI, NSI and NSC, the "Debtors"), hereby move (the "Motion") the Court for entry of an order pursuant to sections 105(a), 363, 365 and 503(b) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule 6004-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules"):

(i) approving certain bid incentives for the Purchaser (defined below) in connection with the Debtors' Insurance Portfolio Sale (defined below), and (ii) granting such other and further relief as may be just and proper under the circumstances. In support of the Motion, the Debtors rely upon and incorporate by reference the Declaration of Michael Buenzow, (the "First-Day

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: New Stream Secured Capital, Inc. (3903), New Stream Insurance, LLC (6966), New Stream Capital, LLC (0364) and New Stream Secured Capital, L.P. (2948). The corporate address of the Debtors is 38C Grove Street, Ridgefield, CT 06877.

Declaration"; D.I. 6)[2], filed with the Court concurrently herewith. In further support of the Motion, the Debtors, by and through their undersigned counsel, respectfully represent as follows:

## JURISDICTION, VENUE AND STATUTORY PREDICATES

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory bases for the relief requested herein are sections 105(a), 363, 365 and 503(b) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007 and 9014, and Local Rule 6004-1.

## RELIEF REQUESTED

3. By this Motion, the Debtors request that the Court approve certain bid protections, including a break-up fee, for the purchaser (Limited Life Assets Master Limited and Limited Life Assets Holdings Limited, collectively, the "Purchaser") of the Debtors' life settlement insurance and premium finance loan portfolio (the "Insurance Portfolio") pursuant to Bankruptcy Code 503(b) and 105(a), pending the Combined Hearing, as actual, necessary costs and expenses of preserving the estate. The Purchaser, along with its affiliates, have extended nearly $42 million of pre-petition bridge financing ("Bridge Financing") and plan to extend an additional $15 million of debtor-in-possession financing ("DIP Financing") in order to service the premium payments for the Debtors' Insurance Portfolio.[3] Without the nearly $57 million in ongoing

---

[2] Any capitalized term utilized in this Motion that is not defined herein, shall have the meaning ascribed to such term in the First Day Declaration.

[3] For a variety of structural and logistical funding reasons, the entities that provide the Bridge Financing and DIP Financing are not the same legal entities that will be the acquisition vehicles for the Insurance Portfolio. However, all of these entities are controlled or managed by MIO Partners, Inc., a Delaware corporation, solely in its capacity as general partner, adviser, managing member, investment manager or manager, as was contemplated in the

Continued on following page

financial support from the Purchaser, the insurance policies in the Debtors' Insurance Portfolio would lapse due to non-payment of premiums and the value of the Insurance Portfolio would swiftly erode to the significant detriment of the Debtors' estates and their creditors.

4. As more fully described below, pre-petition, the Debtors solicited and considered several bids for their Insurance Portfolio. As part of the auction process, the Debtors also specifically sought a purchaser willing to finance the Insurance Portfolio premiums through a reorganization process that would culminate in the transactions that are embodied in the Plan. The Purchaser not only provided the initial Bridge Financing, but also increased the amounts available from $25 million to nearly $42 million as the pre-petition restructuring process was delayed longer than expected. No other offer for these assets provided comparably favorable terms.

5. The Purchaser accommodated the Debtors' need for Bridge Financing as well as DIP Financing in the expectation that it would be the purchaser of the Insurance Portfolio. The Bridge and DIP Financing amounts are designed to be "price-neutral" and to be contributed to the ultimate purchase price of the Debtors' Insurance Portfolio – effectively raising the purchase price from $127.5 million to $184.5 million. The break-up fee is calculated at 3% of the <u>base</u> purchase price of 127.5 million, which constitutes 2% of the $184.5 million of the effective purchase price. In the event that this Court mandates an auction for the Insurance Portfolio and/or approves the sale of the Insurance Portfolio to another party, the Debtors strongly believe that the Purchaser should be compensated for its time, effort and, most importantly, the commitment of nearly $57 million of financing that has preserved over the past year, and will

---

Continued from previous page
MIO Purchaser Term Sheet (as defined below). For ease of reference, each of these entities, individually and collectively, shall be referred to in the Motion as "<u>Purchaser</u>".

continue to preserve, the value of the Debtors' Insurance Portfolio during this bankruptcy reorganization.

