# EXHIBIT 2

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NEW STREAM SECURED CAPITAL, INC., *et al.*,[1] | Case No. 11-10753 (——MFW) (~~Joint Administration Pending~~Jointly Administered) |
| Debtors. | |
| | Re: Docket No. 12 |

**INTERIM ORDER (I) APPROVING DEBTOR-IN-POSSESSION FINANCING PURSUANT TO 11 U.S.C. §§ 105(a), 362, AND 364 AND FED. BANKR. P. 2002, 4001 AND 9014 AND LOCAL BANKRUPTCY RULE 4001-2; (II) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. SECTIONS 105, 361, 362 AND 363 OF THE BANKRUPTCY CODE; (III) GRANTING ADEQUATE PROTECTION AND SUPERPRIORITY ADMINISTRATIVE CLAIMS; (IV) SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

Upon consideration of the motion (the "Motion") of New Stream Secured Capital, Inc. ("~~NSSC~~NSCI"), New Stream Insurance, LLC ("NSI"), New Stream Capital LLC ("NSC"), and New Stream Secured Capital L.P. ("NSSC"), the debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned Chapter 11 cases, pursuant to sections 105(a), 361, 362, 363 and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 4001-2 of the Local Bankruptcy Rules for the District of Delaware (the "Local Bankruptcy Rules"), seeking, on an interim basis pursuant to this interim order (this "Interim Order"), among other things:

    (1)      authorization and approval, ~,~for NSI to obtain post-petition financing up to the aggregate principal amount of not more than $~~8,000,000~~4,000,000 (the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: New Stream Secured Capital, Inc. (3903), New Stream Insurance, LLC (6966), New Stream Capital, LLC (0364) and New Stream Secured Capital, L.P. (2948). The corporate address of the Debtors is 38C Grove Street, Ridgefield, CT 06877.

"Interim Amount Limit"), on the terms and conditions set forth in the Senior Secured, Super-Priority Debtor in Possession Credit Agreement, substantially in the form attached as Exhibit A to the Motion (the "DIP Credit Agreement"), dated as of ~~March ___, 2011,~~ the date hereof, among NSI, as borrower, SSALT Fund Limited, by and through its nominee account which is Barfield Nominees Limited A/C SL101, Compass Special Situations Fund LLC, by and through its nominee account which is Barfield Nominees Limited A/C CSJ01, Compass Coss Master Limited, by and through its nominee account which is Barfield Nominees Limited A/C CSC01, and Special Situations Fund LP, as lenders (collectively, the "DIP Lenders"), and MIO Partners, Inc., as administrative agent (the "Administrative Agent") and collateral agent (the "Collateral Agent", and together with the Administrative Agent, the "Agents"), and that certain Security Agreement, between NSI and the Collateral Agent, dated as of ~~March ___, 2011~~ the date hereof (the "Security Agreement"), and any control agreements, pledge agreements or other similar documents contemplated by the DIP Credit Agreement or Security Agreement (collectively, with the DIP Credit Agreement and Security Agreement, the "DIP Documents");

(2)     authorization for the Debtors to enter into and perform all acts, requirements and obligations set forth in or in connection with the DIP Documents;

(3)     authorization, pursuant to sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code, to grant senior, first-priority, fully-perfected liens (as more fully described in the DIP Documents, the "DIP Liens") to the Collateral Agent, for the

2

benefit of the DIP Lenders, upon all of the Collateral (as defined below), which DIP Liens shall prime all NSI Pre-Petition Liens (as defined below) and any other liens on the Collateral, other than the MIO Pre-Petition Liens (as defined below), as to which the DIP Liens shall be *pari passu*;

(4)      authorization, pursuant to section 364(c)(1) of the Bankruptcy Code, to grant Superpriority Claims (as defined below) to the Collateral Agent, for the benefit of the DIP Lenders, and to the DIP Lenders, with priority over all administrative expenses;

(5)      authorization for NSI to use Cash Collateral in which the MIO-Pre-Petition Lenders and NSI Pre-Petition Lenders have an interest;

(6)      authorization to grant adequate protection, including, among other things, Replacement Liens (as defined below) and Superpriority Claims pursuant to section 364(c)(1) of the Bankruptcy Code to the MIO Pre-Petition Lenders with respect to, *inter alia*, the DIP Liens and NSI's use of Cash Collateral and all diminution in value of the Pre-Petition Senior Collateral (as defined below), which Replacement Liens and Superpriority Claims shall be junior, respectively, to the DIP Liens and Superpriority Claims granted to the Collateral Agent, for the benefit of the DIP Lenders, and to the DIP Lenders, and senior, respectively, to the Replacement Liens and Superpriority Claims granted to the NSI Pre-Petition Lenders;

(7)      authorization to grant adequate protection, including, among other things, Replacement Liens and Superpriority Claims pursuant to section 364(c)(1) of the Bankruptcy Code to the NSI Pre-Petition Lenders whose liens and security

interests are being primed by the Collateral Agent and DIP Lenders in connection with the DIP Facility (as defined below) and pursuant to the DIP Documents, and with respect to NSI's use of Cash Collateral and all diminution in value of the Pre-Petition Subordinated Collateral (as defined below); the Replacement Liens and Superpriority Claims of the NSI Pre-Petition Lenders shall be junior and subordinate in all respects to the DIP Liens and Superpriority Claims granted to the DIP Lenders and the Replacement Liens and Superpriority Claims granted to the MIO Pre-Petition Lenders;

(8)     authorization subject to, and only effective upon the entry of, the Final Order (as defined below) granting such relief, to prohibit the Debtors' from surcharging against collateral pursuant to section 506(c) of the Bankruptcy Code;

(9)     pursuant to Bankruptcy Rule 4001, an interim hearing (the "Interim Hearing") on the Motion be held before this Court to consider entry of this Interim Order; and

(10)     pursuant to this Interim Order, this Court schedule a final hearing (the "Final Hearing") to consider entry of a final order authorizing and approving, on a final basis all of the relief requested in the Motion and DIP Documents on a (the "Final Order"), including authorizing NSI to obtain post-petition financing up to the aggregate principal amount of not more than $56,824,935 (the "DIP Facility").

The Interim Hearing having been held by this Court on March —;15, 2011, and upon the Declaration of Michael Buenzow in Support of First Day Motions; the record made by the Debtors at the Interim Hearing and the evidence and arguments of counsel, and after due deliberation and consideration and sufficient cause appearing therefor;

4

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

1.    <u>Petition Date</u>.  On March ~~—~~13, 2011 (the "<u>Petition Date</u>"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (collectively, the "<u>Cases</u>") with the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>".  The Debtors are continuing in possession of their property, and operating and managing their businesses, as debtors in possession pursuant to Bankruptcy Code §§ 1107 and 1108.  The Debtors have filed a motion requesting joint administration of the Cases.  No trustee or examiner has been appointed in the Cases.

2.    <u>Jurisdiction and Venue</u>.  This Court has jurisdiction over the Cases and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are sections 105(a), 361, 362, 363, and 364(e), 364(d) and 507 of the Bankruptcy Code; Bankruptcy Rules 4001 and 9014; and Local Bankruptcy Rule 4001-2(b).

3.    <u>Committee Formation</u>.  No official committee of unsecured creditors (a "<u>Committee</u>") has been appointed in the Cases.

