## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>NEW STREAM SECURED CAPITAL, INC., *et al.*,[1]<br><br>      Debtors. | Chapter 11<br><br>Case No.  11-10753 (MFW)<br>(Jointly Administered) |

**SECOND AMENDED DISCLOSURE STATEMENT IN CONNECTION WITH THE SECOND AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

~~THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY ANY U.S. BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE.~~

| | |
|---|---|
| **REED SMITH LLP**<br>599 LEXINGTON AVENUE<br>22nd FLOOR<br>NEW YORK, NY 10022<br>Telephone: (212) 521 5400<br>Facsimile:  (212) 521 5450 | **REED SMITH LLP**<br>1201 MARKET STREET<br>SUITE 1500<br>WILMINGTON, DE  19801<br>Telephone: (302) 778 7500<br>Facsimile:  (302) 778 7575<br><br>*Counsel for the Debtors* |
| **QUINN EMANUEL URQUHART & SULLIVAN LP**<br>51 MADISON AVE.<br>22ND FLOOR<br>NEW YORK, NY 10010<br>Telephone: (212) 849 7000 | |

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification numbers are: New Stream Secured Capital, Inc. (3903), New Stream Insurance, LLC (6966), New Stream Capital, LLC (0364) and New Stream Secured Capital, L.P. (2948).

| Facsimile: (212) 849 7100 | |
| --- | --- |
| *Counsel for the Official Committee of Unsecured Creditors* | |

THIS DISCLOSURE STATEMENT AND THE PLAN ARE AN INTEGRAL PACKAGE, AND THEY MUST BE CONSIDERED TOGETHER FOR THE READER TO BE ADEQUATELY INFORMED. THIS INTRODUCTION IS QUALIFIED IN ITS ENTIRETY BY THE REMAINING PORTIONS OF THIS DISCLOSURE STATEMENT, AND THIS DISCLOSURE STATEMENT IN TURN IS QUALIFIED, IN ITS ENTIRETY, BY THE PLAN.

ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OF THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION, AND SUCH ADDITIONAL REPRESENTATIONS AND INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTORS, WHO WILL IN TURN DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS MAY BE APPROPRIATE.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN SUBJECT TO AN AUDIT OR INDEPENDENT REVIEW EXCEPT AS EXPRESSLY SET FORTH HEREIN. ACCORDINGLY, THE DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONCERNING THE DEBTORS OR THEIR FINANCIAL CONDITION IS ACCURATE OR COMPLETE. ANY PROJECTED INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PRESENTED FOR ILLUSTRATIVE PURPOSES ONLY, AND, BECAUSE OF THE UNCERTAINTY AND RISK FACTORS INVOLVED, THE DEBTORS' ACTUAL RESULTS MAY NOT BE AS CONTEMPLATED HEREIN.

ALTHOUGH AN EFFORT HAS BEEN MADE TO BE ACCURATE AND THE DEBTORS BELIEVE IN GOOD FAITH THAT THE INFORMATION HEREIN IS ACCURATE, THE DEBTORS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS CORRECT. THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN. EACH CREDITOR IS STRONGLY URGED TO REVIEW THE PLAN PRIOR TO VOTING ON IT. THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED AS OR DEEMED TO CONSTITUTE AN ACCEPTANCE OF FACT, AN ADMISSION OR APPROVAL BY ANY PARTY , INCLUDING THE JOINT NSSC RECEIVERS, WITH REGARD TO ANY OF STATEMENT, BUDGET, PROJECTION OR AMOUNT SET FORTH HEREIN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE OF THIS DISCLOSURE STATEMENT UNLESS ANOTHER

TIME IS SPECIFIED.  THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THERE HAS NOT BEEN ANY CHANGE IN THE FACTS SET FORTH SINCE THE DATE OF THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NONBANKRUPTCY LAW.  ENTITIES HOLDING OR TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST, INTERESTS IN OR SECURITIES OF, THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT ONLY IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.

**CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, BY ITS NATURE, IS FORWARD LOOKING, CONTAINS ESTIMATES AND ASSUMPTIONS WHICH MAY PROVE TO BE INACCURATE, AND CONTAINS PROJECTIONS WHICH MAY PROVE TO BE WRONG, OR WHICH MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS.  EACH CREDITOR, HOLDER OF AN INTEREST AND ANY OTHER PARTY RECEIVING THIS DISCLOSURE STATEMENT SHOULD INDEPENDENTLY VERIFY THE INFORMATION CONTAINED HEREIN AND IN THE PLAN AND PLAN DOCUMENTS, AS WELL AS THE EFFECT OF THE PLAN, AND SHOULD CONSULT ITS INDIVIDUAL ATTORNEY AND ACCOUNTANT AS TO THE EFFECT OF THE PLAN ON SUCH INDIVIDUAL CREDITOR OR HOLDER OF AN INTEREST.  YOUR RIGHTS MAY BE AFFECTED, EVEN IF YOU ARE NOT A HOLDER OF A CLAIM AGAINST THE DEBTORS.**

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION NOR HAS SUCH COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT WILL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN. EACH CREDITOR SHOULD, THEREFORE, CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISERS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION, THE PLAN OR THE TRANSACTIONS CONTEMPLATED THEREBY.

Table of Contents

**Page**

ARTICLE 1.
INTRODUCTION

1.1    Definitions and Capitalized Terms .................................................................1
1.2    Proponents of the Plan .................................................................................1
1.3    Why You are Receiving this Document ..........................................................2
1.4    Summary of Plan's Classification and Treatment of Claims And Interests ..... ~~7~~9
1.5    Risk Factors and Disclaimer ....................................................................... ~~13~~16

ARTICLE 2.
VOTING PROCEDURES

2.1    Voting in General ..................................................................................... ~~16~~18
2.2    Classes Entitled to Vote ............................................................................ ~~16~~19
2.3    Vote Required for Acceptance by a Class ..................................................... ~~18~~20
2.4    Classes Not Entitled to Vote ...................................................................... ~~18~~20
2.5    Solicitation Procedures ............................................................................. ~~18~~21
2.6    Voting Procedures .................................................................................... ~~20~~22

ARTICLE 3.
Confirmation of the Plan

3.1    Confirmation Hearing for the Plan .............................................................. ~~21~~23
3.2    Any Objections to Confirmation of the Plan .................................................. ~~22~~24

ARTICLE 4.
EVENTS LEADING TO THE CHAPTER 11 CASES

4.1    Introduction ............................................................................................ ~~23~~25
4.2    Changes in Financial Markets Prompt Flood of Redemptions ......................... ~~24~~26
4.3    Changes in the Life Settlement Market Exacerbates the Problem ..................... ~~25~~28
4.4    Development of the 2009 Restructuring Plan ................................................ ~~26~~29
4.5    Investigations .......................................................................................... 30
4.6    Negotiations with the Bermuda Fund Receivers ............................................ ~~28~~31
~~4.6~~4.7  The Original Plan ..................................................................................... ~~29~~32

ARTICLE 5.
THE CHAPTER 11 CASES

5.1    The First Day Applications ........................................................................ ~~31~~34
5.2    The Creditors Committee ........................................................................... ~~33~~36
5.3    Sale of the Life Insurance Portfolio ............................................................ ~~34~~37
5.4    NSI Secured Lenders Settlement Agreement ................................................. ~~35~~38
5.5    The Negotiation of the Plan ....................................................................... ~~37~~39
5.6    The Claims Process .................................................................................. ~~38~~39

ARTICLE 6.
THE DEBTORS AND THEIR BUSINESS

6.1 The Master Fund and Three Feeder Funds .......................................................... 39
6.2 The Restructuring Efforts ........................................................................ ~~48~~39
6.3 The Debtors ........................................................................................ ~~59~~39

ARTICLE 7.
PLAN SUMMARY

7.1 TREATMENT OF UNCLASSIFIED CLAIMS ................................ ~~73~~39
7.2 CLASSIFICATION OF CLAIMS AND INTERESTS ...................... ~~77~~39
7.3 General .............................................................................................. ~~77~~39
7.4 Classification ..................................................................................... ~~77~~39
7.5 IDENTIFICATION OF CLASSES IMPAIRED AND NOT IMPAIRED
    BY THE PLAN ................................................................................... ~~78~~39
7.6 TREATMENT OF CLAIMS AND INTERESTS ............................. ~~79~~39
7.7 TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
    LEASES ............................................................................................. ~~83~~39
7.8 MEANS FOR EXECUTION AND IMPLEMENTATION OF THE
    PLAN ................................................................................................. ~~88~~39
7.9 CLAIM OBJECTIONS ....................................................................... ~~101~~39
7.10 DISTRIBUTIONS ............................................................................. ~~104~~39
7.11 CONDITIONS PRECEDENT ............................................................ ~~107~~39
7.12 EFFECT OF CONFIRMATION ......................................................... ~~110~~39
7.13 COMPROMISE, GLOBAL SETTLEMENT, INJUNCTION AND
     RELATED PROVISIONS .................................................................. ~~111~~39
7.14 RETENTION OF JURISDICTION ..................................................... ~~122~~39
7.15 ACCEPTANCE OR REJECTION OF THE PLAN .............................. ~~124~~39
7.16 MISCELLANEOUS PROVISIONS .................................................... ~~126~~39

ARTICLE 8.
FEASIBILITY OF THE PLAN AND THE BEST INTERESTS TEST

8.1 Feasibility of the Plan ....................................................................... ~~129~~39
8.2 Best Interests Test ............................................................................. ~~129~~39
8.3 Confirmation Without Acceptance by All Impaired Classes: The
    'Cramdown' Alternative .................................................................... ~~133~~39

ARTICLE 9.
IMPORTANT CONSIDERATIONS AND RISK FACTORS

9.1 The Plan Proponents Have No Duty to Update ................................... ~~135~~39
9.2 No Representations Outside the Disclosure Statement are Authorized .......... ~~135~~39
9.3 Information Presented Based on Debtors' Books and Records; No Audit
    Performed .......................................................................................... ~~135~~39
9.4 All Information was Provided by Debtors and was Relied Upon By
    Professionals ..................................................................................... ~~136~~39
9.5 Projections and Other Forward Looking Statements Not Assured ........... ~~136~~39
9.6 No Legal or Tax Advice is Provided to You by this Disclosure Statement ..... ~~136~~39
9.7 No Admissions Made .......................................................................... ~~137~~39
9.8 No Waiver of Rights Except as Expressly Set Forth in the Plan ............. ~~137~~39

9.9     Bankruptcy Law Risks and Considerations........................................137 39
9.10    Tax Considerations.................................................................139 39
9.11    Business Factors And Competitive Conditions..............................39
9.12    Claims Filed by Prime Asset Funding GP, LLC.............................39

ARTICLE 10.
CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

10.1    Federal Tax Consequences to the Debtors.....................................141 39
10.2    Federal Tax Consequences to the Claims and Interests....................144 39
10.3    Information Reporting and Backup Withholding.............................144 39

ARTICLE 11.
ALTERNATIVES TO THE PLAN

11.1    Liquidation Under Chapter 7....................................................145 39
11.2    Dismissal............................................................................145 39
11.3    Alternative Plan....................................................................146 39

ARTICLE 12.
DEFINITIONS AND INTERPRETATION

12.1    Scope of Definitions..............................................................146 39
12.2    Definitions..........................................................................146 39
12.3    Rules of Interpretation...........................................................147 39

ARTICLE 13.
CONCLUSION

## <u>TABLE OF SCHEDULES AND EXHIBITS</u>

Exhibit A        Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code

Exhibit B        Comparison of Potential Recovery to Hypothetical Chapter 7 Liquidation

Exhibit C        Initial Calculation of Available Cash

Exhibit D        Initial Calculation of Pre-Effective Date Net Liquidation Proceeds

Exhibit E        Further Description of Treatment of Class 2 Claims

Exhibit F        Initial Wind Down Budget

Exhibit G        Initial Calculation of Joint NSSC Receivers Reimbursement

Exhibit H        Initial Calculation of Net Liquidation Proceeds

Exhibit I        Liquidation Analysis for each Debtor

# ARTICLE 1.

## INTRODUCTION

New Stream Secured Capital, Inc. ("NSCI"), New Stream Insurance, LLC ("NSI"), New

Stream Capital LLC ("NSC"), and New Stream Secured Capital L.P. ("NSSC" or the "Master

Fund", and, collectively with NSCI, NSI, and NSC, the "Debtors") provide this Disclosure

Statement to the Debtors' creditors to permit creditors to make an informed decision in voting to

accept or reject the Second Amended Joint Plan of Reorganization under Chapter 11 of the

Bankruptcy Code filed with the Bankruptcy Court on ~~February 13,~~March 12, 2012 (the "Plan").[2]

## 1.1    Definitions and Capitalized Terms

A copy of the Plan is attached to this Disclosure Statement as Exhibit A.  All capitalized

terms not defined in this Disclosure Statement shall have the meanings ascribed to them in

Article 1 of the Plan, a copy of which is annexed to this Disclosure Statement.

## 1.2    Proponents of the Plan

The Debtors and the Official Committee of Unsecured Creditors (the "Creditors

Committee")[3] are the joint proponents of the Plan (the "Plan Proponents") within the meaning of

Section 1129 of the Bankruptcy Code.

Chapter 11 of the Bankruptcy Code allows debtors and other parties-in-interest to

sponsor a plan of reorganization that proposes how to dispose of a debtor's assets and treat

claims against, and interests in, such debtor.  A plan of reorganization may provide for a

debtor-in-possession to reorganize by continuing to operate, to liquidate by selling assets of the

---

[2]   The Plan amends and supersedes the Joint Plan of Reorganization Under Chapter 11 of The Bankruptcy Code that was filed with the Bankruptcy Court on March 13, 2011 [D.I. 3].  As detailed in this Disclosure Statement, although the Debtors commenced these cases with the intention of seeking confirmation of that plan of reorganization, and a hearing to consider confirmation thereof was scheduled for April 25, 2011, the Debtors did not proceed with confirmation and the confirmation scheduled for April 25, 2011 has been adjourned from time to time.

[3]   The Creditors' Committee was appointed by the United States Trustee on April 5, ~~2010.~~2011.  The individual members of the Creditors Committee are identified in ¶5.2, *infra*, at page 33.

estate or to implement a combination of both.  The confirmation of a plan, which is the vehicle for satisfying the rights of holders of claims against and interests in a debtor, is the overriding purpose of a Chapter 11 case.  Upon confirmation of the plan, it becomes binding on the debtor and all of its creditors and stakeholders, and the obligations owed by the debtor to those parties are compromised and exchanged for the obligations specified in the plan.

The Debtors and the Creditors Committee urge Holders of Claims entitled to vote on the Plan to read the Plan and the Disclosure Statement in their entirety before voting to accept or reject the Plan.  To the extent, if any, that the Disclosure Statement is inconsistent with the Plan, the Plan will govern.

No solicitation materials other than this Disclosure Statement and any schedules and exhibits attached thereto or referenced therein, or otherwise enclosed in the solicitation package with this Disclosure Statement, have been authorized by the Debtors for use in soliciting acceptances of the Plan.

**1.3**     **Why You are Receiving this Document**

    **1.3.1**    **The Original Plan**

On January 24, 2011, the Debtors had proposed a plan of reorganization under Chapter 11 of the Bankruptcy Code (the "Original Plan").  At the time, the Debtors expected that the Original Plan would be accepted by the requisite number and amount of Holders of Claims to enable the Debtors to seek confirmation of the Original Plan as part of a "prepackaged" bankruptcy filing.

The Original Plan was intended to achieve a global resolution of all inter-creditor issues and contained provisions relating to the distribution of assets, the method of liquidation, the release of claims and the compromise of rights and claims that the Debtors' creditors may have,

and was predicated on the sale of the NSI life settlements portfolio (the "<u>Insurance Portfolio Sale</u>").

As is detailed in this Disclosure Statement, the Debtors commenced these Cases to seek confirmation of the Original Plan after soliciting their Creditors.  However, for the reasons discussed herein, the Debtors have not proceeded with the confirmation process and have, instead, amended the Original Plan with the support of the Creditors Committee.  As a result, all ballots that were submitted in connection with the Original Plan are null and void, and will not be counted as part of the current solicitation of votes to accept or reject the Plan.

### 1.3.2    The Plan.

The Plan provides for the liquidation of the Debtors' assets and a distributions of the net proceeds generated from that liquidation among the various Classes of the Debtors' Creditors, in the manner set forth in the Plan.  In addition, to facilitate the liquidation process, the Plan provides for the voluntary settlement and release of inter-creditor claims and establishes mechanisms for the interim management and liquidation of the Debtors' assets.

### 1.3.3    ~~Third-Party~~ Release Provisions

The Plan provides for two types of consensual third-party releases: (i) the releases given by the Debtors to certain third-parties, and (ii) the releases given by certain Creditors to certain third-parties.  In evaluating whether to confirm a plan containing third-party releases, the courts apply different criteria depending on whether the release is given by the debtor or by third–parties. *See, In re Washington Mutual, Inc.*, 2011 WL 57111 (Bkrtcy.D.Del., Case No. 08–12229-MFW, Jan. 7, 2011)(*citing In re Exide Techs.*, 303 B.R. 48, 71–74 (Bankr. D.Del. 2003).  For the reasons discussed below, the Debtors believe that the third-party releases contained in the Plan satisfy the applicable criteria generally employed by bankruptcy courts for

both of the releases included in this Plan.  However, in reaching its conclusion, the Bankruptcy Court here will consider numerous factors and the outcome will be dictated by the specific facts of this case.  *Id.*

A.    Releases granted by Debtors

Decisions from courts considering plan in other cases[4] have identified five factors that provide guidance for a court's determination whether a debtor's release of a non-debtor is appropriate.  These factors, which are neither exclusive nor mandatory, are :

(1) an identity of interest between the debtor and the released party such that a suit against the non-debtor will deplete the estate's resources;

(2) a substantial contribution to the plan by the non-debtor;

(3) the necessity of the release to the reorganization;

(4) the overwhelming acceptance of the plan and release by creditors and interest holders; and

(5) the payment of all or substantially all of the claims of the creditors and interest holders under the plan.

As consideration for the releases from the Debtors, the Insider Released Parties are making numerous concessions and contributions to these estates.  First, the Insider Released Parties are contributing any treatment they would have been entitled to as US Investors to all Holders of Class 2 Claims.  Second, the Insider Released Parties have not been compensated for almost one year notwithstanding the fact that they have continued to work and provide services to the Debtors during this time.  The Insider Released Parties are waiving any right to seek reimbursement of any unpaid management fees that have accrued since the Petition Date in exchange for releases from the Debtors.  Third, the Insider Released Parties are waiving any

---

[4]    *See, e.g., In re Washington Mutual, Inc., supra;  In re Zenith Electronics Corp.,* 241 B.R. 92, 110 (Bankr. D.Del.1999); *In re Master Mortgage Inv. Fund, Inc.,* 168 B.R. 930, 937 (Bankr. W.D.Mo. 1994).

right, title and interest to the assets of NSC (with exception of the NSC Books and Records which have nominal value to the creditors) and its subsidiaries.  Lastly, the Insider Released Parties are relinquishing any right, title or interest in certain other non-Debtor affiliate entities that they were entitled to.  While some of this value is difficult to estimate, the Debtors' good faith estimate is that the aggregate value of this consideration is in excess of $2,500,000.  Under the Plan, the Debtors and their creditors would lose the benefit of these categories of consideration if an Insider Released Party were denied the Plan releases.  At the confirmation hearing, the Debtors believe that they will be able to demonstrate that the releases that will be granted by the Debtors pursuant to Section 12.4 of the Plan are supported by adequate consideration, are in the best interests of creditors, and should be approved by the Bankruptcy Court.

> B.      Consensual third-party releases

As part of Plan solicitation, US-Cayman Investors will be asked to consider whether they wish to be bound by the provisions of section 12.7 of the Plan providing for the releases of certain third-parties.  These releases are totally consensual and for that they will be separately analyzed at the Confirmation Hearing.  Consenting US-Cayman Investors electing to grant such releases will be entitled, in accordance with section 12.7 of the Plan, to share in a Cash payment to be paid in addition to, and irrespective of, any amounts to be distributed to US-Cayman Investors (i) pursuant to section 5.2 of the Plan as a consequence of the Claims of such US-Cayman Investors, or (ii) any amounts distributed or to be distributed to a Class 2 Creditor from the US-Cayman Estate Cash Payment.

Each US-Cayman Investor who agrees to grant the proposed release (a "Releasing US-Cayman Investor") will receive on the Effective Date a payment from the Global Settlement

Fund that is calculated based on the ratio that each such Releasing US-Cayman Investor's Percentage Share bears to the aggregate of the Percentage Shares of all Releasing US-Cayman Investors.  In consideration of this Cash payment, each Releasing US-Cayman Investor will be agreeing to be bound by the provisions of section 12.7 of the Plan that grants for releases to each of the Released Parties from any and all Claims, Interests, Causes of Action, remedies and liabilities whatsoever.  See the discussion of the Global Settlement, *infra*, at Article 7.13.7.

Each US-Cayman Investor will receive a special form of the Class 2 Ballot that will include an additional, optional section to participate in the payment to be made from the Global Settlement Fund in return for the granting of the releases to the Released Parties.

**Only those US-Cayman Investors who return a US-Cayman Investor Ballot that indicates the granting of such releases will be entitled to participate in payments to be made from the Global Settlement Fund.**

The granting of the releases and participation in payments from the Global Settlement is Fund is optional and distinct from the distributions that will be made to US-Cayman Investors on account of their Class 2 Claims.

Bankruptcy courts generally do not have the power to grant a third party release of a non-debtor. Rather, any such release is based on the consent of the releasing party (either by a separate contract or through the mechanism incorporated into a ballot).  Here each of the releasing third-parties has agreed to give the release, either by executing the Settlement Support Agreement or, in the case of Consenting US-Cayman Investors, by completing the consent section in the Class 2 Ballot.

Because these releases are totally voluntary and are being granted by Consenting US-Cayman Investors in exchange for consideration provided by third-parties that is separate

from, and in addition to, distributions being made to the Class (*i.e.*, Class 2) in which the Claims of these Creditors are classified, the Debtor believes that the releases in Section 12.4 will be approved by the Bankruptcy Court at the Confirmation Hearing.

### 1.3.4    This Disclosure Statement

On March [_____], 2012, after notice and a hearing, the Bankruptcy Court entered an order approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtors' creditors and equity interest holders to make an informed judgment whether to accept or reject the Plan, and establishing certain procedures with respect to the solicitation of votes to accept or reject the Plan (the "Disclosure Statement Order") (D.I. ___).  APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE MERITS OF THE PLAN.

The Bankruptcy Code requires that, in connection with soliciting creditors and interest holders, the party proposing a Chapter 11 plan must provide the creditors and interest holders with "adequate information."  When the solicitation occurs after the commencement of a Chapter 11 case, the proponent of the plan is required to prepare and file with the bankruptcy court a document called a "disclosure statement", which the Bankruptcy Code mandates must contain sufficient information to enable parties who are affected by the plan to vote knowingly for or against the plan, or object to the plan, as the case may be.  The plan proponent is permitted to solicit creditors and interest holders only after the bankruptcy court finds that the proposed disclosure statement contains such information.

This Disclosure Statement summarizes the Plan's content and provides information relating to the Plan and the process the Bankruptcy Court will follow in determining whether to

confirm the Plan.  This Disclosure Statement also describes the negotiation of the Plan, discusses

the events leading to the Debtors' filing their Chapter 11 Cases, and, finally, summarizes the

Plan.  This Disclosure Statement also describes certain U.S.  Federal income tax consequences of

the Plan to the Debtors and Holders of Claims and Interests, voting procedures and the

confirmation process.

   The Disclosure Statement Order sets forth in detail the deadlines, procedures and

instructions for voting to accept or reject the Plan and for filing objections to confirmation of the

Plan, the record date for voting purposes, and the applicable standards for tabulating Ballots.  In

addition, detailed voting instructions accompany each Ballot.  Each Holder of a Claim entitled to

vote on the Plan should read the Disclosure Statement, the Plan, the Disclosure Statement Order

and the instructions accompanying the Ballots in their entirety before voting on the Plan.  These

documents contain, among other things, important information concerning the classification of

Claims and Interests for voting purposes and the tabulation of votes.  No solicitation of votes to

accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

   This Disclosure Statement has been compiled by the Debtors to accompany the Plan.

The factual statements and other information contained in this Disclosure Statement have been

taken from documents prepared by the Debtors.  The information provided in this Disclosure

Statement represents the Debtors' best information regarding facts and financial information and

is true to the best of their knowledge.  Nothing contained in this Disclosure Statement shall have

any preclusive effect against any party (whether by waiver, admission, estoppel or otherwise) in

any cause or proceeding that may currently exist or occur in the future.  This Disclosure

Statement shall not be construed as or deemed to constitute an acceptance of fact or an admission

by any party, including the Receivers, with regard to any of the statements made herein.  This

Disclosure Statement contains the Debtors' views of certain facts and events.  All such disclosures should be read as assertions by the Debtors only and not by any other party.[45]

The statements contained in this Disclosure Statement are made as of the date hereof unless another time is specified herein, and neither delivery of this Disclosure Statement nor any exercise of rights granted in connection with the Plan, should be read to imply that there has been no change in the information set forth herein since the date of this Disclosure Statement.

Certain of the information contained in this Disclosure Statement, by its nature, is forward looking, contains estimates and assumptions which may prove to be inaccurate, and contains projections which may prove to be wrong, or which may be materially different from actual future results.  Each Creditor, Interest Holder, and any other party receiving this Disclosure Statement should independently verify the information contained herein and in the Plan and Plan documents, as well as the effect of the Plan, and should consult its individual attorney and accountant as to the effect of the Plan on such individual Creditor or Interest Holder.  Your rights may be affected, even if you are not a Holder of a Claim against the Debtors.

*All Creditors should carefully review both this Disclosure Statement and the Plan before voting to accept or reject the Plan.  Indeed, Creditors should not rely solely on the Disclosure Statement but should also read the Plan.  The Plan provisions will govern if there are any inconsistencies between the Plan and the Disclosure Statement.*

---

[45]   The NSI Litigation Claimants disagree with many aspects of the Debtors' characterization of their financial and operational history.  The NSI Litigation Claimants disagreement is set forth in the *Motion of Certain U.S. and Cayman Investors for Entry of an Order Pursuant to Section 1104 and 105 of the Bankruptcy Code (I) Appointing a Chapter 11 Trustee or, in the Alternative, (II) Appointing an Examiner* [D.I. 24] and incorporated herein by reference.

**1.4**    **Summary of Plan's Classification and Treatment of Claims And Interests**

THE PLAN PROPOSES TO MODIFY THE RIGHTS OF CERTAIN CREDITORS AND EQUITY HOLDERS OF THE DEBTORS.  THE PLAN ESTABLISHES THE FOLLOWING TREATMENT FOR UNCLASSIFIED AND CLASSIFIED CLAIMS AND INTERESTS:

| Unclassified Claims | Plan Treatment |
|---|---|
| Administrative Claims | Subject to the allowance procedures and deadlines provided herein, on the Effective Date or as soon thereafter as is practicable, each Holder of an Allowed Administrative Claim shall receive on account of such Allowed Administrative Claim and in full satisfaction, settlement and release of and in exchange for such Allowed Administrative Claim, (a) Cash equal to the unpaid portion of such Allowed Administrative Claim, or (b) such other treatment as to which the Debtors and the holder of such Allowed Administrative Claim have agreed upon in writing, *provided, however,* that Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases shall be paid in the ordinary course of business in accordance with the terms and conditions of any agreement or course of dealing relating thereto and (or such other treatment as to which the Debtors and the holder of such Allowed Administrative Claim have agreed) Professional Claims shall be paid in accordance with section 2.4 of the Plan.  Notwithstanding anything to the contrary contained herein, the payment prior to the Effective Date of Allowed Administrative Claims attributable to NSSC shall be subject to the NSSC Receivers' consent to the use of their cash collateral. |
| Intercompany Claims | On the Effective Date, Intercompany Claims shall be deemed discharged, satisfied and released.  Intercompany Claims shall not be entitled to receive any distribution under the Plan. |
| Statutory Fees | On or before the Effective Date, all fees due and payable pursuant to 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid in full, in Cash. |
| Professional Claims | Immediately prior to the Effective Date, the Debtors shall pay all amounts owing to the Professionals for all outstanding Professional Claims that have been awarded by the Court but which were unpaid as of the Effective Date; *provided, however,* that from such amounts |

| Unclassified Claims | Plan Treatment |
|---|---|
| | otherwise due and owing to a Deferring Class B Professional, the Cayman Fund Dissolution Payment shall be paid to the Cayman Funds pursuant to Section 7.10 of the Plan and reimbursed pursuant to Section 7.1.8 of the Plan.  The Professionals shall estimate Professional Claims due for periods that have not been billed as of the Effective Date and the Debtors shall include such amounts in its calculation of the Claims Amount.  On or prior to the Administrative Claims Bar Date (or such other time as the Bankruptcy Court may permit), each Professional shall File with the Bankruptcy Court its final fee application seeking final approval of all fees and expenses from the Petition Date through the Effective Date.  Within ten (10) days after entry of a Final Order with respect to its final fee application, each Professional shall remit any overpayment to the Post Confirmation Debtors or the Post Confirmation Debtors shall pay any outstanding amounts owed to the Professional from the reserved Claims Amount. |
| Tax Claims | All requests for payment of Claims by a Governmental Unit (as defined in section 101(27) of the Bankruptcy Code) for Taxes (and for interest and/or penalties or other amounts related to such Taxes) for any tax year or period, all or any portion of which occurs or falls within the period from and including the Petition Date through and including the Effective Date, and for which no Bar Date has otherwise been previously established, must be Filed on or before the later of: (a) sixty (60) days following the Effective Date; or (b) to the extent applicable, ninety (90) days following the filing of a tax return for such Taxes (if such Taxes are assessed based on a tax return) for such tax year or period with the applicable Governmental Unit.  Tax Claims that are Allowed will be paid in full on the earlier of (i) the Effective Date, or (ii) the date on which the Tax Claim becomes an Allowed Claim. |
| Other Priority Claims | With respect to each Allowed Other Priority Claim, on the Effective Date or as soon thereafter as is practicable, the holder of an Allowed Other Priority Claim shall receive on account of the Allowed Other Priority Claim, and in full satisfaction, settlement and release of and in exchange for such Allowed Other Priority Claim, (a) Cash equal to the unpaid portion of such Allowed Other Priority Claim, or (b) such other treatment as to which the Debtors and the holder of such Allowed Other Priority Claim have agreed upon in writing; *provided, however,* that the Debtors may defer payment of an Allowed Other Priority Claim for Taxes by a Governmental Unit in accordance with the Bankruptcy Code, and provided further, that the Allowed Other Priority Claims of the United States for Taxes shall be entitled to interest, accruing from the Effective Date to the date |

| Unclassified Claims | Plan Treatment |
|---|---|
| | of payment, at the statutory rate established by federal law; and provided further that the Debtor shall pay all fees due pursuant to 28 U.S.C. §1930 and 31 U.S.C. §3717 on or prior to the Effective Date and thereafter until the entry of (i) a Final Decree closing this case or (ii) an order dismissing or converting the case to a case under Chapter 7 of the Bankruptcy Code. |

| Class | Claim | Plan Treatment of Class |
|---|---|---|
| 1 | Bermuda Non-C, F and I | Each Holder of an Allowed Claim in Class 1 shall receive, in full settlement and satisfaction of such Claims, on the Effective Date: (i) all of the Available Cash on the Effective Date or in such other, lesser amount as may be agreed to by the Joint NSSC Receivers; and (ii) the Class A Interests in the Wind-Down Entities.<br><br>**Class 1 is impaired and is entitled to vote.** |
| 2 | US-Cayman Claims | Each Holder of an Allowed Claim in Class 2 shall receive, in settlement of and exchange for such Claims, (a) a beneficial interest in the Liquidating Trust that is the equivalent of its Percentage Share; (b) its *pro rata* share of the actual distributions from the Liquidating Trust to which the Insider Released Parties who are released on the Effective Date under section 12.4 and 12.5 of the Plan would have been entitled on account of the Principal Assigned Claims; and (c) its Percentage Share of the Pre-Effective Date Net Liquidation Proceeds.  The Liquidating Trust shall receive all Class B Interests in the Wind Down Entities on the Effective Date and each Holder of an Allowed Claim in Class 2 shall receive periodic distributions from the Liquidating Trust equal to its Percentage Share of Cash available for distribution from the Liquidating Trust.  The Pre-Effective Date Net Liquidation Proceeds shall be paid to the Joint NSSC Receivers on the Effective Date to reduce the Joint NSSC Receivers Reimbursement owed by the Holders of Allowed Claims in Class 2 pursuant to section 7.1.7 of the Plan; *provided, however,* that if the Joint NSSC |