6.  Given the lack of meaningful financing options available to the Debtors throughout the restructuring process, the Debtors and the Purchaser believe that the extensive value contributed by the Purchaser and its affiliates to the preservation of these estates in the form of time, effort, the Bridge Financing and DIP Financing, were both actual and necessary. Consequently, the Asset Purchase Agreement ("Purchase Agreement"), by and between NSI, as seller, and the Purchaser, as purchaser, dated March 11, 2011 (annexed hereto as Exhibit 1) contemplates that this Motion will be filed and considered prior to any hearing to consider confirmation of the Plan. Furthermore, the Senior Secured, Super-Priority Debtor-In-Possession Credit Agreement dated March ___, 2011 among New Stream Insurance, LLC, as borrower, the Lenders party thereto, MIO Partners, Inc., as administrative agent, and MIO Partners, Inc. as collateral agent (the "DIP Agreement")[4] shall terminate if the order approving this Motion is not entered by April 18, 2011. Accordingly, the Debtors respectfully request entry of an order in the form annexed hereto as Exhibit 2, granting the Motion.

## BACKGROUND

7.  The Debtors are an inter-related group of companies that collectively comprise an investment fund, headquartered in Ridgefield, Connecticut. Until very recently, the Debtors had been focused on investments that provided funding solutions for complex transactions in a wide range of industries.

---

[4] The DIP Agreement is annexed to the motion seeking approval of the DIP Financing and other related relief filed previously with this Court.

8. On March 13, 2011 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession under sections 1107 and 1108 of the Bankruptcy Code. The factual background regarding the Debtors, including their business operations, their capital and debt structure, and the events leading to the filing of these chapter 11 cases, is set forth in detail in the First-Day Declaration.

9. On the Petition Date, the Debtors filed with the Court, among other things, the Debtors' Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code, dated January 24, 2011 (the "Plan"; D.I. 3), and the associated Disclosure Statement (D.I. 4).

10. The Plan is a "prepackaged" plan of reorganization that has been accepted by three impaired classes of creditors eligible to vote on the Plan.[5] The Plan, which was negotiated over several months with the involvement of representatives from each of its three major investor constituencies, is the culmination of restructuring efforts that the Debtors initiated during the first quarter of 2009.

11. The Plan[6] provides, among other things, for the sale (the "Insurance Portfolio Sale") of the Insurance Portfolio, owned by NSI, pursuant to the Purchase Agreement. The

---

[5] While the Debtors did classify and solicit four impaired classes of creditors, there were no voting creditors in one of those classes, which is comprised of unsecured creditors of NSC. The Debtors anticipate that there may not be any creditors with allowable claims in this class and therefore, its non-acceptance would not be an impediment to confirmation.

[6] On March 14, 2011, the Debtors filed their Motion for Entry of an Order Under Sections 105, 1126(b), and 1128 of title 11 of the United States Code, Rules 2002, 3017, 3018, 3020, and 9006(c) of the Federal Rules of Bankruptcy Procedure and Rules 3017-1 of the Local Bankruptcy Rules for the District of Delaware (a) scheduling a combined hearing to consider approval of the adequacy of the Disclosure Statement, confirmation of the Plan and adequacy of the solicitation procedures utilized in connection with the prepetition solicitation of votes to accept or reject the Plan, (b) establishing procedures for objecting to the Disclosure Statement, the Plan, and the Solicitation Procedures, (c) establishing bar dates for the filing of proofs of claim or interests.(d) approving the form, manner, and sufficiency of notice of the Combined Hearing and the Bar Dates, and (e) granting related relief (D.I. 10).

proceeds of the Insurance Portfolio Sale will provide the bulk of the cash needed to fund payments contemplated by the Plan, along with other cash and assets held by the other Debtors.[7]

The Marketing and Auction Process

12. As described in the First Day Declaration, events in the financial markets during the last four months of 2008 compelled the Debtors to develop a process to liquidate investments over a period of time that would maximize their value.[8] This process began with the solicitation of Investors and the adoption of a restructuring plan in May 2009, but continued during the following months despite the legal challenges to the restructuring.[9]

13. On May 3, 2010, NSI engaged Guggenheim Securities, L.L.C. ("Guggenheim"), an independent investment bank which is the market leader in the life settlement market, to help the Debtors explore financing opportunities for NSI's Insurance Portfolio.