4.    <u>Notice</u>.  Notice of the Motion and DIP Documents, the relief requested therein and the Interim Hearing has been served by the Debtors on (i) the Office of the United States Trustee for the District of Delaware (the "<u>U.S. Trustee</u>"); (ii) counsel to the Agents, DIP Lenders and MIO Pre-Petition Lenders; (iii) counsel to the joint receivers of NSSC; (iv) counsel to the NSI Receiver (as defined below); (v) the Debtors' twenty (20) largest unsecured creditors, determined

on a consolidated basis; and (vi) all other known holders of pre-petition liens, encumbrances or security interests against the Debtors' property. Under the circumstances, ~~such notice constitutes due and sufficient notice and complies with~~notice was sent under Bankruptcy Rules 4001(b), 4001(c) and 4001(d), Local Bankruptcy Rule 4001-2 and section 102(1) of the Bankruptcy Code in light of the emergency nature of the interim relief requested in the Motion, and no further notice of the relief sought at the Interim Hearing and the relief granted herein is necessary or required.

5. <u>Necessity of Financing</u>. The Debtors submit that the DIP Facility, to be made available by the DIP Lenders pursuant to the DIP Loan Agreement, the proceeds of which shall be used solely by NSI to fund the actual premium payments and related servicing fees of the insurance policies (the "<u>Permitted Premium Payments</u>") in the NSI Life Portfolio (as defined below) and the fees and expenses to be paid under the DIP Credit Agreement, and NSI's use of Cash Collateral will allow the Debtors to continue the operations of their businesses and administer and preserve the value of their estates during the pendency of the Cases. The ability of NSI to fund the Permitted Premium Payments during the pendency of the Cases requires the availability of additional working capital, the absence of which would immediately and irreparably harm the Debtors, their estates and their creditors and the Debtors' efforts to pursue and consummate the sale of the NSI Life Portfolio to Limited Life Assets LLC, an affiliate of the DIP Lenders, pursuant to a chapter 11 plan of reorganization (the "<u>Sale</u>"). Entry of this Interim Order approving the DIP Facility and NSI's use of Cash Collateral will benefit the Debtors and their estates and creditors. Therefore, it is in the best interest of the Debtor's estates to establish the DIP Facility contemplated by the DIP Loan Agreement and the other DIP Documents, and to

authorize NSI's use of Cash Collateral, subject to the terms and conditions in the DIP Documents and as set forth in this Interim Order.

6.     <u>No Credit Available on Other Terms</u>. The Debtors are unable to obtain unsecured credit allowable under sections 503(b)(1), 364(a) or 364(b) of the Bankruptcy Code.

7.     <u>Willingness to Lend</u>. The Debtors are unable to obtain secured credit allowable solely under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without granting the DIP Liens to the Collateral Agent, for the benefit of the DIP Lenders, and the Superpriority Claims to the Collateral Agent, for the benefit of the DIP Lenders, and the DIP Lenders, pursuant to sections 364(d) and 364(c)(1) of the Bankruptcy Code under the terms and conditions set forth in the DIP Documents and this Interim Order. The Debtors are also unable to obtain financing from sources other than the DIP Lenders, or on more favorable terms, than those set forth in the DIP Documents.

8.     <u>Business Judgment and Good Faith</u>. The terms of the DIP Facility and DIP Documents and the use of Cash Collateral as described in the Motion and as set forth at the Interim Hearing (including the payment of interest to the DIP Lenders at the times, in the amounts and in the manner provided under the DIP Credit Agreement) are fair and reasonable and the entry into the DIP Facility and DIP Documents represent a sound, prudent exercise of NSI's business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration. The DIP Facility and use of the Collateral, including Cash Collateral, were negotiated in good faith (as that term is used in section 364(e) of the Bankruptcy Code) and at arm's length and for fair consideration among the Debtors, the DIP Lenders, and the MIO Pre-Petition Lenders and NSI Pre-Petition Lenders (collectively, the "<u>Pre-Petition Lien Holders</u>"). Accordingly, all of the Debtors' obligations and indebtedness arising

under, in respect of, or in connection with the DIP Facility and the DIP Documents, and any Obligations or Indebtedness (as each such term is defined in the DIP Credit Agreement) permitted thereby, in each case owing to the DIP Lenders or any of their respective affiliates (all of the foregoing collectively, the "DIP Obligations"), shall be deemed to have been extended by the DIP Lenders and their respective affiliates in good faith (as that term is used in section 364(e) of the Bankruptcy Code), and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise. Upon entry of a Final Order, the term "DIP Obligations" as used herein also shall include without duplication, any and all amounts owing or outstanding under the Pre-Petition Senior Credit Agreement (as defined below), and all interest on, fees and other costs, expenses and charges owing in respect of such amounts.

9.     Property of the Estate. Each item of the Collateral constitutes property of the estate of at least one Debtor.

10.     Good Cause. Good and sufficient cause exists for the entry of this Interim Order. The borrowings under the DIP Facility and NSI's use of Cash Collateral and the other relief requested in the Motion (including the conversion of all Pre-Petition Senior Loan Obligations outstanding on the Petition Date into Loans under the DIP Credit Agreement), are necessary, essential, appropriate and in the best interest of the Debtors, their creditors, and their estates, as the implementation of the DIP Facility and access to Cash Collateral will, among other things, (a) fund the Permitted Premium Payments and provide the Debtors with the liquidity necessary to preserve the value of the NSI Life Portfolio pending the Sale thereby freeing up liquidity for the other ongoing operations of the Debtors, (b) preserve and maximize the value of the Debtors'

estates for the benefit of all creditors, (c) enable the Debtors to pursue and consummate the Sale, (d) form a critical building block of the Debtors' proposed Chapter 11 plan, and (e) avoid immediate and irreparable harm to the Debtors and their estates, their creditors, their businesses, their employees, and their assets which would result from the failure to fund the Permitted Premium Payments.

11.    Debtors' Acknowledgments and Agreements.  Without prejudice to the rights of any other party (but subject to the limitations thereon set forth in ~~paragraph 37~~paragraphs 37 and 38, as applicable, of this Interim Order), the Debtors admit, stipulate, acknowledge and agree that:

(i)    Pre-Petition Senior Indebtedness.  Prior to the Petition Date, SSALT Fund Limited, by and through its nominee, Compass Special Situations Fund LLC, by and through its nominee, and Compass Coss Master Limited, by and through its nominee, and Special Situations Fund LP (collectively, the "MIO Pre-Petition Lenders") provided financing to NSI under that certain Secured Promissory Note, dated as of August 4, 2010, in the original principal amount of $25,000,000, as amended and modified by that certain Amended and Restated Secured Promissory Note, dated as of November 8, 2010, in the amended principal amount of $39,480,268.58 (as further amended, restated, supplemented or otherwise modified on or prior to the Petition Date, the "Pre-Petition Senior Credit Agreement").  As of the Petition Date, NSI was liable to the MIO Pre-Petition Lenders in the amount of $41,824,935 which includes fees and expenses incurred under and in connection with the Pre-Petition Senior Credit Agreement as provided therein (collectively, the "Pre-Petition Senior Loan Obligations").  The Pre-Petition Senior Loan Obligations are secured by first priority, fully-perfected security interests in and liens on all of NSI's right, title and interest in, to and under the (a) Additional

Life Insurance Policy Portfolio (as defined in the Pre-Petition Senior Credit Agreement), (b) Life Insurance Policy Portfolio (as defined in the Pre-Petition Senior Credit Agreement) (collectively with the Additional Life Insurance Policy Portfolio, the "NSI Life Portfolio"), (c) the New Stream Securities Account and all property contained or credited therein (including, without limitation, all Investment Property, Securities and Financial Assets contained therein (as each such term is defined in the Pre-Petition Senior Credit Agreement), (d) all Instruments and Documents evidencing any of the foregoing (as each such term is defined in the Pre-Petition Senior Credit Agreement), (e) all Supporting Obligations and Payment Intangibles in respect of any of the foregoing (as each such term is defined in the Pre-Petition Senior Credit Agreement), (f) all books and records pertaining to any of the foregoing, (g) all proceeds and products of any of the foregoing, and (h) all collateral security and guarantees given by any person or entity with respect to any of the foregoing  (collectively, the "Pre-Petition Senior Collateral").