| | | |
|---|---|---|
| | | Receivers Reimbursement is fully reimbursed on the Effective Date then any such excess Pre-Effective Date Net Liquidation Proceeds shall be distributed to each Holder of an Allowed Claim in Class 2 in the amount of such Holder's Percentage Share.<br><br>**Class 2 is impaired and is entitled to vote.** |
| 3 | Indemnification Claims | The Indemnification Claims shall be allowed as filed against each Debtor against which such Indemnification Claims were filed.  Certain Holders of the Indemnification Claims have filed or otherwise hold Claims in addition to the Indemnification Claims against the Debtors or their respective subsidiaries or affiliates, which include: (a) the Principal Assigned Claims; and (b) the Assigned Individual Claims.  As further consideration for the Releases set forth in sections 12.4 and 12.5 of the Plan, (a) the actual distributions to which the Insider Released Parties who are released on the Effective Date under sections 12.4 and 12.5 of the Plan would have been entitled on account of the Principal Assigned Claims (but not the Indemnification Claims) shall be conveyed by the Debtors or the Liquidating Trustee, as the case may be, to those US-Cayman Investors who, in accordance with the Settlement Agreement, provide a release to the Insider Released Parties and (b) any distribution with respect to Assigned Individual Claims of such Insider Released Parties shall be waived.  Notwithstanding anything contained herein, so long as the net economic benefit remains unchanged to all Holders of Class 2 Claims, at the request the Insider Released Parties, the Debtors or the Liquidating Trustee, as the case may be, shall expunge all or any portion of the Principal Assigned Claims and/or the Assigned Individual Claims in lieu of distributing amounts to Releasing US-Cayman Investors or Holders of Class 2 Claims, as the case may be.  Nothing is intended, nor shall it constitute an agreement, to (a) create, impair transfer or assign any right to coverage under any D&O Policies; or (b) entitle the Wind Down Entities or any other party that is not an Indemnification Claimant to pursue or seek the collection of any proceeds from any D&O Policies, other than the Investigation Reimbursement.  Further, the Debtors and any Indemnification Claimants, except |

| | | |
|---|---|---|
| | | to the extent of the Investigation Reimbursement, shall retain any and all rights to pursue, collect, receive and otherwise enforce the D&O Policies and related rights and proceeds, in accordance with the terms of the D&O Policies; *provided, however,* that the Investigation Reimbursement (after any applicable deductible) may be from proceeds of any applicable D&O Policy notwithstanding any contrary "priority of payments" provision in that policy (and the provisions of this clause shall be binding upon all Indemnification Claimants), without prejudice to the Indemnification Claimants' rights with respect to the balance of the proceeds of the D&O Policies.  On account of the Principal Assigned Claims, the Assigned Individual Claims, and the provisions of the Plan regarding the payment, as the case may be, to the NSSC Estate or the Manager Entity (to the extent that such consent is required) of the Investigation Reimbursement (after any applicable deductible) from proceeds of a D&O Policy notwithstanding any contrary "priority of payments" provision in the D&O Policy, the Indemnification Claimants shall receive the benefit of the Releases set forth in the Plan.  Any Indemnification Claimant's obligation to convey the distributions from the Principal Assigned Claims, waive the Assigned Individual Claims or forbear from opposing payment of the Investigation Reimbursement shall not arise unless and until the Releases are in full force and effect with respect to such Indemnification Claimant.<br><br>**Class 3 is impaired and is entitled to vote.** |
| 4(a) | General Unsecured Claims against NSI | Each Holder of a Claim in Class 4(a) shall each receive, in full and final satisfaction of the Holder's Claim, an amount equal to the amount of their Allowed Claim to be paid from the Cash remaining in the NSI Estate after payment in full of Administrative and Priority Claims.<br><br>**Class 4(a) is unimpaired and is not entitled to vote.** |
| 4(b) | NSSC Debtors General Unsecured Claims | Holders of Class 4(b) Claims will be paid in Cash in the ordinary course of business or upon the Effective Date, subject to an aggregate cap of $100,000 from which aggregate amount such Holders will be paid |

| | | |
|---|---|---|
| | | their *pro rata* portion, unless the Holders of such NSSC Debtors General Unsecured Claims agree to different treatment.<br><br>**Class 4(b) is impaired and is entitled to vote.** |
| 4(c) | NSC Debtors General Unsecured Claims | Each Holder of a Claim in Class 4(c) shall receive, in full and final satisfaction of the Holder's Claim, an amount equal to the amount of its Allowed Claim to be paid by the Plan Administrator from the Cash remaining in the NSC Estate after payment in full of Administrative and Priority Claims.<br><br>**Class 4(c) is unimpaired and is not entitled to vote.** |
| 4(d) | NSCI Debtors General Unsecured Claims | Class 4(d) Claims will not receive any distribution nor retain any property under the Plan on account of such Claims.<br><br>**Class 4(d) is not entitled to receive or retain any property under the Plan and therefore is deemed to reject.** |
| 5(a) | Interests in NSI | All Interests in NSI, which are held by NSSC, shall be extinguished on the Effective Date in exchange for (i) the transfer to NSSC of all Cash remaining in the NSI estate after the payment or the payment of the applicable amount of Cash into the Disputed Claim Reserve pursuant to section 8.2 of the plan of all Claims of Class 4(a), and (ii) the transfer to NSSC of all Assets held by NSI.<br><br>**Class 5(a) unimpaired and is not entitled to vote.** |
| 5(b) | Interests in NSSC | All Interests in NSSC shall be extinguished on the Effective Date and the Holders of Interests in Class 5(b) shall not receive or retain any property on account of such Interest.<br><br>**Class 5(b) is not entitled to receive or retain any property under the Plan and therefore is deemed to reject.** |
| 5(c) | Interests in NSC | Each Holder of any Interests in NSC shall retain such Interest. |

| | | |
|---|---|---|
| | | **Class 5(c) unimpaired and is not entitled to vote.** |
| 5(d) | Interests in NSCI | All Interests in NSCI shall be extinguished on the Effective Date and the Holders of Interests in Class 5(d) shall not receive or retain any property on account of such Interest.<br><br>**Class 5(d) is not entitled to receive or retain any property under the Plan and therefore is deemed to reject.** |

Exhibit B sets forth an additional chart describing the potential treatment of each of the Classes and comparing such treatment to a hypothetical chapter 7 liquidation.

## 1.5    Risk Factors and Disclaimer

Prior to deciding whether and how to vote on the Plan, each Holder of a Claim should carefully read this Disclosure Statement, with all attachments and enclosures, in its entirety, and consult with their own advisors, in order to formulate an informed opinion as to the manner in which the Plan affects any Claim(s) they may hold against the Debtors or any other parties and to determine whether to vote to accept the Plan.  Holders of Claims should particularly consider the risk factors described in Article 9 below.

Holders of Claims should also read the Plan carefully and in its entirety.  The Disclosure Statement contains a summary of the Plan for convenience, but the terms of the Plan supersede and control the summary.

In formulating the Plan, the Debtors relied on financial data derived from their books and records.  The Debtors represent that everything stated in this Disclosure Statement is true to the best of their knowledge.  The Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.

The discussion in this Disclosure Statement regarding the Debtors may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "expect," "believe," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology.  The reader is cautioned that all forward looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. Any forward-looking statements are qualified in their entirety by reference to the factors discussed throughout this Disclosure Statement.  To the extent this Disclosure Statement includes any liquidation analyses, distribution projections and/or other information described herein are estimates only, and the timing and amounts of actual distributions to Creditors may be affected by many factors that cannot be predicted.  Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

Nothing contained in this Disclosure Statement is, or shall be deemed to be, an admission or statement against interest by the Debtors for purposes of any pending or future litigation matter or proceeding.

Although the attorneys, accountants and other professionals employed by the Debtors have assisted in preparing this Disclosure Statement based upon factual information and assumptions respecting financial, business and accounting data found in the books and records of the Debtors, they have not independently verified such information and make no representations as to the accuracy thereof.  The attorneys, accountants, advisors and other professionals employed by the Debtors shall have no liability for the information in this Disclosure Statement.

The Debtors and their professionals also have made a diligent effort to identify in this Disclosure Statement, and in the Plan, pending litigation claims and projected Causes of Action and objections to Claims. However, no reliance should be placed on the fact that a particular litigation Claim or projected Cause of Action or objection to Claim is, or is not, identified in this Disclosure Statement or the Plan. The Debtors or the Plan Administrator, as applicable, may seek to investigate, file and prosecute litigation Claims and projected Causes of Action and objections to Claims, in the manner contemplated by the provisions of the Plan, after the Confirmation Date or Effective Date of the Plan irrespective of whether this Disclosure Statement or the Plan identifies any such Claims, Causes of Action or objections to Claims.

While these factors could affect distributions available to Holders of Allowed Claims or Allowed Interests under the Plan, the occurrence or impact of such factors will not affect the validity of the vote of the Impaired Classes entitled to vote to accept or reject the Plan (the "Voting Classes") or require a re-solicitation of the votes of the Holders of Claim in such Voting Classes.

## ARTICLE 2.

## VOTING PROCEDURES

### 2.1    Voting in General

This Disclosure Statement is being provided to Creditors in connection with the Solicitation of votes to accept or reject the Plan.

In January, 2011, the Debtors had solicited votes on the Original Plan. However, they have abandoned the Original Plan and, together with the Creditors Committee, are now seeking confirmation of the Plan. As a result, none of the provisions of the Original Plan have taken

effect and any Ballots submitted in connection with the Original Plan will not be counted as part of the current solicitation in connection with the Plan.

The Plan differs in many respect from the Original Plan.  Any Creditor holding a Claim in a Class that is entitled to vote should carefully read this Disclosure Statement and the Plan before deciding how to vote on the Plan.  Creditors holding Claims in Voting Classes should submit a new Ballot in connection with the Plan.  ***Votes previously submitted in connection with the Original Plan will not be counted.***

**2.2**   **Classes Entitled to Vote**

The following Classes are the Voting Classes, which are the only Classes entitled to vote to accept or reject the Plan:

| | |
|---|---|
| Class 1 | (Bermuda Non-C, F and I Class Claims) |
| Class 2 | (US-Cayman Claims) |
| Class 3 | (Indemnification Claims) |
| Class 4(b) | (General Unsecured Claims against NSSC) |

If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote and you will not receive a Ballot.  If your Claim is in the Voting Classes, you should receive a complete Solicitation Package, including a Ballot, and you should read the documents provided and follow the instructions listed on the Ballot and Ballot Instructions carefully.  Please use only the Ballot that accompanies the Solicitation Package, as each Voting Class has a distinct Ballot.

US Investors holding an interest in the US Fund will receive a US Investor Ballot which: (a) solicits their indication to the manager of the US Fund whether to vote the Claim of the US

Fund under the US Fund Notes to either accept or reject the Plan; and (b) solicits whether such US Investor agrees to be bound by the provisions of section 12.7 of the Plan.

Cayman Investors will receive a Cayman Investor Ballot which (a) solicits their respective non-binding indication to the directors of the particular Cayman Fund in which the Cayman Investor holds shares, whether to vote the Claim of such Cayman Fund under the Cayman Fund Notes to either accept or reject the Plan and (b) solicits whether such Cayman Investor agrees to be bound by the provisions of section 12.7 of the Plan.

The third-party release provisions of section 12.7 of the Plan are voluntary and elective. While the confirmation of the Plan will make the Plan binding upon all Creditors, even those who do not vote or who vote to reject the Plan, the agreement to the provisions of section 12.7 of the Plan – and the resulting right to receive payment from the Global Settlement Fund – will only be binding upon those US-Cayman Investors who return a Ballot that indicates their agreement to be bound by the provisions of section 12.7 of the Plan.  The failure or refusal to agree to be bound by the provisions of section 12.7 of the Plan will have no effect on the right of any US-Cayman Investor to participate in any distributions to be made to Class 2 Creditors.

**2.3**    **Vote Required for Acceptance by a Class**

Under the Bankruptcy Code, acceptance of a plan by a Class of Claims is determined by calculating both the number and the dollar amount of Claims voting to accept, based on the actual total allowed Claims voting in such class.  Acceptance by a Class requires an affirmative vote of more than one-half in number and two-thirds in amount of the total allowed Claims voting in such Class.

**2.4**    **Classes Not Entitled to Vote**

Under the Bankruptcy Code, Creditors are not entitled to vote if their contractual rights are Unimpaired by the Plan or if they will receive no distribution of property under the Plan. Based on this Standard, the following Classes of Claims or Interests will not be entitled to vote on the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 4(a) | General Unsecured Claims against NSI | Unimpaired | Presumed to Accept |
| 4(c) | General Unsecured Claims against NSC | Unimpaired | Presumed to Accept |
| 5(a) | Interests in NSI | Unimpaired | Presumed to Accept |
| 5(c) | Interests in NSC | Unimpaired | Presumed to Accept |
| 4(d) | General Unsecured Claims asserted against NSCI | Impaired | Deemed to Reject |
| 5(b) | Interests in NSSC | Impaired | Deemed to Reject |
| 5(d) | Interests in NSCI | Impaired | Deemed to Reject |

## 2.5    Solicitation Procedures

### 2.5.1    Solicitation Agent

The Debtors have retained Kurtzman Carson Consultants LLC (the "Solicitation Agent" or "Balloting Agent") to, among other things, act as the Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan.  Executed Ballots should be returned to the Solicitation Agent, which will tabulate the ballots and provide a written presentation of the voting to the Court.

### 2.5.2    Solicitation Package

The following materials shall constitute the complete Solicitation Package provided to parties in interest entitled to vote on the Plan:  (a) written notice (the "Confirmation Hearing Notice"), substantially in the form annexed as Exhibit B to the Motion as Exhibit BDebtors' Motion seeking, *inter alia*, approval of the Disclosure Statement (D.I. 827), of (i) the Court's approval of the Amended Disclosure Statement, (ii) the deadline for voting on the Plan, (iii) the

date of the Confirmation Hearing, and (iv) the deadline and procedures for filing objections to confirmation of the Plan, which Confirmation Hearing Notice is approved; (b) the Plan (either by paper copy or in "pdf" format on a CD-Rom, at the Debtors' discretion); (c) the Amended Disclosure Statement, substantially in the form approved by the Court (either by paper copy or in "pdf" format on a CD-Rom, at the Debtors' discretion); (d) the appropriate ballots (substantially in the forms annexed to the Motion as Exhibit C) and ballot return envelope; (e) a copy of the Court's Order (I) Approving The Debtors' Amended Disclosure Statement; (II) Establishing Procedures For Solicitation And Tabulation Of Votes To Accept Or Reject Their Amended Plan Of Reorganization, Including: (A) Approving The Form And Manner Of Distribution Of Solicitation Packages, (B) Approving The Form And Manner Of Notice Of The Confirmation Hearing, (C) Establishing A Record Date And Approving Procedures For Distribution Of Solicitation Packages, (D) Approving Form Of Ballot, (E) Establishing The Deadline For Receipt Of Ballots, And (F) Approving The Procedures For Vote Tabulations; (III) Establishing The Deadline And Procedures For Filing Objections To Confirmation Of The Amended Plan; And (IV) Granting Related Relief (D.I. ____) (either by paper copy or in "pdf" format on a CD-Rom, at the Debtors' discretion); and (f) such other information as the Court may direct or approve.

### 2.5.3    **Distribution of the Solicitation Package**

The solicitation period for eligible Creditors to vote to accept or reject the Plan will not commence until the entry of an order of the Bankruptcy Court approving this Disclosure Statement.

Through the Solicitation Agent, the Debtors intend to distribute the Solicitation Packages to the Holders of Claims in Voting Classes by not later than March 19, 2012.

**2.6**     **Voting Procedures**

The Bankruptcy Court has established February 15, 2012, (the "Voting Record Date") as

the date for determining which Holders of Claims are eligible to vote on the Plan.  The Voting

Record Date, as defined above, is the date for determining (1) which Holders of Claims are

entitled to vote to accept or reject the Plan and therefore receive the Solicitation Package and (2)

whether Claims have been properly assigned or transferred to an assignee such that the assignee

can vote as the Holder of a Claim.  The Voting Record Date and all of the Debtors' solicitation

and voting procedures shall apply to all of the Debtors' Creditors and other parties in interest.

Under the Plan, Holders of Claims in the Voting Classes are entitled to vote to accept or

reject the Plan.  In order for the Holder of a Claim in the Voting Classes to have such Holder's

Ballot counted as a vote to accept or reject the Plan, such Holder's Ballot must be properly

completed, executed and delivered by either:

> **(a)**     regular mail, overnight delivery or hand delivery to:

> NEW STREAM BALLOT PROCESSING CENTER
> C/O KURTZMAN CARSON CONSULTANTS LLC
> 2335 ALASKA AVENUE
> EL SEGUNDO, CA 90245
> TOLL FREE:  888.733.1541
> TELEPHONE:  310.751.2637 (for international callers)

TO BE COUNTED, THE SOLICITATION AGENT MUST RECEIVE THE BALLOT
INDICATING ACCEPTANCE OR REJECTION OF THE PLAN **NO LATER THAN 5:00
P.M., PREVAILING PACIFIC TIME, ON APRIL ~~11,~~16, 2012** (THE "VOTING
DEADLINE") UNLESS THE DEBTORS EXTEND THE PERIOD DURING WHICH VOTES
WILL BE ACCEPTED BY THE SOLICITATION AGENT, IN WHICH CASE THE TERM
"VOTING DEADLINE" FOR SUCH SOLICITATION SHALL MEAN THE LAST TIME AND
DATE TO WHICH SUCH SOLICITATION IS EXTENDED.  IF A BALLOT IS RECEIVED
AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS
DETERMINE OTHERWISE IN THEIR SOLE DISCRETION.

BALLOTS CAST BY FACSIMILE, EMAIL, OR OTHER ELECTRONIC
TRANSMISSION WILL NOT BE COUNTED UNLESS APPROVED IN ADVANCE BY THE
DEBTORS IN WRITING.

## ARTICLE 3.

## CONFIRMATION OF THE PLAN

**3.1**    **Confirmation Hearing for the Plan**

The Bankruptcy Court has set a hearing on the Confirmation of the Plan (the "Confirmation Hearing") to consider objections to Confirmation, if any.  The Confirmation Hearing shall commence at **2:00 p.m., Prevailing Eastern Time on April 23, 2012**, in the United States Bankruptcy Court for the District of Delaware, 824 Market Street, Wilmington, Delaware 19801.  The Confirmation Hearing may be continued from time to time, without notice, other than an announcement of a continuance date at such hearing or a continued hearing, or by posting such continuance on the Court's docket.

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the applicable requirements of Section 1129 of the Bankruptcy Code for confirmation are met.  Among such requirements are that, among other things, the Plan:  (1) is accepted by the requisite Holders of Claims in each Impaired Class under the Plan; (2) provides that each Creditor in the Impaired Classes will receive as much as it would if the Debtors were instead liquidated pursuant to Chapter 7 of the Bankruptcy Code; and (3) is not likely to be followed by the liquidation, or need for further financial reorganization, of the Debtors.

The "cramdown" provisions of Section 1129(b) of the Bankruptcy Code permit confirmation of a Chapter 11 plan of reorganization in certain circumstances even if the plan is not accepted by all impaired classes of Claims and Interests.  The Debtors have reserved the right to request Confirmation pursuant to the cramdown provisions of the Bankruptcy Code.

**3.2** **Any Objections to Confirmation of the Plan**

Any responses or objections to Confirmation of the Plan must be in writing and must be filed with the Clerk of the Bankruptcy Court with a copy to the Court's Chambers, together with a proof of service thereof, and served on the counsel listed below **ON OR BEFORE April** ~~~~**16,** 2012 at **4:00 P.M., Prevailing Eastern Time**.  Bankruptcy Rule 3020 governs the form of any such objection.

**Counsel on whom objections must be served are:**

| | |
|---|---|
| Counsel for the Debtors<br>REED SMITH LLP<br>599 Lexington Avenue<br>New York, NY 10022<br>Attn:   Michael J. Venditto | REED SMITH LLP<br>1201 Market Street, Suite 1500<br>Wilmington, DE 19801<br>Attn:   Kurt F. Gwynne<br>         J. Cory Falgowski |
| Counsel for the United States Trustee<br>Office of the United States Trustee<br>844 N. King Street, Second Floor<br>Wilmington, DE 19801<br>Attention: David Buchbinder | Counsel for the Joint NSSC Receivers<br>DEWEY & LEBOEUF LLP<br>1301 Avenue Of The Americas<br>New York, NY 10019<br>Attention: Irena Goldstein |
| Counsel for the Creditors Committee<br>QUINN EMANUEL URQUHART & SULLIVAN<br>51 Madison Avenue, 22nd Floor<br>New York. New York<br>Attention: Benjamin Finestone | Counsel for McKenna<br>GOODWIN PROCTER LLP<br>The New York Times Building<br>620 8th Avenue<br>New York,  New York 10018<br>Attention:  Deborah Schrier-Rape |

**THE DEBTORS AND THE COMMITTEE BELIEVE THAT THE PLAN IS IN THE BEST INTERESTS OF ALL OF THEIR CREDITORS AS A WHOLE.  THE DEBTORS THEREFORE RECOMMEND THAT ALL HOLDERS OF CLAIMS ENTITLED TO VOTE SUBMIT BALLOTS TO ACCEPT THE PLAN.**

# ARTICLE 4.

# EVENTS LEADING TO THE CHAPTER 11 CASES

**4.1**     **Introduction**

The Debtors are an inter-related group of companies that collectively comprise an investment fund, headquartered in Ridgefield, Connecticut, that is colloquially referred to as "New Stream."  Until recently, New Stream had been focused on investments that provided funding solutions for complex transactions in a wide range of industries.

The primary operating entity for this enterprise is NSSC, a limited partnership.  All of the working capital for the investments made by NSSC was provided by Investors, each of whom have invested through one of three feeder funds (the "Feeder Funds"), which are described below.  Two of the Feeder Funds, one in Bermuda (the "Bermuda Feeder") and the other in the Cayman Islands (the "Cayman Feeder"), are vehicles for investments made by nonresident aliens and foreign entities.  The other Feeder Fund is the vehicle through which U.S. residents have made investments (the "US Feeder").  Neither NSSC nor any of the three (3) Feeder Funds is registered, or is required to be registered, with the U.S. Securities and Exchange Commission or otherwise.

The vast majority of New Stream's Investors are "Fund of Funds", meaning that they are themselves pooled investment vehicles with investors of their own, they invest in other funds, and an investment with the Debtors is among several investments the Fund of Funds has made. The balance of the investors in the Debtors consists largely of pension funds, private bank/trust accounts and investment/wealth advisors.

Since 2005, NSSC and its subsidiaries (including both debtor and non-debtor entities) have invested in a specialized portfolio that yielded positive returns for investors.  These

investments included commercial loans, real estate holdings and investments in oil and gas investments.  But, one of their largest and most valuable assets was the portfolio of life settlements[56] held by NSI (the "NSI Insurance Portfolio").

**4.2**     **Changes in Financial Markets Prompt Flood of Redemptions**

In late September 2008, the first of a series of fund failures (most notably, an allegedly fraudulent ABL fund run by Thomas Petters) had an adverse effect on many of the Investors.  A substantial number of redemption requests were made as a result of the Petters fraud and similar events during the last week of September 2008.[67]

As a result of these redemptions, the Debtors made a decision in October, 2008 to take necessary actions to put all Investors who had not yet requested redemption or whose redemptions had not yet become effective on an equal footing with investors submitting requests in the most recent wave, with respect to any cash to be distributed by the Bermuda, US and Cayman Feeder Funds.  This was to avoid a situation in which Investors in such Feeder Funds who had not sought to redeem, primarily because they had no impairment issues themselves and were satisfied with the Debtors' performance, would find themselves with concentration or other adverse selection issues in a fund that would be shrinking by 60%.[78]  In the US Feeder Fund and the Cayman Feeder Fund, actions were taken to reject the latest wave of redemption requests (that is, all redemptions which had not become effective on or before October 1, 2008).  This would have kept all such Investors in the US Fund and the Cayman Funds, with the intent to pay

---

[56]  A "life settlement" is a life insurance policy that the policy holder has sold to a third party.  The third party makes premium payments going forward and receives the death benefit upon the death of the insured.  These policies are bought and sold in privately negotiated transactions in which the transaction price is based on an estimated life expectancy –expressed in months– of the insured.  As discussed *infra*, this life expectancy calculation is based on mortality data that is published by third-party agencies.

[67]  For a further discussion of the Feeder Funds and their role in the Debtors' organization and capital structure, please see Article 6 of this Disclosure Statement.

[78]  Redemptions from September 2008 together with earlier redemptions would cause the fund to shrink by 60% in the aggregate.

them (and investors who had not requested redemption) on a *pro rata* basis from the net proceeds generated from the liquidation of NSSC's assets in the ordinary course.

In contrast, the Bermuda Fund took no action to prevent redemption requests taking effect in the ordinary course because there were hardly any investors who had not requested redemption.  However, NSC had verbal discussions with all of the investors in the Bermuda Fund and explained that the Debtors intended to pay out redemptions in the Bermuda Fund which had not become effective on or before September 30, 2008 in the same manner as was adopted for the US Fund and the Cayman Funds.

**4.3    Changes in the Life Settlement Market Exacerbates the Problem**

On November 28, 2008, before discussions with the investors had begun in earnest, a second catastrophic event occurred.  AVS, the largest rating agency for life settlements, announced that it was revising its methodology for determining life expectancy.  In simple terms, AVS extended its views on mortality and extending life expectancies, which reduced the implicit value of life settlements.  Over the following three months, secondary sales of life settlements progressively dried up.  Buyers and sellers were unable to translate the changes in mortalities and life expectancies into current policy values, as very few sales were being transacted. Policies that had clear value, using any reasonable estimate of life expectancy, frequently would receive no bids when brought to market.  By late February, 2009, the combination of uncertainty around values and general market illiquidity effectively shut down the life settlement market.

These events impacted the Debtors in two ways.  First, as of November 30, 2008, 42% of NSSC assets were in life settlements or life settlement related investments (such as premium finance loans).  These assets needed to be marked to reflect the rating agencies' changing views on mortality.  The Debtors engaged a respected, independent actuary, Milliman Inc., to revalue

the life assets.  This complex and time-consuming analysis was completed in late February 2009.

As a result, the Debtors took a markdown against the NSI Insurance Portfolio (valued at $194

million in November 2008), resulting in $71 million of unrealized losses for NSSC at December

31, 2008.  Second, the Debtors' ability to monetize assets in the NSI Insurance Portfolio at

reasonable value in the short term was impaired.  Sales could only be achieved at distressed, not

fair, value.  The Debtors needed time for the market to normalize and reasonable trading to

resume.  Indications from leading participants were that the market would re-emerge over time.

The Debtors expected this to take between 12 to 24 months.  Third, regular cash payments to

service the premiums of the individual policies in the NSI Insurance Portfolio required frequent

capital expenditures approximating $5 million per month.

## 4.4    Development of the 2009 Restructuring Plan

Faced with the incompatible demands of Investor liquidity, the illiquidity of assets in the

Debtors' portfolio, and the cash needed to pay premiums on the NSI Insurance Portfolio, the

Debtors were compelled to take decisive action.  During April and May of 2009, the Debtors

negotiated and restructured their relationships with Investors (hereinafter the "2009

Restructuring").  The purpose of the 2009 Restructuring was to allow the Debtors to prudently

liquidate investments over a period of time that would maximize their value.  The Debtors

solicited the consent of the Investors in the three Feeder Funds to this restructuring and, it

believed that it had obtained their unanimous consent.  By May 7, 2009, the Debtors received

consents to this restructuring from 100% of Cayman Funds Investors, 90% of US Fund

Investors, and 60% of Bermuda Fund Investors.

Shortly after the 2009 Restructuring was implemented, two Bermuda Investors who had

not consented to the 2009 Restructuring commenced litigation in the Supreme Court of Bermuda

(the "Bermuda Litigation").[89]  In June, 2010, one of those Bermuda Investors obtained a declaration that that the terms of the 2009 Restructuring did not apply to two of the Segregated Account Classes invested in by that Investor.  And as a result of this ruling, the Debtors were unable to liquidate assets and distribute available funds in the manner anticipated by the 2009 Restructuring.  Shortly after the Bermuda Court made its ruling, it appointed a receiver, McKenna, to act on behalf of Segregated Account Class C and Segregated Account Class I, the Bermuda share classes that were affected by the ruling.

The appointment of McKenna created a potential conflict between the interests of the prevailing Bermuda Investors and the Investors in the other Bermuda segregated account classes, which was in addition to the obvious conflict between the Bermuda Investors and the Investors in the US Fund and the Cayman Funds.  Accordingly, NSC, in its capacity as the investment manager for the Bermuda Fund, caused the Bermuda Fund to request the Bermuda Court to appoint a receiver to act on behalf of the other Bermuda Investors.  In response to that request, on June 18, 2010, the Bermuda Court appointed the Joint Receivers for Segregated Account Classes B, E, H, K, L, N and O of the Bermuda Fund and appointed McKenna as the Receiver over Class F.

On September 13, 2010, the Bermuda Fund Receivers petitioned the Bermuda Court for the winding up of the Bermuda Fund and by ex parte summons for their appointment as joint provisional liquidators of the Bermuda Fund.  They were appointed the joint provisional liquidators that same day.  On October 7, 2010, the Bermuda Court ordered that the Bermuda Fund be wound up under the provisions of the Bermuda Companies Act and confirmed the appointment of the joint provisional liquidators.

## 4.5    Investigations

---

[89]  For further discussion of the Bermuda Litigation, see Article 6.2.2, *infra*.

In December 2009, an Internet blog reported that United States law enforcement authorities had initiated an investigation of the Debtors.  Although no regulatory authorities had contacted the Debtors, the Debtors proactively communicated with the U.S. Attorney's Office for the District of Connecticut to offer their assistance in any investigation and voluntarily supplied information and documents.  In July 2010, the Debtors were contacted by the U.S. Securities and Exchange Commission ("SEC"), which had opened an informal investigation of its own and initially sought copies of the materials provided to the U.S. Attorney's Office. Again, the Debtors voluntarily supplied information and documents.  In mid-December 2010, in connection with its investigation, the SEC sought additional materials from the Debtors and the Debtors have been voluntarily complying with that request.  voluntarily complied with that request.  In late December 2010, the SEC issued a Formal Order of Investigation and thereafter the SEC staff issued a subpoena to the Debtors. To date in excess of 1,200,000 pages of documents have been delivered to the SEC.  The Debtors are also aware that SEC has sent the Debtors auditors, J.H. Cohn a subpoena.  The SEC's investigation is ongoing. No proceeding has been initiated by any law enforcement authority.  The Debtors intend to fully cooperate

In its efforts to cooperate with the pending investigations, the Debtors voluntarily delivered the same documents and information it delivered to the SEC to the US Attorney's Office ("USAO").  The USAO investigation is also ongoing.  The Debtors expect the investigation by both the SEC and the USAO will continue after the Effective Date.  After the Effective Date, the reorganized Debtors NSC will be the party responding to and cooperating with any regulatory or enforcement activity.  NSC is preserving the books and records of the Debtors in order to comply with any future information requests by any regulatory or enforcement agency.

**4.6**    ~~4.5~~ Negotiations with the Bermuda Fund Receivers

Since the appointments of the Bermuda Fund Receivers, the Debtors have been in negotiations with them, as the court-appointed representatives of the Bermuda Fund Segregated Account classes, concerning an orderly liquidation of the Debtors.  During these discussions, there was disagreement concerning the use of cash generated from NSSC's portfolio to pay premiums on the NSI Insurance Portfolio.  Without the use of this cash, NSI was unable to pay premiums and faced the potential loss of value from cancellation of policies for non-payment of premiums.

The Debtors, with encouragement and assent of the Receivers, marketed the NSI Insurance Portfolio.  That marketing effort culminated in the acceptance of an offer made by Limited Life Assets Master Limited and Limited Life Assets Services Limited (collectively, the "Purchaser"), which the Debtors determined to be the highest and best offer received for the NSI Insurance Portfolio, for a cash price of $127.5 million plus a "price-neutral" premium financing in the amount extended under that certain Secured Promissory Note dated August 4, 2010, as amended (the "Pre-Petition Secured Note"), made by NSI in favor of certain secured lenders (the "Note Lenders") to fund premium payments until the sale could be closed.[9][10]

**4.7**    ~~4.6~~ The Original Plan

On November 9, 2010, the Debtors entered into an Initial Plan Support Agreement with, *inter alia*, the Receivers and MIO, as the representative of the prospective Purchaser of the NSI Insurance Portfolio.  The Initial Plan Support Agreement outlined the terms of a restructuring that was to be more fully negotiated.

Over the next several months, the Debtors negotiated the details of a "pre-packaged" plan of reorganization with the Receivers and MIO.  These negotiations centered on a closing of the

---

[9][10] See Article 6.3.4 for a more detailed discussion on the sale process and terms of the purchase.