14. By late May, 2010, Guggenheim was prepared to go to the market to obtain a five year $200 million credit facility designed to maintain the Insurance Portfolio. However, when the Bermuda Judgment was issued on June 8, 2010, Guggenheim advised NSSC that it was necessary to suspend solicitation for the financing until such time as it became clear that any prospective lender would be able to obtain a first priority security interest in NSI's Insurance Portfolio.[10]

---

[7] The Plan provides for distributions of both cash and other assets to certain classes of creditors. A more detailed summary of the Plan is contained in the First Day Declaration, which is incorporated by reference herein.

[8] *See*, First Day Declaration ¶¶ 37 – 49.

[9] *See*, First Day Declaration ¶¶ 54 – 72. *Also see*, Disclosure Statement at 51 – 55.

[10] All of the Debtors' credit documents in effect at such time permitted the Debtors to obtain "Senior Indebtedness" from a "commercial lender." Hence, financing from a source other than from a "commercial lender" was not permitted under the Debtors' credit documents.

15. Following the Bermuda Judgment and the appointment of the Receivers, the Debtors entered into negotiations with the Receivers. While these discussions were ongoing, there was disagreement concerning the use of the cash proceeds generated by NSSC's other investment portfolios to pay the premiums needed to preserve the NSI Insurance Portfolio. Specifically, the Joint NSSC Receivers on behalf of the NSSC Bermuda Lenders objected to any use of NSSC's cash to pay insurance premiums for the Insurance Portfolio since the NSI Secured Lenders had a structurally superior position. Meanwhile, the Bermuda Judgment made it impossible for the Debtors to obtain financing for the insurance premiums from a lender on commercially reasonable terms.

16. Without financing from either NSSC or a third-party, NSI was unable to pay current premiums in full and as a result it made only *de minimis* payments causing the policies in the portfolio to fall into the "grace period" prior to which the policies would lapse for non-payment of premiums. If premiums were not paid during the grace period, the policies would be terminated by the insurer for non-payment of premiums.

17. During this time the Debtors were also engaged in discussions with the Bermuda Fund Receivers about the possibility of providing financing for the payment of premiums for the NSI Insurance Portfolio. Over the course of the month of June and into July numerous attempts were made at obtaining approval from Bermuda Classes C, F and I (the "NSI Bermuda Lenders") to permit Guggenheim to proceed with the offering, but no agreement could be reached.

18. While Guggenheim was exploring the market, the Debtors, with Guggenheim's assistance, also began discussions with some investors in the US Fund and Cayman Funds to explore their interest in making an offer to purchase the NSI Insurance Portfolio (toward the goal of preserving its future value got investors who were structurally subordinate to the NSI Lenders

and the NSSC Bermuda Lenders). Eventually, these discussions coalesced around MIO Partners, Inc. ("MIO") an affiliate of several investors in the US Fund and the Cayman Funds.[11]

19. On July 20, 2010, a meeting was held among the Debtors, the Bermuda Fund Receivers and representatives of the Bermuda Fund Investors, at which a decision was reached to cease efforts to obtaining financing and instead to explore an outright sale of the NSI life settlements.

20. Thereafter, the Debtors, with the encouragement and consent of the Bermuda Fund Receivers, instructed Guggenheim to solicit additional offers for the purchase of the Insurance Portfolio in order to prevent the termination of the Insurance Portfolio.

21. Guggenheim then contacted several parties to seek additional bids and it received expressions of interest from five interested parties. As Guggenheim engaged in discussions with these parties, it became clear that only three of the five had both serious interest and the ability to make binding offers to purchase the Insurance Portfolio. In fact, the three interested parties began making uncommitted offers and continued to negotiate the purchase price with Guggenheim and the Debtors.

22. These efforts to sell or finance the portfolio were conducted under the looming specter of the expiring grace periods and the Debtors' illiquidity. As policies reached the end of their grace periods for payment of premiums, they would lapse and critically diminish the sale value of the portfolio. Between July 23, 2010 and July 28, 2010, Guggenheim worked with each of the parties who had expressed interest in or made offers for the Insurance Portfolio, including MIO. Because there were substantial differences among the various bids, Guggenheim and the

---

[11] MIO is a manager of several investment and retirement funds that hold investments in either the US Fund or the Cayman Fund.

Debtors developed a standard set of terms, which Guggenheim presented to each of the interested parties on July 27, 2010, together with a notice of a bid deadline of 3:00 PM EST on July 28, 2010, for bidders to introduce, refine or improve their offers. The notice made clear that the Debtors would welcome offers on any terms, but that they would ideally like to see certain features in any offer, including bridge financing with a commitment to close by July 30, 2010. The ability of any purchaser to swiftly provide such bridge financing to salvage the value of the Insurance Portfolio was one of the most critical factors considered by the Debtors.