        (ii)     Pre-Petition Subordinated Indebtedness.  Prior to the Petition Date, (a) NSSC and Segregated Account Class C (the "Class C Lender") of New Stream Capital Fund Limited ("NS Capital Fund") provided financing to NSI pursuant to that certain Amended and Restated Loan and Security Agreement; (b) NSSC and Segregated Account Class F of NS Capital Fund (the "Class F Lender") provided financing to NSI pursuant to that certain Amended and Restated Loan and Security Agreement; and (c) NSSC and Segregated Account Class I of NS Capital Fund (the "Class I Lender", and collectively with the Class C Lender and the Class F Lender, the "NSI Pre-Petition Lenders", and collectively with the MIO Pre-Petition Lenders, the "Pre-Petition Lenders") provided financing to NSI pursuant to that certain Amended and Restated Loan and Security Agreement (as amended, restated, supplemented or otherwise modified on or prior to the Petition Date, collectively, the "NSI Pre-Petition Loan Agreements").

As of the Petition Date, NSI was liable to the NSI Pre-Petition Lenders in at least the amount of $81,573,375 and for fees and expenses incurred under and in connection with the NSI Pre-Petition Loan Agreements as provided therein (collectively, the "Pre-Petition Subordinated Loan Obligations", and together with the Pre-Petition Senior Loan Obligations, the "Pre-Petition Obligations"); provided, however, that the NSI Pre-Petition Lenders reserve the right to assert one or more claims with respect to the Pre-Petition Subordinated Loan Obligations which in the aggregate exceed such amount. The Pre-Petition Subordinated Loan Obligations are secured by fully-perfected security interests in and liens on all of NSI's right, title and interest in, to and under the NSI Life Portfolio and the other collateral described in the NSI Pre-Petition Loan Agreements (other than with respect to deposit accounts as no control agreements were entered into between NSI, any depository bank and WTC), which security interests and liens are subordinated to the Pre-Petition Senior Liens (collectively, the "Pre-Petition Subordinated Collateral", and together with the Pre-Petition Senior Collateral, the "Pre-Petition Collateral").

    (iii)  Consent and Subordination Agreements. The Consent and Subordination Agreements, dated as of August 4, 2010 and November 8, 2010, respectively, each among NSI, NSSC, John C. McKenna, in his capacity as Receiver for the Class C Lender, Class F Lender and Class I Lender (the "NSI Receiver"), and Wilmington Trust Company, as Collateral Agent (in such capacity "WTC") for the NSI Pre-Petition Lenders (as each agreement may have been amended, restated, supplemented or otherwise modified on or prior to the Petition Date, collectively, the "Subordination Agreements"), pursuant to which the NSI Pre-Petition Lenders and WTC agreed to, among other things, subordinate their right of payment, security interests and liens in connection with the NSI Pre-Petition Loan Agreements and NSI Pre-Petition Subordinated Loan Obligations to the right of payment, security interests and liens of the MIO

Pre-Petition Lenders in connection with the Pre-Petition Senior Loan Obligations and MIO Pre-Petition Senior Credit Agreement, are valid, binding and enforceable against the parties thereto and shall govern the respective rights and priorities hereunder of the MIO Pre-Petition Lenders, on one hand, and the NSI Pre-Petition Lenders and WTC, on the other hand (collectively, the "Pre-Petition Lien Holders");

        (iv)    Securities Account Control Agreement. The Securities Account Control Agreement, dated as of August 4, 2010, among the MIO Pre-Petition Lenders, NSI, and Bank of Utah, as Securities Intermediary, as amended and modified by that first amendment thereto and as further amended and modified by that certain Amendment No. 2 to the Securities Account Control Agreement, dated as of November 8, 2010 (as further amended, restated, supplemented or otherwise modified on or prior to the Petition Date, the "SACA", and collectively, with the Pre-Petition Senior Loan Agreement, the NSI Pre-Petition Loan Agreements, the Subordination Agreements, and all other agreements, guarantees, security documents, or otherwise, entered into or relating to the foregoing, collectively, the "Pre-Petition Debt Documents"), is valid, binding and enforceable against the parties thereto;

        (v)    Validity and Enforceability. (a) The Pre-Petition Debt Documents are valid and enforceable by the Pre-Petition Lien Holders against NSI, (b) the Pre-Petition Obligations constitute legal, valid, binding, and non-avoidable obligations of NSI and are secured by valid, binding, enforceable, duly perfected first liens and security interests granted by NSI to the MIO Pre-Petition Lenders (the "Senior Pre-Petition Liens"), and valid, binding, enforceable, duly perfected subordinated liens and security interests granted by NSI to the NSI Pre-Petition Lenders and WTC (the "Subordinated Pre-Petition Liens", and collectively with the Senior Pre-Petition Liens, the "Pre-Petition Liens") on the Pre-Petition Collateral in the amount and to the

extent set forth in the Pre-Petition Debt Documents, including the proceeds derived therefrom, (c) the Pre-Petition Lien Holders duly perfected the Pre-Petition Liens by, among other things, filing financing statements and, where necessary, by the SACA or by possession of relevant instruments, certificates, cash or other property, and all such financing statements were validly executed by, or at the direction or with the consent of, authorized representatives of NSI, (d) the Pre-Petition Liens are governed by the Subordination Agreements and subject to the SACA, (e) the Senior Pre-Petition Liens are *pari passu* with the DIP Liens, (f) the Subordinated Pre-Petition Liens are subordinate only to the DIP Liens, Senior Pre-Petition Liens, Replacement Liens of the MIO Pre-Petition Lenders; and (g) the NSI Pre-Petition Lenders' Superpriority Claims are subordinate to the Superpriority Claims of the DIP Lenders and the MIO Pre-Petition Lenders;

(vi) <u>No Challenges</u>. (a) No offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the MIO Pre-Petition Lenders or Pre-Petition Senior Loan Obligations (or to any amounts previously paid to the MIO Pre-Petition Lenders on account thereof or with respect thereto) exist, and no portion of the Senior Pre-Petition Liens or Pre-Petition Senior Loan Obligations (or any amounts previously paid to the MIO Pre-Petition Lenders on account thereof or with respect thereto) is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (whether equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law, (b) the Debtors and their estates have no valid claims, objections, challenges, causes of actions, or choses in action, including without limitation, Avoidance Actions (as defined below), against the MIO Pre-Petition Lenders or against any of their respective affiliates, agents, attorneys, advisors, professionals, officers, managers, members, directors or employees arising out of, based upon or related to the pre-petition loans extended to

NSI under the Pre-Petition Senior Credit Agreement or NSI's incurrence of the Pre-Petition Senior Loan Obligations, and (c) the Debtors irrevocably waive any right to challenge or contest the Senior Pre-Petition Liens of the MIO Pre-Petition Lenders on the Pre-Petition Senior Collateral or the validity or amount of the Pre-Petition Senior Loan Obligations or Pre-Petition Senior Credit Agreement; and

(vii) <u>Cash Collateral</u>. All of NSI's cash constitutes Cash Collateral (as defined below) or proceeds of the Pre-Petition Collateral and, therefore, is Cash Collateral of the Pre-Petition Lien Holders. For purposes of this Interim Order, the term "<u>Cash Collateral</u>" shall be deemed to include, without limitation: (i) all "cash collateral" as defined under Bankruptcy Code section 363; and (ii) all deposits subject to setoff and cash arising from the collection or other conversion to cash of property of NSI in which the Pre-Petition Lien Holders assert security interests, liens or mortgages, regardless of (a) whether such security interests, liens, or mortgages existed as of the Petition Date or arose thereafter pursuant to this Interim Order, and (b) whether the property converted to cash existed as of the Petition Date or arose thereafter.