Insurance Portfolio Sale and an allocation of the net proceeds among the Debtors' creditors.  In

the latter part of January 2011, the parties reached a final agreement on the details of a global

settlement, which were embodied in the Original Plan and described in detail in the Disclosure

Statement in Connection with the Prepetition Solicitation of Votes in Respect of the Joint Plan of

Reorganization Under Chapter 11 of the Bankruptcy Code (the "Initial Disclosure Statement")

(D.I. 4).

The Initial Plan Support Agreement had contemplated that a second, more

comprehensive agreement would be entered into when the parties had agreed on all the terms of

a reorganization plan, to which they would annex copies of an agreed pre-packaged

reorganization plan and disclosure statement.  Consequently, on January 21, 2011, the Debtors

entered into the Plan Support Agreement with, *inter alia*, the Receivers and MIO, which annexed

copies of the Original Plan and Initial Disclosure Statement.

By the Plan Support Agreements, the signatories agreed to support confirmation of the

Original Plan subject to certain terms and conditions.

On January 24, 2011, following execution of the Plan Support Agreement, the Debtors

commenced the solicitation of their Creditors, seeking support for the confirmation of the

Original Plan.  When the solicitation commenced, the Debtors advised all interested parties that

the deadline for returning ballots to accept or reject the Original Plan was February 22, 2011.

However, shortly after the solicitation commenced, the Debtors amended the Original Plan,

solely to correct Schedule 1, which set forth the respective interests of investors in the

US/Cayman Funds.  So, on February 4, 2011, the amendment was sent to all parties who had

received the original solicitation.  To afford affected parties an adequate opportunity to consider

the amendment, the voting deadline was extended to March 8, 2011 at 5:00 p.m. (Pacific).

When the solicitation period ended, the balloting and claims agent certified that the Original Plan had been accepted by all of the required voting classes.

# ARTICLE 5.

## THE CHAPTER 11 CASES

On March 13, 2011 (the "Petition Date"), the Debtors commenced these Chapter 11 Cases with the intention of seeking confirmation of the Original Plan. On the Petition Date, each of the four Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. By order dated March 15, 2011, the Bankruptcy Court approved the joint administration of these Chapter 11 Cases [D.I. 42].

On the Petition Date, the Debtors also filed the Original Plan and the Initial Disclosure Statement.

### 5.1    The First Day Applications

On March 14, 2011, the Debtors filed several "first day applications", which included their *Motion for an Order (I) Scheduling Combined Hearing on Adequacy of Disclosure Statement and Prepetition Solicitation Procedures and Confirmation of Plan, (II) Establishing Procedure for Objection to Disclosure Statement, Solicitation Procedures, and Plan, (III) Approving Form, Manner, and Sufficiency of Notice of Combined Hearing, (IV) Establishing Bar Dates for Filing of Proofs of Claim or Interests, and (V) Granting Related Relief* [D.I. 10].[1011]

At the same time, the Debtors filed the *Motion of Debtors for Entry of Orders (I) Approving Debtor-In-Possession Financing Pursuant to 11 U.S.C. §§ 105(a), 362, and 364 and Fed. Bankr. P. 2002, 4001 and 9014 and Local Bankruptcy Rule 4001-2; (II) Authorizing Use Of Cash Collateral Pursuant To 11 U.S.C. Sections 105, 361, 362 and 363 of the Bankruptcy Code; (III) Granting Adequate Protection and Superpriority Administrative Claims; (IV)*

---

[1011] By an order entered on March 24, 2011 [D.I. 91], the Court (i) scheduled the Combined Hearing to consider the adequacy of the Initial Disclosure Statement and prepetition solicitation procedures and confirmation of the Original Plan for April 25, 2011. That same order established "Bar Dates" for the filing of proofs of Claim and Interests. *See infra.*

- 35 -

*Scheduling A Final Hearing; and (V) Granting Related Relief* (the "<u>DIP Financing Motion</u>")
[D.I. 12].  In the DIP Financing Motion, the Debtors sought approval for post-petition financing
needed to preserve and maintain the NSI Insurance Portfolio pending the closing of the
Insurance Portfolio Sale under the Asset Purchase Agreement between NSI and the Purchaser
relating thereto (the "<u>Asset Purchase Agreement</u>").

On March 17, 2011, the Debtors filed the *Debtors' Motion For An Order (I) Approving
Bid Incentives, Including Break-Up Fee, And (II) Granting Related Relief* (the "<u>Bid Incentives
Motion</u>") [D.I. 58].  By this motion, the Debtors sought approval of certain provisions of the
proposed sale of the NSI Insurance Portfolio under the Asset Purchase Agreement.

On March 29, 2011, certain US/Cayman investors (the "<u>US/Cayman Objectants</u>" or "<u>NSI
Litigation Claimants</u>") filed the *Objection of Certain US/Cayman Investors to the Motion of the
Debtors for a Final Order Under Sections 105, 361, 362, 363(c), and 364(c)(1), 364(c)(2),
364(c)(3), and 364(e) and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, and
9014: (I) Authorizing Debtors to Obtain Postpetition Financing; (II) Authorizing Debtors to Use
Cash Collateral; and (III) Granting Adequate Protection to Prepetition Secured Parties [D.I.
115]; and, on April 4, 2011, the US/Cayman Objectants filed the Objection of Certain
US/Cayman Investors to Debtors' Motion for Entry of an Order (I) Approving Bid Incentives,
Including Break-Up Fee and (II) Granting Related Relief* [D.I. 147] (collectively, the
"<u>US/Cayman Objections</u>").

**5.2**    **<u>The Creditors Committee</u>**

On April 5, 2011, the Office of the United States Trustee appointed the Creditors
Committee.  The members of the Creditors Committee are:

| Banco Nominees (Guernsey) Limited c/o Consulta Limited Attn: Matthew Ridley | SPAR (2004) LP Attn: Philip Siller 43 Hillcrest Drive | ZCALL, LLC Attn: Joseph Umbach 250 Royal Palm Way |

| 20 St. James Street, London England SWIA IES | Toronto Canada M6G 2E2 | Suite 210 Palm Beach FL |
|---|---|---|

Shortly after its appointment, the Creditors Committee engaged Quinn Emanuel Urquhart & Sullivan, LLP as its legal counsel and retained financial advisors, including Zolfo Cooper, to assist the Creditors Committee in performing its duties.  Subsequently, the Creditors Committee appointed a non-voting member of the Creditors Committee.[11][12]

On April 11, 2011, the Creditors Committee filed (1) *the Objection of the Official Committee of Unsecured Creditors of New Stream Capital, Inc. et al., to Motion of Debtors for Entry of Orders (I) Approving Debtor-in-Possession Financing Pursuant to 11 U.S.C. §§ 105(a), 362, and 364 and Fed. Bankr. P. 2002, 4001 and 9014 and Local Bankruptcy Rule 4001-2; (II) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. §§ 105, 361, 362 and 363 of the Bankruptcy Code; (III) Granting Adequate Protection and Superpriority Administrative Claims; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [D.I. 182] and (2) *the Objection of Official Committee of Unsecured Creditors of New Stream Secured Capital Inc., et al., to Debtors' Motion for Entry of an Order (I) Approving Bid Incentives, Including Break-Up Fee and (II) Granting Related Relief* [D.I. 181] (collectively, the "Committee Objections").

**5.3    Sale of the Life Insurance Portfolio**

Thereafter, the Debtors reached an agreement with various parties, including the US/Cayman Objectants, the Creditors' Committee and the Receivers, to resolve the US/Cayman Objections, the Committee Objections, and all other disputes concerning the DIP Financing Motion, the Bid Incentives Motion, and the process for effectuating a sale under section 363 of the Bankruptcy Code of the NSI Insurance Portfolio (the "Sale Process").

---

[11][12]   The *ex-officio* member is Deloitte Financial Advisory Services, Attn: Andrew Childe, acting for Belmont Asset Based Lending Ltd – in Official Liquidation, P.O. Box 1787 GT, Citrus Grove, Goring Avenue, Grand Cayman KY1-1109.

This agreement was memorialized in the *Stipulation Resolving Certain Objections to (A) Motion of Debtors for Entry of Order (I) Approving Debtor-In-Possession Financing Pursuant to 11 U.S.C. §§ 105(a), 362, and 364 and Fed. Bankr. P. 2002, 4001 and 9014 and Local Bankruptcy Rule 4001-2; (II) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. §§ 105, 361, 362, and 363 of the Bankruptcy Code; (III) Granting Adequate Protection and Superpriority Administrative Claims; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief and (B) Debtors' Motion for Entry of an Order (I) Approving Bid Incentives, Including Break-Up Fee, and (II) Granting Related Relief* [D.I. 252] (the "Stipulation"), which was approved by an order of this Court on April 25, 2011 [D.I. 263].

Pursuant to the Stipulation, and in order to ensure the sale of the NSI Insurance Portfolio maximized the value of the Debtors' estates, the Committee was afforded the opportunity to solicit a competing offer for the NSI Insurance Portfolio and the Debtors agreed to cooperate with such efforts, without prejudice to their right to determine whether any competing transaction was higher and better than the terms contained in the Asset Purchase Agreement.

Notwithstanding its efforts and the Debtors' cooperation, the Committee did not obtain any offers for the NSI Insurance Portfolio and after a further hearing this Court entered an order on May 16, 2011, [D.I. 336] authorizing the sale of the NSI Insurance Portfolio on the terms set forth in the Asset Purchase Agreement, subject to certain revisions and improvements provided from under the Stipulation. The sale of the NSI Insurance Portfolio closed on June 3, 2011. At that time, NSI held the proceeds from the Insurance Portfolio Sale in the amount of $124,319,660.00, which were purported cash collateral for the liens of the NSI Secured Lenders.

**5.4    NSI Secured Lenders Settlement Agreement**

Each of the NSI Secured Lenders filed a proof of claim asserting a secured indebtedness, which collectively aggregated $97,393,194 as of the Petition Date, plus accruing post-petition interest (including default interest at a per annum rate of 12.5%) and costs and expenses, including legal fees.  The NSI Secured Lenders estimated that such secured claims would be approximately $107 million (including postpetition interest, costs and legal fees) as of July 31, 2011.  The Creditors Committee conducted an investigation and assessment of estate claims against the NSI Secured Lenders.  Although the precise amount owed to the NSI Secured Lenders was the subject of disagreement, NSI and the Creditors Committee negotiated with the NSI Secured Lenders to, among other things, compromise the NSI Secured Lenders' claims[13] on terms favorable to the Debtors which would avoid protracted and costly litigation.  The Debtors and the NSI Secured Lenders subsequently entered into a Settlement Agreement and Release dated July 14, 2011 (the "Settlement Agreement").

In turn, on July 7, 2011, the Debtors filed the *Motion for an Order Authorizing and Approving Compromise and Settlement with Secured Lenders to New Stream Insurance, LLC* [D.I. 446] to approve the Settlement Agreement.  Following a hearing on July 29, 2011, the Bankruptcy Court entered an order approving the Settlement Agreement [D.I. 495].

The Settlement Agreement approved by the Court provides, among other things, that all claims filed on behalf of the NSI Secured Lenders are allowed as secured claims in the aggregate, collective amount of $93,750,000.  This represents an approximately $13 million reduction from the projected amount of the NSI Secured Lenders' claims as of July 31, 2011 (which asserted amount would have continued to increase if unresolved).

---

[13]   Claims of the NSI Secured Lenders refers, collectively to (i) the secured proofs of claim filed against NSI (claim nos. 78, 79 and 80), and (ii) the unliquidated claims filed by each NSI Secured Lender against NSC (claim nos. 81, 82 and 83).

In addition, the Settlement Agreement contains a number of additional terms that benefit the Debtors and their creditors.  First, the delivery and release of the Assigned Claims and Contingent Assigned Claims (as those terms are defined in the Settlement Agreement) provided a material benefit to the Debtors and their creditors since it eliminated over 100 unliquidated claims asserted against the Debtors, resulting in a substantial reduction in potential and pending litigation and the resolution of the involuntary chapter 11 cases commenced against certain of the Feeder Funds[1314] and it substantially reduced the pool of unsecured claims.  The Contingent Assigned Claims also provided an impetus for a consensual resolution of all remaining inter-creditor disputes affecting the Debtors' estates other than the NSI estate.

Second, the US/Cayman Estate Cash Payment (of $10,150,000) that was established by the NSI Secured Lenders provided a substantial economic benefit to the US/Cayman Creditors, who otherwise might not have received any distribution from these estates (absent costly litigation with uncertain outcome of issues such as substantive consolidation and/or constructively fraudulent transfers).  Thus, the US/Cayman Estate Cash Payment ensured the availability of a cash fund to provide a distribution to this class of investors who are purportedly subordinated to other creditors' claims against NSSC.  The Debtors and the Committee further believe that the establishment of this trust account for the benefit of the US/Cayman Creditors mitigated the odds of expensive litigation over lien priority at NSSC and thereby helped pave the way toward a consensual resolution of the other remaining inter-creditor disputes.

Third, the US/Cayman Creditors were further benefited by the assignment of the claims of the Debtors' principals, which will be released upon confirmation of the Plan subject to the conditions detailed in the Plan.  If this is effectuated, the effective elimination of these Principal

---

[1314]  See *infra*, at Article 6, Sections 6.1 and 6.1.2.

Assigned Claims from the class of US/Cayman Creditors will further enhance the *pro rata* distributions to these creditors when the Plan is confirmed.

The cumulative effect of the Settlement Agreement was significant, removing several impediments to negotiation and confirmation of the Plan.  As is encouraged in bankruptcy, the Settlement Agreement also avoids unnecessary litigation between the Creditors Committee, the US/Cayman Objectants and the NSI Receiver that would have involved the Debtors and substantially increased administrative expenses.

**5.5**      **The Negotiation of the Plan**

During the period commencing in July, 2011 and continuing through the filing of the Plan on February 13, 2012, the Debtors worked cooperatively with major constituencies in these cases to develop the Plan.  The participants in this process included the Joint Receivers, the NSI Receiver, MIO, the NSI Litigation Claimants and the Creditors Committee, each of whom have expressed their support for the confirmation of the Plan.

Throughout this period, the Creditors Committee, through its professionals, has actively participated in the development of the Plan and the negotiations leading to its filing with the Court.  Counsel for the Committee has been directly involved in the negotiation and drafting of the Plan.  As a result of this participation and involvement, the Creditors Committee has joined with the Debtor to be a proponent of the Plan and will actively work with the Debtors in seeking confirmation of the Plan by the Court.

**5.6**      **The Claims Process**

The Bankruptcy Code provides a procedure for each Person who believes he has a Claim against a debtor to assert such Claim, so that such claimant can receive distributions from the debtor's bankruptcy estate.  The bankruptcy court establishes a "bar date" - a date by which

creditors must file their Claims, or else such Claims will not participate in the bankruptcy case or any distribution.  After the filing of all Claims, the debtor evaluates such Claims and can, along with other parties in interest, raise objections to them.  These claims objections allow the debtor to minimize claims against it, and thereby maximize the recovery to creditors with Allowed Claims.

On March 24, 2011, a *Notice of (I) Combined Hearing on (A) Adequacy of the Disclosure Statement and Solicitation Procedures and (B) Confirmation of Plan of Reorganization and Related Matters, (II) Procedures for Objecting to Disclosure Statement, Solicitation Procedures, and Plan, and (III) Bar Dates for the Filing of Proofs of Claim or Interests* [D.I. 92] was issued establishing May 10, 2011 at 5:00 p.m. (Pacific time) as the deadline for filing proofs of Claim against the Debtors (the "Bar Date").  In addition, September 12, 2011 at 5:00 p.m. (Pacific time) was set as the deadline for the filing of Claims by governmental units.

The Debtors have been reviewing, analyzing and resolving Claims on an ongoing basis as part of the claims reconciliation process.  To date an aggregate of 206 proofs of claim have been asserted in the Chapter 11 Cases.  The Debtors have begun to reconcile the amount and classification of outstanding claims and assert and prosecute objections to Claims.  The Debtors have also identified Claims for possible future resolution, as well as other existing or potential Claims disputes.  Additionally, the debtors anticipate that approximately 115 of proofs of Claim have been satisfied as a consequence of the Settlement Agreement and the Court's approval thereof.  *See* Order Authorizing and Approving Compromise and Settlement with Secured Lenders to New Stream Insurance, LLC [D.I. 495].  Nonetheless, a significant number of Claims have not yet been reviewed, and the actual ultimate aggregate amount of Allowed Claims may differ significantly from the amounts used for the purposes of the Debtors' estimates.

Additionally, the Debtors are in the process of reviewing the Debtors' Schedules and, upon the completion of such review, may amend such Schedules to account for certain Claims that have been satisfied or settled.  Accordingly, the amount of the *pro rata* share that will ultimately be received by any particular holder of an Allowed Claim may be adversely affected by the outcome of the claims resolution process.

## ARTICLE 6.

## THE DEBTORS AND THEIR BUSINESS

The businesses of each of the Debtors, and their respective organization and operations, are summarized in this section of this Disclosure Statement.  However, a brief overview of the organizational structure, which is based on the "master-feeder fund" structure commonly used by investment managers, will simplify the explanation.

### 6.1    The Master Fund and Three Feeder Funds

The master-feeder fund structure is commonly utilized by investment managers to accumulate funds raised from both U.S. and foreign investors and pool them into a single master fund.  In this way, the investment manager can achieve a critical mass of investments, realize economies of scale, enhance operating efficiencies and thereby reduce costs.

In this parlance, NSSC is the "master fund."  The capital that it invests is obtained from the three Feeder Funds, one of which is a domestic entity that aggregates investments from U.S. investors.  The other two Feeder Funds are foreign entities that aggregate investments from non-resident investors who are not subject to taxation in the United States.

The US Fund, New Stream Secured Capital (U.S.), LLC, is a Delaware limited liability company and the entity through which U.S. residents have invested in NSSC.  Each domestic investor owns a membership Interest in the US Fund, which indirectly holds an Interest in, and is

a secured creditor of, NSSC.  The US Fund is not one of the Debtors in these cases; however, on March 8, 2011, an involuntary Chapter 11 petition was filed against the US Fund, although no order for relief has been entered in that case.[1415]

As noted, there are two foreign Feeder Funds, organized primarily for non-U.S. investors, structured to allow nonresident aliens and foreign entities to invest without subjecting their investments to U.S.  taxation by taking advantage of the "portfolio interest exemption" under the Internal Revenue Code.  To qualify for the portfolio interest exemption, these foreign investments generally are loans and not equity.

### 6.1.1    The Bermuda Fund

One of the two foreign feeders is the Bermuda Fund, which is a segregated accounts company formed in Bermuda pursuant to SACA.  Each of the individual share classes of the Bermuda Fund owns notes issued by either NSSC or NSI.

In October 2005, New Stream organized the Bermuda Fund for foreign investors not generally subject to U.S. tax laws.  This new fund, now known as New Stream Capital Fund Limited, but then known as PCM Capital Limited, was established as a Bermuda segregated accounts mutual fund company on October 31, 2005.  The Bermuda Fund was formed to offer investment opportunities in NSSC (or NSI) to non-US investors under favorable tax treatment.

Until mid-2008, the directors of the Bermuda Fund were certain of the principals of NSC.  However, as part of the amendment to the Bermuda Fund by-laws which occurred at that time, two independent directors were appointed and they have made decisions for the Bermuda Fund until the appointment of the Bermuda Liquidators.  NSC was the manager of the Bermuda Fund

---

[1415]  *In re New Stream Secured Capital (U.S.), LLC, Putative Debtor.*  (U.S. Bankruptcy Court for the District of Delaware Case No. 11-10690 (MFW)).

until September 8, 2010.  Since that time, the Bermuda Fund has been administered by the Bermuda Liquidators.

The investment prospectus for both NSSC and the Bermuda Fund specifically stated that redemptions of Bermuda Investors would be paid subject to the fund manager's ability to liquidate the assets of the Bermuda Fund.  As with NSSC, the Bermuda Fund documents afforded investors only the right to a monthly valuation report and an annual audit, and vested the fund manager and the Bermuda Fund's directors with the broadest of powers.

The Bermuda Investors made their investments into the Bermuda Fund by purchasing shares in the Segregated Account classes.  In turn, each of the Segregated Account classes entered into a loan transaction with either the Master Fund or NSI (the "Bermuda Loans").  Bermuda Loans were set up pursuant to Loan and Security Agreements that had a fixed commitment amount and could be drawn using one or multiple notes (the "Loan Notes").  Each of the Loan and Security Agreements is governed by Connecticut law.  The Bermuda Fund concluded one Loan and Security Agreement for each Segregated Account.  Initially, the Loan and Security Agreements were materially identical for each of the Bermuda Fund's Segregated Account classes.  However, each of the Loan and Security Agreements and Loan Notes has been through several rounds of amendments since that time.

For each of the Bermuda Loans to NSSC and NSI, the respective borrowers pledged essentially all of their respective assets as Collateral.  Upon expiration of the demand period, or breach of covenant, a default could be declared and various remedies obtained by the lender, including, for certain breaches, foreclosure on the collateral.  However, these actions could only be taken pursuant to the terms of the applicable "Collateral Agency Agreements" which the

applicable borrower entered into with Wilmington Trust Company, the designated "Collateral Agent" and the respective Segregated Account classes.

Each of the Collateral Agency Agreements (one for NSI and one for NSSC) was a form of inter-creditor agreement and clarified the priority of liens among the various lenders who had an interest in the same collateral pool of the respective borrowers in the event of foreclosure or liquidation of the collateral or other enforcement of the liens upon the collateral.

The respective Collateral Agency Agreements were implemented in October, 2006 on behalf of all the lenders at that time.  The Bermuda Fund was a signatory in respect of each Segregated Account and remedies with respect to the Bermuda Loans were made subject to the terms of the Collateral Agency Agreement.  The Collateral Agency Agreements are governed by the law of Delaware.

These documents were prepared solely to deal with the rights of foreclosure and liquidation of collateral following an "Event of Default" under the Loan Notes.  To effect a liquidation of the collateral under the Collateral Agency Agreements, each of the lender signatories holding at least 51% of the aggregate debt held by all the lender signatories must have declared a default under the respective loan agreements and given written notice to the Collateral Agent.  In 2006, the Segregated Accounts of the Bermuda Fund were the only lenders executing the original Collateral Agency Agreements; therefore, upon any such liquidation of NSSC or NSI (as the case may be), Clause 5(n) stated that proceeds were to be paid first to certain "Senior Lender" bank liens, and then in repayment of the Bermuda loans on a *pari passu* basis.

There has never been any action taken in connection with any Event of Default under the Bermuda Loan Notes.

Neither the Collateral Agency Agreements nor an investor's place in the capital structure has ever had any impact on how redemptions were ordered for payment; all redemptions were paid in the order in which they were received, in accordance with their effective date.  Thus, if a US investor placed a redemption and it became effective prior to the effective date of a Bermuda investor's redemption, the US investor would be paid first, irrespective of the debt/equity split or the capital structure position.  As such, this issue of senior or subordinate position was completely irrelevant for most purposes and to most investors, whose primary interest was in safely deploying their capital into a fund that was steadily realizing good returns.

### 6.1.2    The Cayman Feeders

The other foreign feeder is a series of investment corporations organized under the laws of the Cayman Islands (collectively, the "Cayman Funds").  Each of the Cayman Funds is a creditor of NSSC and also owns some of the common stock of NSCI.

None of the Cayman Funds is a debtor in these cases.  On March 8, 2011, an involuntary Chapter 11 petition was filed against two of the Cayman Funds by investors in those funds but to date no order for relief has been entered in either of those cases.[16]

The Cayman Funds were originally organized in September 2007 as part of an intended restructuring of foreign investments in NSSC.  At that time, all loans to NSSC totaled $552,840,000, which was 3.4 times the amount of equity participations in NSSC (that is, a 3.4:1 debt to equity ratio).  Although this debt to equity ratio was permitted under the terms of NSSC's private placement memorandum, it was greater leverage than desired.  This was a result of investments being made in the Bermuda Fund at a rate that was six times more than direct

---

[16] *See In re New Stream Secured Capital Fund P1 (Cayman), Ltd*., Putative Debtor.  (U.S. Bankruptcy Court for the District of Delaware Case No. 11-10694 (MFW)), and *In re New Stream Secured Capital Fund K1 (Cayman), Ltd*., Putative Debtor.  (U.S. Bankruptcy Court for the District of Delaware Case No. 11-10696 (MFW)).  A third involuntary case commenced against the US Feeder Fund.

investments in NSSC.  Since the off-shore investments were all in debt, the growth of off-shore investment had skewed the debt to equity balance.

To offer non-US Investors higher returns by virtue of an equity investment in NSSC, a new feeder fund structure was established: the US Feeder was created for U.S. investors and a series of Cayman Islands exempted companies named New Stream Secured Capital Fund (Cayman), Ltd., one consecutively named company for each investor (collectively, the "Cayman Feeders"), for non-US investors.  NSC is the Managing Member of the US Feeder.  The investment manager of each of the Cayman Feeders is New Stream Capital (Cayman), Ltd., which is administered by an independent board of directors domiciled outside of the United States, but the owners of the investment manager are the three principals of NSC.  The new structure was discussed with many of the investors in advance of the formal announcement, but the formal announcement made on November 28, 2007, together with supporting documentation. The intent of this restructuring was to have all of the direct US Investors in NSSC switch their investments to the US Feeder and all the Bermuda Investors switch their investments to the Cayman Feeders, which were established for off-shore investors.  It was intended that the US and Cayman Feeders would invest through a combination of debt and equity, which would be *pari passu* to each other, thereby reducing leverage.  The US-Cayman Investors shared the fee and expense costs of NSSC and their respective Feeder Funds.

With the creation of the Cayman Funds, the Bermuda Fund was closed to new investment.  However, the Debtors could not force Bermuda Investors to move.  While it was anticipated that all of the US Investors would readily transition to the US Funds, the transition from the Bermuda Fund to the Cayman Funds was more complex.  Nevertheless, with a few minor exceptions, the Bermuda Investors were initially positive about the restructuring and

almost all gave indications of their intention to move their investment from Bermuda to Cayman. The Debtors anticipated that those who remained in the Bermuda Fund could either be gradually redeemed out of the Bermuda Fund over time or paid out with the proceeds of secured financing, which NSSC was actively seeking at such time.

In addition, any investor in any fund who chose to redeem their investment could also do so at this time. However, the Debtors' expectation – at the end of 2007, when these funds were rolled out – was that investments in the Bermuda Fund would shrink substantially as most Bermuda investors had expressed their interest in moving to the Cayman Funds.

Although the Debtors intended to obtain financing, ultimately they could not and therefore were unable to redeem the remaining Bermuda investors. In November 2007, the Debtors entered into negotiations with DZ Bank for a line of credit. On March 3, 2008, the Debtors received a commitment from DZ Bank for $75 million of financing to be secured by the NSI Insurance Portfolio. The understanding was that this facility could be increased to $150 million over time. It was the Debtors' intent to be able to pay out remaining Bermuda Investors from this facility if and as needed. The inability to negotiate mutually agreeable terms caused the commitment to expire on June 24, 2008.

In December 2007, the Debtors opened the Cayman Funds for investment and began moving the Bermuda Fund investors over as it received their written consents. The Debtors also started accepting new investors into the Cayman Feeders. At about the same time, they opened the US Feeder for investment and began moving the US investors, as consents were received. In addition, new investors were also accepted into the US Feeder. Although a few investors moved into the new feeder structures in December 2007, there was substantially more movement beginning in January 2008, particularly among the US Investors into the US Feeder. All of the

US Investors eventually made the transition into the US Feeder by January 31, 2008.  Transition from the Bermuda Fund to the Cayman Feeders was more gradual.  Since no deadline was imposed, or could be, and the target outcome – the eventual termination of the Bermuda Fund by either transfer or redemption over time – was part of the overall restructuring plan, but the Debtors continued to discuss with Bermuda Investors their intentions and preferences.

The US and Cayman Private Placement Memoranda also disclosed how NSC would be compensated.  Specifically, the US and Cayman Feeders would reimburse NSC for all costs and expenses associated with the operation of each feeder, plus the operational costs of NSSC.  In addition, for the US Feeder, NSC is paid a management fee of 0.05% (5 basis points) of the balance of the capital account of each member, which is calculated and paid monthly.  For the Cayman Feeders, the Investment Manager is paid a management fee equal to 0.05% (5 basis points) of the Fund's Net Asset Value, as defined in the PPM.  The US-Cayman Funds also indirectly paid the management fee and any performance allocation arising out of NSSC.  Each month the master fund's general partner, NSC, earns a management fee equal to one-twelfth of 0.45% per annum of the Total Assets of NSSC.  In addition, NSC could earn a performance allocation (sometimes referred to as a Profit Share and calculated in accordance with the formula set forth in the private placement memorandum) equal to 25% of all "Net New Profits" over a LIBOR-based hurdle attributable to each limited partner's capital account for the month for which the accrual calculation is being made.[1617]

Following the 2007 restructuring, 20-35% of each investment made into the US Feeder was held as equity in the form of an interest in a limited partnership interest in the master fund and the remainder of each investment was loaned to NSSC by the US Feeder through the

---

[1617]   It should be noted that the percentage amount of the management fees described above was not a percentage increase of the historic management fee.  The only change made to the fees related to the inclusion of debt in the asset basis of the calculation.  This was done in order to keep the fees aligned with the changes made in the capital structure.

purchase of loan notes ("US Feeder Loans").  The same proportion of Cayman Feeders investments was applied in equity, not into NSSC, but into NSCI, a Delaware corporation.  NSCI then invested this in NSSC equity by acquiring a limited partnership interest.  The remainder of the investment in each Cayman Feeder was loaned directly to NSSC through Cayman Feeder loans.

After As with the Bermuda Fund Loan and Security Agreements, the loans from the US Fund and Cayman Funds took the form of demand notes secured by all the assets of NSSC and provided that NSSC would have one year from the date of demand to repay the loan.  Failure to repay represents an event of default.  Security and foreclosure rights are regulated by the NSSC Collateral Agency Agreement.  The Collateral Agency Agreement for NSSC was amended and restated to include the US Feeder and the Cayman Feeders as lenders to NSSC such that upon full liquidation, proceeds (after payment of Senior Bank lines) were to be made to the Bermuda Loans on a *pari passu* basis first, and then to the Cayman and US Feeder Loans, *pari passu*.  The Creditors Committee and the US/Cayman Objectants take the position that the amendments to the Collateral Agency Agreement provide that the Bermuda Loans and the Cayman and US Feeder Loans were to be paid on a *pari passu* basis.

## 6.2    The Restructuring Efforts

While all of the US Investors successfully switched into the US Feeder and many Bermuda Investors switched into the Cayman Feeders, many investors in the Bermuda Fund declined to move their investments.  Because of the inherently illiquid nature of the investments, the Bermuda Investors could not immediately be redeemed.  As a result, the Bermuda Fund could not be quickly terminated, especially in light of the fact that the Debtors had been unable to secure financing.

New investors were not accepted into the Bermuda Fund after the new Cayman feeder fund structure was implemented during 2007 and 2008.  However, until late 2008, when market forces outside of the control of the Debtors required a freeze on all redemptions, the intention was that the Bermuda Fund would be terminated, either by the redemption of the remaining interests over time, or by those remaining Bermuda Investors changing their decision and deciding to move to the Cayman Feeder, an option that remained available to them.

Beginning in March 2008, the Debtors began to receive substantially increased levels of redemption requests from all of the Feeder Funds.  The flood of redemption requests was a result of the credit crisis, and generally deteriorating market conditions that impacted the financial world and specifically resulted in additional liquidity requirements for Investors.  The Debtors began working toward meeting these redemption requests in the ordinary course as proceeds became available from assets.  However, these redemptions occasioned repayment demands representing a significant percentage of NSSC's portfolio.

At that time, NSSC was performing well.  It was up by over 7% for the year and there had been new inflows from investors every month of the year.  Redemptions were being paid as cash became available from the investment portfolio and new subscriptions.  No new investments were accepted into the US or Cayman Feeders after August 2008.

Ultimately, during the global financial crisis beginning in 2008, even the Debtors' solid performance and planning could not insulate the Debtors from the impact of the liquidity needs of their Investors.  As noted above, a series of fund failures had an adverse effect on many of the Debtors' Investors.  A substantial number of further redemption requests were made in the wake of the Petters fraud and similar events during last week of September 2008.  Despite no investment in or direct exposure to Petters, redemption requests (including both the

approximately $200 million of redemptions already effective, and the further requests received, but not effective, by September 30, 2008) totaled $545 million, as investors with exposure to Petters were forced to seek liquidity.  For the Bermuda Fund, the investors who had placed redemptions or who had notified NSSC of their intention to redeem approached 100%.

In October 2008, the Debtors intended to liquidate the NSSC portfolio in an orderly manner to maximize the value of the portfolio for the benefit of all Investors and so be able to pay the effective redemptions.  The intent was to pay the effective redemptions (for all Investors) out of available cash in the order that the redemptions had become effective prior to October 1, 2008, and then to pay the remainder of the Investors in all of the Feeder Funds (those in the "post-October pool") on a *pari passu* basis thereafter.  Investors were notified of this decision during the fall of 2008, and letters were sent to all US-Cayman Investors in mid-December confirming what Investors had previously been told.