23. Three parties delivered bids to Guggenheim prior to the deadline. Guggenheim and Debtors' special counsel, O'Melveny & Myers LLP, reviewed each bid and provided the Debtor with an evaluation based on (a) an assessment of the assurance of closing the transaction, (b) total economics including the size of the cash component of any offer, (c) the ability to service the premiums associated with the Insurance Portfolio in connection with each bid and (d) any other features proposed.

The Winning Bid

24. On July 29, 2010, the evaluation process concluded with Guggenheim recommending the acceptance of the offer made by MIO, on behalf of the Purchaser, to purchase the entire portfolio for a cash payment of $127.5 million.[12] After reviewing the bids and discussing them with Guggenheim and legal counsel, the Debtors concluded that the MIO offer was the highest and best offer. Thereafter, NSI and MIO, on behalf of the Purchaser, as MIO's designee, entered into a binding term sheet agreement ("MIO Purchaser Term Sheet") on July

---

[12] The Purchaser has advised the Debtors that it subsequently entered into an agreement with an unrelated entity that had been an unsuccessful participant in the auction. The Debtors understand that this post-auction arrangement grants the unrelated entity an option, exercisable after the closing of the Insurance Portfolio Sale, to acquire up to 50% of the equity interests of the Purchaser for a *pro rata* share of the acquisition cost (including the Purchase Price, all amounts loaned under the Bridge Note and DIP Facility, and the transaction costs and fees incurred).

29, 2010 setting forth the terms and conditions of the sale, which was then shared with the Receivers.

25. As of the date of the MIO Purchaser Term Sheet, the terms of the Insurance Portfolio Sale provided for:

(i) A purchase price of $127,500,000 payable in cash at closing;

(ii) No additional due diligence required[13];

(iii) Bridge financing of up to $25,000,000, the proceeds of which were to be used to pay the premiums of the Insurance Portfolio;[14]

(iv) The financing would be provided on a "purchase price neutral" basis (*i.e.*, repayment would be forgiven and the amount outstanding added to the purchase price provided that MIO or its nominee was the ultimate purchaser);

(v) As soon as possible after the execution of the MIO Purchaser Term Sheet, the parties would enter into definitive documentation with a closing to occur no later than September 30, 2010;

(vi) The sale was conditioned upon either (i) consent of 100% of the investors or (ii) a bankruptcy court order authorizing a sale free and clear of all Claims and Interests through a bankruptcy process;

(vii) If the NSI Insurance Portfolio is sold to an alternative bidder, MIO or its nominee (*i.e.*, the Purchaser) would be entitled to a break-up fee equal to 3% of the base purchase price of $127.5 million and expense reimbursement of up to $500,000; and

(viii) MIO or its nominee (*i.e.*, the Purchaser) would offer additional incentives to the US/Cayman investors in order to induce them to support the sale.

The Asset Purchase Agreement

26. Following the execution of the MIO Purchaser Term Sheet, the parties began negotiating and drafting definitive documentation for the Insurance Portfolio Sale. The final,

---

[13] MIO's bid was the only bid that was not subject to additional due diligence.

[14] Pursuant to the NSSC Collateral Agency Agreement and the related Consent and Subordination Agreement, dated November 8, 2010, the Bridge Financing is secured by a first priority perfected lien on a portion of the Insurance Portfolio, senior to the liens and security interests of any other party or creditor.

agreed upon terms of the Sale to the Purchaser are now set forth in the Purchase Agreement, substantially in the form attached to the Plan, and as Exhibit 1 to this Motion.

27. The provisions of the Purchase Agreement are substantially the same as those set forth in the MIO Purchaser Term Sheet. There are however, certain modifications that were negotiated during the documentation of the transaction.

28. Pursuant to the MIO Purchaser Term Sheet, the parties had anticipated a closing on or prior to September 30, 2010. Since the parties were unable to satisfy the conditions to close before such date, the Purchaser has agreed to (i) extend the timeline for closing, (ii) increase the principal amount of the "price neutral" bridge financing from $25 million to $39,480,268.58[15], and (iii) offer post-petition financing under a "price neutral" DIP Financing, provided, however, that all interest, fees and expenses under the DIP Financing would not be "price neutral" and would be fully payable in cash upon termination of the DIP Financing (anticipated to be not more than approximately $1.0 million). In return, the Debtors agreed that any death benefits received by the Debtors on or after October 1, 2010 would be held in escrow for the benefit of the Purchaser upon the closing of the sale (the "Escrowed Benefits").