Based on the foregoing,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED**, that:

12. <u>Motion Granted</u>. The Motion is granted in accordance with the terms and conditions of this Interim Order. Any objections to the Motion with respect to entry of this Interim Order that have not been withdrawn, waived or settled, are hereby denied and overruled.

13. <u>Authorization of the DIP Facility and DIP Documents</u>. NSI is hereby authorized, pursuant to the terms of this Interim Order and the DIP Documents, to enter into the DIP Credit Agreement and other DIP Documents and borrow funds under the DIP Facility up to an aggregate principal amount of no more than $~~8,000,000~~4,000,000 during the period from the date of entry

of this Interim Order until the date of entry of the Final Order (the "Interim Amount Limit"), in accordance with, and subject to, the terms of the DIP Financing Documents and this Interim Order. NSI's use of borrowings under the DIP Facility and Cash Collateral, subject to Permitted Variances, shall be in accordance with the Original Budget (as defined below) and subsequent approved budgets.

14. In furtherance of the foregoing and without further approval of this Court, NSI, and each of the other Debtors, is authorized and directed to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all reasonable fees and expenses of the Agents and DIP Lenders and their counsel or other retained professionals, that may be reasonably required or necessary for the Debtors' performance of their obligations under or in connection with the DIP Facility and DIP Documents, including, without limitation:

(i)     the execution, delivery and performance of the DIP Documents;

(ii)    the execution, delivery and performance of one or more waivers, consents or amendments to the DIP Credit Agreement, in each case in such form as the Debtors and the DIP Lenders may agree in writing, which do not (a) materially modify the DIP Credit Agreement as approved by this Interim Order, (b) shorten the maturity of the extensions of credit thereunder, (c) increase the commitments of the DIP Lenders as set forth in the DIP Credit Agreement (the "DIP Commitments") or the rate of interest thereunder, (d) change in a manner adverse to the Debtors any Event of Default under and as defined in the DIP Credit Agreement (a "DIP Event of Default"), or add, remove or amend any covenants therein, or (e) materially and adversely affect the respective rights of the Debtors or as set forth in this Interim Order; and

(iii)    the execution, delivery and/or performance of all other documents and acts required under or in connection with the DIP Documents.

15.    Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute valid and binding obligations of NSI, enforceable against NSI in accordance with the terms thereof. ~~No~~Subject to paragraphs 37 and 38 of this Interim Order, as applicable, no obligation, payment, transfer or grant of security under the DIP Documents or this Interim Order shall be voidable, or recoverable under the Bankruptcy Code (including without limitation, under section 502(d) of the Bankruptcy Code) or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim.

16.    <u>DIP Liens</u>. As security for the DIP Obligations, effective and perfected upon the date of this Interim Order and without the necessity of the execution, recordation of filings of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, the DIP Liens set forth in sub-sections (a) and (b) below are hereby granted to the Collateral Agent, for the benefit of the DIP Lenders, on all of the following property, whether existing on the Petition Date or thereafter acquired, as more fully set forth in the Security Agreement (collectively, the "<u>DIP Collateral</u>", and together with the Pre-Petition Collateral, the "<u>Collateral</u>"):

(i)    the NSI Life Portfolio (as may be modified from time to time);

(ii)    the New Stream Securities Account (as defined in the SACA, and as may be modified from time to time), including, without limitation, all investment property, securities and financial assets contained therein;

(iii)    the Seller's Securities Account (as defined in the SACA, and as may be modified from time to time) and all property contained or credited therein

(including, without limitation, all investment property, securities and financial assets contained therein);

(iv)    all instruments and documents evidencing any of the foregoing;

(v)    all cash and Cash Collateral of NSI and any investment of such cash and Cash Collateral, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, equipment, general intangibles, documents, instruments, interests in leaseholds, real properties, patents, copyrights, trademarks, trade names, other intellectual property, capital stock of subsidiaries, all property purportedly assigned or pledged as collateral by NSI to secure any intercompany obligations to the extent any such assignment or pledge shall not have been duly perfected as of the Petition Date and the proceeds of all the foregoing; provided, however, that NSI shall not pledge to the DIP Lenders in excess of 65% of the voting capital stock of its direct foreign subsidiaries, if any, or any of the capital stock or interests of its indirect foreign subsidiaries, if any, if, in the good faith judgment of the Debtors, adverse tax consequences would result to the Debtors, which adverse consequences are demonstrated to the reasonable satisfaction of the DIP Lenders;

(vi)    subject to entry of a Final Order, the proceeds or property recovered from, NSI's claims and causes of action under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "Avoidance Actions");

(vii)     all supporting obligations and payment intangibles in respect of any of the foregoing,

(viii)    all books and records pertaining to any of the foregoing;

(ix)      all proceeds and products of any of the foregoing;

(x)       all collateral, security and guarantees given by any person or entity with respect to any of the foregoing;

(xi)      all of the other assets of NSI, including, without limitation, Cash Collateral, all accounts receivable, inventory, general intangibles, machinery, equipment, fixtures, and real property, and all proceeds and products of any of the foregoing; and

(xii)     all other pre-petition and post-petition property and assets as set forth in the Security Agreement, whether existing on the Petition Date or thereafter acquired.

(a)       <u>First Lien on Unencumbered Property</u>.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon the Collateral to the extent not subject to valid, perfected, non-avoidable and enforceable liens in existence as of the Petition Date or valid liens in existence as of the Petition Date that are perfected subsequent to such date to the extent permitted by Section 546(b) of the Bankruptcy Code (collectively, "<u>Unencumbered Property</u>")

(b)       <u>*Pari Passu* and Priming Liens on Pre-Petition Liens</u>.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all Collateral that is subject to the existing liens presently securing the Pre-Petition Obligations.  Such security interests and liens (i) shall be *pari*

18

*passu* in all respects to the MIO Pre-Petition Liens, (ii) shall be senior and prime in all respects the NSI Pre-Petition Liens on such Collateral (other than the MIO Pre-Petition Liens), (iii) shall be senior in all respects to all Replacement Liens granted to the Pre-Petition Lien Holders, and (iv) shall be senior to all other security interests and liens on the Collateral, except with respect to any valid, perfected and unavoidable interests in such property arising out of liens to which the liens of the Pre-Petition Lien Holders become subject subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code.

(c)     Liens Senior to Certain Other Liens.  The DIP Liens and the Replacement Liens granted to the DIP Lenders shall be senior to and shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (ii) subject to applicable law, any liens arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors other than as expressly permitted under the DIP Credit Agreement.

17.     DIP Lender Superpriority Claims.  Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed claims against the Debtors with priority over all administrative expenses (other than any fees arising under 28 U.C.S. §1930), diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code

(collectively, the "Superpriority Claims"), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment or otherwise, which allowed claims shall be payable from and have recourse to all pre-petition and post-petition property of the Debtors and all proceeds thereof (including upon entry of the final order, proceeds of Avoidance Actions).