Returning all capital to Investors in the ordinary course gave rise to a structural issue.  The Loan Notes accrued interest at a stated rate until called.  When called (usually as a result of a redemption request), the Loan Notes were to be repaid within 12 months.  Under ordinary circumstances these demands could be met from principal and interest earned by NSSC.  However, with the loans in the NSSC portfolio carrying maturities of two to four years, it was impossible to meet all demands within 12 months; and, because these portfolio loans were made to private companies, there was no trading market for the NSSC instruments.  Selling the loans under forced sale conditions, particularly given the global economic crisis of 2008 and virtually no market liquidity, would have resulted in a significant loss of value to investors.  As a result, NSC determined it would need to enter into discussions with the directors of the three Feeder Funds to modify the payment period of their Notes.

Before these discussions could begin in earnest, the AVS announcement disrupted the life settlement markets. The combination of uncertainty around values and general market illiquidity effectively shut the life settlement market down by late February 2009, making the NSI Insurance Portfolio completely illiquid.

By the first quarter of 2009, the Debtors were facing a confluence of problems, including impending maturities based on the redemptions that were pending at that time, an unprecedented lack of liquidity in the market, which was compounded by the illiquid nature of the underlying assets, and the cash-consuming nature of the NSI Insurance Portfolio, which was absorbing most of the liquidity available from the remainder of the portfolio.

### 6.2.1    The 2009 Restructuring Plan

These combined circumstances caused the Debtors to conclude that a more comprehensive approach was needed to deal with the situation and protect the interests of its Investors. The aggregate redemption debt owed at this point was $695 million. It was obvious that an orderly liquidation would take several years and that, unless some form of restructuring plan was put in place to commute the payment obligations under the Loan Notes, NSSC and NSI would have to be placed in some form of liquidation to protect assets and realize their value over time.

In developing options, the Debtors attempted to project financial outcomes in a variety of different scenarios. The analysis indicated that a forced liquidation would have resulted in a loss for the Bermuda Fund, in line with its purported seniority, of $100 million, with the Cayman and US Investors experiencing a total loss. And this forced liquidation scenario did not contemplate immediate monetization of assets since that was not a viable option.

Projections based on the maturation of non-life assets and a measured sale of the life assets between year-end 2010 and year-end 2012 indicated the potential for a return of as much as $687 million, an amount that would be sufficient to pay a substantial portion of the loan redemptions due by 2012.  The Debtors determined that a strategy that would allow for such a controlled monetization would be preferable for all Investors and it set about canvassing support from Investors.  However, in formulating a plan, the Debtors had to take into account that fact that it would not be possible to distribute all cash that became available from time to time because of the expenses connected to assets.  In particular because of their cash requirements for funding premium payments on the life insurance assets, this portion of the portfolio became the subject of scrutiny.  The central question was whether, under these extremely unusual circumstances, it was in the best interests of Investors to continue to pay the premiums to support these assets.  The Debtors performed actuarial modeling on the NSI Insurance Portfolio that analyzed the annual cash needs and possible cash generation from the assets in the NSI Insurance Portfolio (which was comprised of life settlements and premium finance loans).  After the mark-down, the net value of life settlements held was $123 million.  The net value of the premium finance loans was $135 million (yielding total life asset net value of $258 million).  As a result of the adjustment in underwriting estimates, the life settlements market had become frozen.  Furthermore, distressed conditions affecting other participants in the life settlements business had caused some sellers to "dump" policies in the market.  The market was over-supplied and dysfunctional.  To make matters worse, there was reason to believe that NSSC might wind up being forced to begin making premium payments on approximately $2 billion of premium finance loans, which had been a cash-generating asset in the past.  The global liquidity crisis had brought about an enhanced likelihood of debtor default on these loans.  This made

more likely that premium finance loans would not be repaid, and there would be foreclosure on the life policies, the collateral under the loans.  The Debtors estimated that a forced sale of all life assets during 2009 (including both life settlements and premium finance loans) would generate around $68 million, if achievable at all given the disarray in the market.  Given the estimated net value of $258 million, a forced sale would have realized only up to 25%.  On the other hand, if all life assets were held until their maturity (until death of the life assureds) the total gross death benefit was expected to be $2.7 billion.  However, the life assets were, and remain, an expensive, significant drag on liquidity.  On the most conservative analysis, assuming that (i) all premium finance loans were swapped for their life policy collateral, (ii) no deaths and (iii) highest likely premiums, NSC estimated NSSC would need to pay approximately $250 million in premium payments between 2009 and 2011.  That meant the Debtors would need to retain a substantial minimum cash reserve to finance premiums, and that meant reserving more cash just when cash was needed most to repay redemption debts to Investors.

To formulate a comprehensive plan, a decision also had to be made about how cash not needed to pay for life assets and other expenses of NSSC (i.e., available cash) was going to be distributed.  There were a variety of options.  Furthermore, a decision was required whether to apply distributions in the same way across all redemptions, or to use one methodology for the redemptions which had already taken effect by the end of September 2008 (before the second wave), and a different one for redemptions taking effect after.  Proposals involving payment *pari passu* were strongly opposed by many investors, particularly those with effective redemptions who had been waiting for many months.  On the other hand, preservation of the payment of redemptions (taking effect before October 2008) received overwhelming investor support.  However, any restructuring had to account for (i) the seniority of the Bermuda feeder loans to

the US and Cayman feeder loans, and (ii) covenants in certain of the Bermuda Fund's loans that effectively permitted repayment of the US and Cayman feeder loans only if such repayment did not result in the outstanding balance of the Bermuda Loans exceeding 50% of the value of the assets of NSSC.

Ultimately, the Debtors developed a restructuring plan that allowed (i) a two year forbearance period (that is, to May 2011) during which Investors agreed to make no redemptions or prosecute any claims for payment of redemptions; (ii) amendment of the demand notes to allow payment in accordance with an "available cash" methodology; and, (iii) payment of interest, based on a LIBOR methodology, to all holders of demand notes.  Another component was that investors in the Bermuda Fund would begin to pay a share of the costs of operating the funds and maintaining the portfolio.  To implement the 2009 restructuring plan, the various loan and security agreements were amended to accommodate the available cash methodology in the restructuring plan and to allow sufficient time to repay all of the demand notes through an orderly liquidation of the portfolio.

Given the nature of the contemplated changes to investors' rights and obligations, the directors of the Bermuda Fund and the Cayman Feeders and the managing member of the US Feeder determined that the consent of each Investor would be solicited prior to implementing the restructuring.

On April 8, 2009, the directors of the Bermuda Fund approved a letter to the Bermuda Investors explaining the restructuring plan and requesting their forbearance and written consent. Subsequently, the 2009 Restructuring was implemented with amended and restated loan agreements and related documents were entered into on or about May 1, 2009.

When it was presented to the Investors, it received the support of 90% of the US Investors; 100% of the Cayman Investors; and 60% of the Bermuda Investors.  Only two Bermuda Investors failed to consent to the Plan, Tensor Endowment Limited and the Gottex AB Funds, both of which subsequently commenced actions in Bermuda against the Bermuda Fund challenging the restructuring.  The restructuring was then implemented on May 1, 2009 for all three Feeder Funds.

### 6.2.2   The Bermuda Litigation

Two groups of Bermuda Investors commenced actions against the Bermuda Fund objecting to the implementation of the proposed restructuring plan.

Tensor Endowment Limited commenced an action, In the Matter of Class K of New Stream Capital Fund Limited, in the Supreme Court of Bermuda.  That action was dismissed by the Bermuda Court in a Judgment dated December 18, 2009.  In ruling in favor of the Bermuda Fund, the Bermuda Court found, among other things, no evidence "that the management of the Respondent or its affiliates have been guilty of any serious misconduct," and that the implementation of the 2009 Restructuring Plan was motivated "by the goal of maximizing the returns to all classes of investors."  Judgment at pp. 9, 25, respectively.  "On the evidence adduced at the substantive hearing . . .  the Plan appeared to be a creative and commercially rational response to the liquidity crisis of 2008 the implementation of which is being supervised by the Respondent's independent [Bermuda] directors."  *Id.*  at 28.

On or about June 18, 2009, one of the investor groups made up of certain investment funds (hereinafter referred to as the "Gottex AB Funds") acting with and through a corporate nominee (collectively, the "Bermuda Petitioners") filed a claim against the Bermuda Fund in the Bermuda Court seeking, *inter alia*, a declaration that the 2009 Restructuring of the Bermuda

Fund was contrary to the provisions of the Bermuda SACA.  BNY AIS Nominees Ltd (as nominees for Gottex ABL (Cayman) Ltd., et al) v. New Stream Capital Fund Limited.  None of the Debtors were a party to that litigation.

In the Bermuda Fund litigation, the Gottex AB Funds sought a declaration that the 2009 Restructuring was *ultra vires* and/or contrary to the bylaws of the Bermuda Fund and/or contrary to the provisions of the Bermuda SACA and therefore void and without legal effect.  The Gottex AB Funds asked the Bermuda Court to invalidate the 2009 Restructuring so that the relationships between their share classes could be restored to their status on April 31, 2009.  Their claim asserted, *inter alia*, that (i) provisions of the 2009 Restructuring that provided for a pooling of repayment obligations to make them joint obligations of NSSC and NSI eliminated the segregation of rights and obligations under the then existing loan documents, (ii) substituted debt obligations owed by, and secured by the assets of, NSI to certain of the Segregated Classes with commingled repayment obligations and security interests owed to all other Segregated Classes of the Bermuda Fund and of the US and Cayman Funds; (iii) failed to maintain the segregation of each Segregated Class's assets and economic position and ceased to consider the interests of each Segregated Class individually to maximize its economic position; and (iv) relinquished the senior priority position of Classes C and I in terms of rights to repayment of loans from NSI, the timing of that repayment obligation, and the security interests that secured that repayment obligation.

After a trial, Justice Ian Kawaley of the Bermuda Supreme Court, the same judge that had presided over the litigation commenced by the other group of investors, in a judgment dated June 8, 2010 ("Bermuda Judgment"), found in favor of the Bermuda Petitioners, finding, *inter alia*, that the proposed 2009 Restructuring Plan contravened the Bermuda Fund's constitutional and

statutory segregation obligations and fell beyond the scope of the Bermuda Fund's investment management powers. Bermuda Judgment at ¶ 167. However, the Bermuda Court did find as a matter of fact, that when the Debtors implemented the restructuring on May 1, 2009 it did not definitively know that Gottex AB Funds' consent would be withheld. The Bermuda Court observed that the 2009 Restructuring might be legally egregious in the absence of this consent, but the fact that the investor group "came within a whisker of approving it is proof" that the Debtors sought to cater to their commercial needs, as the negotiating process demonstrated. Bermuda Judgment at ¶184. Nonetheless, the Bermuda Court ruled that the Bermuda statute "requires those managing segregated account companies to firewall the assets belonging to a segregated account from claims asserted by the company's general creditors and claims asserted by other segregated accounts and (subject to any contrary express agreement) third parties who have not transacted business with the relevant segregated account." Bermuda Judgment at ¶130 at 140. It then found that the security interests were an essential element of the repayment obligation under the loan notes, which constituted assets linked to the segregated accounts and were, therefore, required to be kept as a separate fund under the Bermuda SACA. Bermuda Judgment at ¶145.

Justice Kawaley described the 2009 Restructuring plan as a "creative out-of-court restructuring solution," that was approved by the majority of Investors in all of the funds, as well as by the Bermuda directors, which was "developed in a fair manner." Bermuda Judgment at ¶¶ 199 and 205[17][18]. As a result, the Court declined to invalidate the plan, leaving it applicable to other investors. Bermuda Judgment at ¶ 205. Following the Judgment, the Bermuda Court

---

[17][18] The Joint NSSC Receivers disagree with certain aspects of the Debtors' characterization of the Bermuda Judgment and the Debtors' characterization of certain elements of the Bermuda Litigation. Complete copies of the Bermuda Judgment can be obtained from the Debtors upon request.

made a number of declarations on June 18, 2010 such that the various elements of the 2009 Restructuring were void and without effect for Segregated Account Classes C and I.

On May 27, 2010, the Bermuda Court also approved the appointment of a receiver, McKenna, for Segregated Account Classes C and I, stating that "it would be just and equitable to appoint a receiver in the context of the unique statutory framework of [the Bermuda] SACA." Bermuda Judgment at ¶182.

After consultation with Bermuda counsel, the Bermuda Fund determined that it was in the best interest of the Bermuda Fund as a whole and particularly those Segregated Account classes of the Bermuda Fund that hold Loan Notes issued by NSSC and/or consented to the 2009 Restructuring that a receiver be appointed over the assets of such classes.

Subsequent to the appointment, on June 15, 2010, the Bermuda Fund applied for the appointment of Joint Receivers for Segregated Account Classes B, E, H, K, L, N and O of the Bermuda Fund.  The Bermuda Court granted the application on June 18, 2010 and simultaneously appointed McKenna as the Receiver over class F of the Bermuda Fund.  On June 18, 2010, the Supreme Court of Bermuda appointed Michael Morrison and Charles Thresh, of KPMG Advisory Limited, as interim Joint Receivers for Segregated Account Classes B, E, H, K, L, N and O of the Bermuda Fund pursuant to section 19(1) of the Bermuda SACA and appointed McKenna as the Receiver over Class F.  Their appointments were made final on July 16, 2010.

On September 13, 2010, the Bermuda Fund Receivers filed Petition with the Bermuda Court for the winding-up of the Bermuda Fund under the provisions of the Bermuda SACA and by ex parte summons for their appointment as joint provisional liquidators of the Bermuda Fund. The Court appointed Messrs.  Morrison, Thresh and McKenna Joint Provisional Liquidators on September 13, 2010.  On October 7, 2010, the Bermuda Court ordered that the Bermuda Fund be

wound up under the provisions of the SACA and confirmed the appointment of the Joint

Provisional Liquidators.

On November 26, 2010, the Bermuda Court declared that the 2009 Restructuring was

void under Bermuda law and therefore has no effect on any of the Segregated Account classes of

the Bermuda Fund.

Since the appointments of the Bermuda Fund Receivers, the Debtors have been in

negotiations with them, as the court-appointed representatives of the Segregated Account Classes

of the Bermuda Fund, concerning a means to maximize the return of value to all of their

Creditors in a manner consistent with their respective legal rights and priorities.

### 6.2.3   Management of the Debtors

NSC acts as the investment manager of the Debtors.  The employees of its affiliated

entity, New Stream Capital Services LLC ("NSCS") (which is not a debtor in any bankruptcy

case), provide the administrative and operational support and investment management services

required to operate the Debtors.  NSC works with the Debtors' independent auditor to assure

accurate and timely financial reporting for Investors.  In addition, cash management is effected

through a third party administrator, Barfield, Murphy, Shank & Smith, P.C. (a member of the

BDO Seidman Alliance), which also provides other administrative services to the Debtors.

NSC is indirectly owned and managed by three individuals, David Bryson, Bart

Gutekunst and Donald Porter, who jointly constitute the Debtors' senior management team.  Mr.

Bryson is Chief Executive Officer and is a member of the Investment Committee.  Mr. Bryson

manages sales, marketing and product development.  Mr. Gutekunst is also a member of the

Investment Committee.  Mr. Porter serves as the Chairman of the Investment Committee.

It is common – indeed, it is generally expected – that the principals of an investment manager participate along with their investors.  So, the three principals of NSSC are also Investors in the US Fund.  Like the other US Fund investors, they were originally invested directly in NSSC and then, in 2007 when New Stream's structure was revised, each moved his investment to the US Fund.  Each of the three principals was fully invested at the time of the 2009 Restructuring and therefore they each await payment along with all of the other US Investors.

**6.3    The Debtors**

Neither the Bermuda Fund, the US Fund nor the Cayman Funds is a debtor in these Chapter 11 cases.  To the contrary, each is a Creditor, either of NSSC or NSI.

The following four (4) entities are the Debtors in these cases:

**6.3.1    New Stream Secured Capital, Inc.  – the US-Cayman Holding Company**

Debtor NSCI is a holding company through which the US Fund and the Cayman Funds hold a limited partnership interest in NSSC.  NSCI is a Delaware corporation and is currently the sole limited partner of NSSC.

The equity of NSCI is owned by the Cayman Funds, each of which is managed by New Stream Capital (Cayman), Ltd., as investment manager.  In addition to an equity interest in NSCI, each of the Cayman Funds holds notes that were issued by NSSC and that are secured by a pledge of NSSC's investment portfolio.

**6.3.2    New Stream Secured Capital, L.P.  -  the Master Fund**

NSSC, the master fund, is a Delaware limited partnership.  It was formed in October, 2002 (originally under the name Porter Secured Capital Partners, L.P.).  As an unregistered investment vehicle, investment in New Stream is available only to "accredited investors" under

the Securities Act of 1933 and "qualified purchasers" under Section 2(a)(51)(A) of the Investment Company Act of 1940.

NSSC is a limited partnership.  It does not have any employees.  All management, investment and administrative functions are provided by NSC, its general partner, either directly or through its affiliate, New Stream Capital Services, LLC ("NSCS").

Over the last eight years, NSSC has invested primarily by making loans and equity investments in areas relating to insurance, accounts receivable, inventory, equipment, real property and oil and gas producing properties.  Virtually all of these investments have been made by or through various direct and indirect subsidiaries.  With the exception of NSI, none of these subsidiaries are intended to be debtors in any bankruptcy proceedings.  The ownership and control of these subsidiaries represent a portion of the investment portfolio that is owned and managed by the Debtors.

This investment portfolio has generally included life insurance policies, accounts receivable, inventory, real property and oil and gas producing properties.

The primary debt obligations of NSSC are the following:

(a)      the Second Amended and Restated Notes, made by NSSC to each of the Cayman Funds, as each may have been amended, restated, amended and restated, supplemented or otherwise modified from time to time.

(b)      the Second Amended and Restated Notes, made by NSSC to the US Fund, as each may have been amended, restated, amended and restated, supplemented or otherwise modified from time to time.

(c)      the Second Amended and Restated Notes, made by NSSC to Classes B, E, H, K, L, N and O of the Bermuda Fund, as each may have been amended, restated, amended and restated, supplemented or otherwise modified from time to time.

Pursuant to a Collateral Agency Agreement, dated as of October 5, 2006 (as amended, restated or otherwise modified from time to time), by and among NSSC, the lenders identified above and Wilmington Trust Company, as collateral agent, each of these lenders holds a security interest in NSSC's investment portfolio.  The aggregate indebtedness represented by the foregoing, each of which is secured by a security interest in the investment portfolio of NSSC, is approximately $369,066,322.05.

### 6.3.3    New Stream Capital, LLC.  – the General Partner

NSC is a Delaware limited liability company.  NSC is an unregistered investment adviser and asset management company that serves, among other roles, as the general partner and investment manager for NSSC.  It is also the sole member of (a) NSCS, a Delaware limited liability company whose employees provide administrative and operational support and management services to the Debtors and (b) Silver Spring Securities, L.L.C. ("SSS"), a Delaware limited liability company, which is a registered broker/dealer with the U.S. Securities and Exchange Commission and a member in good standing with the Financial Industry Regulatory Authority.

### 6.3.4    New Stream Insurance, LLC

NSI is a Delaware limited liability company that was formed in June, 2004.  It is one of the directly-owned subsidiaries of NSSC.  Generally speaking, each of these subsidiaries owns a portfolio of particular investments.  In the case of NSI, the portfolio consists of insurance-related investments, including the direct ownership of Life Settlements and interests in companies and

partnerships that invest in life insurance policies, provide premium financing or invest in other insurance related businesses.

NSSC began marketing direct limited partnership interests to U.S. investors in March 2003.  In June 2004, NSSC established a second fund, NSI, then known as Assurance Investments, LLC, to focus on investing in life insurance products; specifically, life settlements and premium finance loans.

NSI was created because NSSC had been investing in this asset class and it was anticipated that it would become too large a percentage of the NSSC portfolio.  By breaking out the NSI Insurance Portfolio into a separate fund, investment in life insurance products could be directed exclusively into NSI, reducing the concentration risk for NSSC.

NSI operated as an independent fund until June 2007.  At that time, the remaining equity investors in NSI were redeemed, with many of those investors transferring their investments, in whole or in part, to NSSC.  NSI then became a wholly-owned subsidiary of NSSC, thereby making the NSI Insurance Portfolio an indirectly held asset of NSSC.

### (a)    New Stream Insurance, LLC – Pre-Petition Indebtedness

The primary debt obligations of NSI were: (i) the Loan and Security Agreement between NSI and Segregated Account Class C, (ii) the Loan and Security Agreement between NSI and Segregated Account Class F and (ii) the Loan and Security Agreement between NSI and Segregated Account Class I, as each may have been amended, restated, amended and restated, supplemented or otherwise modified from time to time.  As of the Petition Date, NSI was indebted to those classes in the approximate aggregate principal amount of US $79.5 million.

Pursuant to each of above-mentioned Loan and Security Agreements, and a Collateral Agency Agreement, dated as of October 5, 2006 by and among the lenders identified therein,

New Stream Insurance and Wilmington Trust Company, as collateral agent, NSI granted Classes C, F and I a security interest in its investment portfolio.  This security interest was perfected by the filing of a UCC financing statement by Wilmington Trust Company, as collateral agent, on August 10, 2006.

With the consent of NSI's other lenders, NSI and the Note Lenders entered into the Pre-Petition Secured Note and related loan documents, pursuant to which the Note Lenders initially advanced the sum of $25 million to fund on-going premium payments until the sale of the NSI Insurance Portfolio closed.  With the further consent of NSI's other lenders, NSI and the Note Lenders amended the Pre-Petition Secured Note on November 8, 2010 to reflect a new principal amount of $39,480,268.58.  Pursuant to the NSSC Collateral Agency Agreement and the related Consent and Subordination Agreement, dated November 8, 2010, the Pre-Petition Secured Note was secured by a first priority lien on a portion of the NSI Insurance Portfolio, senior to the liens and security interests of any other party or creditor.

On December 21, 2010, the Note Lenders sent NSI a Notice of Event of Default and Reservation of Rights Letter (the "Default Letter") (i) indicating that an "Event of Default" (as defined in the Pre-Petition Secured Note) had occurred as of December 20, 2010, (ii) stating that all "Obligations" (as defined in the Pre-Petition Secured Note) became due and payable as of such date and (iii) reserving all rights, powers, privileges and remedies accruing to the Note Lenders under the Pre-Petition Secured Note and related loan and security documents.  The event of default continued in existence as of the Petition Date.

As the Pre-Petition Secured Note was in default, the Debtors sought the permission of the Note Lenders to use certain escrowed funds to pay the premiums relating to the NSI Insurance Portfolio.  Subject to the reservation of rights set forth in the Default Letter and the obligations

of NSI under the Pre-Petition Secured Note and related loan and security documents, the Note Lenders approved the use of the escrowed funds solely to pay the premiums relating to the NSI Insurance Portfolio in the amounts and pursuant to a schedule agreed to by the Purchaser and NSI.

**(b)    Sale of the Life Insurance Portfolio**

(i)    <u>The Marketing and Auction Process</u>

On May 3, 2010, NSI engaged Guggenheim Securities, L.L.C.  ("<u>Guggenheim</u>"), an independent investment bank with extensive experience in the life settlement market, to help the Debtors explore financing opportunities for the NSI Insurance Portfolio.  In late May, 2010, Guggenheim was prepared to go to the market to obtain a five year $200 million credit facility. However, as a result of the Bermuda Judgment that was issued in June 2010, Guggenheim advised NSSC that it would suspend solicitation for the offering until such time as it became clear that any prospective lender would be able to obtain a first priority security interest in the NSI Insurance Portfolio.[19]

Following the Bermuda Judgment and the appointment of the Receivers, the Debtors entered into negotiations with the Receivers.  While these discussions were ongoing, there was disagreement concerning the use of the cash proceeds from NSSC's investment portfolio to pay premiums on the NSI Insurance Portfolio.  Specifically, the Joint NSSC Receivers on behalf of the NSSC Bermuda Lenders objected to the payment of insurance premiums necessary to preserve the value of the NSI Insurance Portfolio on which the NSI Secured Lenders had a structurally superior position.  As noted above, the Bermuda Judgment made it impossible for

---

[19]    All of the Debtors' credit documents in effect at such time permitted the Debtors to obtain "Senior Indebtedness" from a "commercial lender."  Hence, financing from a source other than from a "commercial lender" was not permitted under the Debtors' credit documents.

the Debtors to obtain financing from a commercial lender for the insurance premiums on commercially reasonable terms.  The inability to utilize the cash proceeds resulted in the Debtors' inability to pay current premiums in full and as a result they made only *de minimis* payments causing the policies in the portfolio to fall into the "grace period" prior to which the policies would lapse for non-payment of premiums.

During this time the Debtors were also engaged in discussions with the Bermuda Receivers about the possibility of financing the NSI Insurance Portfolio.  Over the course of the month of June and into July numerous attempts were made at obtaining approval from Bermuda C, F and I to permit Guggenheim to proceed with the offering, but no agreement could be reached.  On July 20, 2010, a meeting was held with the Bermuda Receivers and representatives of the Bermuda Investors, whereby a decision was reached to cease any activities around financing and instead to pursue an outright sale of the portfolio.  Finally, MIO, on behalf of the Purchaser, submitted an offer to purchase the NSI Insurance Portfolio and the Debtors were instructed to move ahead on that offer.

In late July, 2010, the Debtors, with encouragement and assent of the Bermuda Receivers, began to seek means to prevent the termination of the life insurance policies through a sale of the NSI Insurance Portfolio.  Thereafter, the Debtors and Guggenheim began negotiating with MIO, on behalf of the Purchaser, for a purchase of the NSI Insurance Portfolio.  At the behest of a Bermuda Investor, an additional competitive bid was received.  Subsequently, Guggenheim and the Debtors elected to seek out additional competitive bids, as there appeared to be a greater interest in the NSI Insurance Portfolio from legitimate buyers than had previously been thought.  Guggenheim ultimately received expressions of interest from five potential purchasers.

Guggenheim continued to engage the potential purchasers in negotiations and it became clear that three of the five potential purchasers were serious and were in a position to make binding offers to purchase the NSI Insurance Portfolio.  In fact, the three interested parties began making uncommitted offers and continued to negotiate the purchase price with Guggenheim and the Debtors.  Given the looming deadline and lack of liquidity, the Debtors and Guggenheim decided the only way they could timely sell the NSI Insurance Portfolio would be to require that all interested parties submit their final and best offers.  Between July 23, 2010 and July 28, 2010, Guggenheim was working with several parties who had expressed interest in or made written offers for the NSI Insurance Portfolio.  Because there were substantial differences in the bids, Guggenheim and the Debtors were working to create a standard set of terms.  This culminated in a written form term sheet that was sent to all bidders on July 27, 2010, and a deadline was set for final bids 3:00 PM ET on July 28, 2010 for bidders to introduce, refine or improve offers.  The notice made clear that the Debtors would welcome offers on any terms, but that it would ideally like to see certain features in any offer, including bridge financing and a commitment to close by July 30, 2010.  The three interested parties each delivered bids to Guggenheim which were evaluated based on (a) an assessment of the certainty of closing the transaction, (b) total economics on the table including the size of the cash component of any offer and (c) any other features proposed.

(ii)      The Winning Bid

On July 29, 2010, that process concluded with Guggenheim reviewing and recommending an offer made by MIO, on behalf of the Purchaser, to purchase the entire portfolio for a cash payment of $127.5 million.  The Debtors agreed that the offer was the highest and best offer and NSI and MIO, on behalf of the Purchaser, entered into a binding term

sheet agreement ("MIO Purchaser Term Sheet") on July 29, 2010 setting forth the terms and conditions of the sale. MIO assigned its rights under the MIO Purchaser Term Sheet to Purchaser. The terms of the Insurance Portfolio Sale provided for:

(i)    A purchase price of $127,500,000 in cash;

(ii)    No additional due diligence required (this was the only bid that did not require additional due diligence);

(iii)    Interim financing of up to $25,000,000, the proceeds of which were to be used to pay the premiums of the NSI Insurance Portfolio;

(iv)    Any interim financing would be "purchase price neutral"; *i.e.,* repayment would be forgiven and the amount outstanding added to the purchase price so long as MIO or its nominee (*i.e.*, the Purchaser) was the ultimate purchaser;

(v)    As soon as possible after the execution of the MIO Purchaser Term Sheet, the parties would enter into definitive documentation with a closing to occur no later than September 30, 2010;

(vi)    The sale must be approved by either 100% of the investors or the Bankruptcy Court and the assets must be sold free and clear of all Claims and Interests through a bankruptcy process;

(vii)    If the NSI Insurance Portfolio was sold to an alternative bidder, MIO or its nominee (*i.e.*, the Purchaser) would be entitled to a break-up fee equal to 3% of the purchase price and expense reimbursement of up to $500,000; and

(viii)    MIO or its nominee (*i.e.*, the Purchaser) would offer additional incentives to the US/Cayman investors in order to induce them to support the sale.[1920]

_____

[1920] This term culminated in the MIO Contribution.

Subsequent to the execution of the MIO Purchaser Term Sheet the parties diligently began negotiating and drafting the definitive documentation relating to the Insurance Portfolio Sale.  The final agreed upon terms of the Insurance Portfolio Sale to the Purchaser were set forth in the Asset Purchase Agreement.   Pursuant to the MIO Purchaser Term Sheet, the parties had anticipated a closing on or prior to September 30, 2010.  Since the parties were unable to close before such date, the Purchaser and the Note Lenders agreed (i) to extend such date, (ii) to amend the principal amount of "price neutral" interim financing extended under the Pre-Petition Secured Note to $39,480,268.58 and (iii) to offer financing under a "price neutral" DIP facility, *provided, however,* that all interest, fees and expenses under the DIP Facility would not be "price neutral" and would be fully payable in Cash upon termination of the DIP facility.   In return for the significant consideration extended by the Note Lenders and the Purchaser, the Debtors agreed that any death benefits received by the Debtors on or after October 1, 2010 would be held in escrowed for the benefit of the Purchaser upon the closing of the sale.  These terms were reflected in the Asset Purchase Agreement and the Pre-Petition Secured Note.  Although the Debtors were in default under the Pre-Petition Secured Note, the Note Lenders and the Purchaser cooperated with the Plan process, while reserving all rights to enforce their Claims.

As mentioned above, pursuant to the Stipulation, the Committee was given the opportunity to solicit a competing offer for the NSI Insurance Portfolio and the Debtors agreed to cooperate with such efforts, without prejudice to their right to determine whether any competing transaction was higher and better than the terms contained in the Asset Purchase Agreement.

The Committee did not obtain any offers for the NSI Insurance Portfolio, although as provided for in the Stipulation, the Committee did negotiate favorable revisions to certain terms

of the Asset Purchase Agreement concerning post-closing adjustments.   After a further hearing this Court entered an order on May 16, 2011, [D.I.  336] authorizing the sale of the NSI Insurance Portfolio on the terms set forth in the Asset Purchase Agreement, subject to the Stipulation.  The sale of the NSI Insurance Portfolio closed on June 3, 2011.

Prior to the consummation of the sale, the Note Lenders loaned the Debtors approximately $40,000,000 prior to the Petition Date and certain post-petition lenders (the "DIP Lenders") committed to fund up to an additional $15,000,000 during the pendency of the Chapter 11 Cases (the "DIP Facility").  Since the NSI Insurance Portfolio was sold to the Purchaser, this $55,000,000 of financing was effectively added to the purchase price and will not need to be repaid by the Debtors.  On the other hand, a sale to any party other than the Purchaser would have required the Debtors to repay the $55,000,000.  Additionally, the Purchaser would have been entitled to a break-up fee equal to $3,825,000 (3% of the purchase price) plus up to $500,000 for expense reimbursement.  Hence in order for a sale to any party other than the Purchaser to be of greater value to the Debtors' estates, it would have required a purchase price in excess of approximately $181,500,000.

(iii)    Pre-Petition Secured Financing

As previously described, following NSI's acceptance of the MIO Purchaser Term Sheet, NSI and the Note Lenders entered into the Pre-Petition Secured Note, which as of the Petition Date was in default, and related loan documents.

(iv)    Fees Relating to the Sale Transaction

By an application filed with the Court on May 2, 2011, (D.I.  278), the Debtors moved the Court for entry of an order pursuant to sections 105(a), 363, 327 and 328(a) of title 11 of the Bankruptcy Code, *nunc pro tunc* to the Petition Date, authorizing the retention of Guggenheim

Securities, LLC ("Guggenheim"), to provide investment advisory services in connection with the Insurance Portfolio Sale pursuant to the terms of an engagement letter dated May 3, 2010 (as amended pursuant to Amendment No 1, dated May 3, 2010 and Amendment No 2, dated May 2, 2011, the "Guggenheim Engagement Agreement").  That application was granted by an order entered on May 16, 2011 which authorized the Debtors to employ Guggenheim to provide investment management services on the terms set forth in the Guggenheim Engagement Agreement.