---

[15] The total amounts due under the Bridge Financing, given the delays in restructuring prior to the Petition Date, now total approximately $41,825,000. On December 21, 2010, the Note Lenders sent NSI a Notice of Event of Default and Reservation of Rights Letter (the "Default Letter") (i) indicating that an "Event of Default" (as defined in the Bridge Note) had occurred as of December 20, 2010, (ii) stating that all "Obligations" (as defined in the Bridge Note) had become due and payable as of such date and (iii) reserving all rights, powers, privileges and remedies accruing to the Note Lenders under the Bridge Note and the related loan and security documents evidencing the Bridge Loan. The default under the Bridge Loan continues unremedied as of the date hereof. Although the Note Lenders have neither enforced their rights nor taken any action as a consequence of the default, any actions or non-actions of the Note Lenders does not constitute, and should not be construed as, a waiver of the default or any acquiescence thereto. As the Bridge Financing is in default, the Debtors sought the permission of the Note Lenders to use the Escrowed Benefits to pay the premiums relating to the NSI Insurance Portfolio. Subject to the reservation of rights set forth in the Default Letter and the obligations of NSI under the Bridge Note and related loan and security documents, the Note Lenders approved the use of up to $1,815,184.30 from the Escrowed Benefits solely to pay the premiums relating to the NSI Insurance Portfolio in the amounts and pursuant to a schedule agreed to by the Purchaser and NSI.

29. It is important to highlight the critical value of the financing being provided through the Purchaser in connection with the Insurance Portfolio Sale. The Note Lenders have loaned the Debtors approximately $41,850,000 prior to the Petition Date and have committed to fund up to an additional $56,825,000 during the pendency of these Chapter 11 Cases. So long as the Insurance Portfolio is sold to the Purchaser, this approximately $57,000,000 of financing will effectively be added to the purchase price and will not need to be repaid by the Debtors (except for interest, fees and expenses relating to the DIP Facility, which will need to be repaid in cash). The Purchaser's break-up fee is calculated only on the base purchase price of $127,500,000, not the effective actual purchase price of $184,500,000 that includes the Bridge and DIP Financing amounts.

Purchaser Protections

30. Article VII of the Purchase Agreement, respecting "Bankruptcy Matters," details the undertakings promised by the Debtors in connection with these Chapter 11 cases. These undertakings include, but are not limited to, the following:

- The filing of this Motion and other bankruptcy pleadings and the taking of actions in accordance with the bankruptcy timeline and milestone dates attached to the Purchase Agreement;

- Taking no action, directly or indirectly, to promote, cause or authorize any competing transaction, except as may be required by the Court or as provided for under the Purchase Agreement;

- In the event that the Purchase Agreement terminates, pursuant to the provisions of Section 6.01(b) thereof or if the Purchaser is not the successful bidder to purchase the insurance portfolio assets at an auction mandated by this Court, the Purchaser

shall be entitled to a termination fee in the amount of 3% of the purchase price of $127,500,000.00 and actual out-of-pocket expenses of up to $500,000 (the "Break-Up Fee").[16]

31. The Debtors believe that these provisions are not objectionable and have agreed to them, as well as other protections for the Purchaser, in the Purchase Agreement. Further, the approval of the protections afforded to the Purchaser under the Purchaser Agreement is a condition to the Purchaser's obligations thereunder and under the DIP Agreement.

## BASIS FOR RELIEF REQUESTED

32. The Third Circuit has stated that "in considering requests for break-up fees, we would apply the general standard used for all administrative expenses-'the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate.'" *In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) (citing *Calpine Carp. v. O'Brien Env't Energy, Inc. (In re O'Brien Env't Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999)). Here, there can be no doubt that the Bridge Financing and DIP Financing provided by the Purchaser were actual and necessary costs of preserving the value of the Debtors' Insurance Portfolio, a key asset of their estates. In order to merely to maintain its value, the Insurance Portfolio requires ongoing payments to service premiums of $5 million per month. The Purchaser provided the financing for these costs on the basis that it would be the ultimate purchaser of these assets. More critically, this financing would not have been provided if the Break-Up Fee was not agreed to in the MIO Purchaser Term Sheet and Purchase Agreement. Without the Purchaser's financings,

---

[16] The protections afforded the Purchaser in the Purchase Agreement are in no way limited to the undertakings described in this Motion, which have been edited for the sake of clarity.

the Debtors would have forfeited a significant portion of the value of the Insurance Portfolio, the sale of which provides the bulk of the recoveries to creditors in these cases. There is no clearer case of a Break-Up fee being an actual and necessary cost to an estate in order to induce a potential purchaser's bid.