18.    Protection of DIP Lenders' Rights.

(a)    So long as there are any borrowings or amounts outstanding (other than contingent indemnity obligations), any DIP Lender has a DIP Commitment outstanding under the DIP Credit Agreement or any other DIP Obligations are outstanding, the Pre-Petition Lien Holders shall (other than with the prior written consent of the Administrative Agent and the DIP Lenders) (i) take no action to foreclose upon or recover in connection with the Pre-Petition Liens, the Replacement Liens or any other liens granted pursuant to any other agreements or operation of law, or otherwise exercise remedies against any Collateral, except to the extent expressly authorized by a non-appealable order of this Court, (ii) be deemed to have consented to any release of Collateral authorized under the DIP Documents, (iii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the Collateral unless, solely as to this clause (iii), the DIP Lenders file financing statements or other documents to perfect the liens granted to them pursuant to this Interim Order, or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or security interests as of the Petition Date, and (iv) not seek to terminate or modify the use of Cash Collateral, or obtain additional or different adequate protection than as set forth in this Interim Order.  Nothing herein shall permit

the Pre-Petition Lien Holders to take any action in violation of the Bankruptcy Code or other applicable law or that is contrary to this Interim Order.

(b)     The Administrative Agent shall provide five (5) business days' written notice of a DIP Event of Default to counsel for the Debtors, counsel for any Committee, and the U.S. Trustee (the "DIP Default Notice"). Absent entry of an order prohibiting such action, on the sixth (6th) day after receipt of the DIP Default Notice by counsel for the Debtors, counsel for any Committee, and the U.S. Trustee, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified (without further notice or hearing) to permit the Agents and DIP Lenders to exercise immediately, and at any times thereafter, all rights and remedies under the DIP Documents which permit the DIP Lenders to (a) terminate all or any portion of the DIP Facility and the DIP Commitments, (b) declare the DIP Obligations to be immediately due and payable, and (c) take any and all actions and exercise any and all rights and remedies against the Collateral or NSI as permitted under the DIP Financing Documents or applicable law which the DIP Lenders may deem appropriate (including, but not limited to, freezing monies or balances in the Debtors' accounts or in accounts maintained by the Agents or DIP Lenders, charging default interest, and effectuating setoff of monies of the Debtors in accounts maintained with the Agents or DIP Lenders, if any).

19.     Use of Cash Collateral; Budget.  Subject in all respects to the terms and conditions set forth herein, NSI is authorized to use the proceeds of the DIP Loans and the Cash Collateral in the amounts set forth in the Original Budget attached hereto as Exhibit A (the "Original Budget"), subject to Permitted Variances, through the earliest to occur of (the "Interim Period"): (a) the date of entry of the Final Order, (b) May 16, 2011, and (c) the occurrence of the DIP Expiration Date (as defined below).  Subject to the terms and conditions set forth in this

Interim Order, NSI is authorized to use the proceeds of the DIP Loans and the Cash Collateral of

the MIO Pre-Petition Lenders solely for the purpose of funding the Permitted Premium Payments

and the reasonable fees and expenses to be paid under the DIP Credit Agreement the Cash

Collateral of the NSI Pre-Petition Lenders to: (x) ~~continue operating while in chapter 11,~~

~~including paying employees and employee related costs, rent, utilities and other general operating~~

~~and overhead expenses~~<u>paying the actual amounts necessary to fund the premium payments of the</u>

<u>insurance policies in the NSI Life Portfolio, and the actual and reasonable fees and costs</u>

<u>associated therewith (including servicing fees)</u>; and (y) fund the reasonable professional and

other fees associated with the Sale (the "<u>Other Permitted Uses</u>"), in each case in accordance with

the Original Budget, as it may be updated from time-to-time.

20.     The Original Budget reflects on a line-item thirteen (13) week rolling-basis the

Debtors' anticipated aggregate cash receipts and aggregate necessary and required expenses

relating to the Permitted Premium Payments and the Other Permitted Uses for each week covered

by the Original Budget.  For each two-week period covered by the Original Budget and any

subsequent budget, the aggregate actual disbursements by the Debtors during such two-week

period of determination must be no greater than 115% of the aggregate amount of projected

disbursements for such period as set forth in the Original Budget or any subsequent budget (the

"<u>Permitted Variance</u>").  For the avoidance of doubt, for purposes of calculating the Permitted

Variance, any unused amounts set forth in the Original Budget or any subsequent budget for any

period of determination may be carried forward and used during subsequent periods on a line-by-

line basis, with no carry-over to any other line item.  Upon the prior written request of NSI, or

upon its own initiative, the Administrative Agent may, but is not required to, authorize NSI to

exceed the Permitted Variance.  Except as expressly set forth herein, nothing in the Original

Budget or this Interim Order shall be deemed or construed as (x) a finding or admission as to the validity of any claim relating to a budgeted amount, (y) an agreement or promise by any party in interest to pay any such budgeted claim, or (z) a waiver of the rights of any party in interest to contest any such claim. Furthermore, nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, nor authorize the use by the Debtors of any proceeds from any such disposition of assets. The Original Budget may be amended or modified in writing from time to time only with the prior written consent of the Administrative Agent, the DIP Lenders and the NSI Pre-Petition Lenders.

21.     The Debtors shall provide to the U.S. Trustee, DIP Lenders, the MIO Pre-Petition Lenders and the NSI Pre-Petition Lenders, so as to actually be received within four (4) business days following the end of each two-week period, (a) an updated rolling 13-week budget, and (b) a line-by-line variance report for the immediately preceding two-week period and on a cumulative basis from the Petition Date to the report date, comparing actual cash receipts and actual cash disbursements to cash receipts and cash disbursements forecasted in the Original Budget for such period and showing on a line-by-line basis any variance to the corresponding line-item of the Original Budget together with an explanation for such variance.

22.     Adequate Protection for Pre-Petition Lien Holders. In this Interim Order, the term "Replacement Lien" shall mean that, subject to the terms and conditions set forth in this Interim Order, the Pre-Petition Lien Holders shall have and are hereby granted (effective upon the date of this Interim Order and without the necessity of the Debtors or the Pre-Petition Lien Holders' execution of mortgages, deeds of trust, security agreements, pledge agreements, control agreements, financing statements or otherwise), valid and perfected, security interests in, and liens upon the Collateral, in the same priority and to the same extent, priority, enforceability,

unavoidability and validity applicable to the MIO Pre-Petition Lenders' security interests and liens in the Pre-Petition Collateral and the NSI Pre-Petition Lenders' security interests and liens in the Pre-Petition Collateral; provided, however, the Replacement Liens shall be junior in all respects to the DIP Liens granted to the DIP Lenders.

23.     The Pre-Petition Lien Holders are granted the following adequate protection for any diminution in the value of their respective interests in the Pre-Petition Collateral from the Petition Date resulting from (a) the use, sale, lease, disposition, shrinkage, decline in market value, consumption or physical deterioration of the Pre-Petition Collateral (including Cash Collateral) by the Debtors, and (b) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (collectively, the "Adequate Protection Obligations"):

24.     The Pre-Petition Lien Holders shall have and are hereby granted the Replacement Liens subject to (i) unavoidable, duly perfected liens existing as of the Petition Date, which liens shall retain their priority *vis a vis* the Replacement Liens granted hereby to the Pre-Petition Lien Holders; (ii) the priorities set forth herein; and (iii) the Subordination Agreements. Subject in all respects to the Subordination Agreements, and except as otherwise set forth herein, the Replacement Liens granted to the Pre-Petition Lien Holders pursuant to this Interim Order shall be prior and senior to all liens and encumbrances (other than fees arising under 28, U.S.C. §1930) of (a) all other secured creditors in and to such property granted, or arising, subsequent to the date of this Interim Order (including, without limitation, liens and security interests, if any, granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors other than taxes), (b) any intercompany claim of NSI or subsidiary or affiliate of NSI, and (c) any security interest or lien that is avoided or otherwise preserved for the benefit of NSI's estate pursuant to Bankruptcy Code section 551; provided,

24

however, that the Replacement Liens granted to the NSI Pre-Petition Lenders shall be subordinate to the DIP Liens and to the Replacement Liens granted to the MIO Pre-Petition Lenders, and the Replacement Liens granted to the MIO Pre-Petition Lenders shall be subordinate to the DIP Liens.