Following the closing of the sale of the Insurance Portfolio, on June 20, 2011, Guggenheim filed its application for an allowance of compensation due under the Guggenheim Engagement Agreement.  By an order entered on July 14, 2011 (D.I.  470), the Court granted Guggenheim's application for compensation in the amount of $2,868,750, which was thereafter paid by the Debtors from the proceeds of the Insurance Portfolio Sale.

### 6.3.5    Debtor-in-Possession Financing

In order to enable the Debtors to pay premiums and other costs and expenses relating to the NSI Insurance Portfolio during the pendency of the Chapter 11 Cases, the Debtors obtained a commitment for financing from the DIP Lenders.  The DIP Facility was subject to Bankruptcy Court approval, which the Debtors sought immediately upon the filing of the Chapter 11 Cases and obtained by final order of the Bankruptcy Court on April 25, 2011 [D.I.  266].  The proceeds of the loans under the DIP Facility were to be used by the Debtors for the limited purpose of paying the actual amounts necessary to fund the premium payments of the insurance policies in the NSI Insurance Portfolio, and the reasonable fees and costs associated therewith (including servicing fees) in accordance with a budget.

Similar to the Pre-Petition Secured Note, the DIP Facility was structured to be "price neutral", which meant that outstanding amounts were not to be deducted from the sale price at closing, but were effectively added to the purchase price for the NSI Insurance Portfolio; *provided, however,* that the DIP Facility was only price neutral because the assets were sold to the Purchaser, and in any event interest and fees under the DIP Facility was due and payable in cash upon its maturity.  The DIP Facility has been paid in full and no amounts are due or owing.

### 6.3.6    Management and Employee Changes

a.    Employees.  As mentioned above, the employees of NSCS traditionally provided the administrative and operational support and investment management services required to operate the Debtors.  Following confirmation of the Plan, some of these employees may be employed by the Manager Entity.

b.    Management.  On the Effective Date, the three principals of NSC, namely, David Bryson, Bart Gutekunst and Donald Porter, will resign.  Except as described below, David Bryson, Bart Gutekunst and Donald Porter will no longer have any executive or management responsibilities for the Debtors, other than NSC which will own nothing other than the NSC Books and Records and the D&O Policies.

i.    *US Feeder*.  As part of the implementation of the reorganization that is detailed in the Plan, prior to the filing of the Petition Date, NSC, in its capacity of the managing member of the US Fund, appointed an Additional Managing Member (as defined in Section 3.3 of the US Fund's Limited Liability Company Agreement, dated November 15, 2007).  From and after the Petition Date, the Additional Managing Member acts as, and exercises all the duties of, the Managing Member of the US Fund.

ii.     *Cayman Funds Corporations*.  As mentioned above, each Cayman Fund is a separate corporation organized under the laws of the Cayman Islands.  Each corporation has two directors who are entitled to annual fees.  The corporation itself must also pay an annual fee to maintain its corporate existence (together with the director fee and any other costs and expenses relating to maintaining the existence of its Cayman Fund corporation, collectively, the "Cayman Corporation Fees").  These Cayman Corporation Fees were traditionally paid by NSSC on behalf of each Cayman Fund.  The Cayman Corporation Fees will no longer be paid by the Debtors and any Cayman Investor who wants to maintain the existence of its respective Cayman Fund corporation will be solely responsible for paying the Cayman Corporation Fees.  Pursuant to the Plan the Debtors shall pay the Cayman Fund Dissolution Payment to the Cayman Funds (or such account as designated by the director of the Cayman Funds in writing to the Debtors).  The Cayman Fund Dissolution Payment shall be utilized by the Cayman Funds to satisfy all Cayman Corporation Fees and other amounts necessary to cause the dissolution of each of the Cayman Funds.  The directors of the Cayman Funds shall dissolve each of the Cayman Funds by taking such action under applicable Cayman law as they may deem prudent with a view toward minimizing costs and expenses.

## ARTICLE 7.

## PLAN SUMMARY

### 7.1     TREATMENT OF UNCLASSIFIED CLAIMS

#### 7.1.1     Administrative Claims

Subject to the allowance procedures and deadlines provided herein, on the Effective Date or as soon thereafter as is practicable, each Holder of an Allowed Administrative Claim shall receive on account of such Allowed Administrative Claim and in full satisfaction, settlement and

release of and in exchange for such Allowed Administrative Claim, (a) Cash equal to the unpaid portion of such Allowed Administrative Claim, or (b) such other treatment as to which the Debtors and the holder of such Allowed Administrative Claim have agreed upon in writing, *provided, however,* that Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases shall be paid in the ordinary course of business in accordance with the terms and conditions of any agreement or course of dealing relating thereto and (or such other treatment as to which the Debtors and the holder of such Allowed Administrative Claim have agreed) Professional Claims shall be paid in accordance with section 2.4 of the Plan.  Notwithstanding anything to the contrary contained herein, the payment prior to the Effective Date of Allowed Administrative Claims attributable to NSSC shall be subject to the NSSC Receivers' consent to the use of their cash collateral.

**7.1.2  Intercompany Claims**.    On the Effective Date, Intercompany Claims shall be deemed discharged, satisfied and released.   Intercompany Claims shall not be entitled to receive any distribution under the Plan.

**7.1.3  Statutory Fees**.  On or before the Effective Date, all fees due and payable pursuant to 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid in full, in Cash.

**7.1.4  Professional Claims**.  Immediately prior to the Effective Date, the Debtors shall pay all amounts owing to the Professionals for all outstanding Professional Claims that have been awarded by the Court but which were unpaid as of the Effective Date; *provided, however,* that from such amounts otherwise due and owing to a Deferring Class B Professional, the Cayman Fund Dissolution Payment shall be paid to the Cayman Funds pursuant to section 7.10 of the Plan and reimbursed pursuant to section 7.1.8 of the Plan.  The Professionals shall estimate Professional

Claims due for periods that have not been billed as of the Effective Date and the Debtors shall include such amounts in its calculation of the Claims Amount.  On or prior to the Administrative Claims Bar Date (or such other time as the Bankruptcy Court may permit), each Professional shall File with the Bankruptcy Court its final fee application seeking final approval of all fees and expenses from the Petition Date through the Effective Date.  Within ten (10) days after entry of a Final Order with respect to its final fee application, each Professional shall remit any overpayment to the Post Confirmation Debtors or the Post Confirmation Debtors shall pay any outstanding amounts owed to the Professional from the reserved Claims Amount.

**7.1.5** **Other Priority Claims**.  With respect to each Allowed Other Priority Claim, on the Effective Date or as soon thereafter as is practicable, the holder of an Allowed Other Priority Claim shall receive on account of the Allowed Other Priority Claim, and in full satisfaction, settlement and release of and in exchange for such Allowed Other Priority Claim, (a) Cash equal to the unpaid portion of such Allowed Other Priority Claim, or (b) such other treatment as to which the Debtors and the holder of such Allowed Other Priority Claim have agreed upon in writing; *provided, however,* that the Debtors may defer payment of an Allowed Other Priority Claim by a Governmental Unit for Taxes in accordance with the Bankruptcy Code*, and provided further, that the Allowed Other Priority Claims of the United States for Taxes shall be entitled to interest, accruing from the Effective Date to the date of payment, at the statutory rate established by federal law*.

        **7.1.6** **Deadline for Filing Administrative Claims.**

        a.      Administrative Claims Other Than Tax Claims.  Other than with respect to Administrative Claims for which the Bankruptcy Court previously has established a Bar Date, any and all requests for payment or proofs of Administrative Claims, including Claims of all

Professionals or other Entities requesting compensation or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code for services rendered on or before the Effective Date (including any compensation requested by any Professional or any other Entity for making a substantial contribution in the Chapter 11 Cases), must be Filed and served on the Post Confirmation Debtors and their counsel no later than the Administrative Claims Bar Date, or such later date as the Bankruptcy Court may permit.  Notwithstanding the foregoing, the United States Internal Revenue Service shall not be bound by the Administrative Claims Bar Date.  Objections to any such Administrative Claims must be Filed and served on the claimant no later than thirty (30) days after the Administrative Claims Bar Date or such later date as the Bankruptcy Court may permit.  The Plan Administrator shall use reasonable efforts to promptly and diligently pursue resolution of any and all disputed Administrative Claims. Holders of Administrative Claims, including all Professionals or other Entities requesting compensation or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code for services rendered on or before the Effective Date (including any compensation requested by any Professional or any other Entity for making a substantial contribution in the Chapter 11 Cases), that are required to File a request for payment or proof of such Claims and that do not File such requests or proofs of Claim on or before the Administrative Claims Bar Date shall be forever barred from asserting such Claims against any of the Debtors, their Estates, any other Person or Entity, or any of their respective property.

       b.       Tax Claims.  All requests for payment of Claims by a Governmental Unit (as defined in section 101(27) of the Bankruptcy Code) for Taxes (and for interest and/or penalties or other amounts related to such Taxes) for any tax year or period, all or any portion of which occurs or falls within the period from and including the Petition Date through and including the

Effective Date, and for which no Bar Date has otherwise been previously established, must be

Filed on or before the later of: (a) sixty (60) days following the Effective Date; or (b) to the

extent applicable, ninety (90) days following the filing of a tax return for such Taxes (if such

Taxes are assessed based on a tax return) for such tax year or period with the applicable

Governmental Unit.  Any holder of a Claim for Taxes that is required to File a request for

payment of such Taxes and other amounts due related to such Taxes and which does not File

such a Claim by the applicable bar date shall be forever barred from asserting any such Claim

against any of the Debtors, the Estates, or any other Entity, or their respective property and shall

receive no distribution under the Plan or otherwise on account of such Claim.  Tax Claims that

are Allowed will be paid in full on the earlier of (i) the Effective Date, or (ii) the date on which

the Tax Claim becomes an Allowed Claim.

**7.1.7**    **Insider Claims**.  Unless otherwise provided in the Plan Administrator Budget approved by the

Joint NSSC Receivers, no Administrative Claim asserted by an Insider Released Party shall be

Allowed in the ordinary course as an Administrative Claim without the consent of the Joint

NSSC Receivers or approved by a Final Order of the Bankruptcy Court.  If the Joint NSSC

Receivers do not consent to the Allowance of such Administrative Claim in the ordinary course,

the Holder of such Administrative Claim may file a request for Allowance and payment of such

Administrative Claim in accordance with the provisions of the Bankruptcy Code.

**7.2**    **CLASSIFICATION OF CLAIMS AND INTERESTS**

**7.3**    **General**.  Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of

the Classes of Claims and Interests in the Debtors.  A Claim or Interest is placed in a particular

Class only to the extent that such Claim or Interest falls within the description of that Class.  A

Claim or Interest is also placed in a particular Class for purposes of receiving a distribution

under the Plan, but only to the extent such Claim or Interest is an Allowed Claim or Interest and has not been paid, released, or otherwise settled prior to the Effective Date.  Except as otherwise expressly set forth in the Plan, a Claim or Interest which is not an Allowed Claim or Allowed Interest shall not receive any payments, rights or distributions under the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims of the kinds specified in section 507(a)(1) of the Bankruptcy Code and Other Priority Claims of the kind specified in section 507(a) of the Bankruptcy Code (other than section 507(a)(8)) have not been classified.

**7.4**     **Classification**.  Claims against, and Interests, in the Debtors are classified as follows:

**7.4.1**   **Class 1: Bermuda Non-C, F and I Class Claims.**  Class 1 shall consist of the Claims held by the Bermuda Fund on behalf of Segregated Account Classes B, E, H, K, L, N and O.

**7.4.2**   **Class 2:  US-Cayman Claims.**  Class 2 shall consist of all US-Cayman Claims.

**7.4.3**   **Class 3:  Indemnification Claims**.  Class 3 shall consist of all Indemnification Claims.

**7.4.4**   **Classes 4(a) – (d): General Unsecured Claims**.  Classes 4(a), 4(b), 4(c) and 4(d) shall consist of all General Unsecured Claims against the Debtors, which are classified as follows:

      a.      Class 4(a):  General Unsecured Claims asserted against NSI.

      b.      Class 4(b):  General Unsecured Claims asserted against NSSC.

      c.      Class 4(c):  General Unsecured Claims asserted against NSC.

      d.      Class 4(d):  General Unsecured Claims asserted against NSCI.

**7.4.5**   **Class 5 (a) – (d): Interests.**  All Interests in the Debtors are classified as follows:

      a.      Class 5(a):  Interests in NSI.

      b.      Class 5(b):  Interests in NSSC.

      c.      Class 5(c):  Interests in NSC.

      d.      Class 5(d):  Interests in NSCI.

**7.5    IDENTIFICATION OF CLASSES IMPAIRED AND NOT IMPAIRED BY THE PLAN**

**7.5.1    Voting Classes: Classes of Claims Entitled to Vote**.  The following Classes are Impaired by the Plan and Holders of Claims in each of these Classes are entitled to vote to accept or reject the Plan:

      a.      Class 1 (Bermuda Non-C, F and I Class Claims)

      b.      Class 2 (US-Cayman Claims)

      c.      Class 3 (Indemnification Claims)

      d.      Class 4(b) (General Unsecured Claims against NSSC)

**7.5.2    Unimpaired Classes of Claims and Interests Not Entitled to Vote**.  The following Classes are not Impaired by the Plan and Holders of Claims and/or Interests in each of these Classes are not entitled to vote to accept or reject the Plan:

      a.      Class 4(a) (General Unsecured Claims against NSI)

      b.      Class 4(c): (General Unsecured Claims against NSC)

      c.      Class 5(a): (Interests in NSI)

      d.      Class 5(c) (Interests in NSC)

**7.5.3    Impaired Classes of Claims or Interests Deemed to Reject the Plan and Not Entitled to Vote**.  The Debtors will not solicit acceptance or rejections of the Plan from Holders of Claims or Interests in the Classes identified in section 4.3 of the Plan and will seek to confirm the Plan notwithstanding the deemed rejection of such Classes.  The Classes of Claims and Interests identified in section 4.3 of the Plan will not receive any distribution nor retain any property under the Plan on account of such Claims or Interests.  Pursuant to section 1126(g) of the Bankruptcy Code the following Classes will not be solicited and are conclusively deemed to reject the Plan:

    a.        Class 4(d): General Unsecured Claims asserted against NSCI.

    b.        Class 5(b):  Interests in NSSC.

    c.        Class 5(d):  Interests in NSCI.

**7.6**    **TREATMENT OF CLAIMS AND INTERESTS**

The Classes of Claims and Interests shall each be treated as follows, in full settlement, discharge, release and satisfaction of their Claims against, or Interests in, the Debtors:

**7.6.1**  **Class 1 (Bermuda Non-C, F and I)**.  Each Holder of an Allowed Claim in Class 1 shall receive, in full settlement and satisfaction of such Claims, on the Effective Date: (a) all of the Available Cash on the Effective Date or in such other, lesser amount as may be agreed to by the Joint NSSC Receivers; and (b) the Class A Interests in the Wind-Down Entities.  An initial calculation of the projected Available Cash is set forth as Exhibit C.  The initial calculation of the projected Available Cash is only a preliminary calculation and is subject to change and modification.  An updated calculation of the projected Available Cash will be included in the Plan Supplement.

**7.6.2**  **Class 2 (US-Cayman Claims)**.  Each Holder of an Allowed Claim in Class 2 shall receive, in settlement of and exchange for such Claims, (a) a beneficial interest in the Liquidating Trust that is the equivalent of its Percentage Share; (b) its *pro rata* share of the actual distributions from the Liquidating Trust to which the Insider Released Parties who are released on the Effective Date under section 12.4 and 12.5 of the Plan would have been entitled on account of the Principal Assigned Claims; and (c) its Percentage Share of the Pre-Effective Date Net Liquidation Proceeds.  The chart set forth on Exhibit D provides the initial calculation of the Pre-Effective Date Net Liquidation Proceeds, which is only a preliminary calculation and is subject to change and modification.  An updated calculation of the Pre-Effective Date Net Liquidation Proceeds will be included in the Plan Supplement.  The Liquidating Trust shall receive all Class B

Interests in the Wind Down Entities on the Effective Date and each Holder of an Allowed Claim in Class 2 shall receive periodic distributions from the Liquidating Trust equal to its Percentage Share of Cash available for distribution from the Liquidating Trust; provided, however, distributions on account of the Class B Interests shall be paid to the Joint NSSC Receivers until the Joint NSSC Receivers Reimbursement is paid in full.   The Pre-Effective Date Net Liquidation Proceeds shall be paid to the Joint NSSC Receivers on the Effective Date to reduce the Joint NSSC Receivers Reimbursement owed by the Holders of Allowed Claims in Class 2 pursuant to Section 7.1.7 of the Plan; *provided, however,* that if the Joint NSSC Receivers Reimbursement is fully reimbursed on the Effective Date then any such excess Pre-Effective Date Net Liquidation Proceeds shall be distributed to each Holder of an Allowed Claim in Class 2 in the amount of such Holder's Percentage Share. The chart set forth on Exhibit E describes in greater detail the treatment of the treatment of the Holders of Class 2 Claims.

**7.6.3    Class 3 (Indemnification Claims)**.   The Indemnification Claims shall be allowed as filed against each Debtor against which such Indemnification Claims were filed.

a.    Certain Holders of the Indemnification Claims have filed or otherwise hold Claims in addition to the Indemnification Claims against the Debtors or their respective subsidiaries or affiliates, which include: (a) the Principal Assigned Claims; and (b) the Assigned Individual Claims.  As further consideration for the Releases set forth in sections 12.4 and 12.5 of the Plan, (a) the actual distributions to which the Insider Released Parties who are released on the Effective Date under sections 12.4 and 12.5 of the Plan would have been entitled on account of the Principal Assigned Claims (but not the Indemnification Claims) shall be conveyed by the Debtors or the Liquidating Trustee, as the case may be, to those US-Cayman Investors who, in accordance with the Settlement Agreement, provide a release to the Insider Released Parties and

(b) any distribution with respect to Assigned Individual Claims of such Insider Released Parties shall be waived.  Notwithstanding anything contained herein, so long as the net economic benefit remains unchanged to all Holders of Class 2 Claims, at the request the Insider Released Parties, the Debtors or the Liquidating Trustee, as the case may be, shall expunge all or any portion of the Principal Assigned Claims and/or the Assigned Individual Claims in lieu of distributing amounts to Releasing US-Cayman Investors or Holders of Class 2 Claims, as the case may be.

       b.      Notwithstanding the foregoing and for the avoidance of doubt, nothing herein is intended to nor shall it constitute an agreement to (a) create, impair transfer or assign any right to coverage under any D&O Policies; or (b) entitle the Wind Down Entities or any other party that is not an Indemnification Claimant to pursue or seek the collection of any proceeds from any D&O Policies, other than the Investigation Reimbursement.  Further, the Debtors and any Indemnification Claimants, except to the extent of the Investigation Reimbursement, shall retain any and all rights to pursue, collect, receive and otherwise enforce the D&O Policies and related rights and proceeds, in accordance with the terms of the D&O Policies; *provided, however,* that the Investigation Reimbursement (after any applicable deductible) may be from proceeds of any applicable D&O Policy notwithstanding any contrary "priority of payments" provision in that policy (and the provisions of this clause shall be binding upon all Indemnification Claimants), without prejudice to the Indemnification Claimants' rights with respect to the balance of the proceeds of the D&O Policies.

       c.      On account of the Principal Assigned Claims, the Assigned Individual Claims, and the provisions of the Plan regarding the payment, as the case may be, to the NSSC Estate or the Manager Entity (to the extent that such consent is required) of the Investigation Reimbursement (after any applicable deductible) from proceeds of the applicable D&O Policy

notwithstanding any contrary "priority of payments" provision in such D&O Policy, the Indemnification Claimants shall receive the benefit of the Releases set forth in the Plan.  Any Indemnification Claimant's obligation to convey the distributions from the Principal Assigned Claims, waive the Assigned Individual Claims or forbear from opposing payment of the Investigation Reimbursement shall not arise unless and until the Releases are in full force and effect with respect to such Indemnification Claimant.

7.6.4  **Class 4(a) (General Unsecured Claims against NSI)**.  Each Holder of a Claim in Class 4(a) shall each receive, in full and final satisfaction of the Holder's Claim, an amount equal to the amount of their Allowed Claim to be paid from the Cash remaining in the NSI Estate after payment in full of Administrative and Priority Claims.

7.6.5  **Class 4(b) (NSSC Debtors General Unsecured Claims)**.  Holders of Class 4(b) Claims will be paid in Cash in the ordinary course of business or upon the Effective Date, subject to an aggregate cap of $100,000 from which aggregate amount such Holders will be paid their *pro rata* portion, except to the extent a Holder of such NSSC Debtors General Unsecured Claims agrees to different treatment.

7.6.6  **Class 4(c) (NSC Debtors General Unsecured Claims)**.  Each Holder of a Claim in Class 4(c) shall receive, in full and final satisfaction of the Holder's Claim, an amount equal to the amount of its Allowed Claim to be paid by the Plan Administrator from the Cash remaining in the NSC Estate after payment in full of Administrative and Priority Claims.

7.6.7  **Class 4(d) (NSCI Debtors General Unsecured Claims.**  Holders of Class 4(d) Claims will not receive any distribution nor retain any property under the Plan on account of such Claims.

**Class 5(a) (Interests in NSI).**  All Interests in NSI, which are held by NSSC, shall be extinguished on the Effective Date in exchange for (i) the transfer to NSSC of all Cash remaining in the NSI estate after the payment or the payment of the applicable amount of Cash into the Disputed Claim Reserve pursuant to Section 8.2 of all Claims of Class 4(a), and (ii) the transfer to NSSC of all Assets held by NSI.  **Class 5(b) (Interests in NSSC)**

.  All Interests in NSSC shall be extinguished on the Effective Date and the Holders of Interests in Class 5(b) shall not receive or retain any property on account of such Interest.

7.6.10  **Class 5(c) (Interests in NSC)**.  Each Holder of any Interests in NSC shall retain such Interest.

7.6.11  **Class 5(d) (Interests in NSCI)**.  All Interests in NSCI shall be extinguished on the Effective Date and the Holders of Interests in Class 5(d) shall not receive or retain any property on account of such Interest.

7.7     **TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**7.7.1    Assumption; Assignment**.  As of the Effective Date, the Debtors shall assume or assume and assign, as applicable, pursuant to section 365 of the Bankruptcy Code, each of the executory contracts and unexpired leases of the Debtors that are identified in Schedule 2 to the Plan, as amended, that have not expired under their own terms prior to the Effective Date.  Except as provided in section 6.2 below, the Debtors reserve the right upon consultation with the Committee and the Joint NSSC Receivers to amend Schedule 2 to the Plan not later than fourteen (14) days prior to the Confirmation Hearing either to: (a) delete any executory contract or lease listed therein and provide for its rejection pursuant to section 6.4 hereof; or (b) add any executory contract or lease to Schedule 2, thus providing for its assumption or assumption and assignment, as applicable, pursuant to the Plan.  The Debtors shall provide notice of any such amendment of such Schedule 2 to (i) the parties to the executory contract or lease affected thereby and (ii) the Approval Parties not later than fourteen (14) days prior to the Confirmation Hearing.  The Committee and the Joint NSSC Receivers each reserve the right to dispute any cure amount.  The Confirmation Order shall constitute an order of the Bankruptcy Court pursuant to section 365 of the Bankruptcy Code approving all such assumptions or assumptions and assignments, as applicable, described in section 6.1 of the Plan, as of the Effective Date.

**7.7.2**  **Cure Payments; Adequate Assurance of Performance**.  Any monetary defaults under each executory contract and unexpired lease to be assumed under the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, in either of the following ways: (a) by payment of the default amount in Cash, in full on the Effective Date; or (b) by payment of the default amount on such other terms as may be agreed to by the Debtors, the non-Debtor parties to such executory contract or lease and the Joint NSSC Receivers.  In the event of a dispute regarding (i) the amount or timing of any cure payments, (ii) the ability of the Debtors or an assignee thereof to provide adequate assurance of future performance under the contract or lease to be assumed or assumed and assigned, as applicable, or (iii) any other matter pertaining to assumption or assumption and assignment of the contract or lease to be assumed, the Debtors or the Post-Confirmation Debtors shall pay all required cure amounts promptly following the entry of a Final Order resolving the dispute; *provided, however,* notwithstanding any other provision of the Plan, (a) with the written agreement of the counterparty to an executory contract or lease or (b) upon written notice to the counterparty, the Debtors or the Post-Confirmation Debtors may add any executory contract or lease to the list of rejected contracts if the Debtors determine, in their sole discretion, that it is not in their best interests to assume the executory contract or lease considering the cure amount or any other terms of assumption or assumption and assignment as determined by the Bankruptcy Court in a Final Order.

**7.7.3** **Objections to Assumption of Executory Contracts and Unexpired Leases**.  To the extent that any party to an executory contract or unexpired lease identified for assumption asserts arrearages or damages pursuant to section 365(b)(1) of the Bankruptcy Code, or has any other objection with respect to any proposed assumption, revestment, cure or assignment on the terms and conditions provided herein, all such arrearages, damages and objections must be Filed and served: (a) as to any contracts or leases identified in Schedule 2 hereto that is mailed to any party to any such contract or lease along with all other solicitation materials accompanying the Plan, within the same deadline and in the same manner established for the Filing and service of objections to Confirmation of the Plan; and (b) as to any contracts or leases identified in any subsequent amendments to Schedule 2 within fourteen (14) days after the Debtors File and serve such amendment.  Failure to assert such arrearages, damages or objections in the manner described above shall constitute consent to the proposed assumption, revestment, cure or assignment on the terms and conditions provided herein, including an acknowledgement that the proposed assumption and/or assignment provides adequate assurance of future performance and that the amount identified for "cure" in Schedule 2 to the Plan, as amended, is the amount necessary to cover any and all outstanding defaults under the executory contract or unexpired lease to be assumed, as well as an acknowledgement and agreement that no other defaults exist under such contract or lease.

**7.7.4**   **<u>Rejection</u>**.   Except for those executory contracts and unexpired leases that are (a) assumed pursuant to the Plan, (b) the subject of previous orders of the Bankruptcy Court providing for their assumption or rejection pursuant to section 365 of the Bankruptcy Code, or (c) the subject of a pending motion before the Bankruptcy Court with respect to the assumption or assumption and assignment of such executory contracts and unexpired leases, as of the Effective Date, all executory contracts and unexpired leases of the Debtors shall be rejected pursuant to section 365 of Bankruptcy Code; *provided, however,* that neither the inclusion by the Debtors of a contract or lease on Schedule 2 nor anything contained in the Plan shall constitute an admission by any Debtor that such contract or lease is an executory contract or unexpired lease or that any Debtor or its successors and assigns has any liability thereunder.   To the extent any loan agreement or lease agreement pursuant to which any Debtor is lender or lessor is deemed to be an executory contract or unexpired lease within the meaning of 365 of the Bankruptcy Code, rejection of such loan agreement or lease agreement shall not, by itself, eliminate the borrower's or lessee's obligations thereunder or cause any Debtor's Liens, security interests or ownership rights to be released or extinguished.   The Joint NSSC Receivers shall have standing to object to any Claims arising from the rejection of executory contracts or unexpired leases.

**7.7.5**    **Approval of Rejection; Rejection Damages Claims Bar Date**.  The Confirmation Order shall constitute an Order of the Bankruptcy Court approving the rejection of executory contracts and unexpired leases under section 6.4 above pursuant to section 365 of the Bankruptcy Code as of the Effective Date.  Any Claim for damages arising from any such rejection must be Filed within thirty (30) days after the earlier of (i) the Confirmation Date or (ii) service of a written notice deeming such contract or lease to be rejected pursuant to section 6.4 of the Plan.  Any timely filed Claim for damages arising from any such rejection, if Allowed, will be a General Unsecured Claim.

**7.7.6**    **Insurance Policies**.  Notwithstanding any other provisions of the Plan with regard to executory contracts, from and after the Effective Date, each of the Debtors' insurance policies in existence as of the Effective Date, including all D&O Policies, will be reinstated and continued in accordance with its terms and, to the extent applicable, will be deemed assumed by NSC pursuant to section 365 of the Bankruptcy Code.  Nothing in the Plan will affect, impair or prejudice the rights of the insurance carriers, the insured parties or the Post-Confirmation Debtors under the insurance policies in any manner, and such insurance carriers, insured parties and Post-Confirmation Debtors will retain all rights and defenses under such insurance policies, and such insurance policies will apply to, and be enforceable by and against, the Post-Confirmation Debtors in the same manner and according to the same terms and practices applicable to the Debtors, as existed prior to the Effective Date.

**7.7.7    Indemnification Agreements**.  Notwithstanding any other provisions of the Plan with regard to executory contracts, from and after the Effective Date, the obligations of each Debtor or Post-Confirmation Debtor to indemnify any Person who is serving or has served as one of its managers, directors, officers or employees as of the Petition Date by reason of such Person's prior or future service in such a capacity or as a manager, director, officer or employee of any Non-Debtor Affiliates, to the extent provided in the applicable certificates of incorporation, by-laws or similar constituent documents, by statutory law or by written agreement, policies or procedures of or with such Debtor or Non-Debtor Affiliates, will be deemed and treated as of the Effective Date, as executory contracts that are assumed by the applicable Debtor or Post-Confirmation Debtor pursuant to the Plan and section 365 of the Bankruptcy Code; *provided, however,* that from and after the Effective Date the Debtors' liability for such Indemnification Claims shall be limited to (i) the Investigation Administrative Reserve and (ii) the D&O Policies.  Accordingly, any Indemnification Claims will survive and be otherwise unaffected by entry of the Confirmation Order, irrespective of whether such indemnification is owed for an act or event occurring before or after the Petition Date.  Notwithstanding the foregoing, the obligation of the Debtors with respect to the funding of the Investigation Administrative Reserve and the application of the Investigation Administrative Reserve, as outlined in section 7.15 hereof, is not an indemnification obligation of NSI.