33. As described above, prior to the Petition Date, the Debtors conducted an extensive marketing/sales campaign for the subject assets which spanned several months and resulted in highly competitive auction for the Insurance Portfolio. In order to encourage the bidders not to hold back on their highest and best bids waiting for a further "bite at the apple", the Debtors determined that it was necessary to provide bidders with certain bid incentives. No other potential bidders have been "chilled" and the Purchaser has not been unfairly advantaged by the proposed Break-Up Fee because all potential bidders had an equal opportunity to seek the same protections during the Debtors pre-petition auction process. *See Reliant*, 594 F.3d at 206 (stating that it is permissible to offer a break-up fee and reimbursement for expenses to induce an initial bid, provided the allowance of the fee does not give an advantage to a favored purchaser over other bidders by increasing the cost of acquisition).

34. There are a number of other factors concerning the Break-Up Fee that make it better than typical break-up fees in Chapter 11 cases and that provide additional support for its approval under the present circumstances.

35. *First*, the Break-Up Fee is lower than the typical break-up fees awarded in chapter 11 cases. It is two percent (2%) of the purchase price under the Purchase Agreement when factoring in the "price-neutral" Bridge and DIP Financing amounts that maintained the value of the Debtors' assets over this past year. *See, e.g., In re Maxide Acquisition, Inc.*, No. 05-10429 (MFW) (Bankr. D. Del. Mar. 15, 2005) (break-up fee equal of 3% approved); *In re Ameriserve*

*Food Distrib, Inc.*, No. 00-00358 (PJW) (Bankr. D. Del. June 15, 2000) (break-up fee of 3.6% approved).

36. *Second*, the Break-Up Fee provision in the Purchase Agreements was offered not only to the Purchaser but to all other bidders invited to participate in the biddings pursuant to an arms-length open bidding process. Thus, all bidders had the same opportunity as the Purchaser to get the benefit of a break-up fee by submitting the highest and best bid. Accordingly, the Break-Up Fee provision in the Purchase Agreement has not disadvantaged any bidder nor did it "chill" the bidding process in any way.

37. *Third*, since the Debtors have already conducted a comprehensive pre-bankruptcy auction process spanning several months and, since the Debtors are not seeking any further auction of the Insurance Portfolio in the Chapter 11 Cases, the Debtors believe it is unlikely that the Break-Up Fee will ever come into play; however, it was and is a critical inducement to the Purchaser to consummate the acquisition of the Insurance Portfolio.

38. *Fourth*, the NSSC Bermuda Lenders – who, since their secured claim is significantly undersecured, will effectively be the party paying any Break-Up Fee because it will be payable out of the sale proceeds of any Competing Transaction – have consented to the terms of the Break-Up Fee. This obligation to pay the Break-Up Fee, if necessary, is recognized in the Plan Support Agreement to which the Receivers are signatories. The Receivers have also consented to other purchaser protections embodied in the Purchase Agreement.

39. In addition to the Break-Up Fee, the Purchase Agreement provides that:

- The Debtors shall file this Motion and other bankruptcy pleadings and take actions in accordance with the bankruptcy timeline and milestone dates attached to the Purchase Agreement;[17]

- The Debtors shall take no action, directly or indirectly, to promote, cause or authorize any competing transaction, except as may be required by the Court or as provided for under the Purchase Agreement;[18]

Without these protections and the Break-Up Fee, the Purchaser would not have entered into the Purchase Agreement. *See Reliant,* 94 F.3d at 206 ("We also indicated that a break-up fee is not 'necessary to preserve the value of the estate' when the bidder would have bid even without the break-up fee."). These protections are intended to (i) expedite the Insurance Portfolio Sale to release monies into the Debtors estates for the benefit of their creditors and (ii) relieve the Debtors' estates of the burden of the ongoing maintenance of the Insurance Portfolio premiums.