(a)     The Pre-Petition Lien Holders are hereby granted allowed Superpriority Claims; provided, however, that the Superpriority Claims granted to Pre-Petition Lien Holders shall be junior in all respects to the Superpriority Claims granted to the DIP Lenders and Superpriority Claims granted to the MIO Pre-Petition Lenders shall be senior in all respects to the Superpriority Claims granted to the NSI Pre-Petition Lenders.  No cost or expense of administration under Bankruptcy Code §§ 105, 503(b) and 507(b) shall be senior to, or *pari passu* with, any Superpriority Claims; and

(b)     Notwithstanding any provision of this Interim Order or the Pre-Petition Debt Documents to the contrary, the Pre-Petition Lien Holders reserve, and this Interim Order is without prejudice to, their respective rights to, among other things, seek additional adequate protection (provided that any adequate protection provided hereafter shall be junior in all respects to the DIP Liens and Superpriority Claims of the DIP Lenders, and if provided to the NSI Pre-Petition Lenders shall also be provided to the MIO Pre-Petition Lenders on a senior priority basis), claim payment or reimbursement of additional interest (including default interest), reasonable fees and expenses (including, without limitation, professional fees and expenses) or other costs and expenses set forth in the Pre-Petition Debt Documents.

25.     The Administrative Agent, and with the prior written consent of the Administrative Agent, the MIO Pre-Petition Lenders and/or NSI Pre-Petition Lenders, may issue a written notice of the occurrence of a Cash Collateral Event of Default (as defined below) to

counsel for the Debtors, counsel for any Committee, and the U.S. Trustee (the "Cash Collateral Default Notice").  Absent entry of an order to the contrary (or the agreement of NSI Pre-Petition Lenders), on the sixth (6th) day after receipt of the Cash Collateral Default Notice by counsel for the Debtors, counsel for any Committee, and the U.S. Trustee, NSI may not use Cash Collateral. For purposes of this Interim Order, a "Cash Collateral Event of Default" shall occur with respect to the Debtors' use of Cash Collateral if (a) the Debtors fail to perform any of their obligations in accordance with the terms of this Interim Order, including, without limitation, NSI's failure to use Cash Collateral in compliance with the Original Budget (subject to Permitted Variances) or subsequent budgets or to provide the information or access as required herein, (b) any representation or warranty made by the Debtors under this Interim Order or any pleading, certificate, report or financial statement delivered to the Pre-Petition Lien Holders proves to have been false or misleading in any material respect as of the time made or given (including by omission of material information or fact necessary to make such representation, warranty or statement not misleading), (c) the appointment of a Chapter 11 trustee or examiner with expanded powers, (d) the Cases are converted to cases under chapter 7, (e) without the prior written consent of the MIO Pre-Petition Lenders and NSI Pre-Petition Lenders, the Debtors shall purport to grant or file a motion seeking to grant a third party a security interest or lien upon all or part of any property of the Debtors that has a priority which is senior to, or equal with, any of the Pre-Petition Liens or Replacement Liens granted hereunder in all or any of a portion of such property (other than the DIP Liens), or (f) a DIP Event of Default shall have occurred.

26.     Proceeds of Subsequent Financing.  Without limiting any of the other provisions of this Interim Order, if at any time prior to (i) the indefeasible repayment in full in cash of all DIP Obligations, and (ii) the termination of the DIP Commitments, any Debtor or any trustee

subsequently appointed in the Cases shall obtain credit or incur debt pursuant to section 364(b), 364(c) or 364(d) of the Bankruptcy Code which in any way results in security interests or liens in or on any or all of the Collateral, then, except as permitted by the DIP Credit Agreement, all of the proceeds of such credit or debt shall immediately be applied to the indefeasible payment in full in cash of the DIP Obligations in accordance with the DIP Documents.

27.   Limitation on Charging Expenses Against Collateral.  Subject to and effective only upon entry of the Final Order granting such relief, no expenses of administration of the Cases ~~or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code~~, shall be charged against or recovered from the Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Lenders, the MIO Pre-Petition Lenders and the NSI Pre-Petition Lenders, as the case may be, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lenders and/or the Pre-Petition Lien Holders.

28.   Termination.  All (i) DIP Obligations of the Debtors to the DIP Lenders shall be immediately due and payable in accordance with the terms of the DIP Credit Agreement and (ii) authorization to use Cash Collateral shall cease, on the date (the "DIP Expiration Date") that is the earliest to occur of : (a) May 16, 2011; (b) the date on which the Bankruptcy Court enters an order confirming a plan of reorganization for NSI confirmed pursuant to section 1129 of the Bankruptcy Code, (c) the occurrence of a DIP Event of a Default and/or Cash Collateral Event of Default.

29.   Access to Collateral.  The DIP Lenders and the Collateral Agent and their respective experts and advisors shall be given reasonable access to the Collateral for purposes of monitoring the business of the Debtors and valuing the Collateral.

30.     Information.  The Debtors shall provide the DIP Lenders and the Pre-Petition Lien

Holders with all inspection rights and reports (in addition to those required by this Interim Order)

to the extent required under the Pre-Petition Debt Documents or as otherwise reasonably

requested by the DIP Lenders or the Pre-Petition Lien Holders.

31.     Reservation of Rights of Pre-Petition Lien Holders.  Except as expressly provided

herein, nothing contained in this Interim Order (including, without limitation, the authorization

of the use of any Cash Collateral) shall impair or modify any rights, claims or defenses available

in law or equity, to the DIP Lenders or Pre-Petition Lien Holders, including, without limitation,

rights of a party to a swap agreement, securities contract, commodity contract, forward contract

or repurchase agreement with a Debtor to assert rights of setoff or other rights with respect

thereto as permitted by law (or the right of a Debtor to contest such assertion).

32.     Perfection of DIP Liens and Replacement Liens.

(a)     The automatic stay imposed under section 362(a) of the Bankruptcy Code

is hereby vacated and modified to permit NSI to grant the liens and security interests to the DIP

Lenders and Pre-Petition Lien Holders contemplated by the DIP Documents (with respect to the

DIP Lenders) and this Interim Order.

(b)     The DIP Liens and Replacement Liens granted pursuant to this Interim

Order shall constitute valid and duly perfected security interests and liens (subject to the

priorities set forth herein and in the Subordination Agreements), and the DIP Lenders and the

Pre-Petition Lien Holders shall not be required to file or serve financing statements, notices of

lien or similar instruments which otherwise may be required under federal, state or local law in

any jurisdiction, or take any action, including taking possession, to validate and perfect such

security interests and liens; and the failure by the Debtors to execute any documentation relating

to the DIP Liens or Replacement Liens shall in no way affect the validity, perfection or priority of such liens. The DIP Lenders and Pre-Petition Lien Holders are hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction or take any other action in order to validate and perfect the liens and security interests granted to them hereunder. Whether or not the DIP Lenders or Pre-Petition Lien Holders shall, in their sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, nonavoidable and not subject to challenge, dispute or subordination, at the time and as of the date of entry of this Interim Order. Upon the request of the DIP Lenders, the Debtors and the Pre-Petition Lien Holders, without any further consent of any party, are authorized to take, execute and deliver such instruments (in each case without representation or warranty of any kind) to enable the DIP Lenders to further validate, perfect, preserve and enforce the DIP Liens.

(c)    A certified copy of this Interim Order may be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized and directed to accept such certified copy of this Interim Order for filing and recording.

33.    Marshalling.    ~~In~~Upon entry of a Final Order, in no event shall the DIP Lenders or the Pre-Petition Lien Holders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral.