**7.8    MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN.**

**7.8.1    Wind Down Entities.**

a.    Transfer Free and Clear.  On the Effective Date, each of the Wind Down Assets shall be transferred to an Asset Entity, to the extent not already transferred, as requested and determined by the Joint NSSC Receivers.  On the Effective Date, (i) the Class A Interests in

each Wind Down Entity shall be transferred to the holders of Allowed Claims in Class 1; (ii) the

Class B Interests in each Wind Down Entity shall be transferred to the Liquidating Trust (for the

benefit of the US-Cayman Investors); and (iii) Available Cash shall be paid to the Joint NSSC

Receivers for the benefit of the Creditors in Class 1.  The transfer of each of the Wind Down

Assets to the Asset Entities shall be free and clear of all liens, claims, interests or encumbrances.

        b.      Administration of the Wind Down Entities.  The Manager Entity shall

serve as the manager of the Asset Entities, but shall follow the direction of the Wind Down

Oversight Committee.  Each Asset Entity shall enter into a Management Agreement with the

Manager Entity pursuant to which, among other things, it will allow the Manager Entity to

sweep the subject Asset Entity's account in order to pay for the services and overhead provided

as well as grant to the Manager Entity the authority to take such actions necessary to the

maintenance, operation and liquidation of each Asset Entity.

        c.      Wind Down Oversight Committee.  Subject to the membership constraints

of section 1.165 of the Plan, the Wind Down Oversight Committee shall be formed on the

Effective Date.  Members of the Wind Down Oversight Committee shall not be compensated for

their services as a member of the Wind Down Oversight Committee but will receive

reimbursement for their reasonable costs and expenses and will be indemnified jointly and

severally by each of the Wind Down Entities for any damages or legal or professional fees they

incur as a result of any lawsuit or investigation except to the extent that such lawsuit or

investigation is a result of such member's gross negligence or willful misconduct  A member of

the Wind Down Oversight Committee can only be fired for cause.  The Joint NSSC Receivers

shall have the exclusive right to replace a Principal Member who resigns, dies or is otherwise

fired for cause.  The Liquidating Trustee in his or her capacity as a member of the Wind Down

Oversight Committee shall be replaced pursuant to the terms of the Liquidating Trust Agreement.  For the avoidance of doubt, none of the Insider Released Parties will serve on the Wind Down Oversight Committee.

        d.      Wind Down Budget and Liquidation of Wind Down Entities.  The Wind Down Oversight Committee will have oversight and final authority over the Wind Down Budget (including the right to amend and revise) and the liquidation of the Wind Down Entities.  The initial Wind Down Budget is set forth as Exhibit F.  The Wind Down Budget is only a preliminary projection and is subject to change and modification.  An updated Wind Down Budget will be included in the Plan Supplement.

        e.      Net Liquidation Proceeds.  After the Effective Date, no Asset Entity will distribute Cash or any other asset, or make Cash or any other asset available to any other Wind Down Entity to pay costs, expenses, or be used for any purpose, other than as a distribution in complete liquidation of such Asset Entity after all of its assets, other than Cash, have been disposed of and its expenses have been paid.  Nothing in section 7.1.5 of the Plan shall prevent the transfer by an Asset Entity of part or all of its assets so long as such transfer would not result in (i) an actual or constructive distribution by such Asset Entity to any member or shareholder of such Asset Entity that would be subject to United States federal income or withholding tax; or (ii) any member or shareholder being subject to United States federal income tax in any manner.

        f.      Working Capital.  On the Effective Date, the WC Amount shall be paid to the Working Capital Account.  The Manager Entity may use the proceeds in the Working Capital Account for working capital purposes to operate, liquidate and maintain the Wind Down Entities in the Manager Entity's role as manager under the Management Agreement.  At the discretion of the Wind Down Oversight Committee, all or part of the Net Liquidation Proceeds attributable to

an Asset Entity, may be paid to the Working Capital Account if the Wind Down Oversight Committee reasonably believes that the balance of the Working Capital Account is insufficient and such proceeds are necessary to manage the wind down of the remaining Asset Entity or Asset Entities. Any amounts in the Working Capital Account used by the Manager Entity to fund the operation, liquidation, or maintenance of a Wind Down Entity and appropriately allocated thereto shall be treated as an equity contribution to the Wind Down Entity, in the proportion of 85% and 15%, respectively, by the Holders of Class A Interests and Class B Interests. Any WC Amount used by the Manager Entity that is not used to fund the operation, liquidation, or maintenance of a specific Wind Down Entity, but instead is used for a purpose that is common to more than one of the Wind Down Entities, shall be allocated to and among those Wind Down Entities in a reasonable manner. The initial Wind Down Budget is set forth as Exhibit F. The Wind Down Budget is only a preliminary projection and is subject to change and modification. An updated Wind Down Budget will be included in the Plan Supplement. The Debtors' initial calculation is that the WC Amount will equal $3,500,000, which is only a preliminary calculation and is subject to change and modification. An updated calculation of the WC Amount will be included in the Plan Supplement.

g.      Joint NSSC Receivers Reimbursement. To reimburse the Bermuda Non-C, F and I Classes for fifteen percent (15%) of certain Cash used by NSSC (amounts that would have otherwise been paid to the Bermuda Non-C, F and I Classes under the terms of the Plan), to pay the costs and expenses in selling, liquidating, operating and/or maintaining the assets to be owned by the Wind Down Entities and other costs and expenses relating to these Cases, the Holders of the Class B Interests shall repay the Holders of the Class A Interests the Joint NSSC Receivers Reimbursement. The Holders of Class B Interests' obligation to repay the

Joint NSSC Receivers Reimbursement will constitute a non-recourse, non-interest bearing loan made by the Holders of the Class A Interests to the Holders of the Class B Interests. Net Liquidation Proceeds attributable to the Class B Interests shall not be paid to the Liquidating Trust, but rather shall be paid to the Joint NSSC Receivers for the benefit of the Holders of the Class A Interests until the Holders of the Class A Interests shall have received Cash in the aggregate amount of the Joint NSSC Receivers Reimbursement. An initial calculation of the Joint NSSC Receivers Reimbursement is set forth as Exhibit G. The Joint NSSC Receivers Reimbursement is only a preliminary calculation and is subject to change and modification. An updated calculation of the Joint NSSC Receivers Reimbursement will be included in the Plan Supplement.

h.      Cayman Fund Dissolution Payment Reimbursement. To reimburse the Deferring Class B Professionals for the Cayman Fund Dissolution Payment, the Liquidating Trust on behalf of the Cayman Investors shall repay the Deferring Class B Professionals from Net Liquidation Proceeds pursuant to the terms of section 7.1.8 of the Plan. The obligation to reimburse the amount comprising the Cayman Fund Dissolution Payment will constitute a non-recourse, non-interest bearing loan made by the Deferring Class B Professionals to the Liquidating Trust for the benefit of the Cayman Investors. Net Liquidation Proceeds received by the Liquidating Trust after the Holders of the Class A Interests shall have received Cash in the aggregate amount of the Joint NSSC Receivers Reimbursement, shall not be paid to the Cayman Investors, but rather shall be paid to the Deferring Class B Professionals until the Deferring Class B Professionals shall have received Cash in the aggregate amount equal to the Cayman Fund Distribution Payment. The Liquidating Trust on behalf of each Cayman Investor shall only be responsible to reimburse its share of the Cayman Fund Distribution Payment up to the amount

that was necessary to cause the dissolution of its respective Cayman Fund. A schedule setting forth the amount that was necessary to cause the dissolution of each Cayman Fund will be included and attached to the Plan Supplement. For the avoidance of doubt, repayment of the Cayman Fund Dissolution Payment shall only be reimbursed from Net Liquidation Proceeds.

      i.      Classes A and B Interests. Each Wind-Down Entity (including the Manager Entity) shall issue Class A Interests and Class B Interests. Subject to section 7.1.7 and 7.1.8 of the Plan, Holders of the Class A Interests shall be entitled to receive 85% of the Net Liquidation Proceeds and the Liquidating Trust (which is the Holder of the Class B Interests) shall be entitled to receive 15% of Net Liquidation Proceeds until such time that all of the Assets of the Wind-Down Entities shall have been sold, liquidated or otherwise disposed of. Because of the illiquid nature of the assets the liquidation of the Wind Down Entities could take anywhere from 3 years to 10 years or longer. The initial calculation of Net Liquidation Proceeds is set forth as Exhibit H. The calculation of Net Liquidation Proceeds is only a preliminary projection and is subject to change and modification. An updated calculation of Net Liquidation Proceeds will be included in the Plan Supplement.

      j.      Corporate Governance. The Wind Down Oversight Committee shall function as the board of directors of the Manager Entity. The identities and the background of the members of Wind Down Oversight Committee shall be disclosed in the Plan Supplement. The Manager Entity will enter into employment agreements with those current employees to be retained by the Manager Entity, which employment agreement shall be subject to the approval of the Joint NSSC Receivers; *provided, however,* that the Wind Down Oversight Committee in its capacity as the board of directors of the Manager Entity shall be solely responsible for the management and control of the Managing Entity and no former officer or employee of the

Debtors shall be a member of either the Wind Down Oversight Committee or the board of directors of the Manager Entity.  None of the Debtors, post-Confirmation, shall have any claim or cause of action arising from the Manager Entity's hiring of any employee of the Debtors or NSCS.

    k.  NSC.  On the Effective Date, equity in reorganized NSC shall remain with Insider Released Parties as partial consideration for the assignment of the Principal Assigned Claims.  On the Effective Date, all NSC Books and Records shall be deemed to be owned by and transferred to the reorganized NSC.  The reorganized NSC shall conduct no business other than to defend and respond to any Administrative Action.  For the avoidance of doubt, on the Effective Date after giving effect to the provisions of the Plan, NSC will have no assets other than the NSC Books and Records and the D&O Policies.  After the Effective Date at the cost and expense of the requesting party, (a) the reorganized NSC shall take all actions reasonably necessary to make available copies of any non-privileged NSC Books and Records reasonably requested by the Manager Entity; and (b) the Manager Entity shall take all actions reasonably necessary to make available copies of any non-privileged Books and Records reasonably requested by the reorganized NSC.  On and after the Effective Date, NSC shall no longer be the general partner of NSSC or any other Non-Debtor Affiliate, nor shall it manage any Debtor (other than NSC) or Non-Debtor Affiliate.

    l.  Deferring Class A Professionals Reimbursement.  To reimburse the Deferring Class A Professionals for the Deferring Class A Professional Amount, the Joint NSSC Receivers on behalf of the Bermuda Investors shall repay the Deferring Class A Professionals from Net Liquidation Proceeds pursuant to the terms of Section 7.1.12 of the Plan.  The obligation to reimburse the amount comprising the Deferring Class A Professional Amount will

constitute a non-recourse, non-interest bearing loan made by the Deferring Class A Professionals to the Holders of the Class 1 Claims.  Net Liquidation Proceeds received by the Joint NSSC Receivers on behalf of the Holders of the Class 1 Claims (or Class A Interests) shall not be paid to the Holders of the Class 1 Claims (or Class A Interests), but rather shall be paid to the Deferring Class A Professionals until the Deferring Class A Professionals shall have received Cash in the aggregate amount equal to the Deferring Class A Professional Amount.  The Deferring Class A Professional Amount is an amount equal to $1,000,000 or such greater amount as may be agreed to such Deferring Class A Professional and the Joint NSSC Receivers and is for the purpose of creating more Available Cash on the Effective Date for the Holders of Class 1 Claims.

**7.8.2**   **Distributions to the Cayman Funds**.  Other than the Cayman Fund Dissolution Payment, which will be paid to the Cayman Funds on or before the Effective Date, all Cash and property to be distributed to any Cayman Fund on behalf of its Class 2 Claim pursuant to the Plan shall be made to the Cayman Investors in the respective Cayman Funds.   Once the Cayman Fund Dissolution Payment has been paid, each Cayman Investor shall be deemed to be the Holder of the Class 2 Claim relating to its respective Cayman Fund for all purposes under the Plan.

**7.8.3**   **Investigation Reimbursement**.   Notwithstanding anything contained to the contrary herein, prior to the Effective Date the Debtors will take all reasonable and necessary actions to secure payment to the NSSC Estate of the unpaid balance of the Investigation Reimbursement from the applicable D&O Policy.  After the Effective Date, the Plan Administrator will take all reasonable and necessary actions to secure payment of the unpaid balance of the Investigation Reimbursement from the applicable D&O Policy.   Any proceeds from the applicable D&O Policy that are paid as reimbursement of the Investigation Reimbursement shall be paid to the Joint NSSC Receivers for the benefit of the Holders of the Class A Interests and fifteen percent (15%) of such amount shall be credited on a dollar for dollar basis against the Joint NSSC Receivers Reimbursement still owing on that date; *provided, however,* if any proceeds from the applicable D&O Policy that are paid as reimbursement of the Investigation Reimbursement are in excess of the amount of the Joint NSSC Receivers Reimbursement then outstanding, 15% of such excess amount shall be distributed to the Liquidating Trustee and 85% of such excess amount shall be distributed to the Joint NSSC Receivers.

**7.8.4**   **Investigation Administrative Reserve**.  On the Effective Date, the Investigation Administrative Reserve will be paid to reorganized NSC solely to fund Authorized Investigation Administrative Reserve Uses, subject to the provisions of section 7.15 of the Plan.

**7.8.5**    **Continuation of Automatic Stay**.  In furtherance of the implementation of the Plan, except as otherwise provided herein, all injunctions or stays provided for in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect and apply to all Holders of Claims against, or Interests in, the Debtors, the Estates and the Assets until the Final Distribution Date; *provided, however,* that nothing herein shall be deemed to extend the scope of any such injunction or stay beyond the provisions of  section 362 of the Bankruptcy Code.

**7.8.6**    **Post-Confirmation Operations**.  Following Confirmation and prior to the occurrence of the Effective Date, the then-current employees, officers, directors, managers and managing members of each of the Debtors shall continue in their respective capacities and the Debtors shall execute such documents and take such other action as is necessary to effectuate the transactions provided for in the Plan.  On and after the Effective Date, all employees, officers, directors, managers and managing members of the Debtors shall be deemed to have resigned and the Plan Administrator shall be the legal representative of each of the Post-Confirmation Debtors, other than NSC which shall be managed by the Insider Released Parties.

**7.8.7** **The Plan Administrator**.  On the Effective Date, the Plan Administrator Budget Amount shall be paid to the Plan Administrator.  On and after the Effective Date, the Plan Administrator shall act as the representative of each of the Debtors' estates and shall have the authority and right on behalf of each of the Post-Confirmation Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan including to: (i) control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims in accordance with the Plan; (ii) make Distributions to holders of Allowed Claims in accordance with the Plan; (iii) make payments to existing Professionals who may continue to perform in their current capacities; (iv) retain Professionals to assist in performing its duties under the Plan; (v) maintain the books and records and accounts of the Post-Confirmation Debtors other than NSC; (vi) incur and pay reasonable and necessary expenses in connection with the performance of its duties under the Plan, including the reasonable fees and expenses of professionals retained by the Plan Administrator; (viii) file all post-confirmation reports and, at the appropriate time, file an application for a Final Decree closing the Chapter 11 Cases; (ix) administer each Debtor's and Post-Confirmation Debtor's tax obligations, including (A) filing and paying tax returns for all Debtors and Post-Confirmation Debtors, and paying taxes (B) requesting, if necessary, an expedited determination of any unpaid tax liability of each Debtor or its estate under Bankruptcy Code section 505(b) for all taxable periods of such Debtor ending after the Commencement Date and (C) representing the interest and account of each Debtor or its estate before any taxing authority in all matters including any action, suit, proceeding or audit; (x) file all documents, and take such action as the Plan Administrator may deem appropriate, to cause the liquidation and dissolution of each of the Debtors other than NSC, and each of the Non-Debtor Affiliates that

has not previously been dissolved; (xi) liquidate any Assets that do not constitute Wind Down Assets or the NSC Books and Records; and (xii) prepare and file any and all informational returns, reports, statements, returns or disclosures relating to the Debtors that are required by any Governmental Unit or applicable law.  The Plan Administrator shall have no liability for any acts or omissions in its capacity as Plan Administrator to the Post-Confirmation Debtors other than for gross negligence or willful misconduct of the Plan Administrator.

7.8.8    **Liquidation of the Debtors**.  On or after the Effective Date, the Plan Administrator shall liquidate the Debtors (other than NSC) and shall complete the liquidation and dissolution of all Non-Debtor Affiliates that do not constitute Wind Down Entities  and/or merge, consolidate or combine any of the Debtors (other than NSC) with any Non-Debtor Affiliates in such manner as the Plan Administrator may deem prudent with a view toward minimizing costs and expenses.

7.8.9    **Dissolution of the US Fund**.  After the Effective Date, the Plan Administrator shall dissolve the US Fund by taking such action as the Plan Administrator may deem prudent with a view toward minimizing costs and expenses.

7.8.10   **Dissolution of the Cayman Funds**.  On the Effective Date, the Debtors shall pay the Cayman Fund Dissolution Payment to the Cayman Funds (or such account as designated by the director of the Cayman Funds in writing to the Debtors).  The Cayman Fund Dissolution Payment shall be utilized by the Cayman Funds to satisfy all unpaid corporate fees, taxes, administrative charges, directors' fees, professional fees and other amounts necessary to cause the dissolution of each of the Cayman Funds.  The directors of the Cayman Funds shall dissolve each of the Cayman Funds by taking such action under applicable Cayman law as they may deem prudent with a view toward minimizing costs and expenses.  The Cayman Funds are entitled to no Distributions under the Plan except for the Cayman Fund Dissolution Payment.

**7.8.11  Causes of Action and Avoidance Actions**.  Except to the extent released pursuant to Article 12 of the Plan, effective on and after the Effective Date, all Avoidance Actions and Causes of Action shall be Wind Down Assets.  The Plan Administrator shall cooperate with the Manager Entity and take any and all reasonable actions to facilitate the prosecution of Causes of Action and Avoidance Actions.  For the avoidance of any doubt, no Avoidance Actions or Causes of Action against any Released Parties shall be preserved.  The Confirmation Order shall provide that, from and after the Effective Date, the Manager Entity shall have the right to prosecute any and all non-released Causes of Action and/or Avoidance Actions as a representative of the estate under section 1123(b)(3)(B) of the Bankruptcy Code.  The Bankruptcy Court shall retain jurisdiction over any and all Causes of Action and Avoidance Actions.

**7.8.12  Principal Assigned Claim Distributions**.  On the Effective Date, to the extent it is then holding such funds in escrow, the NSI Receiver or Debtors' counsel shall deliver such funds pursuant to section 5(b) of the Settlement Agreement to the Global Settlement Fund for distribution to each Releasing US-Cayman Investor on the Effective Date pursuant to section 12.7 of the Plan.

**7.8.13  NSI Litigation Claimant Distributions**.  Any distributions of Cash or property made pursuant to any provision of the Plan on account of the Claims of those US-Cayman Investors who are NSI Litigation Claimants (other than Stonehaven Opportunities Fund, LP), whether from estate funds, any Wind-Down Entity, the Liquidating Trust or the Global Settlement Fund or otherwise, shall be made payable to and delivered directly to Stevens & Lee, P.C., as attorneys for such NSI Litigation Claimants.

**7.8.14  Closing of the Chapter 11 Cases**.  The Plan Administrator may seek the entry of a Final Decree at any time after the Plan has been substantially consummated provided that all required fees due under 28 U.S.C.  § 1930 have been paid.

**7.8.15** **<u>Post-Effective Date Reporting</u>**.    As promptly as practicable after the making of any distributions that are required under the Plan to be made on the Effective Date, but in any event no later than twenty-one (21) days after the making of such distributions, the Plan Administrator shall File with the Bankruptcy Court and serve on the United States Trustee a report setting forth the amounts and timing of all such distributions and the recipients thereof.    Thereafter, the Plan Administrator shall File with the Bankruptcy Court and serve on the United States Trustee quarterly reports summarizing the cash receipts and disbursements of the Debtors for the immediately preceding three-month period.    Each quarterly report shall also state the Debtors' Cash balances as of the beginning and ending of each such period.    Quarterly reports shall be provided until the entry of a Final Decree.    The Post-Confirmation Debtors shall comply with all tax withholding, reporting requirements and regulatory obligations imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding, requirements or obligations.    Notwithstanding any provision in the Plan to the contrary, the Plan Administrator and the Post-Confirmation Debtors shall be authorized to take all actions necessary or appropriate to comply with such withholding, requirements or obligations.

**7.8.16** **Investigation Administrative Reserve**.  The Investigation Administrative Reserve shall be funded to reorganized NSC by NSSC on the Effective Date and administered and maintained by reorganized NSC until the Investigation Administrative Reserve Termination Date.  Funds may be expended from such reserve by reorganized NSC (a) without any further approvals for the following categories of Authorized Investigation Administrative Reserve Uses: (i) the actual amounts incurred for any third-party database management fees; storage unit fees, up to $300 per month; state franchise taxes fees for reorganized NSC up to $1,000 per annum; and miscellaneous administrative costs up to $250 per month or as otherwise agreed by NSC and the Joint NSSC Receivers; and (b) for other Authorized Investigation Administrative Reserve Uses (including, without limitation, expenses falling within the foregoing categories but exceeding the foregoing dollar limits) only with (i) the prior approval from the Joint NSSC Receivers, which approval shall not be unreasonably withheld or delayed, or (ii) Bankruptcy Court approval (as to which the inquiry will be limited to whether the proposed payment is an Authorized Administrative Reserve Use and is reasonable in amount).  The Investigation Administrative Reserve shall not be used to pay any judgments, fines, restitution, penalties, or any similar sums in connection with any Administrative Action except to the extent (a) such amounts are reimbursable from a D&O Policy; or (b) the Insider Released Parties and the Manager Entity determine in their reasonable business judgment that paying such amount would avoid the cost of permitting the Administrative Action to continue.  The Plan Administrator, Insider Released Parties who retain equity interests in NSC under Section 5.10 of the Plan, reorganized NSC, Debtors and/or Post-Confirmation Debtors (as applicable) will use their reasonable  efforts to secure reimbursement of the Investigation Reimbursement.  The amounts, if any, remaining in the Investigation Administrative Reserve on the Investigation Administrative Reserve

Termination Date after all outstanding fees, expenses and costs have been paid shall be paid to the Joint NSSC Receivers for the benefit of the Holders of the Class A Interests and fifteen percent (15%) of such amount shall be credited on a dollar for dollar basis against the Joint NSSC Receivers Reimbursement still owing on that date; *provided, however,* if the funds remaining in the Investigation Administrative Reserve on the Investigation Reserve Termination Date is in excess of the amount of the Joint NSSC Receivers Reimbursement then outstanding, 15% of such excess amount shall be distributed to the Liquidating Trustee and 85% of such excess amount shall be distributed to the Joint NSSC Receivers.  On a monthly basis until the Investigation Administrative Reserve Termination Date, reorganized NSC will provide a statement to the Manager Entity of the (a) proceeds collected from the D&O Policies, and (b) amounts paid from the Investigation Administrative Reserve.   Until the Investigation Administrative Reserve Termination Date, on a quarterly basis and at the request of and, at the sole cost and expense of the Manager Entity, in an amount to be agreed upon by the reorganized NSC and the Manager Entity, NSC shall provide an accounting to the Manager Entity of any amounts utilized in the Investigation Administrative Reserve.  In addition, the Manager Entity will have the right to audit the use of the Investigation Administrative Reserve, at its own cost and expense, upon reasonable notice to NSC.  If the Plan Administrator, the Insider Released Parties, the Debtors, or the Post-Confirmation Debtors fail to use reasonable efforts to pursue the insurers under any applicable D&O Policies for payment of the Investigation Reimbursement prior to the Investigation Administrative Reserve Termination Date, the Manager Entity shall be subrogated to the rights of the Plan Administrator, the Insider Released Parties, the Debtors or the Post-Confirmation Debtors to pursue the insurer under any applicable D&O Policies for payment of the Investigation Reimbursement.  Nothing is intended herein to limit the rights of

the Plan Administrator, the Insider Released Parties or the Manager Entity to pursue any and all claims, rights and remedies in the event the Investigation Reimbursement is not paid prior to the Investigation Administrative Reserve Termination Date.

For the avoidance of doubt, the cash that is being used to fund the Investigation Administrative Reserve is the asserted cash collateral of the Holders of Class 1 Claims and such cash otherwise would have been paid to the Holders of Class 1 Claims on the Effective Date.

7.8.17 **Plan Administrator Budget Excess Amount**.  The Plan Administrator Budget Excess Amount shall be paid to the Joint NSSC Receivers for the benefit of the Holders of the Class A Interests within (2) business days of the entry of a Final Decree and fifteen percent (15%) of such amount shall be credited on a dollar for dollar basis against the Joint NSSC Receivers Reimbursement still owing on that date; *provided, however,* to the extent the Plan Administrator Budget Excess Amount is in excess of the amount of the Joint NSSC Receivers Reimbursement then outstanding, 15% of such excess amount shall be distributed to the Liquidating Trustee and 85% of such excess amount shall be distributed to the Joint NSSC Receivers.

## 7.9    CLAIM OBJECTIONS

7.9.1    **Objections to Claims**.  Prior to the Effective Date, objections to, and requests for estimation of, Claims against the Debtors may be interposed and prosecuted by the Debtors.  Except to the extent released pursuant to Article 12 of the Plan or as otherwise provided herein, from and after the Effective Date, the Plan Administrator shall have the sole authority to File, settle, compromise, withdraw, arbitrate or litigate to judgment objections to Claims pursuant to applicable procedures established by the Bankruptcy Code, the Bankruptcy Rules, and the Plan. The Plan Administrator shall consult with the Manager Entity regarding any Claim that is filed for an amount in excess of $100,000; and, if following such consultation the Plan Administrator

elects not to file an objection to any such Claim, the Manager Entity shall have the right to file and prosecute such an objection at its sole costs and expense. Objections to any Other Priority Claim or General Unsecured Claim must be Filed and served on the claimant no later than the later of (x) one hundred twenty (120) days after the date the Claim is Filed, (y) ninety (90) days after the Effective Date, or (z) such other date as may be ordered from time to time by the Bankruptcy Court. The Plan Administrator shall use reasonable efforts to promptly and diligently pursue resolution of any and all disputed Other Priority Claims and General Unsecured Claims. Except with respect to Other Priority Claims, General Unsecured Claims and Administrative Claims, no deadlines by which objections to Claims must be Filed have been established in these Chapter 11 Cases.

**7.9.2** **Disputed Claims Reserve**. On or before the Effective Date, the Post-Confirmation Debtors shall establish a reserve, which shall be maintained by the Plan Administrator, as part of the Plan Administrator Budget, for all Disputed Claims, if any, in an amount equal to what would be distributed to holders of such Claims if their Disputed Claims had been Allowed Claims on the Effective Date equal to the Face Amount of such Disputed Claim or such other amount as may be determined by a Final Order of the Bankruptcy Court. With respect to such Disputed Claims, if, when, and to the extent any such Disputed Claim becomes an Allowed Claim by Final Order, the relevant portion of the Cash held in reserve therefore shall be distributed by the Plan Administrator to the Claimant in a manner consistent with distributions to similarly situated Allowed Claims. The balance of such Cash, if any, remaining after any particular Disputed Claim has been resolved and distributions made to the Holder of such Disputed Claim in accordance with the Plan, shall be released and paid to the Joint NSSC Receivers. No payments or distributions shall be made with respect to a Claim that is a Disputed Claim pending the

resolution of the dispute by Final Order or agreement (i) prior to the Effective Date, of the Debtors, the holder of such Disputed Claim and the Joint NSSC Receivers, and (ii) after the Effective Date, of the Plan Administrator, the holder of such Disputed Claim and the Manager Entity.  Objections to Claims may be litigated to judgment or withdrawn, and may be settled with the approval of the Bankruptcy Court, except to the extent such approval is not necessary as provided in the Plan.  After the Effective Date, and subject to the terms of the Plan, the Post-Confirmation Debtor may, upon notice to the Manager Entity, settle any Disputed Claim where the result of the settlement or compromise is an Allowed Claim in an amount of $10,000 or less without providing any notice or obtaining an order from the Bankruptcy Court.  All proposed settlements of Disputed Claims where the amount to be settled or compromised exceeds $10,000 shall be subject to the approval of the Bankruptcy Court after notice and an opportunity for a hearing and (i) prior to the Effective Date, the Joint NSSC Receivers and the Creditors' Committee and (ii) after the Effective Date, the Manager Entity.

**7.9.3** **Claims in Class 4(a)**.  As of the Effective Date, each Claim in Class 4(a) shall be deemed Disputed unless and until (i) such Claim becomes an Allowed Claim, (ii) has been Scheduled by the Debtors as undisputed, or (iii) has been identified in the Plan Supplement as undisputed; *provided, however,* that the rights of the Plan Administrator and Manager Entity pursuant to Section 8.1 of the Plan to object to the Allowance of any Claim in Class 4(a) on any grounds after the Effective Date are fully reserved.

**7.9.4** **Claims Filed After Bar Date**.  Other than a Claim for damages arising from the rejection of any executory contract or unexpired lease that is Filed as provided in Section 6.5 of the Plan, any Claim not filed prior to the Bar Date or the Administrative Claims Bar Date, as applicable, or any other order of the Bankruptcy Court establishing a deadline for filing of such Claim, shall be deemed disallowed as untimely pursuant to Rule 3003(c) of the Bankruptcy Rules and the Holder of such Claim shall not be entitled to any distribution from the Estate or the Liquidating Trust on account of such Claim.  Any amendment of a Claim Filed after the Confirmation Date without leave of the Bankruptcy Court shall be void, of no effect and deemed disallowed and neither the Debtors, the Liquidating Trustee nor the Plan Administrator shall have any obligation to respond in any way thereto.

**7.10** **DISTRIBUTIONS**

**7.10.1**  **No Duplicate Distributions**.  To the extent more than one Debtor is liable for any Claim, such Claim shall be considered a single Claim and entitled only to the payment provided therefor under the applicable provisions of the Plan.

**7.10.2**  **Delivery of Distributions in General**.  Distributions to holders of Allowed Claims shall be made: (a) at the addresses set forth in the proofs of Claim Filed by such holders; (b) at the addresses set forth in any written notices of address change delivered after the date on which any related proof of Claim was Filed; (c) at the addresses reflected in the Schedules relating to the applicable Allowed Claim if no proof of Claim has been Filed and the Post-Confirmation Debtors have not received a written notice of a change of address, or (d) to the Receivers for further distribution.

**7.10.3**  **Cash Payments**.  Except as otherwise provided in the Confirmation Order, Cash payments to be made pursuant to the Plan shall be made by checks drawn on a domestic bank or by wire transfer from a domestic bank, at the option of the Post-Confirmation Debtors and/or the Plan Administrator.

**7.10.4**   **Interest on Claims**.  Postpetition interest shall not accrue or be paid on Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.  Interest shall not accrue or be paid upon any Disputed Claim in respect of the period from the Petition Date to the date a Final Distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim.  To the extent that any Allowed Claim entitled to a distribution under the Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for federal income tax purposes to the principal amount of the Allowed Claim first and then, to the extent the consideration exceeds the principal amount of the Allowed Claim, to the portion of such Allowed Claim representing accrued but unpaid interest.

**7.10.5**   **No De Minimis Distributions**.  No payment of Cash in an amount of less than $50.00 shall be required to be made on account of any Allowed Claim.  Such undistributed amount may instead be made part of the Cash for use in accordance with the Plan.

**7.10.6**   **Face Amount**.  Unless otherwise expressly set forth herein with respect to a specific Claim or Class of Claims, for the purpose of the provisions of the Plan, the "Face Amount" of a Disputed Claim means the liquidated amount (if any) set forth on the proof of Claim, unless no proof of Claim has been timely Filed or deemed Filed, in which case the Face Amount shall be zero.  To the extent that any Disputed Claim is filed in an entirely or partially unliquidated amount, the Post-Confirmation Debtors and/or the Plan Administrator shall be authorized, but not required, to establish reserves for such Disputed Claim in accordance with section 8.2 of the Plan.

**7.10.7  Undeliverable Distributions**.  If the distribution check to any holder of an Allowed Claim is not cashed within 90 days after issuance by the Debtors or Post-Confirmation Debtors, at the discretion of the Post-Confirmation Debtors, a stop payment order may be given with respect to the check and at the election of the Post-Confirmation Debtors, no further distributions shall be made to such holder on account of such Allowed Claim.  Such Allowed Claim shall be released and the holder of such Allowed Claim shall be forever barred from asserting such Claim against the Debtors, their Estates, the Wind-Down Entities or their respective property.  In such cases, any Cash held for distribution on account of such Claim shall be paid to the Manager Entity.

**7.10.8  Effective Date Distributions**.  On the Effective Date, or as soon thereafter as practicable, the Post-Confirmation Debtors and/or the Plan Administrator shall distribute to the holders of Allowed Administrative Claims and Allowed General Unsecured Claims in Classes 4(a), 4(c) and 4(d) Cash equal to the distributions on account of each such Claim that are provided for in the Plan.

**7.10.9  Disputed Claims Reserve**.  The Post-Confirmation Debtors shall establish reserves for Disputed Claims in accordance with section 8.2 of the Plan.  On and after the Effective Date, the Plan Administrator shall maintain such Disputed Claims Reserve and periodically make payments out of such Disputed Claims Reserve in the manner specified in section 8.2 of the Plan.  The Debtors' initial calculation is that the Disputed Claims Reserve is $1,615,000, which is only a preliminary calculation and is subject to change and modification.  An updated calculation of the Disputed Claims Reserve will be included in the Plan Supplement.

**7.10.10**                        <u>**Compliance with Tax Requirements**</u>.  In connection with the Plan and the distributions made in accordance herewith, to the extent applicable, the Debtors and the Post-Confirmation Debtors shall comply with all tax withholding and reporting requirements, if any, imposed by any Governmental Unit and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  The Post-Confirmation Debtors and/or the Plan Administrator shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

7.10.11          **Tax Compliance By Beneficiaries of the Liquidating Trust**.  Within 15 days of the Effective Date, the Liquidating Trustee shall send to each Holder of an Allowed Claim in Class 2 a letter (each, a "Request Letter") (1) instructing such Holder of an Allowed Claim in Class 2 to send the Liquidating Trustee a completed Internal Revenue Service Form W-9 (or, if applicable, a completed Form W-8), and informing such US-Cayman Investor that the Liquidating Trustee will not make any distributions from the Liquidating Trust until the Liquidating Trustee has received a completed Internal Revenue Service Form W-9 (or, if applicable, a completed Form W-8).  The Liquidating Trustee shall send such a Request Letter to each Holder of an Allowed Claim in Class 2 at the address set forth in the Debtors' Schedules, unless superseded by the address set forth on a proof of claim filed by such Holder.  Nothing contained in the Plan shall obligate the Liquidating Trustee to locate any Holder of an Allowed Claim in Class 2 who does not return a completed Internal Revenue Service Form W-9 (or, if applicable, a completed Form W-8).  If the Liquidating Trustee does not receive a completed Internal Revenue Service Form W-9 (or, if applicable, a completed Form W-8) from any Holder of an Allowed Claim in Class 2 within 12 months of the Effective Date, then such Holder of an Allowed Claim in Class 2 will not be a beneficiary of the Liquidating Trust and will not be entitled to receive any distributions and any Cash reserved on account of such Class 2 Claim will be reallocated among those Holders of Allowed Claims in Class 2 who have timely responded to the Request Letter.

7.11    **CONDITIONS PRECEDENT**

7.11.1 **Conditions to Confirmation**.  The following are each conditions to entry of the Confirmation Order:

a.      The Confirmation Order shall be in form and substance satisfactory to the Approval Parties and the Insider Released Parties.

b.      The Wind Down Budget has been agreed to by the Approval Parties.