40. To be clear, first, the Insurance Portfolio requires a monthly influx of $5 million merely to maintain its value. Second, the closing of the Insurance Portfolio Sale and the Petition Date have been delayed several times from early fall of 2010 to spring of this year. Third, each delay represents not only an increase in the Bridge Financing and DIP Financing provided by the Purchaser, but also an <u>increase</u> to the purchaser price for the Insurance Portfolio because the

---

[17] Section 7.01(d) of the Purchase Agreement requires that the Debtor file this "Purchaser Protection Approval Motion" and seek approval of all provisions of Article VII of the Purchase Agreement, the terms of the Bankruptcy Timeline appended to the Purchase Agreement as Schedule 2 thereof, and Article VI of the Purchase Agreement ("Termination").

[18] Section 7.01(j) of the Purchase Agreement provides a limited "no-solicitation" provision, while allowing the Debtors a fiduciary "out" (*i.e.*, "except as Debtors may reasonably determine in good faith to be otherwise required in connection with applicable fiduciary duties after consultation with counsel") and a Bankruptcy Court "out" (*i.e.*, "except as otherwise required by the Bankruptcy Court").

Bridge Financing and DIP Financing are "price neutral" ; i.e., they preserve the value of the Insurance Portfolio without decreasing the net purchase price available to the estates and their creditors. For these reasons, the Purchaser has requested reasonable milestone timeline dates and exclusivity protection so that it will not be in a position of financing a portfolio acquisition and premium payments during a protracted litigation battle while simultaneously increasing its purchase price. It is also for this reason that the DIP Agreement provides that the DIP Financing will terminate if the relief requested in this Motion is not approved by April 18.

41. Furthermore, the Debtors are not aware of any requirement under the Bankruptcy Code or otherwise that requires the Debtors, where, as here, the Insurance Portfolio Sale is occurring pursuant to a confirmed Plan which has been accepted by the impaired creditor classes, to subject that sale to yet a further auction process in their Chapter 11 Cases. Rather, in connection with a proposed sale of estate property pursuant to a confirmed plan, the Debtors are required to comply with the confirmation requirements of section 1129 of the Bankruptcy Code and their fiduciary duties to maximize the value of the property. *See, e.g., In re Reliant Energy Channelview LP*, 594 F.3d 200, 210 (3rd Cir. 2010)("debtors-in-possession have a fiduciary duty to maximize the value of the estate"). The Debtors in their sound business judgment believe, and the overwhelming majority of their creditors clearly agree, that they have satisfied their fiduciary duties in accepting the bid of the Purchaser for the Insurance Portfolio and in seeking approval of the sale of same to the Purchaser pursuant to the "pre-packaged" Plan. Thus, the Debtors submit that the limited "no-solicitation" provision in section 7.01(j) of the Purchase Agreement should be approved as it does not in any way conflict with Debtors' fiduciary duties.

42. For the reasons set forth, the Debtors submit that the purchaser protections, including the Break-Up Fee, are actual and necessary costs of preserving the Debtors' estates and should be approved.

## NOTICE

43. The Debtors will serve notice of this Motion including all exhibits hereto upon: (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to MIO; (iii) counsel to John McKenna, as receiver; (iv) counsel to Michael Morrison and Charles Thresh, as joint receivers; and (v) all parties that have requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

## NO PREVIOUS APPLICATION

44. No previous application for the relief sought herein has been made to this or any other Court in connection with the Chapter 11 Cases.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

WHEREFORE, the Debtors respectfully request that the Court enter the Order, substantially in the form attached hereto as Exhibit 2, granting the relief requested herein and such other and further relief as may be just and proper under the circumstances.

Dated: March 17, 2011
      Wilmington, Delaware

Respectfully submitted,

**REED SMITH LLP**

By: /s/ Kurt F. Gwynne
    Kurt F. Gwynne (No. 3951)
    J. Cory Falgowski, (No. 4546)
    1201 Market Street, Suite 1500
    Wilmington, DE 19801
    Telephone: (302) 778-7500
    Facsimile: (302) 778-7575
    E-mail: kgwynne@reedsmith.com
            jfalgowski@reedsmith.com

- and -

Michael J. Venditto, Esquire
Mark D. Silverschotz, Esquire
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 521-5400
Facsimile: (212) 521-5450
E-mail: mvenditto@reedsmith.com
        msilverschotz@reedsmith.com

*Proposed Counsel for Debtors and Debtors-in-Possession*