34.     Section 552(b).  Subject to entry of a Final Order, the DIP Lenders and Pre-Petition Lien Holders are entitled to all of the rights and benefits of section 552(b)(1) of the Bankruptcy Code and the "equities of the case" exception therein shall not apply.

35.     Proofs of Claim.  The DIP Lenders and Pre-Petition Lien Holders shall not be required to file proofs of claim in the Cases or any successor cases and any order entered by the Court in relation to the establishment of procedures to file proofs or a bar date in any of the Cases or any successor cases shall, or shall be deemed to, so provide.

36.     Preservation of Rights Granted Under this Interim Order.

(a)     NoExcept as otherwise set forth herein, no claim or lien having a priority superior to or *pari passu* with those granted by this Interim Order to the DIP Lenders or to the Pre-Petition Lien Holders, respectively, shall be granted or allowed while any portion of the DIP Facility (or any refinancing thereof), the DIP Commitments, the DIP Obligations or the Adequate Protection Obligations remain outstanding, and the DIP Liens and the Replacement Liens shall not be (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

(b)     To the extent permitted by applicable law, if an order dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code), to the fullest extent permitted by law, that (i) the DIP Liens, Replacement Liens and Superpriority Claims pursuant to this Interim Order shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order (and pursuant to the Subordination Agreements)

until all DIP Obligations and Adequate Protection Obligations shall have been paid and satisfied in full and that such DIP Liens, Replacement Liens and Superpriority Claims, shall, notwithstanding such dismissal, remain binding on all parties in interest and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred provided for this Interim Order.

(c)     If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (i) the validity of any DIP Obligations or Adequate Protection Obligations incurred prior to the effective date of such reversal, stay, modification or vacation or (ii) the validity or enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Credit Agreement with respect to any DIP Obligations or with respect to the Adequate Protection Obligations. Notwithstanding any such reversal, stay, modification or vacation, any use of Cash Collateral, or DIP Obligations or Adequate Protection Obligations incurred by the Debtors prior to the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lenders and Pre-Petition Lien Holders shall be entitled to all the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Interim Order and pursuant to the DIP Documents with respect to all uses of Cash Collateral, DIP Obligations and Adequate Protection Obligations.

(d)     Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Liens, Replacement Liens, Superpriority Claims and all other rights and remedies of the DIP Lenders and Pre-Petition Lien Holders granted by the provisions of this Interim Order and the DIP Documents, as applicable, shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Cases to a case under

31

chapter 7 of the Bankruptcy Code, dismissing any of the Cases, terminating the joint administration of the Cases or by any other act or omission or (ii) the entry of an order confirming a plan of reorganization in any of the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations. The terms and provisions of this Interim Order and the DIP Documents shall continue in these Cases (whether or not these Cases cease to be jointly administered), or in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, Replacement Liens and Superpriority Claims and all other rights and remedies of the DIP Lenders and Pre-Petition Lien Holders granted pursuant to this Interim Order and the DIP Documents, as applicable, shall continue in full force and effect.

37. **Effect of Stipulations on Third Parties. The agreements, stipulations and findings contained in this Interim Order shall be binding upon all parties in interest, including, but not limited to, the Debtors and the Committee, if any, except to the extent that (a) a party in interest with standing (other than the Debtors), has timely filed an adversary proceeding or contested matter asserting any claims or causes of action against the MIO Pre-Petition Lenders, objecting to the MIO Pre-Petition Lenders' claims or liens, or challenging any of the admissions set forth in paragraph 11 of this Interim Order (a "Challenge") no later than the earlier of (the "Challenge Period") (i) forty-five (45) days from the date of entry of this Interim Order (unless the Court orders otherwise, including ordering otherwise at the Final Hearing) or (ii) the deadline established by the Court for filing objections to confirmation of the Debtors' Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code dated January 24, 2011, and (b) the Court rules in favor of the plaintiff or movant in any such timely-filed Challenge and enters a final order**

32

with respect thereto (a "Successful Challenge"). If no such Challenge is timely commenced within the Challenge Period, (v) all of the admissions in paragraph 11 of this Interim Order shall be binding and preclusive on the Debtors and their estates and their respective creditors, the Committee (if any), equity holders, and all other parties in interest, (w) the Pre-Petition Senior Loan Obligations shall constitute allowed claims for all purposes in the Cases and any subsequent chapter 7 cases, (x) the MIO Pre-Petition Lenders' respective security ~~interest~~interests in and liens on the Pre-Petition Senior Collateral shall be deemed legal, valid, binding, perfected and otherwise unavoidable, (y) the Pre-Petition Senior Loan Obligations and the MIO Pre-Petition Lenders' security interests and liens on the Pre-Petition Senior Collateral shall not be subject to subordination, counterclaims, set-off, defense, avoidance or any other or further challenge by any party in interest seeking to exercise the rights of the Debtors' estates, including, without limitation, any successor thereto, and (z) as a result of the foregoing, the repayment of any Pre-Petition Senior Loan Obligations in accordance with the terms of this Interim Order and the Pre-Petition Senior Credit Agreement shall constitute an indefeasible payment and shall be final and binding for all purposes. If any such Challenge is timely commenced within the Challenge Period, the agreements, stipulations and findings contained in paragraph 11 of this Interim Order shall nonetheless remain binding and preclusive on the Debtors' and their estates and their respective creditors, the Committee (if any), equity holders, and all other parties in interest, except to the extent that such findings or admissions were expressly and successfully disputed in ~~such~~a Successful Challenge. ~~Nothing in this Interim Order confers on any Entity (as defined in the Bankruptcy Code), including, but not limited to any Committee, standing or authority to pursue any cause of action belonging to the Debtors or their~~

~~estates, including without limitation, claims and defenses with respect to the Pre-Petition~~
~~Senior Loan Obligations.~~

38. **To the extent a Successful Challenge expressly affects the validity, enforceability, extent, perfection or priority of the MIO Senior Pre-Petition Liens, subject to the final order underlying such Successful Challenge, (i) if the MIO Pre-Petition Lenders have received any funds from the Borrower from the date of entry of this Interim Order until the date of entry of the final order underlying such Successful Challenge in repayment of any Pre-Petition Senior Loan Obligations, the MIO Pre-Petition Lenders shall return such funds to the Borrower within three (3) business days of entry of such final order and (ii) the agreements, stipulations and findings contained in paragraph 11 of this Interim Order shall not be binding or preclusive on the Debtors', their estates, their respective creditors, the Committee (if any), equity holders, or any other parties in interest. Nothing in this Interim Order confers on any Entity (as defined in the Bankruptcy Code), including, but not limited to any Committee, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including without limitation, claims and defenses with respect to the Pre-Petition Senior Loan Obligations.**

39. ~~34.~~ Except with respect to the matters expressly governed by this Interim Order and subject to the provisions of the Subordination Agreements, entry of this Interim Order shall be without prejudice to any and all the rights, remedies, claims and causes of action which the Pre-Petition Lien Holders may have against the Debtors or any third parties, and without prejudice to the rights, if any, of Pre-Petition Lien Holders to seek relief from the automatic stay in effect pursuant to section 362 of the Bankruptcy Code, or any other relief in the Cases, and without prejudice to the rights of the Debtors or any other party in interest to oppose any such

relief.  The provisions of this Interim Order shall be binding upon and inure to the benefit of the

Pre-Petition Lien Holders, the Debtors, and their respective permitted successors and assigns,

including any trustee or other fiduciary hereafter appointed in the Cases as a legal representative

of the Debtors or the Debtors' estates.

40. ~~35.~~ Limitation on Use of DIP Facility Proceeds and Cash Collateral.