**7.11.2** **Conditions to the Effective Date**.  The Plan shall not become effective and the Effective Date shall not occur unless and until:

a.      The Bankruptcy Court shall have entered the Confirmation Order, in form and substance satisfactory to the Approval Parties and the Insider Released Parties;

b.      No stay of the Confirmation Order shall be in effect at the time the other conditions set forth in Article 10 of the Plan are satisfied, or, if permitted, waived;

c.      All documents, instruments and agreements provided for under the Plan or necessary to implement the Plan, including the Management Agreement and Liquidating Trust Agreement, shall be in form and substance satisfactory to the Approval Parties, and have been executed and delivered by the parties thereto, unless such execution or delivery has been waived by the parties benefited thereby;

d.      The payments required pursuant section 2.4 of the Plan have been paid in full;

e.      The Debtors shall have sufficient Cash to fund (i) the Claims Amount; (ii) Plan Administrator Budget Amount, (iii) the Investigation Administrative Reserve; ~~and~~ (iv) the WC Amount and (v) the Liquidating Trustee Amount;

f.      Except as otherwise directed by the Approval Parties, each Wind Down Asset, other than Cash, shall be owned by an Asset Entity, and each Asset Entity shall be classified as an association taxable as a corporation for U.S. federal tax purposes;

g.      The Confirmation Order shall have become a Final Order;

h.    The Debtors shall have received a Final Order from the Bankruptcy Court authorizing the Debtors to cause each of the NSC Subsidiaries to liquidate or otherwise dissolve; and

i.    The Manager Entity shall be formed and those employees of NSCS retained by the Joint NSSC Receivers shall be employed by the Manager Entity pursuant to employment agreements, subject to the approval of the Joint NSSC Receivers.

The Debtors expect and anticipate that the Plan will be confirmed at a hearing before the Bankruptcy Court on April 23, 2012 and that the Effective Date will occur within approximately 15 Business Days thereafter; *provided, however,* such dates are only the Debtors estimate and it they are subject to change.

**7.11.3    Termination of Plan for Failure To Become Effective**.  If the Effective Date shall not have occurred on or prior to the date that is forty-five (45) days after the Confirmation Date, then the Plan shall terminate and be of no further force or effect unless the provisions of section 10.3 of the Plan are waived in writing by the Debtors, the Committee, and the Joint NSSC Receivers.

**7.11.4    Waiver of Conditions**.  The Debtors, with the written consent of the Insider Released Parties (which shall not be unreasonably withheld) and the Approval Parties, may waive any or all of the conditions set forth in sections 10.1 and/or 10.2, other than 10.2.5(iii) of the Plan, that do not affect the Debtors' ability to consummate the Plan.

**7.11.5    Notice of Effective Date**.  On the Effective Date, or as soon thereafter as is reasonably practicable, the Debtors shall file with the Bankruptcy Court "Notice of Effective Date" in a form reasonably acceptable to the Debtors in their sole discretion, which notice shall constitute appropriate and adequate notice that the Plan has become effective, *provided, however,* that the Debtors shall have no obligation to notify any Person of such fact.  The Plan shall be deemed to

be effective as of 12:01 a.m., prevailing Eastern time, on the Effective Date specified in such filing.  A courtesy copy of the Notice of Effective Date may, but is not required to, be sent by first class mail, postage prepaid (or at the Company's option, by courier or facsimile) to those Persons who have filed with the Bankruptcy Court requests for notices pursuant to Bankruptcy Rule 2002.

**7.12**    **EFFECT OF CONFIRMATION**

**7.12.1** **Jurisdiction of Bankruptcy Court**.  Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including jurisdiction over the subject matters set forth in Article 12 of the Plan.

**7.12.2** **Entry of Confirmation Order**.  Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

**7.12.3** **Binding Effect**.  Except as otherwise provided in section 1141(d) of the Bankruptcy Code, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against or Interest in the Debtors and their respective successors and assigns, whether or not the Claim or Interest of such holder is Impaired under the Plan and whether or not such holder has accepted the Plan.

**7.12.4** **Exculpation**.  Except as otherwise specifically provided in ~~the~~this Plan, none of the Exculpated Parties shall have or incur, and are hereby released from, any obligation, Cause of Action or liability to one another or to any Creditor, or any other party in interest, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the negotiation and pursuit of confirmation of ~~the~~this Plan, the Consummation of ~~the~~this Plan or any contract, instrument, release or other agreement or document created in connection with this Plan, or the administration of the Plan or the Estates or the property to be distributed under ~~the~~this Plan, except for their gross negligence, bad faith or willful misconduct~~, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities (if any) under the Plan~~.  Notwithstanding any other provision of ~~the~~this Plan, no Creditor nor other party in interest, shall have any right of action against any Exculpated Party for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the negotiation or execution of the Settlement Support Agreement, the negotiation and pursuit of confirmation of ~~the~~this Plan, the Consummation of ~~the~~this Plan, or the administration of the Estates or the property to be distributed under ~~the~~this Plan, except for such Exculpated Party's gross negligence ~~or willful misconduct.~~

7.12.5  ~~Limitation of Liability~~.  ~~Except as expressly set forth in the Plan, following the Effective Date, no Exculpated Party shall have or incur any liability to any holder of a Claim or Interest for any act or omission in connection with, related to, or arising out of, the Chapter 11 Cases, the negotiation and pursuit of confirmation of the Plan, the Consummation of the Plan or any contract, instrument, release or other agreement or document created in connection with the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for such Exculpated Party's gross negligence~~, bad faith or willful misconduct.

## 7.13    COMPROMISE, GLOBAL SETTLEMENT, INJUNCTION AND RELATED PROVISIONS

### 7.13.1 Compromise and Settlement.

Notwithstanding anything to the contrary contained in the Plan or the Confirmation Order, the allowance, classification and treatment of all Allowed Claims and Allowed Interests, and their respective distributions and treatments hereunder, takes into account and conforms to the relative priority and rights of the Claims and the Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise to the extent such subordination is enforceable under applicable law.  As of the Effective Date, any and all such rights described in the preceding sentence are settled, compromised, ~~discharged~~ and released pursuant hereto.  The Confirmation Order will constitute the Bankruptcy Court's finding and determination that the settlements reflected in the Plan are (i) in the best interests of the Debtors, their estates and all Holders of Claims, (ii) fair, equitable and reasonable, (iii) made in good faith, and (iv) approved by the Bankruptcy Court pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019.  The Confirmation Order shall approve the

releases by all Entities of all such contractual, legal and equitable subordination rights or Causes of Action that are satisfied, compromised and settled pursuant hereto.  Nothing in Article 12 of the Plan shall compromise or settle in any way whatsoever, any Causes of Action that the Debtors, their Estates, the Joint NSSC Receivers, Cayman Funds, US Fund, US-Cayman Investors or the Plan Administrator, as applicable, may have against Entities that are not Released Parties or provide for the indemnity of any Entities that are not Released Parties.  In accordance with the provisions of the Plan, and pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date (i) the Plan Administrator may, in accordance with Section 8.1 of the Plan, compromise and settle Claims against the Debtors and (ii) the Manager Entity may, in its sole and absolute discretion, compromise and settle Causes of Action against other Entities that have been assigned to the Wind Down Entities.

**7.13.2  Satisfaction of Claims and Termination of Interests**.  Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatments that are provided in the Plan are in complete discharge, settlement, satisfaction and release, effective as of the Effective Date, of Claims (including Intercompany Claims), Interests and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

**7.13.3  Release of Liens.**

Except as otherwise provided in the Plan, or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the

Estates shall be fully released and discharged, and all of the right, title and interest of any Holder

of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the

Post-Confirmation Debtors and their successors and assigns.

      **7.13.4  Releases by the Debtors.**

      Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable

consideration, on and after the Effective Date, the Released Parties are each released and

discharged by the Debtors, the Post-Confirmation Debtors and the Estates from any and all

Claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities

whatsoever, whether for tort, fraud, contract, violations of federal or state securities laws, or

otherwise, including any derivative Claims asserted or that could possibly have been asserted on

behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or

hereinafter arising, in law, equity, or otherwise, that the Debtors, the Post-Confirmation Debtors,

the Estates, or their Affiliates would have been legally entitled to assert in their own right

(whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other

Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or

their Non-Debtor Affiliates, the Chapter 11 Cases, the purchase, sale, or rescission of the

purchase or sale of any security, the subject matter of, or the transactions or events giving rise to,

any Claim or Interest that is treated in the Plan, the business or contractual arrangements

between any Debtor, or any Non-Debtor Affiliates, and any Released Party, the restructuring of

Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or

preparation of the Plan and related Disclosure Statement, or related agreements, instruments, or

other documents, upon any other act or omission, transaction, agreement, event, or other

occurrence taking place on or before the Confirmation Date of the Plan, other than Claims or

liabilities arising out of or related to any contractual or fixed monetary obligation owed to the

Debtors; *provided, however,* that if the Debtors do not fulfill their Pre-Effective Date Duties as a

result of any material action or inaction by an Insider Released Party after the date of filing of

the Plan (other than any material action or inaction resulting from such person's reasonable

determination that such action or inaction is required in the exercise of an applicable fiduciary

duty or from such person's lack of authority to perform a requested action) and such action or

inaction is not cured within five (5) business days following written notice of the same by the

Joint NSSC Receivers to such Insider Released Party and the Debtors (which notice shall be

provided not later than six business days preceding the occurrence of the Effective Date), then on

the Effective Date (i) such Insider Released Party shall not be released; and (ii) the Manager

Entity shall be subrogated to any rights and remedies of the Debtors against such Insider

Released Party with respect to any such material action or inaction; (iii) such Insider Released

Party shall retain all rights regarding any request for payment of the Investigation

Reimbursement under any D&O Policy; and (iv) such Insider Released Party shall not be

deemed to have assigned any Principal Assigned Claims or waived or assigned any Assigned

Individual Claims and shall retain any and all rights with regard thereto.  Entry of the

Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy

Rule 9019, of the provisions of section 12.4 of the Plan and further, shall constitute the

Bankruptcy Court's finding that the provisions hereof are: (1) in exchange for the good and

valuable consideration provided by the Released Parties; (2) a good faith settlement and

compromise of the Claims released; (3) in the best interests of the Debtors and all Holders of

Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after due notice and

opportunity for hearing; and (6) a bar to any of the Debtors, the Post-Confirmation Debtors or

their successors asserting any claim or Claim or Cause of Action against any of the Released

Parties.  Notwithstanding anything to the contrary in the foregoing, the release set forth above

does not release any post-Effective Date obligations of any party under the Plan or any

document, instrument, or agreement executed to implement the Plan.  Notwithstanding any

language to the contrary contained in the Disclosure Statement, Plan, and/or Confirmation Order,

no provision shall release any non-debtor, including any of the Released Parties, from liability

pursuant to any legal action or claim brought by the United States Securities and Exchange

Commission.

### 7.13.5  <u>Releases by Holders of Claims.</u>

Notwithstanding any other provision of the Plan or the Confirmation Order, as of the

Effective Date, each Releasing Creditor shall conclusively be deemed to have unconditionally,

irrevocably and forever, released each of the Released Parties from all obligations, suits,

judgments, damages, demands, debts, rights, Causes of Action and liabilities, whether liquidated

or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or

unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are based in

whole or part on any act, omission, transaction, event, or other occurrence taking place on or

prior to the Effective Date (including prior to the Petition Date) in any way relating to the

Debtors, their Non-Debtor Affiliates, the NSI Receiver, the Joint NSSC Receivers, the Bermuda

Liquidators, the Chapter 11 Cases, the Plan, or the Disclosure Statement, the subject matter of, or

the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the

business or contractual arrangements between any Debtor and any Creditor, the restructuring of

Claims and Interests prior to or in the Chapter 11 Cases, the negotiations, formulation, or

preparation of the Plan, the related Disclosure Statement, or related agreements, instruments, or

other documents, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place before the Effective Date and that could have been asserted at any time up to immediately prior to the Effective Date; *provided, however,* that an Insider Released Party shall not be released under section 12.5 of the Plan if he has not been released under section 12.4 of the Plan.  Notwithstanding any language to the contrary contained in the Disclosure Statement, Plan, and/or Confirmation Order, no provision shall release any non-debtor, including any of the Released Parties, from liability pursuant to any legal action or claim brought by the United States Securities and Exchange Commission. No Creditor who is not a Releasing Creditor shall be deemed to have released any of the Released Parties; and, no Class 2 Creditor who is not a Releasing US-Cayman Investor shall be entitled to receive a payment from the Global Settlement Fund pursuant to section 12.7 of the Plan.

**7.13.6** **<u>Injunctions</u>**. *Except as otherwise specifically provided in the Plan or the Confirmation Order, all Entities who have held, hold or may hold Claims, rights, Causes of Action, liabilities or any equity interests based upon any act or omission, transaction or other activity of any kind or nature related to the Debtors, the NSI Receiver, the Joint NSSC Receivers, the Bermuda Liquidators, MIO, or the Chapter 11 Cases that occurred prior to the Effective Date, other than as expressly provided in the Plan or the Confirmation Order, regardless of the filing, lack of filing, allowance or disallowance of such a Claim or Interest and regardless of whether such Entity has voted to accept the Plan and any successors, assigns or representatives of such Entities shall be precluded and permanently enjoined on and after the Effective Date from (a) the commencement or continuation in any manner of any claim, action or other proceeding of any kind with respect to any Claim, Interest or any other right or claim against any Debtor, or its current or former officers, directors, principals, members, employees, or agents for any actions, or any assets of the foregoing (including, but not limited to, the Wind Down Assets), which they possessed or may possess prior to the Effective Date, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order with respect to any Claim, Interest or any other right or claim against any Debtor, or its current or former officers, directors, principals, members, employees, or agents for any actions, which such Entities possessed or may possess prior to the Effective Date, (c) the creation, perfection or enforcement of any encumbrance of any kind with respect to any Claim, Interest or any other right or claim against any Debtor, or its current or former officers, directors, principals, members, employees, or agents for any actions, or any assets of the foregoing which they possessed or may possess and (d) the assertion of any Claim that is released under the Plan.*

*Except as otherwise specifically provided in the Plan or the Confirmation Order, all Releasing Parties who have held, hold or may hold Claims, rights, Causes of Action, liabilities or any equity interests based upon any act or omission, transaction or other activity of any kind or nature related to the Debtors, the NSI Receiver, the Joint NSSC Receivers, the Bermuda Liquidators, MIO, or the Chapter 11 Cases that occurred prior to the Effective Date, other than as expressly provided in the Plan or the Confirmation Order, regardless of the filing, lack of filing, allowance or disallowance of such a Claim or Interest and regardless of whether such Releasing Party has voted to accept the Plan and any successors, assigns or representatives of such Releasing Party shall be precluded and permanently enjoined on and after the Effective Date from (a) the commencement or continuation in any manner of any claim, action or other proceeding of any kind with respect to any Claim, Interest or any other right or claim against any Released Parties, or any assets of the foregoing, which they possessed or may possess prior to the Effective Date, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order with respect to any Claim, Interest or any other right or claim against any Released Party, which such Entities possessed or may possess prior to the Effective Date, (c) the creation, perfection or enforcement of any encumbrance of any kind with respect to any Claim, Interest or any other right or claim against any Released Party, or any assets of the foregoing which they possessed or may possess and (d) the assertion of any Claim that is released under the Plan.  Notwithstanding any language to the contrary contained in the Disclosure Statement, Plan, and/or Confirmation Order, no provision thereof shall release the Joint NSSC Receivers, the NSI Receiver, the Bermuda Fund or the Bermuda Liquidators from any Cause of Action that may be brought by any Bermuda Investor under Bermuda law.*

**7.13.7  Global Settlement Fund**.  In addition to, and irrespective of, any amounts (i) to be distributed to each Class 2 Creditor pursuant to section 5.2 of the Plan, or (ii) any amounts distributed or to be distributed to a Class 2 Creditor from the US-Cayman Estate Cash Payment, each Releasing US-Cayman Investor shall receive on the Effective Date a payment from the Global Settlement Fund that is calculated based on the ratio that each such Releasing US-Cayman Investor's Percentage Share bears to the aggregate of the Percentage Shares of all Releasing US-Cayman Investors.  In consideration thereof, each Releasing US-Cayman Investor who receives a distribution from the Global Settlement Fund, solely in its capacity as such, shall be deemed to have unconditionally, irrevocably and forever, released and discharged each of the Released Parties from any and all Claims, Interests, Causes of Action, remedies and liabilities whatsoever, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, including any derivative Claims asserted on behalf of a Debtor, the US Fund or any Cayman Fund, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, that such entity would have been legally entitled to assert (whether individually or collectively), based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the related Disclosure Statement  or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place at any time on or before the Effective Date of the Plan.  Any agreement

to be bound by section 12.7 of the Plan, or the acceptance of any payment or distribution made from the Global Settlement Fund, by any Investor or Creditor shall constitute, and be conclusively presumed to be, consent and acquiescence to the absolute, unconditional and irrevocable release and discharge of each of the Released Parties from any and all Claims, Interests, Causes of Action, remedies and liabilities, as set forth hereinabove.  Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.  In the event that any vote on the Plan by a Creditor holding an Allowed Claim in Class 2 is designated pursuant to section 1126(e) of the Bankruptcy Code or is otherwise not counted for purposes of determining whether Class 2 has accepted the Plan and such Creditor has timely returned a ballot indicating (a) acceptance of the Plan and (b) agreement to be bound by the provisions of section 12.7 of the Plan, then any such Creditor Holding an Allowed Claim in Class 2 shall nonetheless be entitled to receive its share of the Global Settlement Payment and shall be deemed to have consented to the release and discharge of the Released Parties set forth herein.

The amount of Cash in the Global Settlement Fund on the Effective Date is expected to be $5 million, contributed by MIO.  *See*, ¶7.13.8 immediately below.  Since the Global Settlement Fund will be allocated on a *pro rata* basis among only to those US-Cayman Investors who return a Ballot agreeing to be bound by the provisions of section 12.7 of the Plan, it is not possible to estimate the amounts to be distributed to any Releasing US-Cayman Investor until all of the Ballots have been returned and tabulated.

**7.13.8** **MIO Contribution and Cap**.  In consideration, *inter alia*, of the provisions of section 12.7 of the Plan (i) MIO will contribute $5 million (which is defined as the "MIO Contribution", see section 1.94 of the Plan) to the Global Settlement Fund on the Effective Date and (ii) subject to the provisions of section 12.8.1 of the Plan, the MIO Investors agree that notwithstanding any other provision of the Plan, the distributions to be paid to the MIO Investors, including distributions (i) pursuant to Class B interests in the Liquidating Trust, (ii) from the US Cayman Estate Cash Payment, ~~and~~ (iii) from the Principal Assigned Claims and (iv) from the MIO Contribution, will not exceed the aggregate amount of $10,200,000 (the "MIO Distribution Cap"), and each MIO Investor waives the right to receive any further distributions under the Plan.  After the MIO Investors have received aggregate distributions equal to the MIO Distribution Cap, the Percentage Share for further distributions to be made to all other US-Cayman Investors shall be recalculated by excluding the MIO Investors from the US-Cayman Investors.

The waiver by MIO Investors of their right to receive further distributions under the Plan as provided for in section 12.8 of the Plan is contingent upon their receipt of aggregate distributions totaling $10,200,000 which will be calculated as provided for in ~~section~~sections 5.2 and 12.8 of the Plan.  For the avoidance of doubt, until aggregate distributions to the MIO Investors equal the MIO Distribution Cap, when making calculations pursuant to ~~section~~sections 5.2 and 12.8 of the Plan, the MIO Investors shall be included among the Releasing US-Cayman Investors and US-Cayman Investors for the purposes of qualifying for any distributions made under the Plan.

**7.14** **RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases after the Effective Date to the fullest extent legally permissible, including jurisdiction to, among other things:

(a)    Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim against or Interest in the Debtors, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of all Claims and Interests;

(b)    Hear and determine any and all causes of action against any Person and rights of the Debtors that arose before or after the Petition Date, including any Avoidance Action that is commenced on or prior to the Effective Date;

(c)    Grant or deny any applications for allowance of compensation for Professionals authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

(d)    Resolve any matters relating to the assumption, assumption and assignment or rejection of any executory contract or unexpired lease to which any Debtor is a party or with respect to which any of the Debtors may be liable, including the determination of whether such contract is executory or such lease is unexpired for the purposes of section 365 of the Bankruptcy Code, and hear, determine and, if necessary, liquidate any Claims arising therefrom;

(e)    Enter any orders that may be required approving the Post-Confirmation Debtors' post-Confirmation sale or other disposition of Assets;

(f)    Ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(g)      Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving any Debtor that may be pending in the Chapter 11 Cases on the Effective Date;

(h)      Hear and determine matters concerning state, local or federal taxes in accordance with sections 346, 505 or 1146 of the Bankruptcy Code;

(i)      Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Management Agreement, the Plan, and the Confirmation Order;

(j)      Hear and determine any matters concerning the enforcement of the provisions of Article 11 and 12 of the Plan and any other exculpations, limitations of liability or injunctions contemplated by the Plan;

(k)      Resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of the Management Agreement, the Plan, the Confirmation Order, or the Liquidating Trust Agreement;

(l)      Permit the Debtors, to the extent authorized pursuant to section 1127 of the Bankruptcy Code, to modify the Plan or any agreement or document created in connection with the Plan, or remedy any defect or omission or reconcile any inconsistency in the Plan or any agreement or document created in connection with the Plan;

(m)      Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with Consummation, implementation or enforcement of the Management Agreement, the Plan or the Confirmation Order;

(n)        Enforce any injunctions entered in connection with or relating to the Plan or the Confirmation Order;

(o)        Enter and enforce such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated, or distributions pursuant to the Plan are enjoined or stayed;

(p)        Determine any other matters that may arise in connection with or relating to the Plan or any agreement or the Confirmation Order;

(q)        Enter any orders in aid of prior orders of the Bankruptcy Court; and

(r)        Enter a final decree closing the Chapter 11 Cases, or any of them.

## 7.15    **ACCEPTANCE OR REJECTION OF THE PLAN**

### 7.15.1    **Persons Entitled to Vote.**

a.        Classes Deemed to Accept.  Classes 4(a) and 5(a) are not Impaired and pursuant to section 1126(f) of the Bankruptcy Code they are each deemed to have accepted the Plan and these Classes will not be solicited.

b.        Classes Deemed to Reject.  Holders of Claims in Class 4(c) and Class 4(d) and (ii) Interests in Class 5(b), Class 5(c) and Class 5(d) will not receive or retain any property under the Plan on account of such Interests and are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and these Classes will not be solicited.

c.        Voting Classes.  Only Holders of Claims or Interests in Class 1, Class 2, Class 3 and Class 4(b) will be entitled to vote to accept or reject the Plan.

**7.15.2  <u>Acceptance by Impaired Classes</u>**.  An Impaired Class of Claims shall have accepted the Plan if (i) the holders (other than any holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (ii) the holders (other than any holder designated under section 1126(e) of the Bankruptcy Code) of at least one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

**7.15.3  <u>Voting and Acceptance by US Fund</u>**.  The US Fund Claim is an Allowed Claim in Class 2.  <u>As a matter of law, it is the US Fund who will be entitled to vote on behalf of all US Investors.</u>  For purposes of the Plan, US Investors will be solicited for their indication to the manager of the US Fund on how to vote the Claim of the US Fund under the US Fund Notes to either accept or reject the Plan.  The US Fund will vote that entire Claim in accordance with the indications received from the holders of a majority of the Percentage Shares of the US Fund who vote to either accept or reject the Plan.  US Investors will be provided with the US Fund Investor Ballot, which solicits their indication to the manager of the US Fund of a preference for acceptance or rejection of the Plan.  The US Fund will vote its Claim under the US Fund Notes in the manner indicated by those US Investors who hold a majority of the Percentage Shares in the US Fund and who timely return ballots.  For purposes of sections 5.2 and 12.7 of the Plan, any ballots returned by the US Investors who have voted to (a) accept the Plan and (b) accept the provisions of section 12.7 of the Plan, shall be entitled to receive a *pro rata* share of the amounts in the Global Settlement Fund to be calculated and distributed in the manner provided in section 12.7 of the Plan.

**7.15.4** **Voting and Acceptance by the Cayman Funds**.   The Cayman Fund Claims are Allowed Claims in Class 2.  As a matter of law, it is the Cayman Funds who will be entitled to vote on behalf of the respective Cayman Investors.  For purposes of the Plan, Cayman Investors will be solicited for their non-binding indication to the director of the respective Cayman Fund on how to vote the Claim of such Cayman Fund under the Cayman Fund Notes to either accept or reject the Plan.  By delivering an executedA Cayman Investor who delivers a Cayman Investor Ballot, a Cayman Investor shall be deemed to have consented to a vote by the respective Cayman Fund in accordance with the preference indicated on such Cayman Investor Ballot, and shall thereby release the directors of the Cayman fund from any obligation, Cause of Action or liability the directors of the Cayman Fund, for any act or omission in connection with, relating to, or arising out of, (i) the casting of any Cayman Fund Ballot consistent with such preference, (ii) the solicitation, negotiation and pursuit of confirmation of the Plan, (iii) the Consummation of the Plan or (iv) the administration of any property to be distributed by or through the Cayman Funds under the Plan, except for their gross negligence or willful misconduct.  For purposes of sections 5.2 and 12.7 of the Plan, any ballots returned by the Cayman Investors who have voted to (a) accept the Plan and (b) accept the provisions of section 12.7 of the Plan, shall be entitled to receive a *pro rata* share of the amounts in the Global Settlement Fund to be calculated and distributed in the manner provided in section 12.7 of the Plan.

**7.16** **MISCELLANEOUS PROVISIONS**

**7.16.1  <u>Modification of the Plan</u>**.  Subject to the restrictions on Plan modifications set forth in section 1127 of the Bankruptcy Code, and subject to the written consent of the Approval Parties (and of the Insider Released Parties, to the extent it (a) modifies any of sections 5.3 (including each of its subsections), 6.6, 6.7, 7.4, 7.15, 11.4, or 12.4 through 12.7 of the Plan or any definition used therein, or (b) otherwise would materially affect the rights or interests of the Insider Released Parties), the Debtors reserve the right to alter, amend, abandon, revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent plans of reorganization.  If the Debtors withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases effected under the Plan and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission.

## ARTICLE 8.

### FEASIBILITY OF THE PLAN AND THE BEST INTERESTS TEST

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of Section 1129 of the Bankruptcy Court have been satisfied.  If so, the Bankruptcy Court will enter the Confirmation Order.  Debtors believe that the Plan satisfies or will satisfy the applicable requirements, as follows:

•      The Plan complies with the applicable provisions of the Bankruptcy Code.

•       The Debtors, as Plan proponent, will have complied with the applicable

provisions of the Bankruptcy Code.

•       The Plan has been proposed in good faith and not by any means forbidden by law.

•       Any payment made or promised under the Plan for services or for costs and

expenses in, or in connection with, the Chapter 11 cases, or in connection with the Plan

incident to the case, has been disclosed to the Bankruptcy Court, and any such payment made

before the confirmation of the Plan is reasonable, or if such payment is to be fixed after the

confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as

reasonable.

•       With respect to each Class of Impaired Claims or Interests, either each Holder of

a Claim or Interest of such Class has accepted the Plan or will receive or retain under the Plan on

account of such Claim or Interest property of a value, as of the Effective Date, that is not less

than the amount that such Holder would receive or retain if the Debtors were liquidated on such

date under Chapter 7 of the Bankruptcy Code.

•       Each Class of Claims or Interests that is entitled to vote on the Plan will either

have accepted the Plan or will not be impaired under the Plan, or the Plan may be confirmed

without the approval of each voting Class pursuant to Section 1129(b) of the Bankruptcy Code.

•       Except to the extent that the Holder of a particular Claim will agree to a different

treatment of such Claim, the Plan provides that Allowed Administrative, Allowed Priority Tax

Claims and Allowed Other Priority Non-Tax Claims will be paid in full on the Effective Date, or

as soon thereafter as practicable.

• At least one Class of Impaired Claims or Interests will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of such Class.

• Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

• All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee, will be paid as of the Effective Date.

The Debtors believe that (a) the Plan satisfies or will satisfy all of the statutory requirements of Chapter 11 of the Bankruptcy Code, (b) they have complied, or will have complied, with all of the requirements of Chapter 11 and (c) the Plan has been proposed in good faith.

As a result, the Debtors believe that the Plan does not unfairly discriminate against the Holders of these Claims.

## 8.1     Feasibility of the Plan

To confirm the Plan, the Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors, unless such liquidation or reorganization is proposed in the Plan.  This requirement is imposed by section 1129(a)(11) of the Bankruptcy Code and is referred to as the "feasibility" requirement.  The Plan is premised on transferring all of the Wind Down Assets into the Wind Down Entities and transferring the Class A Interests to the Holders of Class 1 Claims and transferring the Class B Interests to the Liquidation Trust on behalf of the Holders of Class 2 Claims, the liquidation of claims and causes of action, and the consummation of other

transactions contemplated by the Plan.  The Debtors believe that there will be sufficient cash

available to enable the Class A Interests and Class B Interests to be transferred and for the Plan

Administrator to fully and timely perform all obligations described in the Plan and therefore, that

the Plan is feasible.

**8.2**     **Best Interests Test**

    **8.2.1**    **Generally**

The Bankruptcy Code requires the bankruptcy court to determine that a plan is in the

"best interests" of all holders of claims and interests that are impaired by the plan and that have

not accepted the plan.  The "best interests" test, as set forth in Section 1129(a)(7) of the

Bankruptcy Code, requires a bankruptcy court find that each holder of a claim or interest in an

impaired class either (i) has accepted the plan or (ii) will receive or retain under the plan

property of a value, as of the effective date of the plan, that is not less than the amount that such

holder would recover if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to members of each impaired class of holders of

claims and interests if the debtor were liquidated under Chapter 7, a bankruptcy court must first

determine the aggregate dollar amount that would be generated from the debtor's assets if its

Chapter 11 case were converted to a Chapter 7 case under the Bankruptcy Code.  This

"liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's

assets by a Chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by,

first, the claims of secured creditors to the extent of the value of their collateral and, second, by

the costs and expenses of liquidation, as well as by other administrative expenses and costs of

both the Chapter 7 case and the Chapter 11 case.  A liquidation under Chapter 7 does not affect

the priority of several holders of claims to be paid first.  Costs of liquidation under Chapter 7 of

the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and

other professionals retained by the trustee, asset disposition expenses, all unpaid expenses

incurred by the debtor in its bankruptcy case (such as compensation of attorneys, financial

advisors, and restructuring consultants) that are allowed in the Chapter 7 case, litigation costs,

and claims arising from the operations of the debtor during the pendency of the bankruptcy case.

The liquidation itself would trigger certain priority payments that otherwise would be due in the

ordinary course of business.  Those priority claims would be paid in full from the liquidation

proceeds before the balance would be made available to pay general unsecured claims or to make

any distribution in respect of equity interests.  The liquidation also would prompt the rejection of

a large number of executory contracts and unexpired leases and thereby create a significantly

higher number of unsecured claims.

Once the court ascertains the recoveries in liquidation of secured creditors and priority

claimants, it must determine the probable distribution to general unsecured creditors and equity

security holders from the remaining available proceeds in liquidation.  If such probable

distribution has a value greater than the distributions to be received by such creditors and equity

security holders under a debtor's plan, then such plan is not in the "best interests" of creditors

and equity security holders.

### 8.2.2    Best Interests of Creditors Test

The Debtors believe that the Plan meets the "best interests" test of section 1129(a)(7) of

the Bankruptcy Code.  The Plan provides that on the Effective Date substantially all of assets of

the Debtors Assets (other than the NSC Books and Records) will be transferred to the Wind

Down Entities which will issue (i) the Class A Interests to the Holders of Class 1 Claims and (ii)

the Class B Interests to the Liquidation Trust established for the benefit of the Holders of Class 2

Claims.  Consequently, each non-accepting Creditor and each Holder of an Interest will receive

more than they would receive in a hypothetical liquidation under chapter 7 of the bankruptcy

Code.  More specifically, in a chapter 7 liquidation, the Releasing US-Cayman Investors, who

comprise the beneficial interest Holders of Class 2 Claims would not have the benefit of the

Cash to be distributed as a result of the MIO Contribution.  The MIO Contribution alone

provides an additional $5 million of value to the Plan that would not be available under a chapter

7 liquidation.

Conversion of these Chapter 11 Cases to Chapter 7 would also result in additional costs

to the Estates.  In chapter 7 cases, the chapter 7 trustee would be entitled to seek a sliding scale

commission based upon the funds distributed by such trustee, even though the Debtors, through

their orderly liquidation efforts, have already accumulated much of the funds and have already

incurred many of the expenses associated with generating those funds.  In light of historical

experience from other cases, the Debtors believe that the costs of such fees for a chapter 7 trustee

and the professional fees for the professionals retained by the chapter 7 trustee would be at least

5% of available funds.  Accordingly, the Debtors believe that there is a reasonable likelihood

that in a liquidation, any distributions to Creditors would be reduced as a result of additional

administrative expense, since the chapter 7 trustee would be entitled to receive a commission in

some amount for all funds distributed, including the substantial funds already collected by the

Debtors through their liquidation efforts.  In addition to the increased administrative expense, a

Chapter 7 trustee might not have the benefit of operational and management skills of the

Debtors' employees who are familiar with the illiquid assets in the Debtors' portfolio.  The

consequence of the loss of this knowledge could result in both the erosion of value and the need to hire additional professionals to manage and liquidate the assets.