Notwithstanding anything herein or in any other order by this Court to the contrary, no

borrowings under the DIP Facility, Cash Collateral or Collateral may be used to (a) object,

contest or raise any defense to, the validity, perfection, priority, extent or enforceability of any

amount due under the DIP Documents or the Pre-Petition Debt Documents, or the liens or claims

granted under this Interim Order, the DIP Documents or the Pre-Petition Debt Documents, (b)

assert claims and defenses or any other causes of action against the DIP Lenders or the Pre-

Petition Lien Holders or their respective agents, affiliates, representatives, attorneys or advisors,

(c) prevent, hinder or otherwise delay the DIP Lenders' or Pre-Petition Lien Holders' assertion,

enforcement or realization on the Collateral in accordance with the DIP Documents, the Pre-

Petition Debt Documents or this Interim Order, (d) seek to modify any of the rights granted to the

DIP Lenders or the Pre-Petition Lien Holders hereunder or under the DIP Documents or the Pre-

Petition Debt Documents, in each of the foregoing cases without such parties' prior written

consent or (e) pay any amount on account of any claims arising prior to the Petition Date or any

professional fees and disbursements incurred in connection with such claims or any of the actions

set forth in the foregoing clauses (a) through (c) unless in each case such payments are (i)

approved by an order of this Court and (ii) in accordance with the DIP Credit Agreement and

Original Budget or otherwise approved by the DIP Lenders in their sole discretion.

41.    36. Right to Credit Bid.  Upon approval of the Final Order, the DIP Lenders and

MIO Pre-Petition Lenders shall have the right to "credit bid" all or a portion of the allowed

amount of their claims during any sale of the Collateral, including without limitation, sales

occurring pursuant to section 363 of the Bankruptcy Code or as part of a plan of reorganization

subject to confirmation under section 1129 of the Bankruptcy Code.

42.    37. Reimbursement of Fees and Expenses.  The Debtors shall reimburse the

Agents and DIP Lenders for their reasonable costs, fee, charges and expenses incurred in

connection with the DIP Facility, DIP Documents and the Cases (including, without limitation,

their reasonable attorneys' and financial advisors' fees and expenses), whether incurred prior to

or after the Petition Date, in accordance with Section 11.3 of the DIP Credit Agreement.  A copy

of any invoice submitted by the Agents or DIP Lenders to the Debtors shall also be delivered

simultaneously to the Debtor, the U.S. Trustee and counsel to any Committee (the "Fee Notice").

None of such costs, fees, charges and expenses shall be subject to Court approval or required to

be recorded or maintained in accordance with the United States Trustee guidelines relating to

compensation and reimbursement of expenses and no recipient of any such payment shall be

required to file any interim or final fee application with the Court.  Subject to the Debtor, any

Committee, or the U.S. Trustee filing a written objection with this Court to any such fees and

expenses within five (5) days after receipt of the Fee Notice, the Debtors shall pay such invoice

in accordance with Section 11.3 of the DIP Credit Agreement.   To the extent a timely filed

objection is filed by the Debtor, any Committee, or the U.S. Trustee, the Debtor (a) shall pay

such portion of the fees and expenses to which no objection is interposed and (b) shall pay any

remaining fees and expenses as ordered by the Bankruptcy Court (or upon withdrawal or

resolution of the objection.

43.     38. Order Governs.  In the event of any inconsistency between the provisions of this Interim Order and the Motion, DIP Documents and/or Pre-Petition Debt Documents, the provisions of this Interim Order shall govern and control.

44.     39. Enforceability.  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entity and there shall be no stay of execution or effectiveness of this Interim Order.

45.     40. Binding Effect; Successors and Assigns.  The DIP Documents and the provisions of this Interim Order, including all findings herein (subject to the paragraph 37 of this Interim Order), shall be binding upon all parties in interest in the Cases, including, without limitation, the DIP Lenders and the Pre-Petition Lien Holders, any Committee and the Debtors and their respective successors and assigns (including any estate representative or any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors) and shall inure to the benefit of the DIP Lenders, the Pre-Petition Lien Holders and the Debtors and their respective successors and assigns; provided, however, that the DIP Lenders and the Pre-Petition Lien Holders shall have no obligation to permit the use of Cash Collateral or extend any financing, as the case may be, to any trustee or similar responsible person appointed for the estates of the Debtors.

46.     41. Retention of Jurisdiction.  The Bankruptcy Court shall retain jurisdiction to enforce the provisions of this Interim Order and the rights of the parties set forth herein, and this

retention of jurisdiction shall survive the confirmation and consummation of any Chapter 11 plan for any one or more of the Debtors notwithstanding the terms or provisions of any such Chapter 11 plan or order confirming such Chapter 11 plan or any order dismissing or closing the Cases.

47. 42. Exculpation. Subject to the entry of a Final Order, the DIP Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lenders or Pre-Petition Lien Holders any liability for any claims arising from the Pre-Petition or postpetition activities of the Debtors in the operation of their business, or in connection with their restructuring efforts.

48. 43. Final Hearing. The Final Hearing to consider entry of the Final Order will be held on ——,April 1, 2011, at ——9:30 a.m. prevailing Eastern time. The Debtors shall, on or before ——March 22, 2011, mail copies of a notice of the entry of this Interim Order, together with a copy of this Interim Order, to the parties having been given notice of the Interim Hearing, to any party which has filed prior to such date a request for notice with the Bankruptcy Court and to counsel for the Committee, if any. Such notice shall constitute adequate notice of the Final Hearing, including without limitation, notice that the Debtors will seek approval at the Final Hearing of a waiver of rights under section 506(c) of the Bankruptcy Code. The notice of entry of this Interim Order shall state that any party in interest objecting to the DIP Facility, the DIP Documents or the use of Cash Collateral on the terms and conditions set forth therein and herein shall file written objections with the United States Bankruptcy Court Clerk for the District of Delaware no later than ——,March 29, 2011 at 4:00 p.m., which shall be served so that the same are received on or before such date and time by: (i) counsel to the Agents DIP Lenders and MIO Pre-Petition Lenders: Hogan Lovells US LLP, 875 Third Avenue, New York, New York 10022, Attn: Robin E. Keller, Esq.; (ii) counsel to the Debtors: (a) Reed Smith LLP, 599

Lexington Avenue, 22nd Floor, New York, New York 10022, Attn: Michael J. Venditto, Esq. and

(b) Reed Smith LLP, 1201 Market Street, Suite 1500, Wilmington, Delaware 19801, Attn: Kurt

F. Gwynne, Esq.;          (iii) counsel to the joint receivers of NSSC, Dewey & LeBoeuf LLP,

1301 Avenue of the Americas, New York, New York 10019, Attn: Timothy Q. Karcher. Esq.;

(iv) counsel to the NSI Receiver, Goodwin Proctor LLP, The New York Times Building, 620 8th

Avenue, New York, New York 10018, Attn. Emanuel C. Grillo, Esq.; (v) counsel to any

Committee; and (vi) the U.S. Trustee, J. Caleb Boggs Federal Building, 844 King Street, Room

5209, Wilmington, Delaware 19801, Attn: ————David L. Buchbinder.

Dated: March __, 2011
       Wilmington, Delaware

_____

Mary F. Walrath
United States Bankruptcy Court Judge

~~UNITED STATES BANKRUPTCY JUDGE~~

Document comparison by Workshare Professional on Monday, March 21, 2011
12:38:27 PM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://DIGITALFILE/US_ACTIVE/105646787/10 |
| Description | #105646787v10<US_ACTIVE> - Interim Order - Approving DIP Financing |
| Document 2 ID | interwovenSite://DIGITALFILE/US_ACTIVE/105646787/14 |
| Description | #105646787v14<US_ACTIVE> - Interim Order - Approving DIP Financing |
| Rendering set | ReedSmith Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 42 |
| Deletions | 37 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 79 |