It is also reasonable to anticipate that chapter 7 liquidations would result in delay in the distributions to Creditors.  Among other things, chapter 7 cases would trigger a new bar date for filing Claims that would be more than 90 days following conversion of the case to chapter 7.  Fed.R.Bankr.P. 3002(c).  Hence, chapter 7 liquidations would not only delay distributions, but raise the prospect of additional Claims that were not asserted in the Chapter 11 Cases.  Based on the foregoing, the Plan provides an opportunity to bring the greatest return to Creditors.

The Debtors believe that, in the event of conversion of the case to a case under chapter 7, distributions will be reduced by the extra layer of administrative expense created by conversion, as well as significantly delayed.  The Debtors believe that, if the Plan is not confirmed or is not confirmable, the only likely alternative will be conversion of the Chapter 11 Cases to chapter 7 liquidations.

For purposes of the best interests test and in order to determine the liquidation value available to Creditors, the Debtors, with the assistance of their financial advisors, prepared the liquidation analyses that are annexed to this Disclosure Statement as Exhibit I (the "Liquidation Analysis").  A separate Liquidation Analysis has been prepared for each of the four Debtors.  The information in the Liquidation Analysis that is annexed as Exhibit I has been calculated as of December 31, 2011.

The Liquidation Analysis for NSI demonstrates that in a chapter 7 liquidation, the Creditors holding Secured Claims in Class 1 Creditors would be paid in full, and that the Creditors holding Unsecured Claims in Class 4(a) would also be paid in full, with a distribution available to NSSC, as the Holder of the Interests in NSI.  However, under the Plan NSI will have

effectuated its settlement with one of its largest unsecured creditors, namely SPAR 2004. There is significant risk that such settlement would not be agreed to by the parties in a chapter 7 liquidation.

The Liquidation Analysis for NSSC demonstrates that in a chapter 7 liquidation (absent expensive and protracted litigation): (i) the Creditors holding Secured Claims in Class 1 would receive a distribution equivalent to an amount of approximately 15% of the Face Amount of their Secured Claims, (iii) the Holders of Claims in Class 2 would be Unsecured and would not receive any distribution; and (iii) the Holders of Unsecured Claims in Class 4 (b) would not receive any distribution. The Debtors believe that this analysis demonstrates that under the terms of the plan, Class 2 Creditors will receive consideration that materially exceeds what the Liquidation Analysis projects would be available to such creditors in a chapter 7 liquidation. Thus the Debtors believe that Class 2 Creditors too are materially better off under the Plan than they would be in a chapter 7 liquidation.

The Liquidation Analysis for NSC demonstrates that in a chapter 7 liquidation the Holders of Unsecured Claims in Class 4(c) would receive a nominal distribution that is materially less than the distribution that they would receive if the Plan is confirmed.

The Liquidation Analysis for NSCI demonstrates that in a chapter 7 liquidation the Holders of Unsecured Claims in Class 4(d) would receive a nominal distribution that is materially less than the distribution that they would receive if the Plan is confirmed.

The foregoing conclusions are premised upon the assumptions set forth in the Liquidation Analysis. While the Debtors believe that any liquidation analysis is inherently speculative, the Debtors and their financial advisors believe the Liquidation Analysis is reasonable.

The Liquidation Analysis for each of the Debtors necessarily contains estimates of the net proceeds that would be received from a forced sale of assets and/or business units, as well as the amount of Claims that would ultimately become Allowed Claims.  It is not possible to know what order or finding may be entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims or whether such estimates will be more or less than the projected amounts of Allowed Claims set forth in the Liquidation Analysis.  In preparing the Liquidation Analysis, the Debtors have projected an amount of Allowed Claims that represents their best estimate of the Chapter 7 liquidation dividend to Holders of Allowed Claims.  The estimate of the amount of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of the Allowed Claims under the Plan.

For the reasons set forth above, the Debtors believe that the Plan is more likely to yield economic benefits to unsecured creditors than chapter 7 liquidations because it will avoid a layer of administrative expense associated with the appointment of a chapter 7 trustee, while decreasing the efficiency of administrating the Debtors' assets for the benefit of their Creditors.

The Debtors believe that the Holders of Impaired Claims will receive at least as much under the Plan as they would in a liquidation in a hypothetical chapter 7 case.

**8.3**     **Confirmation Without Acceptance by All Impaired Classes: The 'Cramdown' Alternative**

Section 1129(b) of the Bankruptcy Code provides that a plan may be confirmed even if it has not been accepted by all impaired classes as long as at least one impaired class of claims has accepted it.  The Bankruptcy Court may confirm a plan at the request of a debtor notwithstanding the plan's rejection (or deemed rejection) by impaired classes as long as the plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted

it.  A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

A plan is fair and equitable as to a class of secured claims that rejects such plan if the plan provides (1)(a) that the holders of claims included in the rejecting class retain the lien securing those claims, whether the property subject to those liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and (b) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim of a value, as of the effective date of the plan, of at least the value of the holder's interest in the estate's interest in such property; (2) for the sale, subject to Section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (1) or (2) of this paragraph; or (3) for the realization by such holders of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims which rejects a plan if the plan provides (1) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (2) that the holder of any claim or interest that is junior to the claims of such rejecting class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (1) that each holder of an interest included in the rejecting class receives or retains on account of that interest property that has a value, as of the effective date of the plan, equal to the

greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (2) that the holder of any interest that is junior to the interest of such rejecting class will not receive or retain under the plan on account of such junior interest any property at all.

The votes of Holders of  Claims or Interests in Classes 4(d), 5(b) and 5(d)  are not being solicited because such Holders are not entitled to receive or retain under the Plan any interest in property on account of their Claims and Interests.  Such Classes therefore are deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code.  In addition, other Classes may vote to reject the Plan.  Accordingly, the Debtors may be, or are, seeking confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code with respect to such Classes.  Notwithstanding the deemed or actual rejection of the Plan by such Classes, the Debtors believe that Classes, Claims or Interests in ~~Classes~~ Classes 4(d), 5(b) and 5(d) and any other Classes that vote to reject the Plan are being treated fairly and equitably under the Bankruptcy Code.  The Debtors therefore believe the Plan may be confirmed despite the deemed or actual rejection by these Classes.

## ARTICLE 9.

## IMPORTANT CONSIDERATIONS AND RISK FACTORS

### 9.1    The Plan Proponents Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Plan Proponents as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Plan Proponents have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Court.

**9.2**     **No Representations Outside the Disclosure Statement are Authorized**

No representations concerning or related to the Debtors, the Chapter 11 cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance, or rejection, of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to Debtors' counsel and the Office of the United States Trustee.

**9.3**     **Information Presented Based on Debtors' Books and Records; No Audit Performed**

While the Plan Proponents have endeavored to present information fairly in this Disclosure Statement, because of Debtors' financial difficulties, as well as the complexity of Debtors' financial matters, the Debtors' books and records upon which this Disclosure Statement is based might be incomplete or inaccurate.  The financial information contained herein, unless otherwise expressly indicated, is unaudited.

**9.4**     **All Information was Provided by Debtors and was Relied Upon By Professionals**

All counsel and other professionals for the Plan Proponents have relied upon information provided by the Debtors in connection with preparation of this Disclosure Statement.  Although counsel for the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, counsel has not verified independently the information contained herein and no Creditors or Investor should rely upon any statements or representations of counsel or other professionals engaged by the Debtors in connection with these cases.

**9.5**     **Projections and Other Forward Looking Statements Not Assured**

Certain of the information contained in this Disclosure Statement is, by nature, forward looking, and contains estimates and assumptions which might ultimately prove to be incorrect, and contains projections which may be materially different from actual future experiences. While the Debtors believe that their projections are reasonable, there can be no assurance that they will be realized, resulting in recoveries that could be significantly less than projected. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various classes that might be allowed. The allowed amount of Claims in each Class could be significantly more than projected, which in turn, could cause the value of distributions to be reduced substantially.

### 9.6     No Legal or Tax Advice is Provided to You by this Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each Holder of a Claim or Interest should consult his, her or its own legal counsel and accountant as to legal, tax and other matters concerning his, her, or its Claim or Interest.

This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### 9.7     No Admissions Made

Nothing contained herein shall constitute an admission of any fact or liability by any party (including, without limitation, the Plan Proponents) or to be deemed evidence of the tax or other legal effects of the Plan on the Debtors or on Holders of Claims or Interests.

### 9.8     No Waiver of Rights Except as Expressly Set Forth in the Plan

A vote for or against the Plan does not constitute a waiver or release of any Claims or rights of the Plan Proponents (or any party in interest, as the case may be) to object to that creditor's Claim, or recover any preferential, fraudulent or other voidable transfer or estate assets, regardless of whether any Claims of the Debtors or their respective estates are specifically or generally identified herein.

## 9.9    Bankruptcy Law Risks and Considerations

### 9.9.1    Confirmation of the Plan is Not Assured

Although the Plan Proponents believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  There can also be no assurance that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate resolicitation of votes.

### 9.9.2    The Plan May Be Confirmed Without the Approval of All Creditors through So-Called "Cramdown"

If one or more Impaired Classes of Claims does not accept the Plan, the Bankruptcy Court may nonetheless confirm the Plan at the Plan Proponents' request if all other conditions for confirmation have been met and at least one impaired Class of Claims has accepted the Plan (without including the vote of any insider in that Class) and, as to each Impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan does not discriminate unfairly and is fair and equitable.

The votes of Holders of Claims and Interests under Classes 4(d), 5(b) and 5(d) are not being solicited because such Holders are not entitled to receive or retain under the Plan any interest in property on account of their Claims and Interests.  Such Classes therefore are deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code.  In addition, if

Classes 2, 3 or 4(b) fails to accept the Plan, the Plan Proponents may seek confirmation of the Plan pursuant to a Cramdown Process over such Class.  Accordingly, the Plan Proponents are seeking confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code with respect to such Classes and may seek confirmation of the Plan as to other Classes if such Classes vote to reject the Plan.  Notwithstanding the deemed rejection by such Classes, the Plan Proponents believe that Classes 2, 3 or 4(b) are being treated fairly and equitably under the Bankruptcy Code.  The Plan Proponents therefore believe the Plan may be confirmed despite its deemed rejection by these Classes.

### 9.9.3    The Effective Date Might Be Delayed or Never Occur

There can be no assurance as to the timing of the Effective Date or that it will occur.  If the conditions precedent to the Effective Date set forth in the Plan have not occurred or been waived, the Confirmation Order shall be vacated in accordance with the Plan and such Confirmation Order.  In that event, no distributions would be made, and the Holders of Claims and Interests would be restored to their previous position as of the moment before confirmation, and the Debtors' obligations for Claims and the Interests would remain unchanged.

### 9.10    Tax Considerations

There are significant tax consequences to the Debtors and Holders of Claims and Interests.  These are discussed below in the section entitled "Certain U.S. Federal Income Tax Consequences of the Plan."  You should consult your own tax advisor about your particular circumstances.

### 9.11    Business Factors And Competitive Conditions

In their financial projections, including the projections of Net Liquidation Proceeds, the Debtors have assumed that the general economic conditions of the United States economy will

improve over the next several years.  An improvement of economic conditions is subject to many factors outside the control of any person or entity, including interest rates, inflation, unemployment rates, consumer spending, war, terrorism and other such factors.  Any one of these or other economic factors could have a significant impact on the operating performance of the Wind Down Entities.  There is no guarantee that economic conditions will improve in the near term.

There are risks that the goals of the Managing Entity and Wind Down Oversight Committee going-forward business plan and operational restructuring strategy will not be achieved.  In such event, the Wind Down Oversight Committee  may be forced to sell all or parts of the Wind Down Entities business, develop and implement further restructuring plans not contemplated or become subject to further insolvency proceedings.  Accordingly, in the event of further restructurings or insolvency proceedings of any Wind Down Entities the Holders of Class A Interests and Class B Interests could have such Interests substantially diluted or even cancelled.

In addition to uncertain economic and business conditions, the Wind Down Entities will likely face competitive pressures and other third party actions and changes in market conditions.  The Wind Down Entities' anticipated performance will be impacted by these and other unpredictable activities.

Other factors that Holders of Claims should consider are potential regulatory and legal developments that may impact the Wind Down Entities' businesses.  Although these and other such factors are beyond any person's control and cannot be determined in advance, they could have a significant impact on the Wind Down Entities' operating performance.

**Claims Filed by Prime Asset Funding GP, LLC** Prime Asset Funding GP, LLC ("PAF") has filed three proofs of claim in the cases of three of

the four Debtors.[21]  PAF, which claims it is owed management and profit-sharing fees from one of the Debtors' investment subsidiaries, has filed claims against NSSC, NSI and NSC, alleging that each of these Debtors is liable to PAF for the unpaid fees on theories of tort, contract and extra-contractual obligations.  On June 13, 2011, the Debtors filed an objection to each of the PAF Claims.

In support of its claims, PAF asserts that the Debtors violated their PPMs and misled investors and creditors (including creditors of non-Debtors controlled by the Debtors) for the following reasons: (i) that the Debtors paid hundreds of millions of dollars of redemptions largely using the cash generated by selling new securities; (ii) that the Debtors were fully aware that they were insolvent by January 1, 2008, if not much earlier; (iii) that the Debtors' outstanding redemption requests were at least $425 million by April 7, 2008; (iv) that the Debtors concealed this fact from investors and creditors (including creditors of non-Debtors); (v) that the Debtors routinely commingled cash and ignored corporate separateness; and (vi) that the Debtors were long aware of the overvaluation of their insurance and other assets, but still continued to improperly record income (with NSC taking a $5.6 million profit share in 2008) until the excess redemptions caused their collapse.

PAF believes its allegations are supported, in part, by the testimony of the Debtors' former president, Perry Gillies, whom PAF contends previously stated under oath that: "NSI expenses (for example, funding insurance premiums) were treated as expenses of NSSC. NSSC has made and continues to make all these payments on behalf of NSI in order to maintain the

---

[21]    The three claims, which are hereinafter collectively referred to as the "PAF Claims", have been assigned claim numbers 165, 197 and 198, on the claims docket.

value of the NSI portfolio [approximately $300 million from 2007]. NSSC assets have historically been monetized and used to meet premium payments on NSI assets, thus shifting value from NSSC to NSI each month. Critically, there has been no offset to this value transfer to compensate NSSC."

PAF further alleges that NSSC and NSI were never able to pay their obligations, including redemption requests as they became due, from cash generated by their investments. PAF alleges that the Debtors instead paid redemptions of approximately $290 million through December 31, 2007, (NSSC and NSI through June 2007) by using at least $200 million of the proceeds from the sales of securities in violation of the stated "Use of Proceeds" in the PPMs. PAF believes this is also evidenced, in part, by the fact that by January 1, 2008, redemption requests were already approximately $95 million and many of these were already past due because very little new capital was raised in the last part of 2007.  Accordingly, PAF contends that even if one were to ignore the Debtors' improper use of investment proceeds, as of January 1, 2008, the Debtors were unable to meet their obligations as they became due in the ordinary course of business, and were therefore insolvent. Further, PAF contends that total and unpaid redemption requests  continued to grow and were approximately $425 million by April 7, 2008, the date of a 2007 audit.  However, PAF contends that the Debtors failed to disclose any of these matters to their investors or creditors in the audited report, or in the "Risk Factors" of the PPMs, raising at least another $100 million in new investment.  Further, PAF alleges that the Debtors were fully aware that their life insurance assets were already overstated by December 31, 2007, and were improperly valued on their audited financials.  Additionally, PAF alleges that virtually all of their real estate loans were past due by early 2008, with many loan values well in excess of

the prices the borrowers had paid, yet the Debtors not only failed to reserve for this, they continued to record income on many of these investments until the fourth quarter of 2008.

The Debtors dispute the legal and factual basis of PAF's allegations. Many of these contentions do not go to the merits of the PAF Claims and even if proven at trial would not entitle PAF to recover from any of the Debtors. Rather, these factual assertions suggest that PAF is improperly seeking to substantively consolidate the estates of several of the Debtors. However, even if the factual allegations were true they would be insufficient, as a matter of law, to establish a basis for consolidation under applicable Third Circuit precedent where substantially all of the assets were subject to liens granted pursuant to agreements which expressly recognize corporate separateness, indicating creditor reliance on such separateness.

Ultimately, the validity, priority and extent of the PAF Claims will be determined by the Bankruptcy Court when it decides whether to sustain the Debtors' objections to the PAF Claims.

## ARTICLE 10.

## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the Plan which is for general information purposes only and does not purport to be a complete analysis or listing of all potential tax consequences. Moreover, such summary should not be relied upon for purposes of determining the specific tax consequences of the Plan to the Debtors or with respect to a particular Holder of a Claim or Interest. This summary assumes that the various indebtedness and other arrangements to which a Debtor is a party will be respected for U.S. federal income tax purposes in accordance with their form.

The following summary is based upon the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder ("Regulations"), judicial

decisions and published administrative rulings and pronouncements of the Internal Revenue

Service (the "IRS"), as in effect on the date hereof.  Legislative, judicial or administrative

changes or interpretations enacted or promulgated hereafter could alter or modify the analysis

and conclusions set forth below.  Any such changes or interpretations may be retroactive and

could affect significantly the federal income tax consequences discussed below.

No ruling has been requested or obtained from the IRS with respect to any tax aspects of

the Plan and no opinion of counsel has been sought or obtained with respect thereto.  No

representations or assurances are being made to the Holders of Claims or Interests with respect

to the U.S. federal income tax consequences described herein.  This summary does not address

foreign, state or local tax law, or any estate or gift tax consequences of the Plan.  Additionally,

this summary does not purport to address the U.S. income tax consequences of the Plan to

special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds,

insurance companies, financial institutions thrifts, small business investment companies,

regulated investment companies, tax exempt organizations, certain expatriates, non-Debtor

pass-through entities or investors in non-Debtor pass-through entities).

THE TAX CONSEQUENCES TO HOLDERS OF CLAIMS AND INTERESTS MAY

VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER.

MOREOVER, THE TAX CONSEQUENCES OF CERTAIN ASPECTS OF THE PLAN ARE

UNCERTAIN DUE TO THE LACK OF APPLICABLE LEGAL PRECEDENT AND THE

POSSIBILITY OF CHANGES IN THE APPLICABLE TAX LAW.  THERE CAN BE NO

ASSURANCE THAT THE IRS WILL NOT CHALLENGE ANY OF THE TAX

CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF

ASSERTED, WOULD NOT BE SUSTAINED.  ACCORDINGLY, EACH HOLDER OF A

CLAIM OR INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING

THE, FEDERAL, STATE, LOCAL AND, TO THE EXTENT APPLICABLE, FOREIGN TAX

CONSEQUENCES OF THE PLAN.

**TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE**

**CIRCULAR 230, YOU ARE HEREBY NOTIFIED THAT: (1) ANY DISCUSSION OF**

**THE U.S.  FEDERAL INCOME TAX ISSUES IN THIS DISCLOSURE STATEMENT IS**

**NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY**

**PERSON FOR THE PURPOSE OF AVOIDING U.S.  FEDERAL TAX PENALTIES**

**THAT MAY BE IMPOSED ON SUCH PERSON; (2) ANY DISCUSSION OF U.S.**

**FEDERAL INCOME TAX ISSUES IN THIS DISCLOSURE STATEMENT IS WRITTEN**

**IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE**

**TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT;**

**AND (3) TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR**

**CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

**10.1**    **Federal Tax Consequences to the Debtors**

**10.1.1**  **Cancellation of Indebtedness Income Generally**

Pursuant to the Tax Code and subject to certain exceptions, a taxpayer generally must

recognize income from the cancellation of indebtedness ("COD Income") to the extent that such

taxpayer's indebtedness is discharged for an amount less than the indebtedness' adjusted issue

price determined in the manner described below.  Generally, the amount of COD Income, subject

to certain statutory and judicial exceptions, is the excess of (i) the adjusted issue price of the

discharged indebtedness less (ii) the sum of the fair market value (determined at the date of the

exchange) of the consideration, if any, given in exchange for such discharged indebtedness

including cash, property and the issue price of any new indebtedness.  If a new debt instrument is issued to the creditor, then the issue price of such debt instrument is determined under either Section 1273 or Section 1274 of the Tax Code.  Generally, these provisions treat the fair market value of a publicly-traded debt instrument as its issue price and the stated principal amount of any other debt instrument as its issue price if its terms provide for adequate stated interest.  A non publicly-traded debt instrument debt instrument has adequate stated interest if the interest exceeds the applicable IRS federal rate.  The elimination of a guarantee should not result in the recognition of COD Income.

### 10.1.2  Bankruptcy Exception and the Reduction of Tax Attributes Generally

Section 108(a)(l)(A) of the Tax Code provides an exception to the recognition of COD Income, however, where a taxpayer discharging indebtedness is under the jurisdiction of a court in a case under title 11 of the Bankruptcy Code and where the discharge is granted, or is effected pursuant to a plan approved, by a U.S.  Bankruptcy Court (the "Bankruptcy Exception").  Under the Bankruptcy Exception, instead of recognizing COD Income, the taxpayer is required, pursuant to Section 108(b) of the Tax Code, to reduce certain of that taxpayer's tax attributes to the extent thereof by the amount of COD Income.  The attributes of the taxpayer are generally reduced in the following order: net operating losses ("NOLS"), general business and minimum tax credit carryforwards, capital loss carryforwards, the basis of the taxpayer's assets, and finally, foreign tax credit tax carryforwards (collectively, "Tax Attributes").  If the amount of the COD Income is sufficiently large, it can eliminate these favorable Tax Attributes.  To the extent the amount of COD Income exceeds the amount of Tax Attributes available to be reduced, such excess is excluded from income.  Pursuant to Section 108(b)(4)(A) of the Tax Code, the reduction of Tax Attributes does not occur until the end of the taxable year after such Tax

Attributes have been applied to determine the tax in the year of discharge or, in the case of asset basis reduction, the first day of the taxable year following the taxable year in which the COD Income is realized.

Section 108(e)(2) of the Tax Code provides a further exception to the recognition of COD Income upon the discharge of debt, providing that a taxpayer will not recognize COD Income to the extent that the taxpayer's satisfaction of the debt would have given rise to a deduction for United States federal income tax purposes. Unlike Section 108(b) of the Tax Code, Section 108(e)(2) does not require a reduction in the taxpayer's Tax Attributes as a result of the non-recognition of COD Income. Thus, the effect of Section 108(e)(2) of the Tax Code, where applicable, is to allow a taxpayer to discharge indebtedness without recognizing income and without reducing its Tax Attributes.

### 10.1.3  Disregarded and Pass-through Entities Discharging Indebtedness Generally

Pursuant to Section 301.7701-2(a) of the Regulations, an entity that is treated as a disregarded entity for U.S. federal income tax purposes is treated in the same manner as a sole proprietorship, branch or division of such entity's owner. Thus, assets and liabilities owned, or owed, by a disregarded entity should generally be treated as owned by, or liabilities of, the disregarded entity's owner. Pursuant to Section 301.7701-1 of the Regulations, a classification as a disregarded entity applies for all U.S. federal tax purposes. Accordingly, a discharge of a disregarded entity's indebtedness should generally be treated as the discharge of debt owed by such disregarded entity's owner.

### 10.1.4  Debtors' COD Income Attributable to the Plan

It is anticipated that any COD Income recognized by NSI and NSSC attributed to the transactions contemplated by the Plan will be allocated to NSCI. As a result of the Bankruptcy

Exception, it is anticipated that any COD Income realized by or allocated to NSCI will not be recognized.

### 10.1.5  Accrued Interest

To the extent that the consideration issued to Holders of Claims pursuant to the Plan is attributable to accrued but unpaid interest, the applicable Debtor should be entitled to interest deductions in the amount of such accrued interest, but only to the extent the applicable Debtor has not already deducted such amount.  The Debtors should not have COD Income from the discharge of any accrued but unpaid interest pursuant to the Plan to the extent that the payment of such interest would have given rise to a deduction pursuant to Section 108(e)(2) of the Tax Code, as discussed above.

### 10.2  Federal Tax Consequences to the Claims and Interests

Generally, a holder of a claim or interest should in most, but not all circumstances, recognize gain or loss equal to the difference between the "amount realized" by such holder in exchange for its claim or interest and such holder's adjusted tax basis in the claim or interest. The "amount realized" is equal to the sum of the cash and the fair market value of any other consideration received under a plan of reorganization in respect of a holder's claim or equity interest.  The tax basis of a holder in a claim or interest will generally be equal to the holder's cost therefore.

To the extent applicable, the character of any recognized gain or loss (e.g., ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the holder, the nature of the claim or equity interest in the holder's hands, the purpose and circumstances of its acquisition, the holder's holding period of the claim or interest, and the extent to which the holder previously claimed a deduction for the worthlessness of all or a portion of the claim or

interest.  Generally, if the claim or interest is a capital asset in the holder's hands, any gain or loss realized will generally be characterized as capital gain or loss, and will constitute long-term capital gain or loss if the holder has held such claim or equity interest for more than one year.

**10.3**    **Information Reporting and Backup Withholding**

Certain distributions and exchanges made with respect to Claims and Interests pursuant to the Plan may be subject to information reporting by the relevant Debtor-payor to the IRS. Moreover, such reportable distributions and exchanges may be subject to backup withholding (currently at a rate of 28%) under certain circumstances.  Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules may be credited against a Holder's U.S.  federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. federal income tax return).

THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY.  ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL AND, TO THE EXTENT APPLICABLE, FOREIGN TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

## ARTICLE 11.

## ALTERNATIVES TO THE PLAN

The Debtors believe that if the Plan is not confirmed, or is not confirmable, the alternatives to the Plan include:  (a) the commencement of, or conversion to, a Chapter 7 case and accompanying liquidation of the Debtors' assets on a "forced sale" basis; (b) dismissal of the case(s); or (c) an alternative plan of reorganization.

**11.1    Liquidation Under Chapter 7**

If no plan can be confirmed, the Chapter 11 cases may be converted to Chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the assets of the Debtors for distribution to Creditors in accordance with the priorities established by the Bankruptcy Code.  For the reasons previously discussed above, the Debtors believe that confirmation of the Plan will provide each Holder of a Claim entitled to receive a distribution under the Plan with a recovery that is expected to be substantially more than it would receive in a liquidation under Chapter 7 of the Bankruptcy Code.

**11.2    Dismissal**

Dismissal of the Chapter 11 Cases would leave the secured creditors in a position to exercise their legal rights under their existing security interests, including foreclosure of such liens.  The Debtors believe that in a dismissal scenario the unsecured creditors would not receive any distribution.

**11.3    Alternative Plan**

The Debtors believe that any alternative plan would not result in as favorable treatment of Claims as proposed under the Plan.  If the Plan is not accepted by the requisite amount of the Debtors' creditors and confirmed according to the terms and expedited timelines set forth therein, there is no assurance that (i) the Debtors will be able to consummate a sale of their assets to the Purchaser, (ii) any other offer for the Debtors' assets will be available and (iii) the Debtors' will be able to continue to finance payments to maintain the value of their life insurance settlement and premium finance loan portfolio.

<h1 style="text-align:center">ARTICLE 12.</h1>

<h1 style="text-align:center">DEFINITIONS AND INTERPRETATION</h1>

**12.1**    **Scope of Definitions**.  Any term used in the Plan or the Disclosure Statement that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.  Whenever the context requires defined terms shall include the plural as well as the singular and pronouns stated in the masculine, feminine or neutral gender shall include the masculine, feminine and neutral.

**12.2**    **Definitions**.  In addition to such other terms as are defined in other sections of this Disclosure Statement, all capitalized terms set forth herein shall have the meaning ascribed to them in Article 1 of the Plan.

**12.3**    **Rules of Interpretation**.

**12.3.1**. In the event of an inconsistency, the provisions of the Plan shall control over the contents of this Disclosure Statement.  The provisions of the Confirmation Order shall control over the contents of the Plan.

**12.3.2**  For the purposes of the Plan:

(a)    any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; *provided, however,* that any change to such form, terms or conditions that is material to a party to such document shall require the consent of the Purchaser (unless the Insurance Portfolio Sale has closed in which case the consent of the Purchaser will not be required);

(b)    any reference in the Plan to an existing document, exhibit or schedule filed or to be filed means such document, exhibit or schedule, as it may have been or may be amended, modified or supplemented as of the Effective Date;

(c)    unless otherwise specified, all references in the Plan to "Sections," "Articles," "Exhibits" and "Schedules" are references to Sections, Articles, Exhibits and Schedules of or to the Plan, as the same they be amended, waived, supplemented or modified from time to time;

(d)    the words "herein," "hereof," "hereto," "hereunder" and others of similar import refer to the Plan in its entirety rather than to only a particular portion of the Plan;

(e)    captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be part or to affect interpretations of the Plan;

(f)    the rules of construction set forth in Bankruptcy Code Section 102 shall apply, except to the extent inconsistent with the provisions of Article 1 of the Plan; and

(g)    the word "including" means "including without limitation."

**12.3.3**  Whenever a distribution of property is required to be made on a particular date, the distribution shall be made on such date or as soon as promptly as practicable thereafter.

**12.3.4**. All Exhibits to the Plan are incorporated into the Plan and shall be deemed to be included in the Plan, regardless of when they are filed.

**12.3.5.** Subject to the provisions of any contract, certificate, bylaws, instrument, release or other agreement or document entered into in connection with the Plan, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules.

**12.3.6**. The Plan is the product of extensive discussions and negotiations between and among, *inter alia*, the Debtors, the Committee, the Insider Released Parties, the NSI Receiver, the Joint NSSC Receivers, the NSI Litigation Claimants and certain other Creditors and

constituencies.  Each of the foregoing was represented by counsel who either (a) participated in

the formulation and documentation of or (b) was afforded the opportunity to review and provide

comments on, the Plan, the Disclosure Statement, and the documents ancillary thereto.

**ARTICLE 13.**

**CONCLUSION**

The Debtors and the Committee believe that the Plan maximizes recoveries to all

Creditors and, thus, is in their best interests.  The Plan as structured, among other things, allows

Creditors to participate in distributions in excess of those that would be available if the Debtors

were liquidated under Chapter 7 of the Bankruptcy Code and minimizes delays in recoveries to

all Creditors.

**THE DEBTORS AND THE COMMITTEE THEREFORE URGE CREDITORS**

**TO ACCEPT THE PLAN AND TO EVIDENCE SUCH ACCEPTANCE BY RETURNING**

**THEIR PROPERLY COMPLETED BALLOT(S) SO THAT THEY WILL BE**

**ACTUALLY RECEIVED, AS INSTRUCTED ABOVE, BY THE SOLICITATION**

**AGENT PRIOR TO THE VOTING DEADLINE.**

~~Dated:  February 13, 2012~~        ~~By:~~ _____

                                          ~~New Stream Secured Capital, Inc.~~

                                          ~~New Stream Secured Capital LP~~

                                          ~~New Stream Capital LLC~~

                                          ~~New Stream Insurance LLC~~

Dated: March 12, 2012                  ***Respectfully submitted,***

                                       New Stream Secured Capital, Inc.

                                       By: _____

                                       Name: Michael Buenzow

Title: Chief Restructuring Officer


New Stream Insurance, LLC

By: _____

Name: Michael Buenzow
Title: Chief Restructuring Officer


New Stream Capital, LLC

By: _____

Name: Michael Buenzow
Title: Chief Restructuring Officer


New Stream Secured Capital, L.P.

By: _____

Name: Michael Buenzow
Title: Chief Restructuring Officer


The Official Committee of Unsecured Creditors for
New Stream Secured Capital, Inc., et al.

By: _____

Name: Benjamin Finestone, Esquire
Title: Counsel to and on behalf of the Official
Committee of Unsecured Creditors for New Stream
Secured Capital, Inc., et al.

Document comparison by Workshare Professional on Monday, March 12, 2012
4:20:05 PM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://US-DIGITALFILE/US_ACTIVE/106845087/18 |
| Description | #106845087v18<US_ACTIVE> - Disclosure Statement for Amended Plan of Reorganization |
| Document 2 ID | interwovenSite://US-DIGITALFILE/US_ACTIVE/106845087/25 |
| Description | #106845087v25<US_ACTIVE> - Disclosure Statement for Amended Plan of Reorganization |
| Rendering set | ReedSmith Standard |

| Legend: |
|---|
| Insertion |
| Deletion |
| Moved from |
| Moved to |
| Style change |
| Format change |
| Moved deletion |
| Inserted cell |
| Deleted cell |
| Moved cell |
| Split/Merged cell |
| Padding cell |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 234 |
| Deletions | 142 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 376 |